IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
FREE ENTERPRISE FUND,                               )
Suite 800                                           )
1850 M Street, N.W.                                 )
Washington, DC 200036                               )
                                                    )
            and                                     )
                                                    )
BECKSTEAD AND WATTS, LLP,                            )
2425 W. Horizon Ridge Parkway                       )
Henderson, NV 89052                                 )
                                                    )
                    Plaintiffs,                     )
            v.                                       )          Case No. _____
                                                    )
THE PUBLIC COMPANY ACCOUNTING                        )
OVERSIGHT BOARD                                     )
1666 K Street, N.W.                                 )
Washington, DC 20006                                )
                                                    )
            and                                     )
                                                    )
BILL GRADISON, KAYLA J.                              )
GILLAN, DANIEL L. GOELZER,                           )
and CHARLES NIEMEIER,                                )
in their official capacities as Members of the      )
Public Company Accounting Oversight Board           )
1666 K Street, N.W.                                 )
Washington, DC 20006                                )
                                                    )
                    Defendants.                     )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Free Enterprise Fund and Beckstead and Watts, LLP, by and through their

undersigned attorneys, allege as follows:

**INTRODUCTION**

1.    This is an action challenging the formation and operation of the Public Company Accounting Oversight Board (the "Board"), an entity created by the Sarbanes-Oxley Act of 2002 (the "Act") to "oversee the audit of public companies that are subject to the securities laws."  In carrying out this mandate, the Board is authorized to and does exercise broad governmental power, including the power to "enforce compliance" with the Act and the securities laws, to regulate the conduct of auditors through rulemaking and adjudication, and to set its own budget and to fund its own operations by fixing and levying a tax on the nation's public companies.  As a result, and notwithstanding the Act's effort to characterize the Board as a private corporation, the Board is a government entity subject to the limits of the United States Constitution, including the Constitution's separation of powers principles and the requirements of the Appointments Clause.  The Board's structure and operation, including its freedom from Presidential oversight and control and the method by which its members are appointed, contravene these principles and requirements.  For this reason, the Board and all power and authority exercised by it violate the Constitution.

2.    Referred to by one Senator as an entity with "massive unchecked powers," the Board exercises broad discretion to set policy and impose regulations governing the conduct of public accounting firms.  In connection with its open-ended mandate, the Board's five members — appointed for five-year terms by the Securities Exchange Commission (SEC) — have the power to set the Board's budget at any level they desire, and to fund the Board's operations through a "fee" levied on all public companies.  The Board also has the power to promulgate auditing standards and rules, including rules that expand upon the Act's list of nonaudit services that accounting firms are prohibited from offering to a client contemporaneously with an audit.  Under the Act, moreover, any violation of the Board's rules constitutes a violation of the federal

securities laws, subjecting accountants and accounting firms to potential civil and criminal liability.

3.    The Board also exercises core executive powers to "enforce compliance" with the Act by conducting periodic inspections of accounting firms and subjecting those firms to investigations and disciplinary proceedings.  In connection therewith, the Board has the power to punish accounting firms and individual accountants for the violation of the Board's rules, professional accounting standards or federal law, with sanctions of up to $2,000,000 for inadvertent violations and up to $15,000,000 for knowing or reckless ones.

4.    The Board has exercised its broad powers to impose burdensome standards that accounting firms are required to follow when auditing public companies, which ultimately bear the costs of these added procedures.  In the Board's first year of operation alone, the Act's regulations resulted in more than $35 billion in compliance costs imposed on the nation's businesses.

5.    In addition to wielding broad rulemaking and enforcement powers, the members of the Board have the authority to set their own salaries.  The Board in 2003 paid its chairman an exorbitant salary of $556,000, and paid each of its other four members a similarly excessive salary of $452,000.

6.    Because the Board exercises governmental powers, it is, for constitutional purposes, a part of the federal government, and its members — who exercise significant authority pursuant to the laws of the United States — are officers of the United States.

7.    Despite its vast authority and the far-reaching consequences of its actions, the Board is immune from the supervision and control of the President.  The Board's members are not appointed or removable by the President or by the head of any executive department answerable

to him. They are, rather, appointed by the SEC, itself an independent agency. Even the SEC, moreover, exercises only limited review of Board actions. The SEC may only remove Board members if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse." The SEC's other review functions are similarly circumscribed. Thus, the Board exercises wide-ranging, core governmental powers immune from presidential oversight in contravention of the most fundamental elements of the Constitution's separation of powers principles.

8. In addition, although the Board members exercise significant, core governmental powers, they are appointed by the SEC rather than in the manner required by Article II of the Constitution. Their appointments, and the Board's exercise of its delegated powers, are therefore contrary to the Appointments Clause of the Constitution.

9. The Board is also the recipient of improperly and unconstitutionally delegated legislative power, including, but not limited to, its broad power to enact law, its authority to set its own budget without any constraint or legislative cap, and its authority to fund that budget through the imposition of a tax on all public companies.

### JURISDICTION AND VENUE

10. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e).

### PARTIES

11. Plaintiff Free Enterprise Fund ("FEF") is a non-profit public-interest organization under Section 501(c)(4) of the Internal Revenue Code with offices in the District of Columbia. FEF promotes economic growth, lower taxes, and limited government through television and radio issue advertising campaigns, providing timely and tactical policy guidance to members of

- 4 -

Congress and publishing strategic game plans on vital economic and fiscal issues.  In bringing this lawsuit, FEF seeks to vindicate the interests of its members, who are subject to the Board's authority and have been injured by the regulations imposed by the Board.

12.  Plaintiff Beckstead and Watts, LLP ("Beckstead and Watts"), is a public accounting firm that specializes in audits of small publicly traded corporations.  Beckstead and Watts is registered with the Board pursuant to Section 102 of the Act and, as a result, is subject to the Board's regulatory authority.

13.  Defendant Public Company Accounting Oversight Board purports to be a private, nonprofit corporation established by the Act and subject to, and having the powers conferred upon nonprofit corporations under, the District of Columbia Nonprofit Corporation Act.  The Board has a principal office located in the District of Columbia.  Notwithstanding the Act's declarations to the contrary, the Board is an agency and/or establishment and/or instrumentality of the United States.

14.  Defendant Bill Gradison is a Member of the Board and is the Board's Acting Chairman.  As a member, he is responsible for carrying out the powers delegated to the Board by the Act.  Mr. Gradison is sued in his official capacity.

15.  Defendant Kayla J. Gillan is a Member of the Board.  As a member, she is responsible for carrying out the powers delegated to the Board by the Act.  Ms. Gillan is sued in her official capacity.

16.  Defendant Daniel L. Goelzer is a Member of the Board.  As a member, he is responsible for carrying out the powers delegated to the Board by the Act.  Mr. Goelzer is sued in his official capacity.

17.  Defendant Charles D. Niemeier is a Member of the Board.  As a member, he is responsible for carrying out the powers delegated to the Board by the Act.  Mr. Niemeier is sued in his official capacity.

**FACTS**

**I.    The Creation of the Board**

18.  In 2002, in reaction to the highly publicized accounting scandals involving Enron and other public companies, Congress hastily enacted new legislation regulating the accounting industry and creating standards and oversight for public accountants and auditors.

19.  During congressional discussions of various proposals for an agency to regulate accountants and auditors, Senator Gramm, a supporter of the Act, remarked that the agency would be "a strange kind of entity [in that we] want it to be private, but we want it to have governmental powers."

20.  Senator Gramm also remarked that the proposed entity "is going to have massive power, unchecked power, by design. . . .  We are setting up a board with massive power that is going to make decisions that affect all accountants and everybody they work for, which directly or indirectly is every breathing person in the country."

21.  Congress passed the Act on July 25, 2005, and President Bush signed it into law on July 30, 2005.

22.  Among other things, the Act imposes significant new rules governing auditor independence and corporate responsibility for financial reports.  It requires enhanced financial disclosures, imposes new and enhanced criminal penalties for corporate fraud and white-collar crime and provides the SEC with new enforcement powers.  In addition, Title I of the Act creates and empowers the Board.

## II.    The Organization of the Board

23.  Section 101(a) of the Act makes clear that the Board's purpose is the furtherance of governmental objectives.  That provision establishes the Board "to oversee the audit of public companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest in the preparation of informative, accurate and independent audit reports for companies the securities of which are sold to, and held by and for, public investors."  Section 101(a) of the Act further provides that the Board "shall be a body corporate, operate as a nonprofit corporation, and have succession until dissolved by an Act of Congress."

24.   Section 101(b) of the Act provides that, except as otherwise provided in the Act, the Board shall be subject to, and have all the powers conferred upon a nonprofit corporation by, the District of Columbia Nonprofit Corporation Act.

25.  The Act purports to establish the Board's status as a non-governmental entity and the status of its officers and employees as non-governmental actors.  To this end, the Act declares in Section 101(b) that "[t]he Board shall not be an agency or establishment of the United States Government" and "[n]o member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by reason of such service."

26.  Section 101(e) of the Act provides that the Board shall have five full-time members, including a chairperson.  The same provision imposes the conditions that two, and no more than two, of the Board's members must be (or have been) certified public accountants, and that, if one of those two members is the chairperson, he may not have been a practicing certified public accountant for at least five years prior to his appointment to the Board.

27.  Section 101(e) of the Act vests in the SEC as a whole the power to appoint the Board's initial members and fill all subsequent vacancies.  The SEC shall make such

appointments "after consultation with the Chairman of the Board of Governors of the Federal Reserve System and the Secretary of the Treasury."

28. The Act provides that the members of the Board shall serve for staggered five-year terms. It provides that a member of the Board may be removed only by the SEC and only for "good cause shown," which the Act narrowly defines as a finding, after notice and an opportunity for a hearing, that such member "(A) has willfully violated any provision of th[e] Act, the rules of the Board or the securities laws; (B) has willfully abused the authority of that member; or (C) without reasonable justification or excuse, has failed to enforce compliance [by a registered firm or associated person] with any such provision or rule, or any professional standard."

29. Section 101(c) sets forth the following duties of the Board: (i) to register public accounting firms that prepare audit reports for issuers; (ii) to establish and/or adopt quality control, ethics, independence and other standards relating to the preparation of audit reports for issuers; (iii) to conduct regular inspections of registered public accounting firms; (iv) to conduct investigations and disciplinary proceedings concerning, and to impose appropriate sanctions where justified upon, registered public accounting firms and associated persons of such firms; (v) to perform such other duties or functions as the Board or the SEC determines are necessary or appropriate to promote high professional standards among, and improve the quality of audit services offered by, registered public accounting firms and associated persons thereof, or otherwise to carry out the Act, in order to protect investors, or to further the public interest; (vi) to enforce compliance with the Act, the Board's rules, professional standards, and the securities laws relating to the preparation and issuance of audit reports and the obligations and liabilities of accountants with respect thereto, by registered public accounting firms and

associated persons thereof; and (vii) to set the Board's budget and manage the operations of the Board and its staff.

30.  Section 101(f) of the Act provides that the Board shall have, *inter alia*, the additional powers to sue and be sued, complain and defend, in its corporate name and through its own counsel, with the approval of the SEC, in any federal, state or other court; to conduct operations and maintain offices without regard to any provision of state law; to acquire property; and to enter into contracts.

31.  Section 101(h) of the Act requires the Board to submit an annual report to the SEC, which in turn is required to transmit a copy of that report to specified committees of the Senate and House of Representatives.

### III.    The Regulatory Authority of the Board

32.  As detailed below, the Act grants the Board substantial regulatory authority over public accounting firms and their employees, including the authority to "enforce compliance" with federal law, to promulgate rules, to inspect, to investigate, to conduct disciplinary proceedings and to impose sanctions.  The Act even provides that failure to comply with a rule of the Board constitutes a violation of federal law, thereby subjecting accounting firms and individual accountants to potential civil and criminal liability.

33.  Section 102 of the Act establishes a mandatory system of registration for public accounting firms by making it unlawful for any person that is not a registered firm to prepare or issue, or to participate in the preparation or issuance of, any audit report with respect to any issuer.  (The Act's  broad definition of "issuer" includes all companies whose securities are registered under the Securities Exchange Act of 1934.)  Section 102 establishes procedures for, and provides that the Board may by rule prescribe additional procedures for, the submission of applications for registration.

34. Each registered corporation is required to submit an annual report to the Board, and may be required to provide the Board with such additional information as the Board or the SEC may demand.

35. As of January 26, 2006, 1,611 accounting firms were registered with the Board.

36. Section 103 of the Act grants the Board the authority, through its rulemaking powers, to establish "such auditing and related attestation standards, such quality control standards, and such ethics standards to be used by registered public accounting firms in the preparation and issuance of audit reports, as required by this Act or the rules of the [SEC], or as may be necessary or appropriate in the public interest or for the protection of investors." The Act specifies certain requirements that must be included in these standards.

37. Section 103 of the Act also grants the Board the authority, through its rulemaking powers, to "establish such rules as may be necessary or appropriate in the public interest or for the protection of investors," to implement the auditor-independence requirements set forth in Title II of the Act. Those requirements prohibit a registered accounting firm performing an audit for an issuer from providing certain non-audit services contemporaneously with the audit, including bookkeeping, financial-information-systems design and implementation, appraisal or valuation services, actuarial reports, investment services, legal services, and "any other service that the Board determines, by regulation, is impermissible."

38. In addition to its sweeping authority to ban auditor practices that it deems inappropriate, the Board has broad discretion to "on a case by case basis, exempt any person, issuer, public accounting firm, or transaction from the [Act's] prohibition on the provision of services" to the extent that the Board deems such exemption "necessary or appropriate in the public interest and . . . consistent with the protection of investors."

39. Section 3 of the Act provides that a violation of the Board's rules "shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934" and that the person committing such violation "shall be subject to the same penalties, and to the same extent, as for a violation of that Act." Such penalties include civil fines and, for willful violations, criminal sanctions, including up to twenty years in prison.

## IV.    The Enforcement Authority of the Board

40. Section 104 of the Act grants the Board the authority to "conduct a continuing program of inspections to assess the degree of compliance of each registered public accounting firm with th[e] Act, the rules of the Board, the rules of the [SEC], or professional standards, in connection with its performance of audits, issuance of audit reports, and related matters involving issuers." The frequency of such inspections shall depend upon the number of issuers for which the registered public accounting firm regularly provides audit reports, with firms that regularly provide audit reports for more than 100 issuers to be inspected annually. Upon uncovering a violation, the Board is required to report that violation, "if appropriate," to the SEC and appropriate state regulatory authority, and to begin a formal investigation or take disciplinary action, "if appropriate," with respect to any such violation.

41. Section 105 of the Act grants the Board the power to "conduct an investigation of any act or practice, or omission to act, by a registered public accounting firm, any associated person of such firm, or both, that may violate" the Act, the rules of the Board, the securities laws, or professional standards. The Act also grants the Board the authority to establish, through its rulemaking power, "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms."

42. In conducting an investigation under Section 105 of the Act, the Board is empowered to require testimony and demand documents, including audit work papers, from a registered

public accounting firm or associated person. The Act allows the Board to sanction firms or associated persons who refuse to produce testimony or documents or to otherwise cooperate in an investigation.

43. In addition, the Board is empowered to request testimony and documents from any other person, including any client of a registered public accounting firm, and to seek the issuance of a subpoena by the SEC to require such testimony and documents.

44. If the Board determines that a registered public accounting firm or associated person has violated the Act, the Board's rules, the relevant securities laws or professional standards, "the Board may impose such disciplinary or remedial sanctions as it determines appropriate," including temporary suspension or permanent revocation of an accounting firm's registration or of an associated person's right to further association with any registered firm; civil monetary penalties of up to $2,000,000 for inadvertent violations and up to $15,000,000 for knowing or reckless violations; and "any other appropriate sanction provided for in the rules of the Board."

## V.    The Funding Authority of the Board

45. The Act also grants the Board the extraordinary power to set its own budget and fund its own activities by levying a tax on public companies.

46. Section 109(b) of the Act empowers the Board to establish a budget for each fiscal year. The Act provides no guidance as to or statutory cap on the size of the budget.

47. Section 109(c) of the Act provides that funds to cover the Board's annual budget, less any registration or annual fees collected from public accounting firms, are to be payable from annual "accounting support fees" collected from issuers pursuant to standards established by the Board.

48. Section 109(d) of the Act empowers to Board to establish a "reasonable" annual accounting support fee, or a formula for the computation thereof, as may be necessary or

appropriate to establish and maintain the Board.  Section 109(d) further provides that rules of the Board relating to the annual accounting support fee shall provide for the equitable allocation, assessment, and collection by the Board (or an agent thereof) of the fee among issuers, allowing for differentiation "among classes of issuers."  Section 109(g) of the Act provides that any amount due from issuers shall be allocated among and payable by each issuer (or, if applicable, by each issuer in a particular class) in an amount based on the ratio of the issuer's average monthly equity market capitalization to the overall average monthly equity market capitalization of all such issuers.

49.  On April 18, 2003, the Board issued final rules with respect to the allocation, assessment and collection of its accounting fees.  These rules were approved by the SEC on August 1, 2003.

50.  Pursuant to the Board's rules, the Board calculates an accounting support fee for each year, equal to the budget of the Board less the sum of all registration fees and annual fees received during the previous calendar year from public accounting firms.

51.  Pursuant to the Board's rules, the Board subjects to the accounting support fee, with certain exceptions, (i) all non-investment-company issuers whose average monthly market capitalization during the preceding calendar year is greater than $25 million and whose share price on a monthly or more frequent basis is publicly available, and (ii) all investment-company issuers whose average monthly market capitalization is greater than $250 million and whose share price on a monthly or more frequent basis is publicly available.

52.  Pursuant to Board rules, each issuer is required to pay its share of the accounting support fee.  The Board will use its best efforts to send a notice to each issuer, but the failure to

send such notice does not relieve the issuer of the obligation to pay or otherwise waive the Board's right to seek payment of the issuer's share.

53. Subject to certain narrow exceptions, no registered public accounting firm shall sign an unqualified audit opinion with respect to an issuer's financial statements, or issue a consent to include a previously issued audit opinion, unless the registered public accounting firm has ascertained that the issuer has outstanding no past-due share of the accounting support fee or has petitioned the Board for a correction.

54. The failure of an issuer to pay the accounting support fee constitutes a violation of Section 13(b)(2) of the Securities Exchange Act of 1934, as amended by the Act. The Board is required to refer to the SEC the failure by an issuer to pay its share of the accounting support fee.

## VI. The SEC's Nominal Oversight of the Board

55. SEC oversight of the Board's activities is limited to only some of the Board's functions. The SEC does not exercise day-to-day control over the Board, has no control over the conduct of the Board's regular inspections, and exercises no oversight over decisions to bring an investigation or the manner in which an investigation is carried out. As noted above, moreover, the SEC's power to remove Board members is extremely limited, with removal permitted only for a member's willful violation of the law, willful abuse of authority, or inexcusable failure to enforce the Act.

56. Even where SEC approval or oversight of Board action exists, the SEC's role is minimal. For example, the SEC is required by the Act to approve any rule proposed by the Board so long as it is merely "consistent with the requirements" of the Act and the securities laws, "or is necessary or appropriate in the public interest or for the protection of investors."

57. The SEC's power to censure or impose limitations upon the activities, functions and operations of the Board is also extremely limited and may only be exercised if the SEC finds, on

- 14 -

the record and after notice and opportunity for a hearing, that the Board "(A) has violated or is unable to comply with a provision of this Act, the rules of the Board, or the securities laws; or (B) without reasonable justification or excuse, has failed to enforce compliance [by a registered firm or associated person] with any such provision or rule, or any professional standard."

58.   The SEC's review of Board sanctions is similarly limited.  The Board is required by the Act to file notice of a final sanction with the SEC, which is empowered to review the sanction on its own motion or by application by the sanctioned party.  The SEC must affirm a sanction if the sanction was "applied in a manner, consistent with the purposes" of the Act.  By contrast, the SEC may modify or set aside the sanction only if "having due regard for the public interest and the protection of investors, [it] finds . . . that the sanction—(A) is not necessary or appropriate in furtherance of this Act or the securities laws; or (B) is excessive, oppressive, inadequate, or otherwise not appropriate to the finding or the basis on which the sanction was imposed."

59.   The Act also permits a public accounting firm to seek review by the SEC if it disagrees with any final assessments contained in a final inspection report prepared by the Board. The Act does not set forth the applicable standard of review.

60.   SEC review of the Board's budgetary decisions is similarly minimal.  The Act provides that the Board's budget and the annual accounting support fee are subject to the approval of the SEC, but does not provide any standards for the SEC to use in evaluating the budget and the fee.  Moreover, because the Board's budget is funded through a tax on public companies, rather than through limited appropriations, the SEC has every incentive to allow the Board to spend freely.

**VII.    The Board's Operations**

61.  On October 25, 2002, the five commissioners of the SEC voted on the appointment of the first five members of the Board.  The chairman of the Board was appointed by a vote of three to two, and the other four members of the Board were appointed by votes of four to one. One of the SEC commissioners stated that the selection process was "inept and seriously flawed."

62.  The Board thereafter promulgated a series of rules and auditing standards, all of which were approved by the SEC.

63.  The Board's auditing standards impose specific and substantial new duties on registered accounting firms and persons associated with such firms.  For example, Auditing Standard No. 1 requires accounting firms to affirm, in each audit report, that the audit was performed in accordance with the standards of the Board.  Auditing Standard No. 2 sets forth over 150 pages of detailed requirements concerning the scope and reporting of an accounting firm's audit of a public company's internal controls over financial reporting.  And Auditing Standard No. 3 prescribes detailed requirements for the documentation that a registered accounting firm is required to prepare and retain in connection with its audits of public companies.

64.  These burdensome standards have imposed substantial compliance costs on registered accounting firms and their public-company clients.  Smaller accounting firms have been especially hard hit by the costs of complying with the Board's standards.  As a result, many smaller accounting firms have been forced to give up auditing public companies altogether, reducing public companies' range of choices among accountants and increasing concentration in the accounting industry.

65. The Board has funded its activities through the assessment on issuers of "accounting support fees."  In 2003, for example, approximately 8,424 companies paid approximately $51 million to support the Board during its first year of operations.

66. In 2004, the Board's budget was approximately $103 million and was financed by the payment of fees by issuers.  The Board started that year with 126 employees and ended the year with 262 employees.

67. The Board's budget for 2005 calls for expenditures of approximately $136 million, again financed through the collection of accounting support fees from issuers.  The Board expected to end the year with 450 employees.

68. As of February 1, 2006, approximately 10,000 issuers had paid an accounting support fee.

**VIII.  Beckstead and Watts's Efforts to Comply With the Board's Standards**

69. Plaintiff Beckstead and Watts is an accounting firm located in Henderson, Nevada, and engaged in the business of auditing companies and issuing audit reports.

70. As a small "niche" firm, Beckstead and Watts focuses its auditing business on "micro-cap" and "development stage" companies.  Such companies generally have no operations, limited assets and insignificant market capitalization.  They present a comparatively high level of investment risk, as is understood by investors.  Indeed, at the time of the events described herein, a majority of Beckstead and Watts's clients had "going-concern" audit reports and significant non-operating losses, facts which highlight the degree of risk posed to the potential investor.

71. Beckstead and Watts's client base has typically included public companies with securities trading on the Over-the-Counter Bulletin Board Exchange.  Because these clients are

issuers under the Act, Beckstead and Watts registered with the Board pursuant to Section 102 of the Act.

72.  The Board's promulgation of the Auditing Standards described above has caused substantial increases in the time and expense of the public-company audits conducted by Beckstead and Watts.  For example, the Board's standards have added numerous layers of additional audit steps and documentation requirements above those imposed by existing professional standards.

73.  Because its typical audit clients are generally too small to absorb the entirety of these increased costs and compliance standards, Beckstead and Watts lost a substantial amount of clients and profits as a result of the Board's actions.

74.  Seven inspectors from the Board visited the office of Beckstead and Watts over a two-week period, from May 17 to 28, 2004.  These inspectors evaluated Beckstead and Watts's audits in the same manner that one would evaluate the audits of a Fortune 1000 company, notwithstanding the costs issues discussed above and the relative benefits (or lack thereof) to the investing public of applying such strict standards to this segment of the marketplace.

75.  Applying the Board's standards in such a manner, the Board's inspectors identified numerous auditing deficiencies with respect to Beckstead and Watts's audits of its clients.

76.  The Board prepared a draft inspection report and permitted Beackstead and Watts to comment upon it.

77.  In an effort to remedy some of the defects identified by the Board, Beckstead and Watts reduced the number of clients with which it had an auditor relationship from over sixty SEC-reporting companies to just over ten.  This reduction in Beckstead and Watts's public-

company client base led to a further reduction in Beckstead and Watts's revenues and profits for the fiscal year ended 2005 as compared to the fiscal year ended 2004.

78. On September 28, 2005, the Board issued the final report based on the May 2004 inspection. This report requires Beckstead and Watts to address the Board's concerns to the Board's satisfaction within twelve months of the issuance of the report.

79. At the same time it issued the final report, the Board initiated formal investigation proceedings against Beckstead and Watts, subjecting the company to burdensome discovery, including the pulling of company files and the taking of testimony from one of its principals and one of its employees. This investigation and discovery is currently ongoing.

80. Beckstead & Watts has incurred legal fees in defending itself against the investigation proceedings, and its professional reputation has been damaged by the inspection report posted on the Board's public website.

## COUNT I

### (Violation of the Separation of Powers — Improper Exercise of Executive Power)

81. Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

82. The Constitution provides that "[t]he executive Power shall be vested in a President," U.S. Const., art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const., art. II, § 2. These provisions vest all executive power, including the power to enforce the law, in the President of the United States.

83. As set forth above, the Board exercises wide-ranging executive power, including the power to "enforce compliance" with the Act and the securities laws, to enact wide-ranging rules and regulations, to conduct inspections of registered public accounting firms, to conduct investigations and disciplinary proceedings, and to impose sanctions and otherwise to enforce

compliance with the Act, the rules of the Board, professional standards, and the securities laws. In addition, the Board is entitled to sue and be sued, complain and defend, in its corporate name and through its own counsel, with the approval of the SEC, in any federal, state, or other court.

84.  The Board's wide-ranging exercise of executive or administrative power is immune from Presidential supervision or control.  The Board's members are not appointed or removable by the President.  They are, rather, appointed by the SEC, itself an independent agency.  Even the SEC, moreover, exercises only limited review of Board actions.  The SEC may remove Board members only if they have "willfully violated" applicable laws or regulations, "willfully abused" their authority, or "failed to enforce" applicable laws and regulations "without reasonable justification or excuse."  The SEC's other review functions are similarly circumscribed.

85.  The Board's exercise of wide-ranging, core executive power, immune from Presidential oversight, impermissibly impedes and undermines the President's ability to perform his constitutional duties and prerogatives.  As a result, the creation of the Board, as well as its implementation of its delegated responsibilities under the Act, violates the separation of powers.

## COUNT II

### (Violation of the Appointments Clause of the U.S. Constitution)

86.  Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

87.  Notwithstanding the Act's statements to the contrary, the Board is a public entity and/or an agency and/or an instrumentality of the United States subject to the constraints imposed on the federal government by the Constitution.  Facts supporting the status of the Board as a public rather than a private entity, set forth more fully in the preceding paragraphs, include:

- The Board was created by special law.

- The SEC was authorized to appoint the Board's five initial members and is authorized to appoint all subsequent members.

- The Board was created to further government objectives of "protect[ing] the interests of investors and further[ing] the public interest."

- The Board has the authority to engage in quintessentially governmental tasks, including making rules the violation of which constitutes a violation of federal law; enforcing federal law through investigation and adjudication; and setting its own budget and funding that budget through the imposition of taxes on public companies.

88. Because the Board is an agency and/or instrumentality of the United States, and because, as described in the preceding paragraphs, its members exercise significant authority pursuant to the laws of the United States, those members are, notwithstanding provisions of the Act to the contrary, officers of the United States whose appointments must comply with the Appointments Clause of the United States Constitution (art. II, sec. 2).

89. The Appointments Clause provides in relevant part that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

90. By virtue of the wide-ranging discretion, duties, functions and independence of the Board, members of the Board are principal officers whose appointments must be made by the

President by and with the advice and consent of the Senate.  Accordingly, the appointment of Board members by the SEC violates the Appointments Clause.

91.  In the alternative, the members of the Board are inferior officers whose appointments must be made by the President, a court of law, or the head of a department.  Because the SEC is not a department within the meaning of the Clause and, in all events, the appointment power is not vested in the head of the SEC but rather in the SEC as a whole, the appointment of Board members by the SEC violates the Appointments Clause.

92.  The Act's requirements that the SEC consult with the Chairman of the Board of Governors of the Federal Reserve System and the Secretary of the Treasury prior to appointment of the members of the Board, that two of the members of the Board must be members of the accounting profession, and that three of the members must not be members of the accounting profession, constitute improper limitations on the power to appoint, in further violation of the Appointments Clause.

## COUNT III

### (Unconstitutional Delegation)

93.  Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

94.  The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.

95.  By virtue of the grant of wide-ranging authority to the Board, the Act improperly and unconstitutionally delegates legislative power to an entity outside the Legislative Branch.  This delegation is unconstitutional if the Board is deemed part of the federal government, and is even more problematic if the Board is deemed to be a private entity.

## PRAYER FOR RELIEF

Wherefore, plaintiffs pray for the following relief:

1.  an order and judgment declaring unconstitutional the provisions of the Act creating and empowering the Board;

2.  an order and judgment enjoining the Board and its Members from carrying out any of the powers delegated to them by the Act;

3.  an order and judgment enjoining the Board and its Members from taking any further action against Plaintiff Beckstead and Watts and nullifying and voiding any prior adverse action against Beckstead and Watts;

4.  costs and attorneys' fees pursuant to any applicable statute or authority;

5.  any other relief that this Court deems just and appropriate.


Date:  February 7, 2006                     Respectfully submitted,


                                            _/s/_____
                                            Michael A. Carvin (D.C. Bar No. 366784)
                                            Noel J. Francisco (D.C. Bar No. 464752)
                                            Christian G. Vergonis (D.C. Bar No. 483293)
                                            JONES DAY
                                            51 Louisiana Avenue, N.W.
                                            Washington, D.C.  20001-2113
                                            (202) 879-3939
                                            (202) 626-1700 (fax)

                                            Kenneth W. Starr (D.C. Bar No. 273425)
                                            24569 Via De Casa
                                            Malibu, CA 90265
                                            (310) 506-4621

                                            Viet D. Dinh (D.C. Bar No. 456608)
                                            Wendy Keefer
                                            BANCROFT ASSOCIATES PLLC
                                            601 13th St., N.W.

Suite No. 930 South
Washington, D.C. 20005
(202) 234-0090
(202) 234-2806 (fax)

Sam Kazman (D.C. Bar No. 946376)
Hans Bader (D.C. Bar No. 466545)
Competitive Enterprise Institute
1001 Connecticut Avenue, N.W.
Suite 1250
Washington, D.C. 20036
(202) 331-1010 (fax)

*Attorneys for Plaintiffs Free Enterprise Fund
and Beckstead and Watts, LLP*