IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FREE ENTERPRISE FUND, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. A. No. 06-217 (JR) |
| | ) |
| THE PUBLIC COMPANY ACCOUNTING | ) |
| OVERSIGHT BOARD, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## STATEMENT OF INTEREST OF THE UNITED STATES

Pursuant to 28 U.S.C. § 517, non-party the United States submits this Statement of Interest to address issues raised by defendants' motion to dismiss for lack of jurisdiction and failure to state a claim.[1]  The government has a significant interest in ensuring that where, as here, Congress has required that challenges to regulatory authority be channeled through specific administrative and judicial review mechanisms, those mechanisms are allowed to run their course without the distraction of premature, extra-statutory litigation in courts other than those chosen by Congress.  Such mechanisms, which plaintiffs seek to avoid, serve a number of vitally important interests.

As a general matter, government works best if, before courts are called upon to resolve disputed issues, agencies are permitted to bring their expertise to bear on those issues and to attempt to solve them without resort to litigation.  Permitting agencies to address matters in the

---

[1]  This filing is being made at the earliest practicable date following the Department of Justice's decision to make a submission.  The United States is aware of the parties' current briefing schedule, and in an effort to avoid surprise and minimize disruption, notified the parties of its intent to make this filing one week ago, and, of course, has no objection to plaintiffs being afforded a reasonable opportunity to respond to this Statement of Interest.

first instance narrows and crystallizes issues and ensures that later reviewing courts are presented with concrete, well-formed questions. Further, channeling review to a particular court at a particular stage – generally, when agency action has become final – promotes the orderly, efficient resolution of disputes and avoids the chaos and disarray that would result if agencies and other regulatory bodies were forced constantly to expend scarce resources answering litigation in scattered courts at various procedural stages. This is particularly important where the litigation seeks to preempt an ongoing investigation or other enforcement activities critical to public policy. Finally, adherence to a statutory review mechanism that channels claims through an agency enables courts to avoid the grave and delicate task of passing on the constitutionality of the actions of the political branches unless and until absolutely necessary.

Each of these interests is implicated by the instant case, in which plaintiffs seek to force a premature judicial ruling on the constitutionality of the Public Company Accounting Oversight Board ("PCAOB" or the "Board"), without having complied with the exclusive mechanism established by Congress for review of claims that challenge the PCAOB and its actions. As set forth below, such claims must be presented in the first instance to the Securities and Exchange Commission ("SEC" or "Commission") in a proceeding to review PCAOB action; if the SEC approves the PCAOB's action, judicial review can then be obtained in an appropriate court of appeals. The instant action flies in the face of each aspect of this scheme: it is brought at the wrong time, in the wrong court, and without the requisite prior review by the SEC. For these reasons, the United States respectfully submits that defendants' motion to dismiss should be granted.

## STATUTORY AND PROCEDURAL BACKGROUND

### A.    Passage of the Sarbanes-Oxley Act

In 2002, in response to Enron and other corporate scandals, Congress passed and the President signed into law the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745. Among a number of other wide-ranging reforms, Title I of the Act created the PCAOB, a nonprofit corporation, to administer a new system of regulation of public company accountants under the oversight of the SEC.  See 15 U.S.C. §§ 7211-7219.

Under the securities laws, the financial statements of publicly traded companies are audited by independent accountants who assume a critical "public watchdog" function.  See generally United States v. Arthur Young & Co., 465 U.S. 805, 810-11, 817-18 (1984).  However, prior to the Sarbanes-Oxley Act, there had been no central oversight body with meaningful regulatory authority over, and sufficient independence from, public company accountants.  Many audit failures associated with the corporate scandals leading up to the Sarbanes-Oxley Act were seen as at least partly attributable to this regulatory void, which Congress intended the PCAOB to fill.  See, e.g., S. Rep. No. 107-205, at 2, 4-5 (2002).  Under the umbrella of the SEC's responsibilities, the PCAOB was vested with the functions of registration of public company accounting firms, promulgation of rules and standards relating to public company audits; periodic inspections of registered accounting firms; and investigation and discipline of registered accounting firms.  See 15 U.S.C. §§ 7212, 7213, 7214, 7215.

The SEC was given overarching supervisory authority over the PCAOB.  The SEC appoints the PCAOB's members.  15 U.S.C. § 7211(e)(4)(A).  It approves the PCAOB's budget. 15 U.S.C. § 7219(b).  It has general "oversight and enforcement authority over the Board,"

including the authority to impose recordkeeping requirements on the PCAOB and to examine those records at any time. 15 U.S.C. § 7217(a) (incorporating 15 U.S.C. §§ 78q(a)(1), (b)(1)). It can censure or remove the PCAOB's members "for good cause," 15 U.S.C. § 7211(e)(6), as described in section 7217(d)(3). In certain circumstances, the SEC may also censure or impose limitations on the activities, functions, and operations of the PCAOB as a whole, 15 U.S.C. § 7217(d)(2), or "relieve the Board of any responsibility to enforce compliance with any provision of this Act, the securities laws, the rules of the Board, or professional standards," 15 U.S.C. § 7217(d)(1). Further, as detailed below and as particularly relevant to the jurisdictional and procedural issues currently before the Court, the statute vests the SEC with specific oversight functions as part of the process for reviewing challenges by accountants to the PCAOB and its actions.

**B.      The Sarbanes-Oxley Act's Mechanism for Review of PCAOB Actions**

In enacting the Sarbanes-Oxley Act, Congress anticipated that accounting firms under the PCAOB's jurisdiction might object to its actions and challenge its authority. To provide avenues for redress, Congress imported the longstanding mechanism under the securities laws for channeling and streamlining review of challenges to regulatory authorities and their actions. Under that mechanism, the SEC considers matters in the first instance, either in its own regulatory capacity, or, as relevant here, as the initial reviewer of actions taken by regulatory bodies that operate under its umbrella (e.g., the PCAOB, or self-regulatory organizations ("SROs") such as the National Association of Securities Dealers ("NASD") or New York Stock Exchange, among others). See 15 U.S.C. § 78s(b), (d), (e). After the SEC issues a final order on

the matter, a party aggrieved by that order then may obtain judicial review by filing a petition for review in an appropriate court of appeals. 15 U.S.C. § 78y(a).

By incorporating this framework and generally treating the PCAOB as an SRO for purposes of administrative and judicial review, Congress ensured that any regulatory action by the PCAOB that imposes binding legal consequences on public company accountants under its jurisdiction would be subject to extensive review by the SEC and then, if sought, by a federal circuit court of appeals. As detailed below, such procedures apply both to PCAOB rules governing public company accountants and to disciplinary sanctions imposed by the PCAOB on accountants.

Rules of the PCAOB. The PCAOB is charged with promulgating various rules governing public company accountants and the conduct of public company audits. See generally 15 U.S.C. § 7213. With respect to review of those rules, the statute provides that "[t]he provisions of paragraphs (1) through (3) of section 78s(b) of this title shall govern the proposed rules of the Board, as fully as if the Board were a 'registered securities association' [a type of SRO] for purposes of that section 78s(b) . . . ." 15 U.S.C. § 7217(b)(4). Section 78s(b), in turn, requires SROs – and thus the PCAOB – to submit any proposed rule to the SEC, whereupon the SEC gives notice of the proposed rule and provides interested persons an opportunity to comment on it. 15 U.S.C. § 78s(b)(1). The SEC is then charged with deciding whether to approve the SRO's (or, by extension, the PCAOB's) proposed rule. 15 U.S.C. § 78s(b)(2); see also 15 U.S.C. § 7217(b)(3). Other than certain initial or transitional standards at the PCAOB's inception, "[n]o rule of the Board shall become effective without prior approval of the Commission . . . ." 15 U.S.C. § 7217(b)(2).

Under the general judicial review provision of the Securities Exchange Act of 1934 ("Exchange Act"), the SEC's order approving or disapproving the SRO's (or PCAOB's) proposed rule is then subject to judicial review in a court of appeals.  See 15 U.S.C. § 78y(a) (also commonly referred to as Section 25 of the Exchange Act).  Such review may be initiated by any person aggrieved by the order by filing a petition for review either in the circuit in which he resides or has his principal place of business, or in the D.C. Circuit.  15 U.S.C. § 78y(a)(1).  The person seeking review may challenge the SEC's order approving or disapproving the proposed rule on any ground previously urged before the SEC.  15 U.S.C. § 78y(c)(1).  The SEC may stay its order pending judicial review, "if it finds that justice so requires," up until the filing of a petition for review; thereafter, the court of appeals may stay the SEC's order "on whatever conditions may be required and to the extent necessary to prevent irreparable injury."  15 U.S.C. § 78y(c)(2).

Disciplinary Sanctions by the PCAOB.  A similar process governs review of disciplinary sanctions that the PCAOB may impose on public company accountants, after notice and an opportunity for a hearing, for violating the Sarbanes-Oxley Act, other applicable securities laws, or the rules of the SEC or PCAOB.  The statute requires the PCAOB to "promptly file notice with the Commission of any final sanction" imposed on a public company accounting firm or associated person.  15 U.S.C. § 7217(c)(1).  The statute further provides that "[t]he provisions of sections 78s(d)(2) and 78s(e)(1) of this title shall govern the review by the Commission of final disciplinary sanctions imposed by the Board . . . as fully as if the Board were a self-regulatory organization . . . for purposes of those sections  . . . ."  15 U.S.C. § 7217(c)(2).

Sections 78s(d)(2) and (e)(1), in turn, establish a process in which the SEC reviews disciplinary sanctions of SROs (and thus the PCAOB), either on application of the disciplined party or on its own initiative. After notice and an opportunity for a hearing, the SEC makes a <u>de novo</u> determination of (1) whether the disciplined person engaged in the acts, practices, or omissions charged by the SRO, (2) whether such acts, practices, or omissions are in violation of the securities laws or applicable rules or regulations, and (3) whether the securities laws or applicable rules or regulations were applied in a manner consistent with the purposes of the statute. 15 U.S.C. § 78s(e)(1)(A). If the SEC makes affirmative findings on each of those questions, it must affirm the SRO's imposition of the sanction, 15 U.S.C. § 78s(e)(1)(A), although it is permitted to "enhance, modify, cancel, reduce, or require the remission of a sanction imposed by the Board" in certain circumstances, 15 U.S.C. § 7217(c)(3). Otherwise the SEC must set aside the sanction imposed by the SRO. 15 U.S.C. § 78s(e)(1)(B). As noted above, these provisions apply to the PCAOB as if it were an SRO.

Just as the PCAOB's rules do not become effective unless and until the SEC has approved them, a disciplinary sanction imposed by the PCAOB on an accountant likewise is presumptively stayed pending SEC review. <u>See</u> 15 U.S.C. § 7215(e) ("Application to the Commission for review, or the institution by the Commission of review, of any disciplinary action of the Board shall operate as a stay of any such disciplinary action" unless the Commission affirmatively decides, after notice and an opportunity for hearing, to lift stay); <u>see also</u> 15 U.S.C. § 7215(d)(1)(C) (disciplinary sanctions not publicly reported until after stay is lifted).

If the SEC affirms a disciplinary sanction that the PCAOB imposes on an accounting firm or accountant, that person may obtain judicial review in an appropriate court of appeals under the same statute, discussed above, that confers judicial review of the SEC's orders approving the PCAOB's rules. 15 U.S.C. § 78y.

## C.     The Instant Litigation

This action was filed on February 7, 2006, by plaintiffs Free Enterprise Fund ("FEF") and Beckstead and Watts, LLP ("B&W"). Plaintiffs challenge the constitutionality of Title I of the Sarbanes-Oxley Act on the grounds that the PCAOB and its actions violate the separation of powers, the Appointments Clause, and the non-delegation doctrine. Plaintiffs seek a declaratory judgment of unconstitutionality as well as injunctive relief prohibiting the PCAOB from functioning generally and from taking "any further action" against B&W.

On May 15, 2006, defendants moved to dismiss for lack of jurisdiction and failure to state a claim. Defendants argue that the Court lacks jurisdiction because this suit was brought outside the Sarbanes-Oxley Act and securities laws' exclusive statutory review mechanism. Defendants also contend that the Complaint is defective because it is not based on any recognized cause of action, and the Court should not fashion an implied cause of action in derogation of the statutory review scheme already provided for in the securities laws. Finally, defendants challenge the standing of FEF in toto and the standing of both plaintiffs to assert certain arguments.

## ARGUMENT

The United States agrees with defendants that this action should be dismissed because plaintiffs have not based their claims on any recognized cause of action but, to the contrary, have

attempted to bypass the exclusive statutory remedial scheme that Congress enacted as part of the

securities laws to govern challenges to regulatory entities and their actions.  The Sarbanes-Oxley

Act and the Exchange Act specify the timing, forum, and prerequisites for judicial review.  This

lawsuit is inconsistent with each of those requirements, and the fact that it does not rest on any

other recognized cause of action underscores the deficiency.  It should be dismissed.[2]

---

[2] In addition, the United States agrees that, for the reasons set forth in Defendants'
Memorandum of Points and Authorities in Support of Motion to Dismiss the Complaint ("Defs'
Mem.") at 39-43, plaintiff FEF plainly lacks any standing and plaintiff B&W also lacks standing
in the respects described.  Indeed, there are significant questions as to B&W's standing more
generally.  Many of B&W's allegations of harm are vague and makeweight (e.g., Compl. ¶¶ 72,
73).  Some allegations claim injury resulting from actions B&W apparently undertook
voluntarily (Compl. ¶ 70).  Others run counter to third-party standing limitations, if not
economic logic; B&W argues that it is injured because standards promulgated by the PCAOB
increase the "time and expense of the public-company audits conducted by [B&W]" (Compl. ¶
72), but any injury from audit services becoming more expensive would presumably be borne in
the first instance by the audit clients who pay for those services, rather than by the auditors who
are paid for them.  Cf. Arthur Andersen & Co. v. SEC, No. 76C-2832, 1978 WL 1073, *6 (N.D.
Ill. Mar. 1978) (rejecting derivative standing for accounting firm to invoke harm to audit clients
from auditing standards because "there is no reason why the registrant-client could not speak for
itself and bring its own action" (citing Warth v. Seldin, 422 U.S. 490, 499 (1975))).  Finally, it is
questionable whether merely having to submit to an investigation (Compl. ¶¶ 79-80), as opposed
to incurring sanctions or other concrete consequences eventually arising out of the investigation,
constitutes the type of concrete injury necessary for standing.  See Stardust, Inc. v. SEC, 225
F.2d 255, 257 (9th Cir. 1955) (rejecting contention that distraction from company affairs and
negative publicity from ongoing SEC investigation are cognizable injury).

In any event, because this case is subject to dismissal due to the exclusive statutory
review mechanism's displacement of the Court's jurisdiction, the Court need not conclusively
determine the question of B&W's standing.  See Ruhrgas A.G. v. Marathon Oil Co., 526 U.S.
574, 584-85 (1999) ("It is hardly novel for a federal court to choose among threshold grounds for
denying audience to a case on the merits."); see also Hwang Geum Joo v. Japan, 413 F.3d 45,
47-48 (D.C. Cir. 2005) (holding that it is appropriate for court to dismiss case on one threshold
jurisdictional ground while pretermitting another), cert. denied, 126 S. Ct. 1418 (2006).

A.    **Courts Commonly Require Litigants to Bring Claims in**
      **Accordance with Applicable Statutory Review Mechanisms**

Many federal statutes contain specific judicial review provisions that require claims

against agencies charged with administering those statutes to be brought in a particular court, at

a particular time, and upon particular conditions.  These channeling provisions are vitally

important to the government and advance a number of salutary goals.  See supra at pp. 1-2.

Courts consistently require litigants bringing challenges to regulatory authority, including

constitutional challenges, to utilize such exclusive review mechanisms where available.  The

leading case exemplifying this principle is Thunder Basin Coal Co. v. Reich, 510 U.S. 200

(1994), in which a mine operator sued in federal district court on constitutional and other

grounds to enjoin the Mine Safety and Health Administration ("MSHA") from enforcing certain

labor relations requirements of a mine safety statute ("Mine Act") against it.  The Mine Act,

however, "establish[d] a detailed structure for reviewing violations" of the standards or

provisions adopted under it.  Id. at 207.  If cited for a violation, the mine operator could

challenge the citation and obtain a hearing before an ALJ and potentially the Federal Mine

Safety and Health Review Commission, following which it could obtain review by a federal

court of appeals.  Id. at 207-08.

Noting that it would "find that Congress has allocated initial review to an administrative

body where such intent is 'fairly discernible in the statutory scheme,'" id. at 207 (quoting Block

v. Cmty. Nutrition Inst., 467 U.S. 340, 351 (1984)), and examining the scheme of the Mine Act,

the Court found that the statute's structure "demonstrates that Congress intended to preclude

challenges such as the present one."  Id. at 208.  As a result, mine operators aggrieved by

MSHA's regulatory activities were obligated "to complain to the Commission and then to the

court of appeals." Id. at 209.  The Supreme Court also rejected the mine operator's contention that the particular types of claims it was bringing, including claims under the Constitution and challenges to the very review process that the Court was applying, were exempt from the requirement that they be brought through the statutory channels.  Id. at 212-16.  The Court reasoned that, even if  "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies," the mine operator's constitutional claims could be "meaningfully addressed in the Court of Appeals" following administrative review.  Id. at 215 (internal quotation marks omitted).  And even though the Mine Act was "facially silent with respect to pre-enforcement claims," id. at 208, the Court held that the exclusive review scheme barred such claims.  Thus, "[t]o uphold the District Court's jurisdiction in these circumstances would be inimical to the structure and purposes of the Mine Act."  Id. at 216.[3]

The Thunder Basin Court also noted that under the Mine Act, the agency's penalty assessments became final and payable only after full review by the Commission and the court of appeals, and that procedures were built into the Act to obtain temporary relief from other orders. Thunder Basin, 510 U.S. at 218.  The Court therefore found that the Mine Act "does not present the situation confronted in Ex parte Young, 209 U.S. 123, 148 (1908), in which the practical effect of coercive penalties for noncompliance was to foreclose all access to the courts."  Id.

---

[3]  In so holding, the Thunder Basin Court distinguished Abbott Labs. v. Gardner, 387 U.S. 136 (1967), a drug industry challenge to an FDA drug labeling rule, in which the Court had declined to infer that a statutory review scheme for certain types of claims precluded extra-statutory review of other, different claims.  The Thunder Basin Court contrasted the drug statute in Abbott with the Mine Act, emphasizing that the latter did not include a savings clause and did not have legislative history suggesting an intent to preserve extra-statutory remedies, two factors that had contributed substantially to the Abbott Court's conclusion.  510 U.S. at 212.

"Nor does this approach a situation in which compliance is sufficiently onerous and coercive penalties sufficiently potent that a constitutionally intolerable choice might be presented."  Id.

    While <u>Thunder Basin</u> is the most recent occasion on which the Supreme Court has spoken on this topic, it is representative of the approach the Court has taken in a number of other cases as well.  See, e.g., <u>FCC v. ITT World Comms.</u>, 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders, such as the FCC's denial of respondents' rulemaking petition, lies in the Court of Appeals.  Litigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order."); <u>Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.</u>, 379 U.S. 411, 420, 421-22 (1965) (holding that "where Congress has provided statutory review procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive" and that the Board's determination "is subject only to review in the Court of Appeals and "may not be collaterally attacked in the District Court").

    Following the Supreme Court's lead, the lower courts, particularly the D.C. Circuit, have also regularly required litigants to channel claims against agencies, including constitutional ones, through statutory review mechanisms rather than circumventing those mechanisms through a preemptive action in federal district court.  See, e.g., <u>Sturm, Ruger & Co. v. Chao</u>, 300 F.3d 867, 876 (D.C. Cir. 2002) (holding that <u>ultra vires</u> challenge to Occupational Safety and Health Administration, including Fourth Amendment claims, had to be dismissed because "[o]ur obligation to respect the review process established by Congress bars us from permitting Sturm Ruger to make this end run [by suing for injunction against review process]"); <u>Am. Coal. for Competitive Trade v. Clinton</u>, 128 F.3d 761, 765-67 (D.C. Cir. 1997) (holding that

Appointments Clause and other constitutional claims challenging provisions of international

treaty had to be brought through administrative process specified in treaty before judicial review

could be afforded); <u>Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin.</u>, 376 F.3d 239, 244 (4th Cir.

2004) (holding that facial First Amendment challenge to portion of social security statute had to

be channeled through statutory review mechanism, and affirming dismissal of noncompliant

lawsuit); <u>Great Plains Coop. v. CFTC</u>, 205 F.3d 353, 355 (8th Cir. 2000) (holding that <u>ultra vires</u>

challenge to Commodity Futures Trading Commission by target of administrative enforcement

proceeding must be dismissed as an "impermissible attempt to make an 'end run' around the

statutory scheme").[4]

**B.      The Securities Laws Have Long Provided an Exclusive
        <u>Mechanism for Judicial Review of Challenges to Regulatory Authority</u>**

These principles have long been applied in the context of the securities laws, which have

always included exclusive review provisions, and which courts have consistently held preclude

preemptive actions in federal district court.  Only three years after the Exchange Act created the

SEC, the D.C. Circuit rejected as "untenable" the notion that "petitioners [challenging SEC

action] may seek relief outside the Act by a suit in equity" in federal district court, which it said

would result in "inconvenience" and "would constitute [a] circuitous route[] for the

determination of issues."  <u>Am. Sumatra Tobacco Corp. v. SEC</u>, 93 F.2d 236, 241 (D.C. Cir.

---

[4] As courts have noted, exclusive statutory review mechanisms generally do not prevent
claims from receiving judicial review altogether; they merely specify appropriate parameters for
such review.  <u>See</u> <u>Thunder Basin</u>, 510 U.S. at 207 n.8 ("Because court of appeals review is
available [following exhaustion of review process within agency], this case does not implicate
the strong presumption that Congress did not mean to prohibit all judicial review." (internal
quotation marks omitted)); <u>Great Plains</u>, 205 F.3d at 356 ("The issue here is not <u>whether</u> the
judiciary may determine if the CFTC exceeded the bounds of its power, but rather <u>when</u> the
judiciary may make such a determination." (emphasis in original)).

1937).  The Court held that in Section 25(a) of the Exchange Act, 15 U.S.C. § 78y(a), "Congress

has provided within the Act the exclusive remedy for persons aggrieved by the operations of the

Act."  93 F.2d at 241.  The same year, the Second Circuit affirmed the district court's dismissal

of a cross-bill to enjoin an SEC investigation, holding that Section 25 "provides how and where

a person aggrieved by an order of the Commission may obtain judicial review of such order,"

that an order to open an investigation is "interlocutory and not reviewable under section 25," and

that even if it were so reviewable, "review could only be had in a Circuit Court of Appeals," not

in district court.  SEC v. Andrews, 88 F.2d 441, 441-42 (2d Cir. 1937).  See also SEC v. R.A.

Holman & Co., 323 F.2d 284, 287 (D.C. Cir. 1963) (reversing district court injunction against

SEC administrative proceeding, because "such claims as the appellee has here presented should

be adduced in the first instance at the administrative level and any challenge to the resolution of

these issues is subject to judicial review when the administrative record reaches us in due

course").

     The securities laws' exclusive review mechanism precludes district court review not only

of claims challenging action taken by the SEC in the first instance, as in the foregoing cases, but

also of claims challenging actions taken by SROs in the first instance and committed to the

SEC's initial review.  For example, in First Jersey Securities, Inc. v. Bergen, 605 F.2d 690

(3d Cir. 1979), cert. denied, 444 U.S. 1074 (1980), the Third Circuit granted a petition by NASD

for a writ of mandamus directing the district court to dismiss a suit filed by a brokerage company

undergoing a NASD disciplinary proceeding.  The company's district court lawsuit alleged, inter

alia, that both the disciplinary proceeding and NASD's very ability to perform functions under

the securities laws were unconstitutional, and sought to enjoin the proceeding.  Id. at 693.  The

Third Circuit held that, in light of the exclusivity of the statutory review mechanism requiring exhaustion before the SEC and designating the court of appeals for subsequent judicial review, "the comprehensiveness of the review procedures suggests that the doctrine of exhaustion of remedies should be applied to prevent circumvention of the established procedures." Id. at 695. "The district court's exercise of jurisdiction where none exists," the court further explained, "results in substantial interference with a congressionally mandated administrative process and amounts to a judicial usurpation of power." Id. at 701.

The First Circuit reached the same conclusion in Swirsky v. NASD, 124 F.3d 59 (1st Cir. 1997), a case where a broker who had been subjected to discipline pursuant to a settlement with the NASD sought to undo the settlement and challenge the NASD's actions, including on constitutional grounds, see id. at 61 n.1, 63. Instead of filing a petition in a court of appeals to review the SEC's order upholding the NASD, however, the broker filed suit in federal district court. The district court dismissed the complaint, and the First Circuit affirmed. The court observed that "[t]he Exchange Act mandates a three-tiered process of both administrative and judicial review of NASD disciplinary proceedings": the first tier consisting of NASD's own disciplinary process; the second tier consisting of de novo review by the SEC pursuant to 15 U.S.C. § 78s; and the third tier being the availability of judicial review of the SEC's final order in a court of appeals. 124 F.3d at 61-62. "Swirsky's proper course of action, once the SEC denied his appeal, was to appeal to this court," the court explained. Id. at 64. Because the district court action was inconsistent with the review process spelled out in the statute, it was improper and subject to dismissal. Id.

Thus, well before the enactment of Sarbanes-Oxley, a substantial body of precedent had developed around the proposition that the statutory review mechanism in the securities laws is exclusive and precludes preemptive actions in district court challenging SEC and SRO authority. See also cases cited in Defs' Mem. at 23 n.16. Indeed, courts have found the securities laws' system for review of challenges to SROs to be "indistinguishable" from the statutory review mechanism that the Supreme Court held was exclusive in Thunder Basin. Hayden v. NYSE, 4 F. Supp. 2d 335, 338 (S.D.N.Y. 1998). Such is the backdrop against which Congress legislated when it expressly provided in Title I of the Sarbanes-Oxley Act that review should be governed by that same mechanism.

**C.      The Statutory Review Mechanism Here Provides
        the Exclusive Vehicle for Plaintiffs to Obtain
        Review of Their Challenges to the PCAOB and its Actions**

**1.      The Sarbanes-Oxley Act and Exchange Act Manifest a
        Clear Congressional Intent to Require Challenges to
        the PCAOB to Proceed Through the Statutory Review Mechanism**

Congress's intent with regard to litigation against the PCAOB is more than "fairly discernible," Thunder Basin, 510 U.S. at 207; it is unmistakably transparent. As discussed above, Congress intentionally and expressly incorporated the same statutory review provisions that have long governed challenges to the authority of the SEC and SROs. By doing so, Congress made clear its intent to have the PCAOB governed by the well-developed body of law applying those same provisions to require challenges – whether statutory or constitutional – to the SEC and the regulatory authorities that operate under its umbrella to be channeled through the process specified in the statute, with any eventual judicial review provided in the court of

appeals.  See United States v. Alaska, 521 U.S. 1, 35 (1997) (Congress is presumed to legislate

against the backdrop of existing decisional law).[5]

Moreover, as defendants point out, the legislative history of the Sarbanes-Oxley Act

confirms Congress's intent to adopt the pre-existing review framework.  See Defs' Mem. at 25

(citing Senate Banking Committee report).  In fact, at one point an amendment was introduced

that would have given accounting firms subjected to discipline by the PCAOB an alternate

option of bypassing SEC review and obtaining immediate judicial review in federal district

court.[6]  However, that amendment was never adopted.  Rather, the statute, as enacted, preserved

the longstanding framework requiring exhaustion of the SEC review process and placing any

judicial review in the court of appeals.  Cf. Whitney Nat'l Bank, 379 U.S. at 420, 422 (requiring

---

[5] This background makes the rationale for finding the statutory review mechanism to be exclusive even more compelling in this case than in Thunder Basin itself, where the Court had to analyze the Mine Act on a blank slate without the benefit of a pre-existing body of law that Congress incorporated in the legislation and that already answered the question presented.  It also starkly distinguishes this case from Abbott Labs., 387 U.S. 136, where the pre-existing body of law included extra-statutory remedies and the legislation contained a savings clause preserving those remedies.  See Thunder Basin, 510 U.S. at 212 (explaining the result in Abbott Labs. as driven by the savings clause and legislative history).

[6] The amendment would have added the following language to the provision codified in the final legislation as 15 U.S.C. § 7215(e):

> JUDICIAL REVIEW OF DISCIPLINARY ACTIONS.  Instead of filing an application for Commission review under paragraph (1) [15 U.S.C. § 7215(e)(1)], a public accounting firm or person associated with such firm may, not later than 10 days after the date on which a disciplinary action by the Board becomes final, seek review of such disciplinary action by the United States District Court for the District of Columbia or the appropriate Federal district court in the State in which such person is domiciled.  Application to a Federal district court for review of such disciplinary sanction shall operate as a stay of such disciplinary sanction.

148 Cong. Rec. at S6661 (July 11, 2002) (quoting Senate Amendment 4225).

compliance with statutory review scheme placing review in court of appeals, based on, <u>inter alia</u>, "legislative history which shows that Congress rejected a proposal for a <u>de novo</u> review in the district courts of Board decisions"); <u>Nat'l Taxpayers Union</u>, 376 F.3d at 243 (finding review scheme preclusive after noting that "Congress specifically rejected a proposal allowing alleged violators to challenge final agency actions in trials <u>de novo</u> in district court").

Thus, the text, structure, background, and legislative history all make clear that the statutory process is the exclusive vehicle for plaintiffs to obtain review of their claims challenging the PCAOB.  Plaintiffs should be required to comply with that process no less than other parties regulated under the securities laws have consistently been required to comply with that same process for challenges to NASD and other SROs, or even the SEC itself.

### 2.    The Particular Claims Made By Plaintiffs Do Not Warrant a Special Exception from the Statutory Review Mechanism

Plaintiffs may contend that the claims they raise in this action are exempt from the statutory review mechanism either because they arise under the Constitution or because they are not couched as challenges to any specific rule or disciplinary sanction of the PCAOB.  Such arguments would be unavailing.  Courts commonly require plaintiffs to assert their constitutional claims, no less than other types, through an exclusive statutory review mechanism, particularly where, as here, no irreparable harm would result from following the process prescribed by statute.  "Many agency adjudication schemes require petitioners to exhaust their administrative remedies before bringing their constitutional claims to Article III courts."  <u>Am. Coal. for Competitive Trade v. Clinton</u>, 128 F.3d 761, 766 (D.C. Cir. 1997).  In <u>Thunder Basin</u> itself, the Court noted the presence of constitutional claims but held that those claims "can be meaningfully addressed in the Court of Appeals" through the process established by statute.  <u>Thunder Basin</u>,

510 U.S. at 215; accord Sturm, Ruger, 300 F.3d at 874 (holding that Fourth Amendment claims

must be brought in accordance with exclusive statutory review scheme); Nat'l Taxpayers Union,

376 F.3d at 243-44 (holding that lawsuit raising purely constitutional claims, including facial

First Amendment claims, must be brought in accordance with exclusive statutory review

scheme).

      These principles have been applied both to the same kinds of constitutional claims raised

here and in cases involving similarly situated entities. In American Coalition for Competitive

Trade, the D.C. Circuit held that it lacked subject matter jurisdiction to consider an industry

group's challenge to a treaty's binational panel review system under the Appointments Clause

and other facial constitutional grounds, because plaintiffs had not followed the statutory review

scheme, which "establishes reasonable requirements to ensure that plaintiffs have a concrete

stake in the proceedings and have exhausted their administrative remedies before they may

challenge the constitutionality of the binational panel review system." 128 F.3d at 165-67. And,

in First Jersey Securities, 605 F.2d 690, the Third Circuit required that constitutional challenges

resembling the claims in the present case – specifically, an argument that NASD's functions

under the securities laws were invalid under constitutional non-delegation principles – be

channeled through the same statutory review mechanism that governs this case.

      Here, in particular, there are several reasons why the interests of justice are best served

by requiring plaintiffs' claims to proceed through the normal statutory channels even though

they sound in the Constitution. First, while constitutional issues may not necessarily draw on the

SEC's specialized expertise to the same extent as do issues arising under securities statutes and

regulations,[7] there are still compelling reasons why the claims should be considered by the SEC

in the first instance. Analysis of each of plaintiffs' constitutional claims involves the

interpretation and application of the statute – specifically, its provisions describing the

relationship between the SEC and the PCAOB and the degree of control and supervision

exercised by the former over the latter. But the SEC is charged with "applying [the] statute in

the first instance," McKart v. United States, 395 U.S. 185, 193-94 (1969), such interpretation

may be informed by constitutional avoidance principles, Ohio Civil Rights Comm'n v. Dayton

Christian Schools, Inc., 477 U.S. 619, 629 (1986) ("[I]t would seem an unusual doctrine . . . to

say that the Commission could not construe its own statutory mandate in the light of federal

constitutional principles."), and such interpretation, if reasonable, will be entitled to deference

from a reviewing court, Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837,

845 (1984). While the Complaint repeatedly characterizes the SEC's review powers as

"limited," "extremely limited," "minimal," and "circumscribed," see, e.g., Compl. ¶¶ 55-60, 84,

plaintiffs should not be heard to make these self-serving assumptions about the nature of the

SEC's oversight under the statute even as they urge the Court to dispense with the administrative

---

    [7] Of course, the benefit from allowing the agency to bring to bear its special expertise is
only one of several important considerations that underlie the exclusive statutory review scheme;
equally important are limiting of judicial review to final actions that have attained the necessary
level of concreteness, and Congress's conferral of subject matter jurisdiction on particular courts
to the exclusion of others. See, e.g., McKart v. United States, 395 U.S. 183, 194 (1969) ("of
course it is generally more efficient for the administrative process to go forward without
interruption than it is to permit the parties to seek aid from the courts at various intermediate
stages"); United Transp. Union v. Norfolk & W. Ry. Co., 822 F.2d 1114, 1120 (D.C. Cir. 1987)
("[C]oherence and economy are best served if all suits pertaining to designated agency decisions
are segregated in particular courts.").

process under which the SEC would be permitted to interpret the statute and exercise that

oversight in the first instance.

Second, this case does not remotely present a situation where district court jurisdiction

might be allowed on the ground that "a finding of preclusion could foreclose all meaningful

judicial review," Thunder Basin, 510 U.S. at 212-13, or where "the practical effect of coercive

penalties for noncompliance [is] to foreclose all access to the courts," id. at 218 (distinguishing

Ex parte Young, 209 U.S. 123).  The appropriate court of appeals will be fully equipped to

provide meaningful judicial review of plaintiffs' constitutional claims in a duly filed petition for

review of an SEC order approving a concrete action of the PCAOB affecting plaintiffs.  Even

assuming arguendo that there might be some level of immediate and irreparable harm that could

justify extra-statutory review in an appropriate case, the Complaint here does not point to any

harm approaching that level.[8]  Indeed, the presumptive stay of the effectiveness of any PCAOB

disciplinary sanction or rule pending SEC review would appear, by its terms, to obviate any

cognizable harm up until the point of judicial review.  See 15 U.S.C. §§ 7215(e), 7217(b)(2).[9]

---

[8] While the Complaint refers to the burdens and fees associated with plaintiff B&W's
"defending itself against the investigation proceedings" (Compl. ¶¶ 79-80), the Supreme Court
has rejected the notion that "the expense and disruption of defending [one]self in protracted
adjudicatory proceedings," even if "substantial," "constitutes irreparable harm."  FTC v.
Standard Oil Co., 449 U.S. 232, 244 (1981).

[9] Notably, the presumptive stay pending SEC review of PCAOB disciplinary sanctions
reverses the default rule generally applicable to disciplinary sanctions imposed by SROs on their
members.  Compare 15 U.S.C. § 7215(e) ("Application to the Commission for review . . . shall
operate as a stay of any such disciplinary action, unless and until the Commission orders
[otherwise] . . . ."), with 15 U.S.C. § 78s(d)(2) ("Application to such appropriate regulatory
agency for review . . . shall not operate as a stay of such action unless such appropriate
regulatory agency otherwise orders . . . ." (emphasis added)).  Thus, accountants disciplined by
the PCAOB are in a more favorable position with regard to review compared to other securities
(continued...)

Third, plaintiffs do not appear to contend that the exclusive statutory review mechanism, which exists independently of Title I of the Sarbanes-Oxley Act, is itself unconstitutional. In any event, as noted above, any such claim would be foreclosed by <u>Thunder Basin</u>, which required compliance with the statutory review process despite the petitioner's constitutional attack on the adequacy of the process itself. <u>See</u> <u>Thunder Basin</u>, 510 U.S. at 205 (summarizing petitioner's argument that "requiring it to challenge the MSHA's interpretation . . . through the statutory review process would violate the Due Process Clause").

Nor can plaintiffs evade the statutory review mechanism by portraying their lawsuit as not challenging any specific PCAOB rule or anticipated disciplinary sanction. Such a contention would blink reality. Substantial portions of the Complaint are devoted to discussion of how certain past actions and possible future actions of the PCAOB allegedly have injured or might injure plaintiff B&W. <u>See</u>, <u>e.g.</u>, Compl. ¶¶ 62-64 (complaining about PCAOB's issuance of "burdensome" Auditing Standards Nos. 1, 2, and 3, which "have imposed substantial compliance costs on registered accounting firms and their public-company clients"), ¶¶ 72-73 (same), ¶¶ 79-80 (complaining about PCAOB investigation); <u>see also</u> Compl. at 23 (Prayer for Relief ¶ 3) (requesting "an order and judgment enjoining the Board and its Members from taking any further action against Plaintiff Beckstead and Watts and nullifying and voiding any prior adverse action against Beckstead and Watts").[10] After all, it is only through concrete actions of

---

[9](...continued)
industry actors regulated and disciplined by SROs, as to whom the securities laws' exclusive review scheme has been repeatedly applied without hesitation, <u>see</u> <u>supra</u> Section B and cases cited in Defs' Mem. at 23 n.16.

[10] The Complaint's emphasis on the fact that "formal investigation proceedings" are
(continued...)

the PCAOB, not by virtue of its mere existence as an abstract matter, that plaintiffs can be affected or suffer any conceivable injury-in-fact.  Absent these allegations of specific proceedings and actions of the PCAOB with effects on B&W, standing in this case – which is dubious even on the current Complaint, see supra note 2 – would not even be arguable.  Cf. Am. Coal. for Competitive Trade, 128 F.3d at 765 n.3 (noting that statutory provision limiting judicial review of statute to situations where certain formal action has been taken against litigant "ensures that constitutional challenges . . . are sufficiently concrete to allow for meaningful review and prevents this court from issuing advisory opinions in violation of Article III").

To the extent that the Complaint refers to specific actions and proceedings of the PCAOB as having injured or threatening to injure plaintiffs, each of those actions and proceedings falls squarely under the exclusive statutory review scheme.  With respect to the auditing standards that plaintiffs allege have caused them hardship, plaintiffs had the opportunity to present their objections during SEC review of those standards, see 15 U.S.C. § 7217(b); 15 U.S.C. § 78s(b)(1), and, upon SEC approval of those standards, to obtain judicial review in an appropriate court of appeals, see 15 U.S.C. § 78y.[11]  To the extent that the ongoing investigation

_____

[10](...continued)
"currently ongoing" (Compl. ¶ 79) and its request that those proceedings (as well as any future ones) be enjoined, among other factors, clearly distinguish this case from Time Warner Entertainment Co. v. FCC, 93 F.3d 957 (D.C. Cir. 1996), where the D.C. Circuit, without discussion of Thunder Basin, articulated a narrow exception allowing a facial First Amendment challenge to a cable television statute to proceed outside a statutory review mechanism where the challenge was "entirely independent of any agency proceedings, whether actual or prospective." Id. at 965.

[11] In such a petition-for-review proceeding, plaintiffs, of course, could have argued that the PCAOB's auditing standards are invalid on the ground that the PCAOB is unconstitutional. Ironically, if plaintiffs had only proceeded in this manner as specified by statute and duly filed

(continued...)

of plaintiff B&W might eventually lead to the Board's imposition of a disciplinary sanction on it, the firm will likewise be entitled to SEC review and then review in an appropriate court of appeals. Since each of the ways in which plaintiffs complain that the PCAOB has concretely and materially affected them (or could do so in the future) would be redressable through the statutory review mechanism, they should not be able to dodge that mechanism through artful pleading.

**D.    Plaintiffs' Failure to Invoke Any Recognized Cause of Action Underscores the Invalidity of this Lawsuit**

That this lawsuit is unauthorized and contrary to statute is further demonstrated by its failure to be based on any known cause of action. While the Complaint cites 28 U.S.C. §§ 1331 and 2201, those statutes merely provide, respectively, for federal question jurisdiction and declaratory judgments as a form of relief; a plaintiff must look elsewhere for a cause of action.[12] A generally applicable cause of action to seek declaratory and injunctive relief against the government, of course, is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, but here, plaintiffs do not rely on the APA, nor could they, because the APA does not apply to the PCAOB. See 15 U.S.C. § 7211(b) ("The Board shall not be an agency or establishment of

---

[11](...continued)
petitions for review from the SEC's orders approving Auditing Standards Nos. 1, 2, and 3, which were issued in 2004 (see Defs' Mem. at 10 n.7), it is possible that they would have already received a judicial ruling on the question.

[12] See, e.g., Cale v. City of Covington, 586 F.2d 311, 313 (4th Cir. 1978) (calling it "elementary" that "the enactment of § 1331 did not of itself create any cause of action"); White v. Paulsen, 997 F. Supp. 1380, 1382 (E.D. Wash. 1998) ("§ 1331 is a pure jurisdictional statute that does not, on its own, create a private right of action"); Akins v. Penobscot Nation, 130 F.3d 482, 490 n.9 (1st Cir. 1997) (Declaratory Judgment Act does not create a "substantive cause of action"); Earnest v. Lowentritt, 690 F.2d 1198, 1203 (5th Cir. 1982) ("Section 2201 does not provide an independent cause of action for a determination of the constitutionality of a statute . . . ."); see also Califano v. Sanders, 430 U.S. 99, 105 (1977) (§ 1331 is subject to "preclusion-of-review statutes created or retained by Congress").

-24-

the United States Government . . . ."); Lebron v. Nat'l Railroad Passenger Corp., 513 U.S. 374,

393 (1995) (finding language similar to 15 U.S.C. § 7211(b) "assuredly dispositive of [the

entity's] status as a Government entity for purposes of matters that are within Congress's control

– for example, whether it is subject to statutes . . . such as the Administrative Procedure Act").

Plaintiffs' decision not to include a cause of action in their Complaint is not mere

happenstance.  As discussed above, there is an applicable cause of action – contained in Section

25 of the Exchange Act, 15 U.S.C. § 78y – that provides a basis for plaintiffs, after exhausting

their administrative remedies before the SEC, to obtain judicial review of their challenge to the

PCAOB and its actions.  See supra at pp. 6, 8.  Plaintiffs have simply elected to disregard that

provision, apparently in the hope that the Court will fashion some implied cause of action that

dispenses with the statutory requirements they find inconvenient.  They do so at their peril, since

the Court is "oblig[ed] to respect the review process established by Congress."  Sturm, Ruger,

300 F.3d at 876.[13]

In this regard, it is revealing that the procedural posture of plaintiffs' lawsuit – not

anchored in any known cause of action, statutory or non-statutory – stands out as an aberration

against the background of the major cases that comprise the body of substantive law governing

each of their constitutional claims.  In leading cases construing the Appointments Clause, the

separation-of-powers doctrine, and the non-delegation principle, the plaintiffs' claims were

---

[13] Because there is an available cause of action that could be utilized if plaintiffs
complied with its conditions and filed in the appropriate court at the appropriate time, the Court
does not need to consider the question of whether to fashion some new, non-statutory, implied
cause of action.  See Correctional Services Corp. v. Malesko, 534 U.S. 61, 67-68 (2001)
(availability of remedial scheme provided by Congress obviates need to fashion new, judicially
created remedy).

uniformly raised either through established statutory causes of action (including the particular

statutory scheme at issue here) or as defenses in appeals from a criminal conviction, contempt

sanction, or enforcement action.[14]  In none of the cited cases did the plaintiff bring an offensive

action except through a particular statutory or other defined, recognized route.  Plaintiffs should

not be heard to urge that the court invent a new form of action just for this case when a defined

statutory process exists and is adequate.

---

[14] Appointments Clause: see Buckley v. Valeo, 424 U.S. 1, 8 & n.4 (1976) (special
statutory judicial review provision contained within statute being challenged); Morrison v.
Olson, 487 U.S. 654, 668-69 (1988) (appeal from district court order in miscellaneous
proceeding denying motion to quash subpoena and holding movants in contempt for refusal to
comply with subpoena); Freytag v. Comm'r, 501 U.S. 868, 871-73 (1991) (appeal from adverse
decision of special trial judge of Tax Court in tax case filed under tax laws); Edmond v. United
States, 520 U.S. 651, 655 (1997) (appeal from decisions of Coast Guard Court of Criminal
Appeals affirming convictions by courts-martial); United States v. Germaine, 99 U.S. 508 (1879)
(appeals from convictions for crime that had defendant's status as "officer" of the United States
as an element); United States v. Eaton, 169 U.S. 331 (1898) (suits brought by ex-official to
recover compensation for services during tenure as officer); Landry v. F.D.I.C., 204 F.3d 1125,
1128 (D.C. Cir.) (appeal from decision of FDIC affirming disciplinary sanction against bank
officer recommended by ALJ whose appointment was argued to be invalid), cert. denied, 531
U.S. 924 (2000).

Separation-of-Powers: see Bowsher v. Synar, 478 U.S. 714 (1986) (special judicial
review provision contained within statute being challenged, see 626 F. Supp. 1374, 1378 (D.D.C.
1986)); Mistretta v. United States, 488 U.S. 361, 370-71 (1989) (appeals of criminal conviction
and sentence); Morrison, 487 U.S. at 668-69; FEC v. NRA Political Victory Fund, 6 F.3d 821,
822-23 (D.C. Cir. 1993) (defense to statutory civil enforcement action by FEC), cert. dismissed,
513 U.S. 88 (1994).

Non-Delegation: see Am. Power & Light Co. v. SEC, 329 U.S. 90, 96 (1946) (appeal
from order of SEC requiring dissolution of companies); Sunshine Anthracite Coal Co. v. Adkins,
310 U.S. 381, 391 (1940) (defense against action to collect tax pursuant to statute alleged to be
invalid for unconstitutional delegation); Mistretta v. United States, 488 U.S. 361, 370-71 (1989)
(appeals of criminal conviction and sentence); Todd & Co., Inc. v. SEC, 557 F.2d 1008, 1012
(3d Cir. 1977) (appeal from order of SEC affirming disciplinary sanction imposed by NASD);
R.H. Johnson & Co. v. SEC, 198 F.2d 690, 694-95 (2d Cir.) (same), cert. denied, 344 U.S. 855
(1952).

***

Preemptive challenges to regulatory authority in circumvention of a statutory review scheme enacted by Congress should not be countenanced.  As discussed above, in order for government to function effectively and efficiently, agencies must be free to conduct their statutory missions, especially the conduct of investigations, without being interrupted and hobbled by piecemeal litigation outside the appropriate statutory framework.  While these governmentwide interests transcend the PCAOB and even the securities laws generally, they take on particular vitality in an area of regulation as demonstrably critical to a healthy national economy and the fortunes of millions of investors, retirees, and employees as the integrity of public company audits.  Permitting the SEC to address plaintiffs' claims in the first instance in the context of an actual case or controversy will enable a later reviewing court to address plaintiffs' constitutional claims in light of the actual degree of control exerted by the SEC over the PCAOB, rather than rushing to constitutional judgment based on plaintiffs' mere supposition about how the agency will construe and apply the statute.  Moreover, delaying judicial review so that it may occur in the manner prescribed by statute does not come at any significant cost to plaintiffs, who have not articulated any cognizable immediate harm, did not petition a court of appeals for review of the PCAOB's allegedly burdensome auditing standards when they had the opportunity, and in the meantime simply have to live under the same regulatory regime that governs approximately 1,600 other registered public company accounting firms.  The statutory

process should be allowed to run its course unimpeded by collateral litigation, just as Congress intended for it to do.[15]

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that defendants' motion to dismiss should be granted.

Dated: June 2, 2006                          Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             KENNETH L. WAINSTEIN
                                             United States Attorney

                                             SUSAN K. RUDY
                                             Assistant Director
                                             Federal Programs Branch

                                             [*signature block continued on next page*]

---

[15] The considerations discussed in defendants' brief and in this Statement of Interest also strongly support dismissal on the separate and independent ground of lack of ripeness, regardless of whether or not the statutory review scheme, in and of itself, precludes jurisdiction per se.   See Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) (purpose of ripeness doctrine is to "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties"); Sabre, Inc. v. Dep't of Transp., 429 F.3d 1113, 1119 (D.C. Cir. 2005) ("Determining whether administrative action is ripe for judicial review requires a court to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."); Arthur Andersen v. SEC, No. 76C-2832, 1978 WL 1073, *7 (N.D. Ill. Mar. 1978) ("We look unfavorably on the fact that plaintiff bypassed the administrative procedures and sought to bring the question of validity of [accounting standards release] before the court prematurely.").

      __/s/ Robert J. Katerberg_____
      ROBERT J. KATERBERG (D.C. Bar No. 466325)
      MARC A. PEREZ
      Trial Attorneys
      U.S. Department of Justice
      Civil Division, Federal Programs Branch
      Mailing Address
      P.O. Box 883
      Washington, DC 20044
      Delivery Address
      20 Massachusetts Avenue, N.W., Room 6112
      Washington, D.C. 20001
      Telephone:    (202) 616-8298
      Facsimile:    (202) 616-8460
      Robert.Katerberg@usdoj.gov

      Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June 2006, I caused a copy of the foregoing

Statement of Interest to be served by (1) electronic mail and (2) first-class United States mail

upon the following:

> Michael A. Carvin
> Noel J. Francisco
> Christian G. Vergonis
> JONES DAY
> 51 Louisiana Avenue, N.W.
> Washington, D.C. 20001-2113
> macarvin@jonesday.com
> njfrancisco@jonesday.com
> cvergonis@jonesday.com
>
> Counsel for Plaintiffs
>
>
> Joe R. Caldwell
> Stephen L. Braga
> Jeffrey Lamken
> BAKER BOTTS, L.L.P.
> The Warner Building
> 1299 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004
> joe.caldwell@bakerbotts.com
> stephen.braga@bakerbotts.com
> jeffrey.lamken@bakerbotts.com
>
> Counsel for Defendants

> /s/ Robert J. Katerberg
> Robert J. Katerberg
> Attorney for the United States

-30-