IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
FREE ENTERPRISE FUND *et al.*           )
                                        )
              Plaintiffs,               )
                                        )
       v.                               )       Civil Action No. 1:06-cv-00217-JR
                                        )
THE PUBLIC COMPANY ACCOUNTING           )
OVERSIGHT BOARD *et al.*                )
                                        )
              Defendants.               )
_____)


### PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Viet D. Dinh (D.C. Bar No. 456608)          Michael A. Carvin (D.C. Bar No. 366784)
Wendy Keefer                                 Noel J. Francisco (D.C. Bar No. 464752)
BANCROFT ASSOCIATES PLLC                     Christian G. Vergonis (D.C. Bar No. 483293)
601 13th Street, N.W.                        JONES DAY
Suite No. 930 South                          51 Louisiana Avenue, N.W.
Washington, D.C. 20005                       Washington, D.C. 20001-2113
(202) 234-0090                               (202) 879-3939
(202) 234-2806 (fax)                         (202) 626-1700 (fax)


Sam Kazman (D.C. Bar No. 946376)             Kenneth W. Starr (D.C. Bar No. 273425)
Hans Bader (D.C. Bar No. 466545)             24569 Via De Casa
COMPETITIVE ENTERPRISE INSTITUTE             Malibu, CA 90265
1001 Connecticut Avenue, N.W.                (310) 506-4621
Suite 1250
Washington, D.C. 20036                        *Attorneys for Plaintiffs Free Enterprise Fund*
(202) 331-1010 (fax)                          *and Beckstead and Watts, LLP*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 3

    A.    The Sarbanes-Oxley Act and the Public Company Accounting Oversight Board.................................................................................................................... 3

    B.    Plaintiffs ................................................................................................................. 7

          1.    Beckstead and Watts ................................................................................ 7

          2.    Free Enterprise Fund ................................................................................ 8

    C.    Plaintiffs' Claims ................................................................................................. 8

SUMMARY OF ARGUMENT ............................................................................................. 9

ARGUMENT ....................................................................................................................... 11

I.    THE SARBANES-OXLEY ACT DOES NOT REQUIRE PLAINTIFFS TO PURSUE THEIR CONSTITUTIONAL CLAIMS THROUGH THE ADMINISTRATIVE-REVIEW PROCESS ........................................................ 11

    A.    An Implicitly Exclusive Administrative-Review Mechanism Does Not Preclude Federal-Court Jurisdiction Over Constitutional Challenges to the Very Source of the Agency's Authority ................................................. 11

    B.    This Lawsuit Involves a Facial Constitutional Challenge That Is Wholly Collateral to the Sarbanes-Oxley Act's Review Provisions .................................. 19

    C.    No Logical Purpose Is Served by Requiring Administrative Review Here........... 29

II.    PLAINTIFFS HAVE A CAUSE OF ACTION TO PREVENT ONGOING CONSTITUTIONAL VIOLATIONS THROUGH THE EQUITABLE REMEDIES OF AN INJUNCTION AND DECLARATORY RELIEF........................... 33

III.    PLAINTIFFS HAVE STANDING................................................................................. 37

CONCLUSION ................................................................................................................... 43

# TABLE OF AUTHORITIES

## CASES[*]

*American Coalition for Competitive Trade v. Clinton*, 128 F.3d 761 (D.C. Cir. 1997) ...............24

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967).................................................16, 18, 26, 32

*Adelphia Communications Corp. v. FCC*, 88 F.3d 1250 (D.C. Cir. 1996)...................................17

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984).................9, 17, 20, 21, 22, 25, 29, 30, 40, 41

*Bell v. Hood*, 327 U.S. 678 (1946)................................................................................................34

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
    403 U.S. 388 (1971)...............................................................................................34, 36

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................................................37, 40

*Bush v. Lucas*, 462 U.S. 367 (1983) ...................................................................................35, 36

*Carlson v. Green*, 446 U.S. 14 (1980) ........................................................................................35

*Cellco Partnership v. FCC*, 357 F.3d 88 (D.C. Cir. 2004).........................................................37

*Central Florida Enterprises, Inc. v. FCC*, 683 F.2d 503 (D.C. Cir. 1982) ................................38

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).................................................36

*Committee for Monetary Reform v. Board of Governors of Federal Reserve System*,
    766 F.2d 538 (D.C. Cir. 1985) ............................................................................38, 41, 42

*Compensation Department of District Five v. Marshall*, 667 F.2d 336 (3d Cir. 1981) ...............11

*Competitive Enterprise Institute v. National Highway Traffic Safety Administration*,
    901 F.2d 107 (D.C. Cir. 1990) ............................................................................................39

*Continental Air Lines, Inc. v. Department of Transportation*,
    843 F.2d 1444 (D.C. Cir. 1988) ....................................................................16, 17, 26, 29

*Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) ..............................................34, 36

*Crawford-El v. Britton*, 93 F.3d 813 (D.C. Cir. 1996), *rev'd on other grounds*,
    523 U.S. 574 (1998)...........................................................................................33, 35

---

[*] Authorities on which Plaintiffs chiefly rely are marked by an asterisk.

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988) ....................................................36

*Davis v. Passman*, 442 U.S. 228 (1979) .....................................................................35

*Davis Broadcasting Inc. v. FCC*, 63 F. App'x 526 (D.C. Cir. 2003) ............................................28

*Federal Election Commission v. NRA Political Victory Fund*,
        6 F.3d 821 (D.C. Cir. 1993) ......................................................................41, 42

*First Jersey Securities, Inc. v. Bergen*, 605 F.2d 690 (3d Cir. 1979) ...............................12, 16, 29

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ...........................................................35

*General Electric Co. v. EPA*, 360 F.3d 188 (D.C. Cir. 2004) .....13, 14, 18, 19, 24, 25, 28, 29, 30

*General Electric Co. v. Whitman*,
        257 F. Supp. 2d 8 (D.D.C. 2003), *rev'd*, 360 F.3d 188 (D.C. Cir. 2004) ........................13

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995) ...................................................17

*Harmon v. Brucker*, 355 U.S. 579 (1958) ...................................................................34

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) ............................................28

*Johnson v. Robison*, 415 U.S. 361 (1974) .........................................................12, 23, 29

*Lebron v. National Railway Passenger Corp.*, 513 U.S. 374 (1995) ..............................................4

*Local Union No. 12004 v. Massachusetts*, 377 F.3d 64 (1st Cir. 2004) .........................................33

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ...........................................................2

*Marchiano v. National Association of Securities Dealers, Inc.*,
        134 F. Supp. 2d 90 (D.D.C. 2001) .............................................................15, 16

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......................................................12, 30, 31

*McNary v. Haitian Refugee Center Inc.*, 498 U.S. 479 (1991) .......................12, 18, 19, 24, 25

*Murrhee v. Principi*, 364 F. Supp. 2d 782 (C.D. Ill. 2005) ...................................................15

*National Juvenile Law Center, Inc. v. Regnery*, 738 F.2d 455 (D.C. Cir. 1984) .................................35

*National Mining Association v. Department of Labor*,
        292 F.3d 849 (D.C. Cir. 2002) ....................................13, 14, 15, 23, 24, 25, 27, 28

- iii -

*National Taxpayers Union v. Social Security Administration*,
    376 F.3d 239 (4th Cir. 2004), *cert. denied*, 543 U.S. 1146 (2005) ........................12, 15, 24

*National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) ....................................39

*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997) .................................................37

*Northwestern Indiana Telephone Co. v. FCC*, 872 F.2d 465 (D.C. Cir. 1989) ............................17

*Pharmaceutical Research & Manufacturers America v. Thompson*,
    362 F.3d 817 (D.C. Cir. 2004) .......................................................................................38

*Philadelphia Co. v. Stimson*, 223 U.S. 605 (1912) ........................................................................34

*Planned Parenthood v. Sanchez*, 403 F.3d 324 (5th Cir. 2005) ...................................................37

*Public Citizen Health Research Group v. Commissioner, F.D.A.*,
    740 F.2d 21 (D.C. Cir. 1984) .........................................................................................28

*Public Citizen v. FTC*, 869 F.2d 1541 (D.C. Cir. 1989) ................................................................39

*Rhode Island Department of Environmental Management v. United States*,
    304 F.3d 31 (1st Cir. 2002) ............................................................................................15

*Reuss v. Balles*, 584 F.2d 461 (D.C. Cir. 1978) ......................................................................41, 42

*Rickert Rice Mills, Inc. v. Fontenot*, 297 U.S. 110 (1936) ............................................................34

*SEC v. Waco Financial, Inc.*, 751 F.2d 831 (6th Cir. 1985) ..........................................................16

*Seminole Tribe v. Florida*, 517 U.S. 44 (1996) ............................................................................36

*Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963 (D.C. Cir. 1990) .........18

*Sturm, Ruger & Co. v. Chao*, 300 F.3d 867 (D.C. Cir. 2002) ......................................................12

*Thomas v. Union Carbide Agriculture Products Co.*, 473 U.S. 568 (1985)....................16, 20, 25

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)....................11, 12, 13, 15, 22, 23, 27, 32

*Ticor Title Insurance Co. v. FTC*, 814 F.2d 731 (D.C. Cir. 1987) ..........................................17, 21

*Time Warner Entertainment Co., L.P. v. FCC*,
    93 F.3d 957 (D.C. Cir. 1996)....................................................9, 14, 19, 23, 24, 25, 28, 29

*Verizon Maryland Inc. v. Public Service Commission*, 535 U.S. 635 (2002)................................36

*Webster v. Doe*, 486 U.S. 592 (1988) ........................................................................23

*Weinberger v. Salfi*, 422 U.S. 749 (1975) .......................................................23, 24, 29

*Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411 (1965) ...................11

**Ex parte Young*, 209 U.S. 123 (1908).....................................................26, 32, 33, 36

## STATUTES AND RULES

15 U.S.C. § 78s ............................................................................................15, 26

15 U.S.C. § 78y ............................................................................................15, 26

15 U.S.C. § 78ff ...................................................................................................5

Sarbanes-Oxley Act of 2002 (codified at 15 U.S.C. §§ 7201 *et seq.*) ................................. *passim*

    § 3, 15 U.S.C. § 7202............................................................................................5

    § 101, 15 U.S.C. § 7211............................................................................................1, 4

    § 102, 15 U.S.C. § 7212............................................................................................4, 7

    § 103, 15 U.S.C. § 7213............................................................................................4

    § 104, 15 U.S.C. § 7214............................................................................................5, 7

    § 105, 15 U.S.C. § 7215............................................................................................5, 6

    § 107, 15 U.S.C. § 7217............................................................................4, 22, 26, 30

    § 109. 15 U.S.C. § 7219............................................................................................6

28 U.S.C. § 2201 ................................................................................................37

PCAOB Rule 7101................................................................................................6

## MISCELLANEOUS

13B Charles A. Wright *et al.*, *Federal Practice & Procedure: Jurisdiction* 2d § 3566
    (2006 Supp.)................................................................................................33

**INTRODUCTION**

As part of the Sarbanes-Oxley Act of 2002 ("Act" or "SOX"), Congress created the Public Company Accounting Oversight Board ("PCAOB" or "Board") to "oversee the audit of public companies that are subject to the securities laws." SOX § 101(a), 15 U.S.C. § 7211(a). In furtherance of this goal, Congress vested the Board with broad governmental powers, including the power to enact binding auditing standards, to inspect and investigate public-company auditors, to enforce compliance with its auditing standards and the federal securities laws through adjudication and the levying of sanctions, and to fund its own operations by fixing and levying a tax on the nation's public companies.

Plaintiffs are Beckstead & Watts, LLP ("Beckstead"), a public-company accounting firm that is subject to the regulatory authority of the Board, and the Free Enterprise Fund ("FEF"), a public-interest organization that promotes economic growth and limited government and whose members are variously subject to the Board's taxing power and regulatory authority. In this facial constitutional challenge to the creation and empowerment of the Board, Plaintiffs allege that Congress violated three separate aspects of the constitutional doctrine of separation of powers: it improperly immunized the Board's exercise of executive power from presidential control and supervision; it provided for the appointment of Board members in a manner that contravenes the Constitution's Appointments Clause; and it improperly delegated to the Board quintessentially legislative powers, including the power to tax. Plaintiffs seek a declaratory judgment that these aspects of the Act are unconstitutional and an injunction preventing the Board and its members from asserting any of its governmental powers against Beckstead and FEF's members.

Seeking to avoid the merits of these claims, Defendants contend that the Act evinces a congressional intent to require any and all claims against the Board — including this facial

constitutional challenge to the very authority of Congress to create and empower the Board — to be brought pursuant to the administrative-review mechanism set forth in the Act, and that, in any event, Plaintiffs lack a cause of action to challenge the constitutionality of the Act. According to Defendants, in other words, a broad facial constitutional challenge to the Board's creation can *never* be initiated in federal district court by an entity injured by the Board's conduct. Rather, that entity must first wait for — or manufacture — a dispute concerning some specific action taken by the Board and then raise its facial constitutional claim only in connection with the particularized administrative review of that specific action.

Under Defendants' radical approach to the adjudication of constitutional grievances, unelected congressional designees, rather than Article III courts, would entertain and resolve constitutional challenges to their own authority. Such a system would be unimaginable to those who established the independent judiciary as an essential bulwark of constitutional government and constant guardian of the rule of law. And, indeed, it is not our system. To the contrary, from the earliest days of our constitutional republic, the enduring message has been and continues to be that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This case — presenting a facial constitutional challenge to an act of Congress — is for the courts and the courts alone to resolve.

The regime proffered by Defendants also makes no sense, for requiring administrative review in a case like this would serve no logical purpose: the relevant administrative agencies have no expertise over and, indeed, no authority to answer the constitutional questions posed by a facial challenge to the Act; there is no factual record to be developed by agency review; and

there are no non-constitutional grounds that might resolve Plaintiffs' grievances and thereby moot their constitutional claims.

Quite predictably, nothing in the law requires the absurd, wasteful regime advanced by Defendants. A wealth of binding Supreme Court and D.C. Circuit precedents makes clear that facial or systemic challenges to agency authority — including, especially, structural constitutional challenges to the statute creating and empowering the agency — are not barred by a comprehensive administrative scheme where, as here, they are "wholly collateral" to any such scheme. In such cases, the injuries that flow from the structural violation cannot possibly be remedied through the administrative process regardless of how those proceedings are resolved, and so no court requires a plaintiff to undertake such a pointless, futile effort. Defendants simply ignore this tsunami of precedent, relying instead on decisions requiring the exclusive use of administrative remedies to resolve the sort of as-applied or particularized challenges to agency action that are not at issue here.

Finally, it has long been settled that an action for declaratory and injunctive relief against the challenged agency and its officers in their official capacities is an appropriate mechanism for challenging government action alleged to be outside the scope if the actor's constitutional authority. Accordingly, there is no obstacle to this Court addressing the merits of Plaintiffs' claims.

## STATEMENT OF FACTS

### A.    The Sarbanes-Oxley Act and the Public Company Accounting Oversight Board

In reaction to the highly publicized accounting scandals involving Enron and other public companies, Congress enacted the Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7201 *et seq.* Among other things, the Act subjects public-company accounting firms to the regulatory

authority of a new organization, the Public Company Accounting Oversight Board. Though putatively private, SOX § 101(b), 15 U.S.C. § 7211(b), the PCAOB is in fact an agency or instrumentality of the United States under the standards set forth in *Lebron v. National Railway Passenger Corp.*, 513 U.S. 374 (1995), and its governing members (the individual Defendants here) are officers of the United States. Compl. ¶¶ 87-88.

In the Act, Congress delegated to the Board numerous incidents of government power, some — but not all — of which are subjected to minimal and deferential review by the Securities Exchange Commission ("SEC"). The most significant of these for purposes of the instant lawsuit are:

*Mandatory Registration.* The Act makes it unlawful for any entity to engage in the auditing of public companies without submitting to the authority of the PCAOB by (i) filing a detailed application, *see* SOX § 102(b)(2), 15 U.S.C. § 7212(b)(2); (ii) filing periodic reports, *see* SOX § 102(d), 15 U.S.C. § 7212(d); and (iii) paying annual fees to the Board, *see* SOX § 102(f), 15 U.S.C. § 7212(f). While the Act provides for review by the SEC of decisions disapproving an application for registration, *see* SOX §§ 102(c)(2), 107(c), 15 U.S.C. §§ 7212(c)(2), 7217(c), it provides no mechanism for administrative review of the obligation to submit to the regulatory authority of the Board.

*Binding Auditing Standards.* The Act gives the PCAOB broad authority to make rules, including auditing and related attestation standards, quality control standards, ethics standards, and auditor-independence requirements, "as may be necessary or appropriate in the public interest or for the protection of investors." SOX § 103, 15 U.S.C. § 7213. The PCAOB has exercised this authority by promulgating numerous rules and auditing standards that impose specific and substantial new duties on registered accounting firms. *See* Compl. ¶¶ 62-63. These

burdensome standards have imposed substantial compliance costs on registered accounting firms and their public-company clients.  *Id.* ¶ 64.

A registered entity's violation of the Board's rules and standards subjects that entity to disciplinary actions by the Board or the SEC.  *See* SOX § 105(c)(4), 15 U.S.C. § 7215(c)(4).  Moreover, the willful violation thereof can subject a regulated entity to severe criminal sanctions.  In particular, the Act provides that the Board's rules "shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934" and that the person committing such violation "shall be subject to the same penalties, and to the same extent, as for a violation of that Act."  SOX § 3(b), 15 U.S.C. § 7202(b).  The Securities Exchange Act in turn provides for criminal sanctions, including up to twenty years in prison, for willful violations of its provisions.  *See* 15 U.S.C. § 78ff.

*Inspections of Registered Firms*.  The Act delegates to the Board the authority to undertake burdensome inspections of public accounting firms.  SOX § 104, 15 U.S.C. § 7214.  The Board is also empowered to issue interim reports publicizing deficiencies that it finds during its inspections.  SOX § 104(g), 15 U.S.C. § 7214(g).  While a registered accounting firm may seek review by the SEC if it disagrees with the PCAOB's assessments, SOX § 104(h)(1), 15 U.S.C. § 7214(h)(1), any ensuing decision of the SEC "shall not be reviewable" by any court, SOX § 104(h)(2), 15 U.S.C. § 7214(h)(2).  Moreover, the Act provides no mechanism of administrative review for an accounting firm that objects to the burdens of Board inspections where the firm does not disagree with the findings of the inspection report or where the inspection does not reveal any deficiencies.

*Investigations and Disciplinary Proceedings*.  The Act grants the Board the power to conduct investigations of any act or practice by a registered accounting firm that "may violate"

the Act, the rules of the Board, the federal securities laws or professional standards.  SOX § 105(b)(1), 15 U.S.C. § 7215(b)(1).  In conducting such an investigation, the Board is empowered to require testimony and documents, including audit work papers, from a registered firm.  SOX § 105(b)(2), 15 U.S.C. § 7215(b)(2).  If the Board determines that there has been a violation, it may impose such disciplinary or remedial sanctions as it determines appropriate, including the temporary suspension or permanent revocation of an accounting firm's registration or an associated person's right to further association with any registered firm; civil monetary penalties of up to $2,000,000 for inadvertent violations and up to $15,000,000 for knowing or reckless violations; and "any other appropriate sanction provided for in the rules of the Board."  SOX § 105(c)(4), 14 U.S.C. § 7215(c)(4).

*Taxation*.  The Act also grants the Board the extraordinary power to set its own budget and fund its own activities by levying a tax on public companies.  In particular, the Act gives the Board the power to establish a budget for each fiscal year, while providing no guidance as to or statutory cap on the size of the budget.  SOX § 109(b), 15 U.S.C. § 7219(b).  The Act then provides that funds to cover the Board's annual budget are to be payable from an annual tax, called an "accounting support fee," levied upon public companies pursuant to standards established by the Board.  SOX § 109(c)-(d), 15 U.S.C. § 7219(c)-(d).  The failure by a public company to pay the tax constitutes a violation of Section 13(b)(2) of the Securities Exchange Act of 1934, as amended by the Act.  *See* SOX § 109(h), 15 U.S.C. § 7219(h).  The Board has exercised its authority under these provisions by promulgating a rule that levies this tax on some, but not all, of the nation's public companies.  *See* PCAOB Rule 7101.

### B.     Plaintiffs

#### 1.     Beckstead and Watts

Plaintiff Beckstead and Watts is a Nevada accounting firm whose auditing business has traditionally focused on development stage companies, which generally have no operations, limited assets, and very small market capitalizations.  Compl. ¶¶ 69-70.  Because its clients are issuers as defined in the Act, Beckstead duly registered with the Board pursuant to Section 102 of the Act, 15 U.S.C. § 7212, and undertook to comply with the auditing requirements promulgated by the Board.  *See* Compl. ¶ 71.  Such compliance caused substantial increases in the time and expense of Beckstead's public company audits.  *Id.* ¶ 72.  For example, the Board's standards have added numerous steps to the conduct of audits as well as documentation requirements above those imposed by earlier professional standards.  *Id.*  Because its typical audit clients are generally too small to absorb increased audit costs, Beckstead and Watts lost many clients and substantial profits soon after the Board promulgated its new standards.  *Id.* ¶ 73.

Pursuant to Section 104 of the Act, 15 U.S.C. § 7214, PCAOB inspectors conducted an inspection of Beckstead in May 2004.  *See* Compl. ¶ 74.  As set forth in a draft inspection report, the Board concluded that there were various weaknesses and deficiencies in Beckstead's audit engagements and quality control system.  *Id.* ¶¶ 75-76.  In an effort to cooperate with the Board, Beckstead undertook to improve its compliance with PCAOB rules by reducing the number of its audit clients from over sixty to just over ten.  *Id.* ¶ 77.  This reduction in client base led to an even further reduction in Beckstead and Watts's revenues and profits.  *Id.*

On September 28, 2005, the Board issued a final report based on the May 2004 inspection.  *Id.* ¶ 78.  This report requires Beckstead to address the Board's concerns to the Board's satisfaction within twelve months of its issuance.  *Id.*  Notwithstanding Beckstead's

efforts to remedy the deficiencies and limit its audit practice, the Board commenced a formal investigation of the firm as it issued its final report.  *Id.* ¶ 79.  The Board has also published a redacted version of this report on its website, thereby damaging Beckstead's professional reputation.  *Id.* ¶ 80.

### 2.    Free Enterprise Fund

Plaintiff FEF is a non-profit public-interest organization under Section 501(c)(4) of the Internal Revenue Code.  Compl. ¶ 11.  FEF promotes economic growth, lower taxes, and limited government through television and radio issue advertising campaigns, providing timely and tactical policy guidance to members of Congress and publishing strategic game plans on vital economic and fiscal issues.  *Id.*  Certain of FEF's members are directly injured by the regulations imposed by the Board.  *Id.*  These include public companies that are subject to and have been forced to pay the Board's "accounting support fee" tax, as well as public company auditors who, like Beckstead, are subject to the regulatory authority of the Board and have been burdened by the costs of compliance.

### C.    Plaintiffs' Claims

Plaintiffs' lawsuit is a facial challenge to the provisions of the Sarbanes-Oxley Act creating and empowering the Board.  None of the allegations in the complaint seeks to challenge the decisions of the Board or the manner in which the Board has carried out its authority.  Rather, the complaint makes three principal claims:  (i) that the Act violates the constitutional doctrine of separation of powers because it permits the Board to exercise executive power without adequate presidential supervision and control; (ii) that the Act's method for the appointment of PCAOB members is inconsistent with the methods required by the Appointments Clause of the Constitution for the appointment of officers of the United States; and (iii) that the Act improperly delegates legislative powers to the Board.   *See* Compl. ¶¶  81-95.  Plaintiffs seek a declaratory

judgment declaring those provisions of the Act unconstitutional and an injunction enjoining the Board and its members from carrying out any of the powers unconstitutionally granted to them by the Act. *See id.* at 23.

## SUMMARY OF ARGUMENT

There is no merit to Defendants' contention that this Court lacks the authority to adjudicate this lawsuit.

First, although there is no statutory language expressly barring this action, Defendants contend that the administrative-review system established by the Sarbanes-Oxley Act is sufficiently comprehensive to *implicitly* require all claims involving the PCAOB to be resolved within that system. It is well settled, however, that where a plaintiff brings claims against an agency that are wholly collateral to a statute's administrative-review provisions and involve issues outside the agency's expertise, the plaintiff is not required to resort to the statutory review mechanism. And it is equally well settled that constitutional claims challenging the very basis of the agency's authority — including separation-of-powers and Appointments Clause claims of the sort asserted by Beckstead and FEF here — constitute just such a collateral challenge. *See Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984). A plaintiff is required to use an implicitly exclusive administrative-review mechanism, by contrast, only when seeking to resolve the sort of particularized, as-applied challenges to agency action not at issue here.

Common sense, moreover, dictates this "necessary distinction." *Time Warner Entm't Co., L.P. v. FCC*, 93 F.3d 957, 965 (D.C. Cir. 1996) (per curiam). An agency established to administer a particular regulatory regime and to apply its special expertise in carrying out a statutory mandate is by definition unsuited to resolve antecedent questions concerning Congress's authority to create and empower that agency. Similarly, a review mechanism designed to resolve whether agency *action* violates statutory (or even related constitutional)

norms is inherently ill-equipped to resolve fundamental questions about the constitutionality of an agency's *structure*, which do not turn on the lawfulness or propriety of any such agency *action*. It would therefore be quite illogical to deem such a mechanism the exclusive means of resolving such issues, thereby foreclosing the district-court injunctive action that is both perfectly designed to, and the traditional method for, resolving such issues. Consequently, it is quite impossible to infer that Congress intended to erect such an unwieldy regime that accomplishes nothing but wholly unnecessary delay, particularly where, as here, there is absolutely no legislative history suggesting such a gratuitous barrier to adjudication of important constitutional values.

Second, there is also no merit to Defendants' contention that the lawsuit must be dismissed because Plaintiffs have failed to identify a statutory cause of action authorizing suit against the Board and its members. No statutory cause of action is necessary here because Plaintiffs' complaint exclusively seeks equitable relief for constitutional violations, and it has been settled for over a century that the Constitution itself provides a cause of action to enjoin ongoing constitutional violations.

Finally, Defendants' partial objections to Plaintiffs' standing also lack merit. The Free Enterprise Fund has standing to bring this lawsuit on behalf of its members because those members are suffering concrete injuries as a result of the Board's conduct. And, as Defendants do not object to Beckstead's standing generally, or Beckstead's standing to bring an Appointments Clause claim in particular, their objection to Beckstead's "standing" to make certain arguments in support of that claim is without merit.

**ARGUMENT**

**I.    THE SARBANES-OXLEY ACT DOES NOT REQUIRE PLAINTIFFS TO PURSUE THEIR CONSTITUTIONAL CLAIMS THROUGH THE ADMINISTRATIVE-REVIEW PROCESS**

The separation-of-powers and Appointments Clause claims asserted in this case constitute a facial constitutional challenge to the very basis of the PCAOB's authority. As such, these claims are wholly collateral to the Sarbanes-Oxley Act's administrative-review mechanism and wholly outside the expertise of the PCAOB and the SEC. For this reason, the claims are not of the type that Congress would have wanted reviewed pursuant to that statutory review scheme.

**A.    An Implicitly Exclusive Administrative-Review Mechanism Does Not Preclude Federal-Court Jurisdiction Over Constitutional Challenges to the Very Source of the Agency's Authority**

Defendants correctly observe that a claimant is required to use a statutory administrative-review mechanism to resolve his grievance with an agency where an intent to allocate review of that grievance to the administrative mechanism is "fairly discernible in the statutory scheme." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (internal quotation marks omitted); *see also Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411 (1965). The Supreme Court has emphasized, however, that even where Congress has established a comprehensive administrative review structure meant to be exclusive, district-court jurisdiction over claims challenging agency action is precluded *only* to the extent that the claims asserted "are *of the type* that Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212 (emphasis added).[1] And, as *Thunder Basin* itself noted, it is well-

---

[1] Because an exclusive administrative-review scheme serves to allow the agency to apply its special expertise in carrying out a statutory mandate, the type of claims generally precluded by such a scheme are particularized, as-applied challenges to the manner in which an agency exercises its authority or the manner in which agency action is reviewed. These include disputes relating to the grant or denial of benefits, *see, e.g.*, *Compensation Dep't of Dist. Five v. Marshall*, 667 F.2d 336, 340-44 (3d Cir. 1981); approvals needed for operating a business, *see, e.g.*,

established that claims that are "wholly collateral to a statute's review provisions and outside the

agency's expertise" are *not* of the type precluded by an implicitly exclusive administrative-

review mechanism. *Thunder Basin*, 510 U.S. at  212-13 (internal quotation marks omitted).

      Principal among the types of "wholly collateral" claims that remain within the district

court's jurisdiction are facial constitutional challenges.  *See, e.g.*, *McNary v. Haitian Refugee*

*Ctr. Inc.*, 498 U.S. 479, 492 (1991) (district court not deprived of jurisdiction over "general

collateral challenges to unconstitutional practices and policies used by the agency"); *Mathews v.*

*Eldridge*, 424 U.S. 319, 330 (1976) (upholding district-court jurisdiction over plaintiff's

constitutional challenge to administrative-review proceedings because that "constitutional

challenge is entirely collateral to [plaintiff's] substantive claim of entitlement"); *Johnson v.*

*Robison*, 415 U.S. 361, 373 (1974) (finding, despite exclusive administrative-review mechanism,

no preclusion of "judicial cognizance of constitutional challenges to veterans' benefits

legislation").  Indeed, Defendants are unable to cite a *single case* in which an administrative-

review mechanism has been held to implicitly preclude claims of this sort.  *Thunder Basin* not

only makes clear that the Court was in no way modifying or altering these earlier holdings, but

expressly reaffirms that district courts have "jurisdiction over claims considered wholly

_____

(continued…)

*Whitney Nat'l Bank*, 379 U.S. at 420; the imposition of civil sanctions by the agency for particular instances of alleged misconduct, *see, e.g.*, *Nat'l Taxpayers Union v. Soc. Sec. Admin.*, 376 F.3d 239, 244 n.3 (4th Cir. 2004), *cert. denied*, 543 U.S. 1146 (2005); the particularized circumstances of a specific enforcement proceeding, *see, e.g.*, *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 693 (3d Cir. 1979) (claims relating to alleged agency "bias" against target of enforcement proceeding); and specific agency "enforcement strateg[ies]," *Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 876 (D.C. Cir. 2002).  In *Thunder Basin*, for example, the precluded claims involved the allegation that the agency's acceptance of a particular slate of employee representatives at a particular mine was inconsistent with the applicable statute and with the mine owner's First Amendment rights.  These were precisely the type of claims that Congress intended to be reviewed under that statutory-review mechanism because they fell "squarely within the [administrative agency's] expertise."  510 U.S. at 214.

collateral to a statute's review provisions and outside the agency's expertise," such as "broad

'pattern and practice' challenges to [an administrative] program." *Thunder Basin*, 510 U.S. at

212-13 (internal quotation marks omitted).  In *Thunder Basin* itself, for example, the Court held

district-court jurisdiction precluded only with respect to the plaintiff-employer's two

particularized, as-applied challenges to the designation of particular employee representatives,

but found no impediment to jurisdiction over the plaintiff's facial Due Process challenge to the

administrative-review structure itself.  *See id.* at 216.

    The D.C. Circuit has even more clearly established that administrative-review procedures

do not implicitly preclude district-court jurisdiction over facial constitutional challenges, but

only preclude jurisdiction where "a plaintiff [seeks] to short-circuit the administrative process by

challenging a[n agency's] enforcement position in a district court."  *Nat'l Mining Ass'n v. Dep't*

*of Labor*, 292 F.3d 849, 858 (D.C. Cir. 2002).  In one recent case, for example, a plaintiff

brought a pre-enforcement challenge to the administrative-orders regime established by

CERCLA, contending that the regime violated the Due Process Clause because it failed to

provide a hearing and other procedural safeguards prior to EPA issuance of administrative orders

requiring remediation of hazardous waste sites.  *See Gen. Elec. Co. v. EPA*, 360 F.3d 188 (D.C.

Cir. 2004) (per curiam).  Placing heavy reliance on *Thunder Basin*, the district court had

concluded that CERCLA's exclusive review mechanisms barred the lawsuit.  *See Gen. Elec. Co.*

*v. Whitman*, 257 F. Supp. 2d 8, 17-19 (D.D.C. 2003).  The D.C. Circuit reversed, holding that

district-court jurisdiction obtained because General Electric raised a "facial, or 'systemic,'"

constitutional challenge to the CERCLA regime, as opposed to an "as-applied, or particularized

challenge[]."  *Gen. Elec.*, 360 F.3d at 192.  In so holding, the court emphasized the "distinction"

between "a [constitutional] challenge to the way in which [the agency] is administering the

statute in any particular removal or remedial action or order," which would be precluded, and "a [due process] challenge to the [enabling] statute itself," which is not precluded. *Id.* at 191. "[T]he usual practical considerations counseling against pre-enforcement review," the court noted, "are not present in the adjudication of a facial due process claim." *Id.* at 194.

The D.C. Circuit reached the same conclusion in *Time Warner Entertainment Co., L.P. v. FCC*, 93 F.3d 957, 965 (D.C. Cir. 1996) (per curiam). In that case, the D.C. Circuit held that the district court had jurisdiction to hear claims that certain statutory and regulatory restrictions on cable programming violated the First Amendment, notwithstanding the Communications Act's comprehensive administrative scheme, which vests the court of appeals with jurisdiction to review FCC orders. *See id.* at 964-65. The court reasoned that there is a "*necessary* distinction between a constitutional challenge that is exclusively directed to the source of putative agency authority and a challenge to the manner in which the agency has exercised or . . . failed to exercise that authority." *Id.* at 965 (emphasis added). Requiring the former to be heard by the agency would "do nothing to advance" the policies behind administrative review, the court explained, and therefore such claims would not be subject to the statutorily prescribed review mechanism. *Id.*

Similarly, in *National Mining Association*, the D.C. Circuit considered the government's argument that *Thunder Basin* precluded district court jurisdiction over a claim that various Department of Labor regulations were impermissibly retroactive. *See* 292 F.3d at 858. The court noted that neither *Thunder Basin* nor any of the other cases cited by the government supported preclusion of the district court's jurisdiction because those cases involved attempts by plaintiffs to "short-circuit the administrative process by challenging an [agency] enforcement position in a district court." *Id.* By contrast, the D.C. Circuit explained, the plaintiffs' "broad-

scale attack" on the regulations required the court "to analyze carefully all of the regulations together as well as the entire rulemaking process, which would not be feasible in individual adjudications dealing with particular regulatory provisions." *Nat'l Mining Ass'n*, 292 F.3d at 856, 858. Accordingly, it authorized district-court review even though there was an express mechanism to review any agency order requiring the challenged retroactive payments. *See id.* at 856.

This same "necessary distinction" has been recognized and applied by other courts as well. In one case cited by Defendants, for example, the Fourth Circuit distinguished the sort of particularized, as-applied claims precluded by *Thunder Basin* from "a case in which the plaintiff challenges the validity of the agency's enabling statute in an action wholly independent of the agency's enforcement of a substantive provision." *Nat'l Taxpayers Union*, 376 F.3d at 244 n.3; *see also R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 43 (1st Cir. 2002) ("state's entitlement to sovereign immunity is 'wholly collateral to a statute's review provisions and outside the agency's expertise'" (quoting *Thunder Basin*, 510 U.S. at 212)); *Murrhee v. Principi*, 364 F. Supp. 2d 782, 789 (C.D. Ill. 2005) (distinguishing, for purposes of *Thunder Basin*, between "facial constitutional challenges to the [enabling] statutes themselves" and "challenges [to] the agency's conduct").

Indeed, this distinction has been recognized in cases involving the materially identical administrative-review mechanism established by the Securities Exchange Act for the acts of self-regulatory organizations ("SROs"). *See* Defs.' Mem. at 22 (noting Sarbanes-Oxley Act's incorporation of procedures for SEC review of SROs); 15 U.S.C. §§ 78s(d)(2) & 78y(a)(1). In *Marchiano v. National Association of Securities Dealers, Inc.*, 134 F. Supp. 2d 90 (D.D.C. 2001), for example, this Court was asked to determine whether this administrative-review

mechanism divested the Court of jurisdiction over of the plaintiff's claims that NASD officials were unconstitutionally biased against him.  The Court concluded that jurisdiction was lacking because those claims challenged "the manner in which the agency acted."  *Id.* at 94.  By contrast, the Court explained, it *would* have had jurisdiction if the plaintiff had asserted — like Beckstead and FEF do in this case — "a constitutional challenge to the *enabling statute* by which the agency acts."  *Id.* (emphasis in original); *accord First Jersey Sec.*, 605 F.2d at 693 (finding claims against NASD and its officers precluded because they alleged particularized bias against the plaintiff).  The Sixth Circuit made a similar distinction in *SEC v. Waco Financial, Inc.*, finding a constitutional challenge to an NASD disciplinary proceeding barred because the plaintiffs "question[ed] the constitutionality of procedures followed by an agency and its delegate," rather than "the constitutionality of the Securities Exchange Act" itself.  751 F.2d 831, 834 (6th Cir. 1985).

    This same "necessary distinction" has also been recognized and applied, moreover, in all other contexts in which a defendant claims that there are jurisdictional or similar grounds for requiring a case to proceed before an agency prior to federal-court review.  For example, an Article III challenge to an administrative arbitration mechanism is ripe without the need for submission to the challenged arbitration mechanism because the "Article III injury is not a function of whether the tribunal awards reasonable compensation but of the tribunal's authority to adjudicate the dispute."  *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967).

    Similarly, for purposes of the defense of failure to exhaust administrative remedies, "the distinction" between an objection "based on the statute itself" and one based on an agency's "expansive interpretation of the statute" is "of critical importance," *Cont'l Air Lines, Inc. v.*

*Dep't of Transp.*, 843 F.2d 1444, 1455 (D.C. Cir. 1988), because "facial constitutional arguments . . . are not generally subject to exhaustion requirements," *Nw. Ind. Tel. Co. v. FCC*, 872 F.2d 465, 470 n.3 (D.C. Cir. 1989); *see also Adelphia Commc'ns Corp. v. FCC*, 88 F.3d 1250, 1256 (D.C. Cir. 1996) (for purposes of exhaustion, "a constitutional attack upon a statute need not be raised before the agency"). Thus, in *Andrade v. Lauer*, the D.C. Circuit considered whether a plaintiff was required to exhaust his claim that an agency's exercise of authority was unconstitutional because its members were appointed in a manner inconsistent with the Appointments Clause. 729 F.2d at 1493. Exhaustion was *not* required, the D.C. Circuit concluded, because (i) the constitutional issue was truly separate from the dispute before the agency, such that none of the factual or legal issues resolved in the grievance procedure would aid the court in resolving the constitutional question, and (ii) the constitutional violation was a continuing one because, even if the action at issue was overturned, the officers would continue to hold their offices, allegedly in violation of the Appointments Clause. *Id.* at 1491-93; *see also Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 739 n.11 (D.C. Cir. 1987) (opinion of Edwards, J.) ("where all possible nonconstitutional objections . . . have been eliminated, and the *sole* issue for decision is the constitutionality of a statutory requirement, exhaustion is unnecessary").

In all contexts, therefore, district-court jurisdiction is not precluded if the plaintiff's challenge is not fairly encompassed within the statutory review mechanism. Any ambiguity about the scope of preclusion, moreover, must be resolved in favor of permitting the suit to proceed in district court in light of the longstanding canon that "judicial review of executive action 'will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 424 (1995) (quoting *Abbott Labs.*, 387 U.S. at 140). While this presumption is strongest where the government seeks to

- 17 -

foreclose all judicial review, it applies as well where the government seeks to bar immediate

recourse to the district court in favor administrative procedures that will be followed by judicial

review.  Indeed, on several occasions, the Supreme Court has relied upon the "strong

presumption in favor of judicial review of administrative action," *McNary*, 498 U.S. at 498, to

reject the contention that immediate judicial review of facial constitutional claims was deferred

(rather than barred completely) by a particular statutory scheme.  *See, e.g.*, *id.*; *Abbott Labs.*,

387 U.S. at 139-40.  Accordingly, before this Court may infer "that Congress intended to

preclude pre-enforcement constitutional challenges to the [enabling] statute," Defendants "must

show either that, as a matter of historical fact, Congress did not mean what it appears to have

said, or that, as a matter of logic and statutory structure, it almost surely could not have meant

it." *Gen. Elec.*, 360 F.3d at 193.

  In sum, courts should not infer a congressional intent to preclude district-court

jurisdiction over constitutional claims where administrative review would stand as an

unnecessary barrier that impedes, rather than facilitates, judicial review.  This is not to suggest

that constitutional claims can never be barred by an implicitly exclusive administrative-review

scheme.  It is to say, rather, that such claims are precluded only where they themselves involve,

or are intertwined with, particularized challenges to specific agency actions or orders.  Thus,

"[w]hen the statutory and constitutional claims are 'premised on the same facts' and the

[statutory] remedy 'would have been fully effective in remedying the constitutional violation,'"

resort to the statutory remedy is required.  *Steadman v. Governor, U.S. Soldiers' & Airmen's

Home*, 918 F.2d 963, 967 (D.C. Cir. 1990) (quoting *Andrade*, 729 F.2d at 1493).  But where the

constitutional issue is separate from the statutory issues, use of the administrative review

mechanism will not be required.

As we presently show, Plaintiffs' claims here cannot possibly be viewed as anything but "separate" from any statutory review challenge because (1) they are premised on entirely different facts than, and otherwise wholly unrelated to, any administrative challenge under the statutory mechanism; (2) there is no current controversy sufficient to trigger the administrative-review mechanism, and it is entirely speculative whether there ever will be one; and (3) the administrative mechanism cannot moot the relief sought here because any favorable determination that Beckstead complied with the Board's auditing standards will not eliminate even that Plaintiff's more fundamental challenge to the Board's ability to regulate it at all.

**B.** **This Lawsuit Involves a Facial Constitutional Challenge That Is Wholly Collateral to the Sarbanes-Oxley Act's Review Provisions**

In view of the necessary distinction between a challenge to particularized agency action and a challenge to the constitutionality of the creation and empowerment of the agency, and given the presumption in favor of judicial review, there is simply no doubt that this Court has jurisdiction over this case.

As described above, Plaintiffs' claims consist solely of facial separation-of-powers, Appointments Clause, and non-delegation challenges to the very authority of the Board to act. Unlike a challenge to the manner in which the PCAOB has exercised its regulatory authority in any one particular instance, this case takes aim at *the very source of the PCAOB's authority to do anything at all*. Thus, the challenge here is the paradigmatic example of one that is inherently collateral to the statutory review mechanism because it is a structural challenge that has nothing to do with "the *manner* in which the agency has exercised" its statutory authority, but focuses exclusively on *who* is exercising the statutory power. *Time Warner*, 93 F.3d at 965 (emphasis added). Indeed, this is a far easier case than *McNary*, *General Electric*, *Time Warner*, and like authorities, because, unlike those cases, there is no allegation that the agency's *action* violates

substantive constitutional rights such as free speech or due process. The challenge, rather, is that the entity designated by the statute cannot, consistent with the Constitution, exercise any regulatory authority, *regardless* of whether its "manner" of regulation conforms with statutory and constitutional substantive provisions.

Since, as noted, district-court challenges even to agency *conduct* are permissible if brought as a facial challenge to the enabling statute (*i.e.*, where the statute mandates the challenged conduct), it follows *a fortiori* that a statutory challenge wholly unrelated to whether agency conduct is lawful, but relating exclusively to who performs the statutorily assigned tasks, is permissible. In such cases, the challenge is even further removed from any issues that the statutory mechanism was designed or is equipped to resolve. Because, as in *Thomas*, Plaintiffs' alleged "injury is not a function of" *how* the allegedly improper decisionmaker resolves disputed issues, "but of the [decisionmaker's] authority" under the Constitution to exercise the statutorily granted power, no rational purpose would be served by going through an adjudicatory procedure that presupposes the administrative agency's authority to resolve the dispute. *Thomas*, 473 U.S. at 580.

*Andrade* is particularly instructive in this regard. There, the D.C. Circuit held that the plaintiff employees' statutory challenge to allegedly unlawful layoffs had to first be presented through the statutorily created administrative-review mechanism. 729 F.2d at 1488. It further noted that certain constitutional claims, such as equal protection or First Amendment challenges to employee dismissals, also had to be processed through that administrative mechanism because there was substantial overlap between those constitutional claims and the statutory requirement permitting dismissals only for "just cause." *Id.* at 1492. But it found that the plaintiffs' *Appointments Clause* challenge could proceed directly to federal district court because a

"constitutional claim of this type" had nothing to do with the merits of the layoff decision, but went to *who* made that decision, thus implicating "important principles concerning the relative influence of the Legislative and Executive Branches over carrying out of this country's laws." *Id.* at 1491. This "almost complete divergence between the constitutional and non-constitutional claims renders irrelevant" the purposes for using the statutorily-created administrative mechanism. *Id.* at 1492. This was true even though, unlike here, the required administrative proceeding on the ripe statutory claims could provide full relief and therefore avoid a "possibly needless decision of constitutional questions." *Id.*[2] This was because "the constitutional violation pleaded by [the plaintiffs] is a continuing one, and even granting relief to these [plaintiffs] would not preclude the same issue arising with respect to other acts of [the government defendants]." *Id.* at 1493. Accordingly, the D.C. Circuit authorized the Appointments Clause challenge to be brought in district court because "the constitutional question is clear and depends on facts almost entirely unrelated to the facts upon which the non-constitutional claims are based." *Id.*

In short, while substantive constitutional issues do overlap to a certain extent with the factual and other issues presented in a typical case subject to a statutory review mechanism, separation of powers challenges are inherently collateral and unrelated to those sorts of issues. For essentially the same reason, unlike those cases where the statutory and constitutional claims

---

[2] Some have suggested, contrary to *Andrade*, that a plaintiff must pursue even a separation-of-powers challenge in an agency adjudication where that challenge is inextricably intertwined with non-constitutional issues in an ongoing agency adjudication that can resolve the dispute. *See Ticor Title Ins. Co.*, 814 F.2d at 741-42 (opinion of Edwards, J.). This, of course, is not the situation here; as explained herein, there is no actual or imminent agency adjudication in this case and no non-constitutional issue to be resolved. And nothing in Judge Edwards' opinion takes issue with the point that structural challenges are inherently collateral to a statutory review mechanism. To the contrary, Judge Edwards acknowledged that where "the sole issue for decision is the constitutionality of the statutory requirement, exhaustion is unnecessary." *Id.* at 739 n.11.

overlap, administrative review cannot possibly provide plaintiffs' full relief or moot out the ongoing controversy between the parties. Unlike, for example, favorable administrative resolution of a statutory challenge to adverse employment action, "which, perforce, would satisfy any constitutional due process claim arising out of an asserted property interest in the job protections," *Steadman,* 287 F.2d at 967, a favorable determination that Beckstead *has complied with* the Board's auditing standards cannot resolve that Plaintiff's objection to the Board's authority to impose those standards or to otherwise regulate it at all. *See Andrade*, 729 F.2d at 1493. That broader issue will necessarily need to be resolved in a court challenge. Consequently, administrative review mechanisms can never impliedly preclude structural challenges brought in district court.[3]

There is yet another reason why this is a far easier case than others involving wholly collateral challenges to an enabling act: neither of the Plaintiffs has an actual or imminent dispute with the PCAOB that is in any way amenable to review through the statutory administrative-review mechanism. Specifically, although Defendants repeatedly invoke the PCAOB's investigation of plaintiff Beckstead, that investigation, as Defendants concede, is not itself subject to administrative review. Rather, the administrative review process is triggered only if the PCAOB decides to impose a sanction, SOX § 107(c), 15 U.S.C. § 7217(c); *see also* Defs.' Mem. at 4-5, and it is entirely speculative whether there ever will be such a reviewable sanction or order against Beckstead (unless the Board has improperly prejudged the investigation — a claim that neither Beckstead nor the Board makes). In short, while Beckstead has suffered

---

[3] Moreover, here, unlike *Andrade*, Plaintiffs' challenge to the Board's authority necessarily includes a challenge to the powers it exercises under *the administrative review scheme*. And, as *Thunder Basin* makes clear, such facial constitutional challenges to the administrative scheme itself are always subject to immediate district-court review. *See Thunder Basin*, 510 U.S. at 216-18; *id.* at 221 n.* (Scalia, J., concurring in part and concurring in the judgment).

concrete injuries (sufficient to give it standing here) as a result of the burdens of the Board's

registration requirements, regulations, inspections and investigations, *see* Compl. ¶¶ 74-80, there

is no existing PCAOB action or order reviewable in the administrative process, and hence no

concern that Beckstead is attempting to "short-circuit" that process. *Nat'l Mining Ass'n*,

292 F.3d at 858. This case is therefore a far cry from *Thunder Basin*, in which the plaintiff had a

present, particularized dispute with the agency concerning the plaintiff's statutory obligation to

accept its employees' designation of two specific employee representatives; this dispute was

subject to immediate resolution before the agency, and the plaintiff simply sought to resolve it in

the wrong forum. *See Thunder Basin*, 510 U.S. at 204-05.[4]

1.      Defendants only response to all of the foregoing is to suggest, in a footnote, that,

under *Time Warner,* facial challenges must be subject to a statutory review procedure if there is

any ongoing agency regulation of the plaintiff because, in such circumstances, the facial

challenges must be deemed "defenses to enforcement" procedures that may be brought in the

future. Defs.' Mem. at 27 n.20. This is a grotesque distortion both of the law and of Plaintiffs'

lawsuit.

First, insofar as Defendants are contending that current regulatory impositions coupled

with potential future enforcement actions preclude district-court jurisdiction of facial

constitutional challenges, they are contradicted by the voluminous authority discussed above.

---

[4] Indeed, because there may *never* be any administrative proceedings before the agency, denying Plaintiffs the opportunity to present their constitutional claims to the district court could result in Plaintiffs having *no* forum at all in which to bring those claims. But in order "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim," the Supreme Court requires "that where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (citing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986)); *see also Weinberger v. Salfi*, 422 U.S. 749, 762 (1975); *Johnson*, 415 U.S. at 373-74. No such clear statement precluding all judicial review appears in the Sarbanes-Oxley Act, and Defendants do not contend otherwise.

Specifically, in each case in which district-court jurisdiction was found to exist, regulatory impositions were "ongoing" and administrative proceedings were inevitable in light of statutory requirements that the agency undertake such proceedings in response to the plaintiffs' conduct. In *McNary*, for example, the plaintiffs were applicants for special immigration status whose claims had been denied by the INS and who, as a result, were subject to imminent deportation proceedings. *See* 498 U.S. at 487-88. In *General Electric*, "GE and EPA ha[d] ongoing interactions over remediation at several locations." 360 F.3d at 191. Likewise, *National Mining Association* involved a challenge to regulations that were being used to resolve benefits claims before the agency. *See* 292 F.3d at 854-56. And *Time Warner* involved a refusal by certain cable companies to comply with a particular set of FCC regulations. *See* 93 F.3d at 963-64. In each of these cases, therefore, there was a near-certainty the plaintiff's respective dispute with the agency would, but for the district-court action, end up in the administrative process, but each plaintiff's wholly collateral facial challenge was nevertheless allowed to proceed in district court. It is obviously not the potential for an enforcement action, but the type of claim being asserted, that drives the courts' holdings in these cases.[5]

---

[5] By contrast, the three cases cited by Defendants (Defs.' Mem. at 27) are all inapposite. *American Coalition for Competitive Trade v. Clinton*, involved a statute (the NAFTA Act) that *expressly* bars facial constitutional challenges by any party that failed to comply with specified exhaustion requirements, and is therefore completely irrelevant to the question of implied preclusion. *See* 128 F.3d 761, 765 (D.C. Cir. 1997). *Weinberger*, too, involved a statute that "[o]n its face . . . bars district court federal-question jurisdiction over suits" raising even constitutional claims, 422 U.S. at 756; *see also id.* ("[n]o action . . . shall be brought . . . to recover on any claim" (quoting 42 U.S.C. § 405(h))), and, in all events, involved particularized claims for social security benefits, not a wholly collateral challenge. And in *National Taxpayers Union*, the plaintiff's constitutional claims "amount[ed] to defenses to" "imminent enforcement proceedings" (376 F.3d at 244 n.3) because the agency had "expressed its dissatisfaction with [the plaintiff's] mailing and threatened enforcement action." *Id.* at 241. Indeed, the Fourth Circuit expressly distinguished the case from those, like this one, "in which the plaintiff challenges the validity of the agency's enabling statute in an action wholly independent of the agency's enforcement of a substantive provision." *Id.*

As an empirical matter, moreover, the potential for administratively reviewable enforcement action in this case is far more remote than it was in *McNary*, *General Electric*, *National Mining Association* and *Time Warner*.  There is simply no reason to suspect that there ever will be administratively reviewable sanctions imposed on Beckstead and Watts, and nobody suggests that there is any threat at all of such sanctions being imposed on FEF's members.  Moreover, in this case, the potential for overlap between the district-court action and any subsequent administrative proceeding is far less than in these other cases.  In each of them, the plaintiffs' constitutional challenges were directed at the manner by which authority was being asserted against them, and thereby relied on at least some of the same facts that would be at issue in an administrative-review proceeding.  In this case, by contrast, as in *Thomas* and *Andrade*, there is no overlap at all between the constitutional issues raised in this district-court lawsuit and any issues that might arise in a hypothetical administrative proceeding.  This is so because this lawsuit challenges who is doing the regulating, not how it is being done.

More generally, the arguments made by Plaintiffs in this lawsuit are not "defenses to enforcement" in any relevant sense.  As was true in *Time Warner*, *General Electric*, *McNary* and similar cases, Plaintiffs' facial constitutional challenge, if successful, would bar all prospective enforcement actions under the invalidated provisions.  But that is, by definition, the relief that ordinarily results from a facial constitutional challenge.  To assert, as Defendants do, that obtaining such relief amounts to "short-circuiting" the statute's administrative procedures is to make nonsense of the "necessary distinction" recognized in all of the relevant cases.

Finally, it is, of course, no answer to say that Plaintiffs can manufacture a presently reviewable administrative order by purposefully violating the Board's regulations and thereby subjecting themselves to the risk of severe civil and criminal sanctions.  The Supreme Court has

long rejected any such requirement, recognizing that "to impose upon a party interested the burden of obtaining a judicial decision . . . only upon the condition that, if unsuccessful, he must suffer imprisonment and pay fines . . . is, in effect, to close up all approaches to the courts." *Ex parte Young*, 209 U.S. 123, 148 (1908); *see also Abbott Labs.*, 387 U.S. at 153 (refusing "[t]o require [plaintiffs] to challenge these regulations only as a defense to an action brought by the Government").

2.      Apparently recognizing that the uncertain prospect of a completely hypothetical future enforcement action is an insufficient basis for preventing this Court from hearing this case, Defendants fall back on the extraordinary contention that, instead of bringing this lawsuit, Plaintiffs should challenge the constitutionality of the Board by rifling through the Federal Register in an effort to find a proposed PCAOB rule applicable to them, objecting to that proposed rule during the notice-and-comment period (*see* SOX § 107(b)(4), 15 U.S.C. § 7217(b)(4); 15 U.S.C. § 78s(b)), and then petitioning the court of appeals for review of the SEC's approval of the rule (*see* 15 U.S.C. § 78y).  *See* Defs.' Mem. at 29.  Because the agency is, of course, "powerless" to address Plaintiffs' constitutional claims, *Cont'l Air Lines*, 843 F.2d at 1456, the notice-and-comment portion of this process would be a mere sham en route to circuit-court review of those claims.  This strange proposal to require Plaintiffs to jump through pointless procedural hoops in order to present their constitutional grievance to a court suffers from several fatal flaws.

First, by invoking the notice-and-comment procedure, Defendants concede that, contrary to their own argument, the Act's mechanism for administrative *adjudication* of PCAOB orders is *not* the exclusive means by which to review a constitutional challenge to the Board's authority. Indeed, Defendants' notice-and-comment approach suffers from all of the same alleged evils that

Defendants find in the instant district-court action:  as a "pre-enforcement" challenge, it prevents the agency from bringing its expertise to bear on the facts (Defs.' Mem. at 32); it denies the agency the opportunity to "exonerate Beckstead and Watts of any wrongdoing" (*id.* at 34); and it "undermines [the alleged] purpose of 'preventing premature interference' with agency enforcement proceedings" (*id.*).  While these purported concerns are in all events unfounded in this case, Defendants make no effort to explain why, if they were real, Congress would have considered judicial review of constitutional claims by the court of appeals to be an acceptable alternative to administrative adjudication, while at the same time considering judicial review by the district court to be inappropriate.

More to the point, no court anywhere has ever suggested that a petition to the court of appeals following notice-and-comment rulemaking is the exclusive mechanism for a facial challenge to the constitutionality of the agency's authority to regulate.  Indeed, even in the more difficult case where a plaintiff *is* challenging the merits of a particular set of regulations in district court, the D.C. Circuit has strongly indicated that *Thunder Basin* does not apply to challenges to agency rulemaking.  In *National Mining Association*, the court of appeals stated that "it is important to note that [*Thunder Basin*] did not involve a regulation, which is typically treated differently from an adjudication."  292 F.3d at 857.  In concluding that district-court review of regulations was appropriate absent any administrative order, the Court noted that there was an express provision making the regulations "explicitly reviewable in the Court of Appeals." *Id.*  Thus, the presence of a statutory provision for appellate-court review of regulations is, if anything, an indicia that *Thunder Basin* preclusion is *not* appropriate.  More specifically, the court noted that the district court review was preferable to review of an individual regulation because "it is necessary to analyze carefully all of the regulations together as well as the entire

rulemaking process, which would not be feasible in individual adjudications dealing with particular regulatory provisions." *Id.* at 858. Here, of course, Plaintiffs are making an even more fundamental challenge, where the particulars of any regulatory provision are completely irrelevant, thus making the use of "individualized adjudications" even more inappropriate.

At a minimum, there is no basis in logic or law for Defendants' bizarre suggestion that a typical provision for appellate review of notice-and-comment rulemaking is the exclusive means for facial challenges. The obvious purpose of such provisions is to have the courts review the procedural or substantive propriety of the rules being challenged. They are not designed to be an indirect vehicle for judicial review of the agency's constitutional structure, and certainly do not implicitly preclude district-court actions that *are* designed to resolve such challenges.

In sum, Defendants' proposed alternatives for review of Plaintiffs' facial constitutional claims are so bizarre and contrary to ordinary practice that Defendants fall far short of their burden of demonstrating that "as a matter of logic and statutory structure, [Congress] almost surely" intended "to preclude pre-enforcement constitutional challenges to the [enabling] statute." *Gen. Elec.*, 360 F.3d at 193. Rather, because Plaintiffs' claims are wholly collateral to the Act's administrative-review provisions and wholly outside the expertise of the PCAOB and the SEC, they fall squarely within the jurisdiction of this Court. [6]

---

[6] In a single sentence of a footnote, Defendants also assert that *Time Warner*'s jurisdictional holding is not controlling because it does not reach the question of *exhaustion*. *See* Defs.' Mem. at 27 n.20. But Defendants do not affirmatively assert that the doctrine of exhaustion requires Plaintiffs to present their claims to the Board and the SEC in the first instance. And, to the extent this cursory argument is made at all, it is only in a footnote and is therefore waived. *Davis Broad. Inc. v. FCC*, 63 F. App'x 526, 527 (D.C. Cir. 2003); *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc); *see also Pub. Citizen Health Research Group v. Comm'r, F.D.A.*, 740 F.2d 21, 29 (D.C. Cir. 1984) ("the exhaustion requirement is not jurisdictional in nature"). In all events, the exhaustion defense fails here for same reasons that the jurisdictional arguments fail. *See supra* pp. 16-17.

### C.    No Logical Purpose Is Served by Requiring Administrative Review Here

That district-court jurisdiction over Plaintiffs' claims is not precluded by the Sarbanes-Oxley Act's administrative-review provisions is further confirmed by the fact that none of the reasons for requiring use of an administrative-review scheme exists here.

The requirement that a plaintiff use an administrative review scheme has been said to serve several related purposes: (1) it allows the administrative agency to bring its particular expertise to bear on the issues at hand; (2) it aids judicial review by permitting factual development of issues relevant to the dispute; and (3) it promotes judicial economy by avoiding repetitive administrative and judicial fact-finding and by resolving some claims without judicial intervention.  *See, e.g.*, *Time Warner*, 93 F.3d at 965; *Andrade*, 729 F.2d at 1491-93.  None of these purposes would be served by requiring the use of administrative proceedings in this case.

*First*, purely legal "[q]uestions concerning the constitutionality of an agency's enabling statute," such as Plaintiffs' claims here, plainly "do not require any particular agency expertise." *Time Warner*, 93 F.3d at 965.  Indeed, the Board and the SEC are "powerless" to review the constitutionality of the Sarbanes-Oxley Act.  *Cont'l Air Lines*, 843 F.2d at 1456; *see also Andrade*, 729 F.2d at 1491; *Weinberger*, 422 U.S. at 765; *Johnson*, 415 U.S. at 368.  Because Plaintiffs allege no other claims besides their constitutional ones, there is no issue in this case on which agency expertise might be brought to bear.

*Second*, requiring Plaintiffs to use the administrative-review procedure would not aid in judicial review.  As the D.C. Circuit recognized in *General Electric*, "the usual practical considerations counseling against pre-enforcement review are not present in the adjudication of a facial [constitutional] claim; it is a purely legal issue whose resolution does not depend on the type of information available only after [administrative proceedings are] completed, and does not have the potential of producing inconsistent programmatic results."  360 F.3d at 194.  In *General*

*Electric*, accordingly, "although GE and EPA ha[d] ongoing interactions over remediation at several locations," administrative proceedings would not aid in judicial review because "GE's lawsuit [did] not challenge any particular action or order by EPA." *Id.* at 191. Here, too, there are simply no facts that the Board or the SEC could find that would aid the court in deciding the purely legal questions presented.

*Third*, there is no chance that any administrative review would moot Plaintiffs' grievances by, for example, "exonerate[ing] Beckstead and Watts of any wrongdoing" or rejecting specific rules "as not in the public interest." Defs.' Mem. at 34. Indeed, while Beckstead fully expects to be "exonerated . . . of any wrongdoing," that is completely beside the point. Even if the Board's ongoing investigation were to conclude that Beckstead is in full compliance with all laws and regulations, all that will have been resolved in Beckstead's favor are questions that are not at issue in this lawsuit. The grievance that *is* at issue in this lawsuit — whether the Board may, consistent with the Constitution, continue to assert regulatory authority over Beckstead and FEF's members — will persist. Thus, here, as in *Mathews*, an agency decision "denying [the plaintiff's] substantive claim 'for other reasons' or upholding it 'under other provisions' at the post-termination stage would not answer his constitutional challenge." 424 U.S. at 331-32 (internal citation omitted); *see also Andrade*, 729 F.2d at 1493 ("the constitutional violation . . . is a continuing one, and even granting relief to these [plaintiffs in an administrative proceeding] would not preclude the same issue arising [again]").

Nor is there any merit to Defendants' contention that, had Plaintiffs sought review before the SEC, "the Commission could have relied on principles of constitutional avoidance" by, for example, departing from the statutory mandate to approve all rules that are "consistent" with the Act or "in the public interest," SOX § 107(b)(3), 15 U.S.C. § 7217(b)(3), and instead treating the

Board's rules and sanctions as merely advisory. Defs.' Mem. at 33-34. Such a broad-based

policy decision is entirely unrelated to the administrative-review mechanism and is not the sort

of decision appropriately made in individualized adjudicative proceedings. If the SEC seeks to

diminish the PCAOB's statutory powers because it believes, correctly, that those powers are

unconstitutional, it is entirely free to try and do so now. There is no reason that such limitations

would or should be done in the hypothetical adjudicatory proceeding against Beckstead. Indeed,

as the Supreme Court recognized, "[i]t is unrealistic to expect that the [agency] would consider

substantial changes in the current administrative review system at the behest of a single [entity]

raising a constitutional challenge in an adjudicatory context." *Mathews*, 424 U.S. at 329.

      Nor could any action by the SEC affect the core of Plaintiffs' claims, based on the

manner in which PCAOB members are appointed and removed. In any event, all questions

concerning narrowing interpretations to avoid constitutional problems are interpretive and

constitutional legal questions for courts, not agencies, to resolve. As noted, the SEC has no

particular expertise that would guide a reviewing court in resolving such purely legal questions.

And any advice the SEC or the Board wishes to offer on the relationship between the two entities

can be offered through the normal briefing process; nothing is gained with respect to resolution

of that general constitutional question by forcing Plaintiffs through an administrative hearing

having no relation to that issue.

      On the other hand, much would be lost if, as Defendants would have it, Plaintiffs were

put to the Hobson's choice of either continuing to comply with the Board's unconstitutional

regulations or violating those regulations, at the risk of severe civil and criminal penalties, in

order to manufacture a dispute in which to litigate their constitutional claims. The Supreme

Court's analysis in rejecting the similar argument that the administrative-review provisions of the

Food and Drug Act implicitly barred a pre-enforcement challenge to the FDA's authority to

promulgate certain rules is equally applicable here:

> These regulations are not meant to [be] advis[ory] . . ., but purport
> to be directly authorized by the statute.  Thus, if within the
> [agency's] authority, they have the status of law and violation of
> them carry heavy criminal and civil sanctions. . . .
>
> . . . .  The regulations are clear-cut, and were made effective
> immediately upon publication; . . . immediate compliance with
> their terms was expected.  If [Plaintiffs] wish to comply they must
> change [their business practices].  The alternative to compliance
> . . . may be even more costly.  That course would risk serious
> criminal and civil penalties . . . .
>
> . . . . To require [plaintiffs] to challenge these regulations only as a
> defense to an action brought by the Government might harm them
> severely and unnecessarily.  Where the legal issue presented is fit
> for judicial resolution, and where a regulation requires an
> immediate and significant change in the plaintiffs' conduct of their
> affairs with serious penalties attached to noncompliance, access to
> the courts . . . must be permitted, absent a statutory bar or some
> other unusual circumstance . . . .

387 U.S. at 151-53; *see also Ex parte Young*, 209 U.S. at 148 ("to impose upon a party interested

the burden of obtaining a judicial decision . . . only upon the condition that if unsuccessful he

must suffer imprisonment and pay fines . . . is in effect to close up all approaches to the courts");

*cf. Thunder Basin*, 510 U.S. at 221 (Scalia, J., concurring in part and concurring in the judgment)

(noting that the statutory provisions at issue gave the aggrieved mine owners "the option of

complying [with the agency's determination] *and then* bringing a judicial challenge").

Accordingly, no logical purpose is served by requiring administrative review in this case.

II.     **PLAINTIFFS HAVE A CAUSE OF ACTION TO PREVENT ONGOING
        CONSTITUTIONAL VIOLATIONS THROUGH THE EQUITABLE REMEDIES
        OF AN INJUNCTION AND DECLARATORY RELIEF**

Defendants next contend that Plaintiffs have failed to invoke a statutory cause of action

authorizing them to seek relief.  *See* Defs.' Mem. at 37-38.  This argument suffers from the same

flaw as Defendants' appeal to the putatively exclusive statutory mechanism for review:  it simply

has no application to the claims asserted in this lawsuit.  Specifically, where, as here, a lawsuit

seeks to enjoin ongoing constitutional violations, an express statutory right of action is not

required.  Rather, the cause of action arises directly out of the Constitution.

The federal courts have long recognized that constitutional rights may be enforced by

private lawsuits seeking equitable relief against government officials in their official capacities,

even in the absence of congressional authorization.  Specifically, after the passage of the general

federal question jurisdiction statute in 1875, the Supreme Court "gradually concluded that an

implied cause of action under the Constitution existed where the remedy sought was an

injunction."  *Crawford-El v. Britton*, 93 F.3d 813, 831 (D.C. Cir. 1996) (en banc) (Silberman, J.,

concurring), *rev'd on other grounds*, 523 U.S. 574 (1998).  The most notable early recognition of

this implied right of action is *Ex parte Young*, 209 U.S. at 144-45, in which the Court upheld an

injunction of a state official to prevent future prosecutions under an unconstitutional statute.[7]

While *Ex parte Young* dealt with state officials acting pursuant to a state statute, the Supreme

---

[7] As the leading commentator in this field has noted, "[t]he best explanation of *Ex parte Young* and its progeny is that the [Constitution itself] creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution." 13B Charles A. Wright *et al.*, *Federal Practice and Procedure: Jurisdiction* 2d § 3566 (2006 Supp.); *see also Local Union No. 12004 v. Massachusetts*, 377 F.3d 64, 75 & n. 8 (1st Cir. 2004) (no "explicit statutory cause of action" is needed for an *Ex parte Young* action because "'the rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision—and that such an action falls within the federal question jurisdiction—is well-established.'" (quoting Richard H. Fallon *et al.*, *Hart & Wechsler's The Federal Courts & The Federal System* 903 (5th ed. 2003))).

Court subsequently made clear that "[t]he principle that [courts have the power to enjoin] state officers [from] seeking to enforce unconstitutional enactments" is "equally applicable to a Federal officer acting . . . under an authority not validly conferred." *Philadelphia Co. v. Stimson*, 223 U.S. 605, 619-20 (1912); *see also Rickert Rice Mills, Inc. v. Fontenot*, 297 U.S. 110, 113 (1936) (permitting suit to enjoin federal revenue agent from collecting unconstitutional tax); *Bell v. Hood*, 327 U.S. 678, 684 (1946) (noting, in suit against federal officials, that "it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"); *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) (noting, in declaratory and injunctive action against the Secretary of the Army, that "[g]enerally, judicial review is available to one who has been injured by an act of a government official which is in excess of his express or implied powers").

Thus, when the Supreme Court first addressed whether a private plaintiff had an implied right of action under the Constitution to seek *money damages* against federal officials for the violation of constitutional rights, it did so against the backdrop of a "presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 404-05 (1971) (Harlan, J., concurring); *see also id.* ("a general grant of jurisdiction to the federal courts by Congress is thought adequate to empower a federal court to grant equitable relief for all areas of subject-matter jurisdiction enumerated therein"). And, following *Bivens*, this implied right of action for equitable relief has been repeatedly reaffirmed, both where the Supreme Court has extended, and where it has refused to extend, the implied right of action for money damages. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been

- 34 -

recognized as the proper means for preventing entities from acting unconstitutionally"); *Bush v. Lucas*, 462 U.S. 367, 373-74 (1983) (noting that "[t]he federal courts' power to grant relief not expressly authorized by Congress is firmly established" and that the jurisdictional grant of 28 U.S.C. § 1331 "provides . . . the authority to choose among available judicial remedies in order to vindicate constitutional rights"); *Davis v. Passman*, 442 U.S. 228, 241-43 (1979) (explaining, in suit against United States congressman, that Court had "already settled that a cause of action may be implied directly under" the Constitution). Indeed, even those who have doubted the propriety of *Bivens*'s creation of an implied *damages* remedy have recognized that "[t]he broad power of federal courts to grant equitable relief for constitutional violations has been long established." *Carlson v. Green*, 446 U.S. 14, 42 (1980) (Rehnquist, J., dissenting); *see also Franklin v. Massachusetts*, 505 U.S. 788, 828-29 (1992) (Scalia, J., concurring in part and concurring in judgment) ("unlawful legislative action can be reviewed . . . by enjoining those congressional (or executive) agents who carry out Congress's directive"); *Crawford-El*, 93 F.3d at 832 (Silberman, J., concurring) ("The availability of the historically recognized right to injunctive relief [to prevent unconstitutional actions by federal officials] obviates the need for a judicially-created damages remedy.").

In short, "[a]t least in the absence of 'a textually demonstrable constitutional commitment of [an] issue to a coordinate political department,' . . . litigants who allege that their own constitutional rights have been violated" have a cause of action. *Davis*, 442 U.S. at 242 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). Unsurprisingly, therefore, the D.C. Circuit has repeatedly recognized that, where a plaintiff seeks declaratory and injunctive relief, "jurisdiction over . . . constitutional claims . . . do[es] not depend on the implication of any private right of action." *Nat'l Juvenile Law Ctr., Inc. v. Regnery*, 738 F.2d 455, 459 (D.C. Cir. 1984); *see also*

*Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority."); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (discussing and applying this principle).

There is therefore no merit to Defendants' contention that a cause of action for an injunction to prevent an ongoing constitutional violation is typically available only where the plaintiff lacks any other remedy for the constitutional violation. To the contrary, the cases cited by Defendants for this proposition, including *Correctional Services Corp.*, *Davis*, and *Bush*, all involved decisions not to extend *Bivens* to permit the recover of money damages under certain circumstances. Where the claims are solely for injunctive and declaratory relief, by contrast, no further analysis is required.

Defendants' final argument in this regard is to reiterate in a different guise their contention that the Sarbanes-Oxley Act should be read to implicitly preclude district-court jurisdiction over Plaintiffs' constitutional claims. In this regard, Defendants cite *Verizon Maryland Inc. v. Public Service Commission*, 535 U.S. 635 (2002), which in turn relies on *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), for the proposition that a "detailed remedial scheme" provided by Congress might affirmatively preclude an *Ex parte Young* claim for injunctive relief. As demonstrated above, however, this argument has no application where, as here, the claims constitute a broad facial challenge to the constitutionality of the statute creating the agency. *See supra* Part I. Nothing in *Seminole Tribe* is to the contrary, for the claim barred by the congressional scheme at issue there was an effort to enforce a particularized provision of the statute as applied to the plaintiffs, not a broad facial challenge to the statute itself. *See* 517 U.S. at 74.

In sum, given that Congress has not affirmatively precluded private plaintiffs from challenging the constitutionality of the creation of the PCAOB through a suit for declaratory and injunctive relief, Plaintiffs have a cause of action arising directly under the Constitution.  In any event, Plaintiffs' lawsuit is independently authorized by the Declaratory Judgment Act, which provides that, in the case of an actual controversy within its jurisdiction, the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  While the Declaratory Judgment Act is not an independent ground for *jurisdiction*, it provides a cause of action and a remedy where, as here, federal-question jurisdiction is well-established.  *See Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997) ("the Declaratory Judgment Act, 28 U.S.C. § 2201 (1994), provides the mechanism for seeking preenforcement review in federal court"); *Planned Parenthood v. Sanchez*, 403 F.3d 324, 334 n.47 (5th Cir. 2005).

## III.    PLAINTIFFS HAVE STANDING

Defendants do not suggest that Beckstead and Watts lacks standing to bring its core constitutional challenge to the Board's authority.  Nor could they.  As a registered accounting firm that has been, and continues to be, directly subject to the regulatory authority of the Board and thereby injured by the costs of regulatory compliance, it plainly has standing to challenge the constitutionality of that authority even though it has not been subjected to penalties or formal disciplinary action.  *See Buckley v. Valeo*, 424 U.S. 1, 12 n.10 (1976) (per curiam) ("parties with sufficient concrete interests at stake have been held to have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights"); *Cellco P'ship v. FCC*, 357 F.3d 88, 100 (D.C. Cir. 2004) ("As an entity continuously burdened by the costs of complying . . . with what it contends are [illegal] regulations . . . ,

[plaintiffs'] injuries are concrete and actual, traceable to the Commission's alleged failure to [comply with the statute], and redressable by a ruling adopting [plaintiffs'] interpretation of [the statutory] mandate."); *Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.*, 766 F.2d 538, 543 (D.C. Cir. 1985) ("litigants have standing to challenge the authority of an agency on separation-of-powers grounds . . . where they are directly subject to the authority of the agency, whether such authority is regulatory, administrative, or adjudicative in nature").

Instead, Defendants challenge the standing of FEF to participate in the litigation, and the standing of both parties with respect to certain aspects of their Appointments Clause challenge. Given that Beckstead's standing is clear and that Beckstead and FEF raise identical claims and seek identical relief, this Court need not resolve the separate question of FEF's standing. *See Pharm. Research & Mfrs. Am. v. Thompson*, 362 F.3d 817, 819 n.1 (D.C. Cir. 2004) ("[w]e need not resolve [one plaintiff's standing] because [its co-plaintiffs] have standing"); *Cent. Fla. Enters., Inc. v. FCC*, 683 F.2d 503, 505 n.3 (D.C. Cir. 1982) ("[W]e need not resolve the issue of [one party's] standing since it raises no issues not raised by [the other party] that would affect the disposition of the appeal, making irrelevant whether we view their submissions as those of parties or of amici.").

In any event, contrary to Defendants' contentions, FEF does have standing to bring this suit on behalf of its members. Defendants' objection to FEF's standing is premised on the argument that FEF's allegations of injury are, even at this pleadings state, "*too* general" to satisfy the injury-in-fact requirement of Article III standing because FEF's members are unidentified and their injuries unspecified. Defs. Mem. at 39-40.[8] But unlike the cases cited by Defendants,

---

[8] Defendants do not challenge the other elements of FEF's organizational standing, which are satisfied here. In particular, (i) the interests that this lawsuit seeks to protect are germane to FEF's organizational purpose of promoting economic growth through limited government and

in which there was no averment of any concrete injury, FEF has alleged the nature of the injuries suffered by its members: those members are subject to the regulatory authority of the Board and therefore, like Beckstead, have been injured by the requirement that they conform their behavior to the Board's regulations. Compl. ¶ 11. Indeed, because FEF's membership includes both public companies and auditors of public companies, its members have suffered two distinct types of concrete injury: some are subject to the "accounting support fee" levied by the Board, and others, like Beckstead, have been required to conform their business practices to the Board's standards and otherwise submit to the Board's regulatory authority. These concrete injuries, fairly traceable to the Board's actions and redressable by the relief sought in this litigation, are sufficient to establish FEF's standing, especially at the pleadings stage. This is so, moreover, even though FEF has not (for reasons of confidentiality) set forth the specific identities of its injured members. *See Pub. Citizen v. FTC*, 869 F.2d 1541, 1552 (D.C. Cir. 1989) ("the identity of individual members is only a means to an end, and it should not be confused with the real purpose of the inquiry—that is, for the court to be satisfied that the requisite injury really has occurred or will occur in the future to members of the organizations"); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 313 (D.C. Cir. 1987) (rejecting the argument that an organization lacks standing when "it has not identified any specific member who uses a particular parcel of land").

Finally, there is no merit to Defendants' contention that Plaintiffs lack standing to raise "significant components of their Appointments Clause claim." Defs.' Mem. at 40. The Appointments Clause claim focuses on the Act's provision for the appointment of PCAOB members by a majority vote of the commissioners of the SEC. Plaintiffs contend that PCAOB

---

(continued…)

(ii) neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 111-12 (D.C. Cir. 1990).

members are principal officers whose appointments must be made by the President by and with

the advice and consent of the Senate.  Compl. ¶ 90.  Plaintiffs further contend, in the alternative,

that if PCAOB members are held to be inferior officers whose appointments may be made by the

head of a department, then the SEC is not a department and (even if it is) that the appointment

power is not vested in the head of the SEC.  *Id.* ¶ 91.

      Defendants do not challenge Plaintiffs' standing to mount an Appointments Clause

challenge generally.  Nor could they, for it is settled that a regulated entity has standing to claim

that the appointment of an official with regulatory authority over him was not made by the

constitutionally proper actor.  *See Buckley*, 424 U.S. at 12 & n.10; *Andrade*, 729 F.2d at 1494-96.

Instead, Defendants argue that, were the Court to conclude (contrary to Plaintiffs' arguments)

that the Board members are inferior officers and further conclude (again contrary to Plaintiffs'

arguments) that the SEC is a department for purposes of the Appointments Clause, then (and

only then) Plaintiffs would lack standing to argue that the appointment of PCAOB members by

majority vote of the five SEC commissioners fails to satisfy the requirement that the appointment

be by the head of a department.  This is so, Defendants argue, because Plaintiffs cannot contend

that the Board's composition would have been different if its members had been appointed by

the SEC Chairman alone and, therefore, any injury was not fairly traceable to the improper

appointment.

      Even assuming *arguendo* that Plaintiffs' standing to make arguments in support of their

Appointments Clause claim could be parsed in so fine a manner (and, further, that Defendants'

understanding of Plaintiffs' Appointments Clause argument is correct), Defendants' contention

lacks merit.  The D.C. Circuit in *Andrade* has already rejected the argument that a plaintiff lacks

standing to bring an Appointments Clause challenge simply because the constitutionally

appropriate appointing entity might have made the same appointments.  The Appointments

Clause "would be a nullity," the D.C. Circuit explained, "if it could be assumed [as part of the

court's analysis of plaintiff's standing] that these very officials *would* in fact have been properly

appointed" had the Appointments Clause been followed.  729 F.2d at 1495.  Indeed, while

Defendants argue that the chairman of the SEC voted in favor of the appointment of all of the

PCAOB's current members, the presence of additional, improperly present members (*i.e.*, the

other SEC commissioners) "during [the agency's] deliberations" will necessarily "have some

impact (even though the extent of which may be impossible to measure) on how the [agency]

decides matters before it."  *Fed. Election Comm'n v. NRA Political Victory Fund*, 6 F.3d 821,

825 (D.C. Cir. 1993).  As such, there is no guarantee that the Board's membership would have

been the same if the appointments decision had been made by the Commissioner of the SEC

acting alone.  In other words, "causation [of injury] is in fact present" in a case like this one

because, as a matter of law, "it cannot be assumed that action in accord with the correct

procedures would have produced the same result."  *Andrade*, 729 F.2d at 1496.

   None of the cases cited by Defendants is to the contrary.  Rather, in denying standing in

*Reuss v. Balles* and *Committee for Monetary Reform v. Board of Governors of the Federal

Reserve System*, the D.C. Circuit simply concluded that the plaintiffs in those cases lacked the

sort of particularized injuries that give rise to standing.  *See Comm. for Monetary Reform*,

766 F.2d at 543-44 (finding lack of standing because "it is clear that the [challenged agencies] in

no way exercise direct governmental authority over the [plaintiffs]"); *Reuss v. Balles*, 584 F.2d

461, 469 (D.C. Cir. 1978).  The D.C. Circuit even drew an express contrast between those cases

and the situation in *Buckley*, emphasizing that the plaintiffs would have had standing to bring

their Appointments Clause claims had they been "subject to the authority of the agency."  *Comm.*

*for Monetary Reform*, 766 F.2d at 543; *see also Reuss*, 584 F.2d at 470 ("Unlike the plaintiffs in

*Buckley* . . . , [plaintiff] has not demonstrated a personal stake so sufficient that he would benefit

from a favorable decision on the merits.").[9]

---

[9] Relying on *NRA Political Victory Fund*, 6 F.3d at 825, Defendants also contend that Plaintiffs lack standing to argue that the Act's imposition of qualifications on PCAOB members constitutes an improper limitation on the power to appoint.  *See* Defs.' Mem. at 40-42.  But *NRA Political Victory Fund* is inapposite here because it involved restrictions on the *President's* appointment power, and in finding traceability absent, the court relied on considerations unique to the context of presidential appointments requiring the advice and consent of the Senate. Specifically, the court noted that because "Presidents have often viewed restrictions on their appointment power not to be legally binding," and because (given the need for Senate confirmation for the appointments at issue) "a Senate resolution or even an informal communication to the President would have had the same effect as the statute," it was "not the law . . . which arguably restrain[ed] the President, but his perception of the present Senate's view as it may be assumed to be reflected in the statute."  6 F.3d at 825.  These other explanations for the appointing entity's compliance with the Act's requirements are, of course, absent here.  But whether or not Plaintiffs would have standing to challenge the Act's qualifications as a separate claimed constitutional violation is in all events irrelevant, because this argument is only incidental to Plaintiffs' principal contention, which they do have standing to raise, that appointments to the PCAOB are not made by the constitutionally appropriate actors.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated:  June 5, 2006                          Respectfully submitted,


  /s/
Michael A. Carvin (D.C. Bar No. 366784)
Noel J. Francisco (D.C. Bar No. 464752)
Christian G. Vergonis (D.C. Bar No. 483293)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
(202) 879-3939
(202) 626-1700 (fax)

Kenneth W. Starr (D.C. Bar No. 273425)
24569 Via De Casa
Malibu, CA 90265
(310) 506-4621

Viet D. Dinh (D.C. Bar No. 456608)
Wendy Keefer
BANCROFT ASSOCIATES PLLC
601 13th Street, N.W.
Suite No. 930 South
Washington, D.C. 20005
(202) 234-0090
(202) 234-2806 (fax)

Sam Kazman (D.C. Bar No. 946376)
Hans Bader (D.C. Bar No. 466545)
COMPETITIVE ENTERPRISE INSTITUTE
1001 Connecticut Avenue, N.W.
Suite 1250
Washington, D.C. 20036
(202) 331-1010 (fax)

*Attorneys for Plaintiffs Free Enterprise Fund*
*and Beckstead and Watts, LLP*