## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
FREE ENTERPRISE FUND *et al.*,            )
                                          )
                         Plaintiffs,      )
                                          )
           v.                             )          Case No. 1:06CV00217-JR
                                          )
THE PUBLIC COMPANY ACCOUNTING             )
OVERSIGHT BOARD *et al.*,                  )
                                          )
                         Defendants.      )
_____)


## <u>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES</u>
## <u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

Viet D. Dinh (D.C. Bar No. 456608)          Michael A. Carvin (D.C. Bar No. 366784)
Wendy Keefer                                 Noel J. Francisco (D.C. Bar No. 464752)
BANCROFT ASSOCIATES PLLC                     Christian G. Vergonis (D.C. Bar No. 483293)
601 13th Street, N.W.                        JONES DAY
Suite No. 930 South                          51 Louisiana Avenue, N.W.
Washington, D.C. 20005                       Washington, D.C.  20001-2113
(202) 234-0090                               (202) 879-3939
(202) 234-2806 (fax)                         (202) 626-1700 (fax)


Sam Kazman (D.C. Bar No. 946376)            Kenneth W. Starr (D.C. Bar No. 273425)
Hans Bader (D.C. Bar No. 466545)            24569 Via De Casa
COMPETITIVE ENTERPRISE INSTITUTE             Malibu, CA 90265
1001 Connecticut Avenue, N.W.                (310) 506-4621
Suite 1250
Washington, D.C. 20036                       *Attorneys for Plaintiffs Free Enterprise Fund*
(202) 331-1010 (fax)                         *and Beckstead and Watts, LLP*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 3

    A.     The PCAOB's Wide-Ranging Government Powers ............................................. 4

    B.     Appointment and Removal of PCAOB Members ............................... 7

    C.     Limited SEC Oversight of PCAOB Activities.................................... 8

SUMMARY OF ARGUMENT ............................................................................................ 10

ARGUMENT ................................................................................................................... 13

I.     THE PCAOB VIOLATES THE CONSTITUTION'S SEPARATION OF
       POWERS ........................................................................................................ 13

    A.     Sarbanes-Oxley's Limitations On Presidential Removal Authority Violate
         Separation Of Powers ......................................................................... 14

         1.     The President Must Have Broad Removal Power Over All
             Officials Who Exercise "Executive Power" ............................. 14

         2.     The PCAOB Exercises "Executive Power" That Must Be Subject
             To The President's Removal Authority .................................... 19

         3.     The Sarbanes-Oxley Act "Completely Strips" The President Of
             Removal Authority.................................................................. 22

    B.     The PCAOB Taken As A Whole Violates Separation Of Powers...................... 23

II.    THE PCAOB'S BOARD MEMBERS ARE APPOINTED IN VIOLATION OF
      THE APPOINTMENTS CLAUSE.................................................................... 28

    A.     PCAOB Members Are Principal Officers............................................ 29

    B.     Appointment of PCAOB Members By the SEC Violates the Appointments
         Clause Even If Those Members Are Inferior Officers........................... 35

         1.     The SEC Is Not A "Department".............................................. 35

         2.     The Five-Member SEC As A Whole Is Not The SEC's "Head"............. 39

III.   THE PCAOB EXERCISES LEGISLATIVE POWER IN VIOLATION OF THE
      NON-DELEGATION DOCTRINE.................................................................. 43

CONCLUSION.................................................................................................................. 45

# TABLE OF AUTHORITIES[*]

**Page**

## CASES

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) .......................................44

*\*Bowsher v. Synar*, 478 U.S. 714 (1986).........................................................1, 16, 19-21, 23, 29

*\*Buckley v. Valeo*, 424 U.S. 1 (1976) ..............................................................1, 8, 19-21, 29, 37

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ...............................................................44

*Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)................................................................................................28

*Cunningham v. Neagle*, 135 U.S. 1 (1890) ............................................................36, 42

*\*Edmond v. United States*, 520 U.S. 651 (1997) ............................................... 30-32, 34

*Elrod v. Burns*, 427 U.S. 347 (1976) ...............................................................................17

*Fahey v. Mallonee*, 332 U.S. 245 (1947).......................................................................44

*Field v. Clark*, 143 U.S. 649 (1892) ...................................................................... 43-44

*First West Government Securities v. Commissioner of Internal Revenue*,
    94 T.C. 549 (1990), *aff'd sub nom Samuels, Kramer & Co. v.
    Commissioner of Internal Revenue*, 930 F.2d 975 (2d Cir. 1991)......................................32

*\*Freytag v. Commissioner of Internal Revenue*,
    501 U.S. 868 (1991)................................................... 11, 22, 29, 32, 34, 35, 37-41

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) ......................................................2, 11

*In re Hennen*, 38 U.S. (13 Pet.) 230 (1839)...............................................................16

*\*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ...........................18-19, 21-23, 39

*INS v. Chadha*, 462 U.S. 919 (1983) ...........................................................................23

*INS v. St. Cyr*, 533 U.S. 289 (2001)...........................................................................24

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) .................................44

---

[*] Authorities on which Plaintiffs chiefly rely are marked by an asterisk.

# TABLE OF AUTHORITIES
## (continued)

Page

*Lebron v. National Railway Passenger Corp., 513 U.S. 374 (1995) ....................................14, 22

*Loving v. United States, 517 U.S. 748 (1996) ..........................................................2, 11, 24

MFS Securities Corp. v. SEC, 380 F.3d 611 (2d Cir. 2004)............................................19

Metropolitan Washington Airports Authority v. Citizens for Abatement of
    Aircraft Noise, Inc., 501 U.S. 252 (1991)...........................................................2, 11, 14, 23

Mistretta v. United States, 488 U.S. 361 (1989)...........................................................2, 22, 43-44

*Morrison v. Olson, 487 U.S. 654 (1998) ............................................14, 16-19, 22-26, 30-34, 36

*Myers v. United States, 272 U.S. 52 (1926)....................................................13, 15-16, 22-23, 42

National Cable & Telecommunications Association v. Brand X Internet Services,
    125 S. Ct. 2688 (2005)...........................................................................................28

National Petroleum Refiners Association v. FTC, 482 F.2d 672 (D.C. Cir. 1973) ......................21

Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982) ................24

Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995)....................................................24

*Public Citizen v. U.S. Department of Justice, 491 U.S. 440 (1989)......................................2, 43

Ryder v. United States, 515 U.S. 177 (1995)..................................................................28

Shurtfleff v. United States, 189 U.S. 311 (1903)..........................................................16

Silver v. U.S. Postal Service, 951 F.2d 1033 (9th Cir. 1991) ........................................43

*Synar v. United States, 626 F. Supp. 1374 (D.D.C.),
    aff'd, Bowsher v. Synar, 478 U.S. 714 (1986) ....................................................15, 21, 39

Touby v. United States, 500 U.S. 160 (1991)..................................................................44

United States v. Eaton, 169 U.S. 331 (1898) ................................................................33

United States v. Germaine, 99 U.S. 508 (1879)..........................................................30, 36

*United States v. Mouat, 124 U.S. 303 (1888) ..........................................................36, 42

United States v. Nixon, 418 U.S. 683 (1974) ................................................................33

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Perkins*, 116 U.S. 483 (1886) ..............................................................17

*Weiss v. United States*, 510 U.S. 163 (1994) ........................................................38, 41

*Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457 (2001) ....................43

*Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C. Cir. 1987) ...............................22

## CONSTITUTIONS, STATUTES AND RULES

U.S. Const. art. I, § 1.........................................................................................................43

U.S. Const. art. II, § 1 ................................................................................................ 12-13

U.S. Const. art. II, § 2 ............................................................................................... *passim*

U.S. Const. art. II, § 3 ................................................................................................ 12-13

U.S. Const. amend. XXV..................................................................................................38

12 U.S.C. § 2 ....................................................................................................................34

12 U.S.C. § 241 ................................................................................................................34

12 U.S.C. § 242 ................................................................................................................20

12 U.S.C. § 1462a.............................................................................................................34

12 U.S.C. § 1812 ..............................................................................................................34

15 U.S.C. § 41 ............................................................................................................20, 34

15 U.S.C. § 78d................................................................................................................34

15 U.S.C. § 78s ..................................................................................................................9

15 U.S.C. § 78u................................................................................................................45

15 U.S.C. § 78ff .................................................................................................................5

15 U.S.C. § 2053...............................................................................................20, 34

# TABLE OF AUTHORITIES
## (continued)

**Page**

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745

§ 2, 15 U.S.C. § 7202 ................................................................................................4

§ 3, 15 U.S.C. § 7203 ............................................................................................5, 45

§ 101, 15 U.S.C. § 7211 ......................................................... 3, 7, 14, 22, 43-45

§ 102, 15 U.S.C. § 7212 .........................................................................................4, 9

§ 103, 15 U.S.C. § 7213 ............................................................................................5

§ 104, 15 U.S.C. § 7214 .........................................................................................6, 8

§ 105, 15 U.S.C. § 7215 ......................................................................................5, 6, 8

§ 107, 15 U.S.C. § 7217 .......................................................... 8-10, 22, 27

§ 109, 15 U.S.C. § 7219 ............................................................................................7

42 U.S.C. § 2996c .........................................................................................................34

47 U.S.C. § 154 ............................................................................................................34

49 U.S.C. § 24302 .......................................................................................................34

PCAOB Rule 7101 .......................................................................................................7

PCAOB Auditing Standards, *available at* http://www.pcaob.org/Standards/
Standards_and Related_Rules/index.aspx ...........................................................5

# LEGISLATIVE MATERIALS

*1 Annals of Cong. (Joseph Gales ed., 1834)............................................ 1, 12-13, 15, 18

148 Cong. Rec. S6327-06 (daily ed. July 8, 2002) .........................................4, 10, 34

S. Rep. No. 107-205 (2002)........................................................................................3

*Accounting Reform and Investor Protection Hearings Before the S. Comm. on Banking,
Housing and Urban Affairs*, 107th Cong. (2002) ..........................................3-4

**TABLE OF AUTHORITIES**
**(continued)**

Page

**EXECUTIVE MATERIALS**

*Applicability of Executive Order 12674 to Personnel of Regional Fishery
    Management Councils*, 17 Op. Off. Legal Counsel 150 (1993) ............................ 30, 33-34

*Authority of Civil Service Commission to Appoint a Chief Examiner*,
    37 Op. Att'y Gen. 227 (1933) ............................................................. 42

*The Constitutional Separation of Powers Between the President and Congress*,
    20 Op. Off. Legal Counsel 124 (1996) ..................................................... 14, 42

**MISCELLANEOUS**

Albert J. Beveridge, *The Life of John Mashall* (1916) ................................. 16

*Black's Law Dictionary* (8th ed. 2004) ................................................. 23

*The Federalist* No. 48 (Madison) ...................................................... 23

*The Federalist* No. 70 (Hamilton) ..................................................... 1, 24

\**The Federalist* No. 72 (Hamilton) .................................................... 13, 18

\**The Federalist* No. 76 (Hamilton) .................................................... 40

*Hamilton's Works* (J.C. Hamilton ed., New York 1851) .................................. 13

Samuel L. Johnson, *A Dictionary of the English Language*
    (Baltimore, Fielding Lucas, Jr. 1814) ................................................ 41

Charles Pinckney, O*bservations on the Plan of Government Submitted to the Federal
    Convention of May 28, 1787, reprinted in 3 Records of the Federal
    Convention of 1787* (Max Farrand ed., 1911) ......................................... 1

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ................. 1, 36, 41

Joseph Story, *Commentaries on the Constitution* (1833) ............................. 41

Noah Webster, *A Compendious Dictionary of the English Language*
    (Philip B. Gove ed., facsimile 1970) (1806) ........................................ 41

Noah Webster, *An American Dictionary of the English Language*
    (New York, S. Converse 1828) ....................................................... 41

# TABLE OF AUTHORITIES
## (continued)

**Page**

PCAOB, *Inspection Reports*, *available at* http://www.pcaob.org/Inspections/
Public_Reports/index.aspx................................................................................6

PCAOB, *List of Issuers with No Outstanding Past-Due Share of the Accounting
Support Fee*, http://www.pcaob.org/Support_Fees/Issuers_Paid.pdf................................7

PCAOB, *Registered Public Accounting Firms*, http://www.pcaob.org/
Registration/Registered_Firms.pdf ..................................................................4

## INTRODUCTION

"If there is a principle in our Constitution . . . more sacred than another, it is that which separates the Legislative, Executive, and Judicial powers."  1 Annals of Cong. 581 (Joseph Gales ed., 1834) (remarks of James Madison).  This tripartite structure of our government is "the heart of our Constitution."  *Buckley v. Valeo*, 424 U.S. 1, 119 (1976) (per curiam).  It is not a matter of mere form.  "In a government, where the liberties of the people are to be preserved . . . , the executive, legislative and judicial, should ever be separate and distinct, and consist of parts, mutually forming a check upon each other."  Charles Pinckney, *Observations on the Plan of Government Submitted to the Federal Convention of May 28, 1787*, *reprinted in* 3 *Records of the Federal Convention of 1787*, at 108 (Max Farrand ed. 1911) [hereinafter *Records*].  As "[t]he Framers recognized . . . , in the long term, structural protections against abuse of power [are] critical to preserving liberty."  *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

By separating the various exercises of the coercive power of the government, the Constitution guarantees that the people know whom they should reward for its fair and just exercise, and more importantly, whom they should punish for its abuse.  As Alexander Hamilton explained, the Constitution's division of power provides "the two greatest securities [the people] can have for the faithful exercise of any delegated power"—"the restraints of public opinion" and "the opportunity of discovering with facility and clearness the misconduct of the persons they trust."  *The Federalist* No. 70.  The Founding-ordained structure of separated powers thus guarantees that the exercise of governmental authority is, in the end, always to be checked by the will of the people expressed through their republican institutions.

It is precisely for this reason that the Supreme Court has affirmed, time and again, that "[t]he ultimate purpose of this separation of powers is to protect the liberty and security of the

governed." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*
501 U.S. 252, 272 (1991). It was "the central judgment of the Framers of the Constitution that,
within our political scheme, the separation of governmental powers into three coordinate
Branches is essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361,
380 (1989); *see also, e.g.*, *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2800 (2006) (Kennedy, J.,
concurring in part) ("the Constitution's three-part system is designed to avoid" the
"[c]oncentration of power [that] puts personal liberty in peril of arbitrary action by officials");
*Loving v. United States*, 517 U.S. 748, 756 (1996) ("Even before the birth of this country,
separation of powers was known to be a defense against tyranny.").

It necessarily follows that when this constitutionally-mandated division of power is
abandoned or blurred, the people are deprived of these vital democratic checks on the exercise of
governmental power. Consequently, "it remains one of the most vital functions of this Court to
police with care the separation of the governing powers. That is so even when . . . no immediate
threat to liberty is apparent. When structure fails, liberty is always in peril." *Public Citizen v.
U.S. Dep't of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J., concurring in the judgment).

The PCAOB violates the most basic precepts of our Constitution's separation of powers
because it is a public agency that exercises enormous and important governmental power, but is
wholly unaccountable to any person whom the people may control or remove through the ballot
box. Indeed, by divorcing governmental power from political accountability to an extent not
previously known in American jurisprudence, the Sarbanes-Oxley Act violates virtually every
aspect of the separation of powers doctrine. By completely insulating the PCAOB's execution of
federal statutes from presidential supervision and control, the Act ensures that there is no
democratic check on the PCAOB's exercise of the coercive power of the government. By

conferring the authority to appoint the PCAOB's Members to their public offices not on the President or one of his departments, but rather, in an independent agency that is, itself, insulated from democratic accountability, the Act violates both the text and spirit of the Appointments Clause. And by bestowing core legislative power on the PCAOB, including the power to tax and the ultimate power to deprive an individual of his liberty through the enactment of criminal prohibitions, the PCAOB runs afoul of the non-delegation doctrine.

The PCAOB is, in short, thoroughly unconstitutional. It should be declared as such.

## STATEMENT OF FACTS

In reaction to high-profile accounting scandals involving Enron and other companies, Congress enacted the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (codified at 15 U.S.C. §§ 7201 *et seq.*) ("Act" or "SOX"), to "oversee the audit of public companies that are subject to the securities laws." SOX § 101(a), 15 U.S.C. § 7211(a). Title I of the Act subjects accounting firms who audit public companies to the broad regulatory authority of a new organization, the Public Company Accounting Oversight Board ("PCAOB" or "Board").

The PCAOB was designed to maximize its "independence," S. Rep. No. 107-205, at 6 (2002), and to "insulate" it from all political pressure, *Accounting Reform and Investor Protection Hearings Before the S. Comm. on Banking, Housing and Urban Affairs*, 107th Cong. 44 (2002) (testimony of Arthur Levitt, former Chairman of the SEC), so that it could "make the tough decisions" without regard to "the myriad of constituent pressures" that it would otherwise face, *id.* at 195 (statement of Michael H. Sutton, former Chief Accountant of the SEC). This feared political "pressure," moreover, extended to that which might be brought by the Securities and Exchange Commission ("SEC") itself, since the Act was intended to avert the "extraordinary amount of political pressure [that] was [previously] brought to bear on the [SEC]" when it

attempted to limit the consulting work that auditors could perform.  *Id.* at 15 (statement of Arthur

Levitt).[1]  The Act thus authorizes the PCAOB to exercise its wide-ranging governmental power

on a permanent basis without any supervision by the President and subject only to limited

deferential oversight by the SEC.  As one of the Act's supporters accurately described, the

PCAOB has "massive power, unchecked power, *by design*," and will "make decisions that affect

all accountants and everybody they work for, which directly or indirectly is every breathing

person in the country."  148 Cong. Rec. at S6334 (statement of Sen. Gramm) (emphasis added).

A.    **The PCAOB's Wide-Ranging Government Powers**

The Act delegates to the PCAOB, on a permanent basis, substantial regulatory authority

over all accounting firms (and the employees thereof) that engage in the business of auditing

publicly traded companies.[2]  This authority includes the power to promulgate binding rules and

auditing standards, to inspect and investigate accounting firms, to conduct disciplinary

proceedings and impose sanctions, and to provide for the PCAOB's own funding by levying a

tax on the nation's public companies.

---

[1] *See also, e.g.*, *id.* at 186 (comments of Sen. Stabenow) ("I am certainly concerned about
finding a better way to insulate the establishment of accounting standards from politics and
pressures, both from the industry and, frankly, from Congress."); *id.* at 793 (statement of Bevis
Longstreet, former Commissioner of the SEC) ("The independence of the SEC, itself, was being
challenged as the accounting firms did all they could, on Capitol Hill and throughout the
business and legal communities, to bring political pressure to bear against a[n independence]
proposal . . . that could not be defeated by argument on the merits."); 148 Cong. Rec. S6327-06,
S6331 (daily ed. July 8, 2002) (statement of Sen. Sarbanes) ("I believe, frankly, that we need to
establish this oversight board in statute in order to provide an extra guarantee of its independence
and its plenary authority to deal with this important situation.").

[2] Accounting firms are made subject to the PCAOB's authority through a system of
mandatory registration.  *See* SOX §§ 2(a)(7) & 102(a), 15 U.S.C. §§ 7201(a)(7) & 7212(a)
(making it unlawful for any unregistered firm to audit any publicly traded company).  According
to its website, the Board had registered 1,675 accounting firms as of July 18, 2006.  *See* PCAOB,
*Registered Public Accounting Firms*, http://www.pcaob.org/Registration/Registered_Firms.pdf
(last visited July 24, 2006).

*Binding Auditing and Independence Standards* — The Act gives the PCAOB broad authority to interpret and implement the Act through the promulgation of rules, including auditing and attestation standards, quality-control standards, ethics standards, and auditor-independence requirements, "as may be necessary or appropriate in the public interest or for the protection of investors."  SOX § 103(a)(1), 15 U.S.C. § 7213(a)(1).  Through these powers, the PCAOB requires accounting firms to follow certain procedures and comply with specified standards when carrying out their audits of public companies.  The PCAOB has exercised this authority by promulgating numerous rules and auditing standards that impose specific and substantial new duties on registered accounting firms.  *See* PCAOB Auditing Standards, *available at* http://www.pcaob.org/Standards/Standards_and_Related_Rules/index.aspx.

As described below, a registered entity's violation of the Board's rules and standards subjects that entity to disciplinary actions by the Board or the SEC.  *See* SOX § 105(c)(4), 15 U.S.C. § 7215(c)(4).  In addition, the willful violation of the PCAOB's rules exposes a regulated entity to severe criminal sanctions.  Specifically, the Act provides that a violation of any of the PCAOB's rules "shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934 (15 U.S.C. [§§] 78a et seq.) or the rules and regulations issued thereunder" and that the person committing such violation "shall be subject to the same penalties, and to the same extent, as for a violation of that Act or such rules and regulations."  SOX § 3(b), 15 U.S.C. § 7202(b).  These "same penalties" include the severe criminal sanctions, including up to 20 years imprisonment and $5 million in fines, that are imposed for willful violations of the Exchange Act and its implementing rules.  *See* 15 U.S.C. § 78ff(a).

*Inspections* — The Act gives the PCAOB the power to enforce the Act and the PCAOB's auditing standards and other rules through a "continuing program of inspections" that

involves the selective inspection and review of an accounting firm's audit engagements.  SOX

§ 104(a), 15 U.S.C. § 7214(a).  While the Act initially determines inspection frequency based

upon the number of issuers for which the registered accounting firm provides audit reports, *id.*

§ 104(b)(1), 15 U.S.C. § 7214(b)(1), the PCAOB has the power to change the frequency of

inspections if it finds "that different inspection schedules are consistent with the purposes of

th[e] Act, the public interest, and the protection of investors."  *Id.* § 104(b)(2), 15 U.S.C.

§ 7214(b)(2).  The PCAOB has inspected hundreds of registered firms, including plaintiff

Beckstead and Watts, and has posted reports of those inspections on its website.  *See* PCAOB,

*Inspection Reports*, *available at* http://www.pcaob.org/Inspections/Public_Reports/index.aspx.

 *Investigations and Sanctions* — The Act grants the Board the power to conduct formal

investigations of any act or practice by a registered accounting firm that "may violate" the Act,

the rules of the Board, the federal securities laws or professional standards.  SOX § 105(b)(1),

15 U.S.C. § 7215(b)(1).  The Board may begin such an investigation of any firm at its discretion

and regardless of inspection results.  *Id.*  If the Board finds a violation, it "may impose such

disciplinary or remedial sanctions as it determines appropriate."  *Id.* § 105(c)(4), 15 U.S.C.

§ 7215(c)(4).  Available sanctions include temporary suspension or permanent revocation of an

accounting firm's registration or of an associated person's right to further association with any

registered firm; civil monetary penalties of up to $15,000,000; and "any other appropriate

sanction provided for in the rules of the Board."  *Id.* § 105(c)(4)(A)–(G), 15 U.S.C.

§ 7215(c)(4)(A)-(G).  The Board may also sanction firms for failure to supervise employees or

other associated persons who violate Board rules, securities laws, or professional standards.  *Id.*

§ 105(c)(6)(A), 15 U.S.C. § 7215(c)(6)(A).

 *Taxation* — In addition to its broad rulemaking, investigative and adjudicative power

over the entire accounting profession, the Act also grants the PCAOB the extraordinary power to set its own budget and to fund its own activities by levying a tax on publicly traded companies. In particular, the Act gives the Board the power to establish a budget for each fiscal year, while providing no guidance as to or statutory cap on the size of the budget.  SOX § 109(b), 15 U.S.C. § 7219(b).  The Act then provides that funds to cover the Board's budget are to be payable from an annual tax, called an "accounting support fee," levied upon public companies pursuant to standards established by the Board.  SOX § 109(c)-(d), 15 U.S.C. § 7219(c)-(d).  The Board has acted under these provisions to promulgate a rule levying this tax on some, but not all, of the nation's public companies, *see* PCAOB Rule 7101, and to collect the tax from approximately 10,000 such companies, *see* PCAOB, *List of Issuers with No Outstanding Past-Due Share*, http://www.pcaob.org/Support_Fees/Issuers_Paid.pdf (last visited July 24, 2006).  These funds have been used, *inter alia*, to pay the exorbitant salaries that the Board has established for its own Members:  $556,000 for its Chairman and $452,000 for each of the other Members.

###    B.    Appointment and Removal of PCAOB Members

The PCAOB exercises its authority through its five full-time Members, who are appointed for staggered five-year terms by a majority vote of the five commissioners of the SEC—an independent agency.  SOX § 101(e), 15 U.S.C. § 7211(e).  Similarly, only the SEC may remove a PCAOB member from office.  In addition, its ability to do so is severely restricted.  The Act provides that "[a] member of the Board may be removed by [the SEC] from office, *in accordance with section 107(d)(3)*, for good cause shown before the expiration of the term of that member."  SOX § 101(e)(6), 15 U.S.C. § 7211(e)(6) (emphasis added).  The cross-referenced subsection, however, establishes the highly circumscribed bases upon which a finding of "good cause" must be predicated:

> The Commission may, as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this Act or the securities laws, remove from office . . . any member of the Board, if the Commission finds, on the record, after notice and opportunity for a hearing, that such member--
>
> (A) has willfully violated any provision of this Act, the rules of the Board, or the securities laws;
>
> (B) has willfully abused the authority of that member; or
>
> (C) without reasonable justification or excuse, has failed to enforce compliance with any such provision or rule, or any professional standard by any registered public accounting firm or any associated person thereof.

SOX § 107(d)(3), 15 U.S.C. § 7217(d)(3).  Thus, a PCAOB member may be removed by the SEC only for what is tantamount to a willful abuse of power.

### C.    Limited SEC Oversight of PCAOB Activities

The PCAOB's policy choices are further insulated from oversight—and its "independence" maintained—by procedural and substantive limitations on the SEC's ability to review and modify the PCAOB's actions.

*Lack of SEC Oversight Over Day-to-Day Activities* — The Act permits the PCAOB to conduct many of its day-to-day activities without any supervision at all.  For example, the SEC has no control over the conduct of the Board's regular inspections, including the Board's choices about which audits to inspect.  *See* SOX § 104(d)(1), 15 U.S.C. § 7214(d)(1).  Likewise, the SEC does not supervise the Board's choice of firms to investigate, as the Board may commence an investigation whenever it appears to the Board that a violation "may" have occurred.  *Id.* § 105(b)(1), 15 U.S.C. § 7215(b)(1).  The SEC also has no power to oversee Board demands for documents or testimony from firms or associated persons during an investigation.  *See id.* § 105(b)(2)(A)-(B), 15 U.S.C. § 7215(b)(2)(A)-(B).  And the SEC has no authority to direct the PCAOB to impose sanctions on the target of an investigation when the PCAOB chooses not to.

- 8 -

*SEC Oversight of Procedures and Standards* — Even where the Act provides for SEC oversight of PCAOB activities, that oversight frequently entails the use of cumbersome notice-and-comment procedures.  For example, although the SEC may amend the PCAOB's rules, *see* 15 U.S.C. § 78s(c) (made applicable to the PCAOB by SOX § 107(b)(5), 15 U.S.C. § 7217(b)(5)), and rescind the PCAOB's authority, SOX § 107(d)(1), 15 U.S.C. § 7217(d)(1), it may do so only through notice-and-comment rulemaking.  The same cumbersome procedural requirements govern the SEC's review of proposed PCAOB rules and standards.  *See* SOX § 107(b)(2), 15 U.S.C. § 7217(b)(2); 15 U.S.C. § 78s(b) (made applicable to the PCAOB by SOX § 107(b)(4), 15 U.S.C. § 7217(b)(4)).  And if the SEC wishes to reject a PCAOB rule or standard following this period of notice and comment, it must institute further proceedings, including notice of the grounds for disapproval and an opportunity for a hearing.  *Id.* § 78s(b)(2).

Moreover, in these and other circumstances in which the SEC exercises oversight authority, the standard of review is generally so deferential that it provides no effective supervisory check on the PCAOB.  Indeed, SEC review of PCAOB actions is often at least as deferential as the *Chevron* deference that appellate courts accord to agency action.  For example, the Act requires the SEC to approve any proposed rule (including auditing standards and budgetary decisions) that either is merely "consistent with the requirements" of the Act and the securities laws "or is necessary or appropriate in the public interest or for the protection of investors."  SOX § 107(b)(3), 15 U.S.C. § 7217(b)(3).

SEC review of PCAOB sanctions (as well as denials of registration applications, which are treated as sanctions, *see* SOX § 102(c)(2), 15 U.S.C. § 7212(c)(2)) is similarly circumscribed. The Act provides that SEC may modify or set aside a sanction only if "having due regard for the public interest and the protection of investors, [it] finds . . . that the sanction—(A) is not

necessary or appropriate in furtherance of this Act or the securities laws; or (B) is excessive, oppressive, inadequate, or otherwise not appropriate to the finding or the basis on which the sanction was imposed."  SOX § 107(c)(3), 15 U.S.C. § 7217(c)(3).

Finally, the SEC's power to rescind PCAOB authority may be invoked only if doing so is "consistent with the public interest, the protection of investors, and the other purposes of the Act and the securities laws."  SOX § 107(d)(1), 15 U.S.C. § 7217(d)(1).  Similarly, the SEC's power to censure or limit the activities of the PCAOB may only be exercised if the SEC finds, on the record and after notice and opportunity for a hearing, that the Board "(A) has violated or is unable to comply with a provision of this Act, the rules of the Board, or the securities laws; or (B) without reasonable justification or excuse, has failed to enforce compliance [by a registered firm or associated person] with any such provision or rule, or any professional standard."  SOX § 107(d)(2), 15 U.S.C. § 7217(d)(2).

## SUMMARY OF ARGUMENT

The Public Company Accounting Oversight Board separates governmental power from political accountability to an extent not before known to American law.  Its officials are vested with "massive unchecked powers"—*viz.*, the "massive power . . . to make decisions that affect all accountants and everybody they work for, which directly or indirectly is every breathing person in the country."  148 Cong. Rec. at S6334 (statement of Sen. Gramm).  Yet the PCAOB's exercise of "unchecked power" is shielded from all political accountability.  This structure violates the most basic tenets of our constitutional republic.

The democratically-elected President, accountable to the people and constitutionally charged with responsibility to implement the laws passed by Congress, has absolutely no ability to influence the Board's membership or activities, and thus no recourse if the Board or its

Members implement Sarbanes-Oxley or the securities laws in an unwise or even corrupt manner. Neither he nor his Executive Branch subordinates have any say in selecting or removing Board Members and no ability to review their policies, or even their budget. Accordingly, the Board is entirely unaccountable to the President or any other federal official who is accountable to the people through the electoral process.

The Board was deliberately created in this manner in order to render it "independent" of "politics." *See supra* pp. 3-4 (surveying the legislative history). But since the people exercise ultimate control over government officials through the political process, this renders the Board "independent" of the people who are supposed to exercise ultimate sovereignty. So vesting government agencies with coercive power over the citizenry, and simultaneously depriving the citizenry of any ability to control or check those exercising such potentially tyrannical authority, is precisely the fundamental threat to the "liberty and security of the governed" that separation of powers principles were designed to prevent. *Metro. Wash. Airports Auth.*, 501 U.S. at 272. The Framers understood that "personal liberty [was] in peril of arbitrary action by officials," *Hamdan*, 126 S. Ct. at 2800 (Kennedy, J., concurring in part), unless structural guarantees "ensure[d] that those who wielded [government power] were accountable to political force and the will of the people," *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991). As the Supreme Court has often noted, "clear assignment of power to a branch . . . allows the citizen to know who may be called to answer for making, or not making, those delicate and necessary decisions essential to governance." *Loving*, 517 U.S. at 758.

While courts have permitted some insulation of those who execute the law from a President accountable to the people, by tolerating certain constraints on his power to appoint or to remove or to oversee officers exercising significant government authority, here, *all* three of

those basic control mechanisms have been taken from the Chief Executive. No such complete break in the chain of "dependence" between federal "officers" and "the President [and] the community" has been, or can be, countenanced under the fundamental precepts of our tripartite and democratic system of government. 1 Annals of Cong. 495, 499 (remarks of Madison).

Specifically, the PCAOB violates fundamental separation of powers principles. The bare minimum required by the Constitution is that the President exercise broad removal authority over all who wield "[t]he executive power" on his behalf and through whom he ensures that the laws are "faithfully executed." U.S. Const. art. II, §§ 1, 3. Members of the PCAOB, however, are not removable by the President *at all*. Rather, they are removable by an entity itself independent of the President and, even then, only for what amounts to a willful abuse of power. The Supreme Court has *never* endorsed such a separation of executive power from political accountability.

Second, the PCAOB violates the Appointments Clause. U.S. Const. art. II, § 2, cl. 2. The Members of the PCAOB exercise widespread, unsupervised governmental power, by virtue of which they are principal officers who must be appointed by the President with the Senate's advice and consent. But even assuming they are inferior officers, the Appointments Clause requires that they be appointed by the "head" of a "department." Independent agencies like the SEC, however, are not "departments" under the Appointments Clause, which, the Supreme Court has held, include only those entities within the Executive Branch that are under the President's control. Nor in any event are PCAOB Members appointed by the "head" of the SEC, but rather collectively by the five-member commission as a whole.

Finally, by exercising core legislative power—including the power to enact criminal laws and to tax broad swaths of the public—the PCAOB runs afoul of the non-delegation doctrine.

For all of these reasons, the PCAOB is unconstitutional.

## ARGUMENT

## I.    THE PCAOB VIOLATES THE CONSTITUTION'S SEPARATION OF POWERS

The Constitution vests all of the "executive Power . . . in a President," U.S. Const. art. II,

§ 1, and provides that "he shall take Care that the Laws be faithfully executed," *id.* art. II, § 3.

Through this simple command, "the executive power of the nation is vested in the President;

subject only to the exceptions and qualifications, which are expressed in the instrument." *Myers*

*v. United States*, 272 U.S. 53, 138-39 (1926) (quoting remarks of Alexander Hamilton reprinted

in 7 *Hamilton's Works* 80-81 (J.C. Hamilton ed., 1851)).  The President, of course, "'alone and

unaided could not execute the laws.  He must execute them by the assistance of subordinates.'"

*Buckley*, 424 U.S. at 135 (quoting *Myers*, 272 U.S. at 117).  But in order to ensure that he is

accountable for all exercises of the "executive power," all government officials who wield that

power on his behalf must "'act for him under his direction in the execution of the laws.'"  *Id.* at

136 (quoting *Myers*, 272 U.S. at 117).  In the words of Hamilton, executive officers "ought to be

considered the assistants or deputies of the chief magistrate . . . and ought to be subject to his

superintendence."  *The Federalist* No. 72.  For only then will "all those who are employed in the

execution of the law . . . be in their proper situation, and the chain of dependence be preserved;

the lowest officers, the middle grade, and the highest, will depend, as they ought, on the

President, and the President on the community."  1 Annals of Cong. 499 (remarks of Madison).

This core structural principle is safeguarded through the Supreme Court's separation of

powers doctrine.  This doctrine requires that, at a minimum, the President exercise broad

removal power over all government officers who wield the "executive power" on his behalf.  But

even where such officials are subject to the President's removal authority, courts must undertake

a searching inquiry to determine whether a statutory scheme "taken as a whole" unduly reduces

"the President's ability to control" the exercise of executive power. *Morrison v. Olson*, 487 U.S. 654, 685 (1998). The PCAOB runs afoul of both of these separation of powers principles.[3]

### A.    Sarbanes-Oxley's Limitations On Presidential Removal Authority Violate Separation Of Powers

It has long been understood that the core of the President's ability to supervise and control all exercises of "executive power" lies in his ability to remove from office those individuals who cease to hold his confidence. The Supreme Court has made clear that "there are some 'purely executive' officials who must be removable by the President *at will* if he is to be able to accomplish his constitutional role." *Morrison*, 487 U.S. at 690 (emphasis added). At a minimum, all those who wield the "executive power" of the President must broadly be subject to removal "for cause." Here, however, the Sarbanes-Oxley Act "completely strip[s]" the President of all removal authority over government officials that exercise wide-ranging and permanent governmental power. *Id.* at 692. For this reason alone, it is unconstitutional.

### 1.    The President Must Have Broad Removal Power Over All Officials Who Exercise "Executive Power"

Since the early days of the Republic, it has not been doubted "that Article II grants to the

---

[3] Although the Sarbanes-Oxley Act states that the PCAOB is "not . . . an agency or establishment of the United States Government," and its officials are not "officer[s] or employee[s] or agent[s] for the Federal Government," SOX § 101(b), 15 U.S.C. § 7211(b), it clearly is a governmental entity for constitutional purposes. *See Lebron v. Nat'l Ry. Passenger Corp.*, 513 U.S. 374 (1995). *Lebron* makes clear that "where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government" for constitutional purposes. *Id.* at 400; *see also Metro. Wash. Airports Auth.*, 501 U.S. at 269-70. Here, as in *Lebron*, the PCAOB was created by Congress, *see* SOX § 101(a), 15 U.S.C. § 7211(a); its Members are appointed by the Government, *see id.* § 101(e)(4), 15 U.S.C. § 7211(e)(4); and its purpose is to further governmental objectives, *see, e.g., id.* § 101(a), 15 U.S.C. § 7211(a). *See also The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124, 148 n.70 (1996) (memorandum from Assistant Attorney General Walter Dellinger) ("Congress may [not] evade the 'solemn obligations' of the doctrine of separation of powers by resorting to the corporate form any more than it may evade the obligations of the Bill of Rights through this artifice.").

President the executive power of the Government, *i.e.*, the general administrative control of those executing the laws, *including the power of appointment and removal of executive officers*—a conclusion confirmed by his obligation to take care that the laws be faithfully executed." *Myers*, 272 U.S. at 163-64 (emphases added). Indeed, this was recognized by the very First Congress in the so-called "decision of 1789." *See id.* at 112-32. There, "the First Congress, after heated debate, deleted from a proposed bill creating the Department of Foreign Affairs language which provided that the Secretary of Foreign Affairs was 'to be removable from office by the President.'" *Synar v. United States*, 626 F. Supp. 1374, 1395 (D.D.C.) (three-judge district court), *aff'd*, *Bowsher v. Synar*, 478 U.S. 714 (1986). It did so not because it wished to deny the President that power, but out of fear that "the original text implied"—wrongly—"the absence of a constitutionally conferred power of the President to effect removal." *Id.* But the President's "duty to see the laws faithfully executed" was intended to encompass "that species of power which is necessary to accomplish that end," including the broad power of removal. 1 Annals of Cong. 499 (remarks of Madison). This removal power was vital to preserve "'that great principle of unity and responsibility in the executive department, which was intended for the security of liberty and the public good.'" *Myers*, 272 U.S. at 131 (quoting 1 Annals of Congress 499 (remarks of Madison)). And only "'[i]f the President should possess *alone* the *power of removal* from office, [would] those who are employed in the execution of the law . . . be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Id.* (quoting 1 Annals of Congress 499 (remarks of Madison)).

"This 'decision of 1789' provides 'contemporaneous and weighty evidence' of the Constitution's meaning since many of the Members of the First Congress 'had taken part in

framing that instrument,'" *Bowsher*, 478 U.S. at 723-24 (citation omitted), and "'has ever been considered as a full expression of the sense of the Legislature on this important part of the American Constitution,'" *Myers*, 272 U.S. at 144 (quoting 3 Albert J. Beveridge, *The Life of John Marshall* 248, 252, 272, 273 (1916)).  And since then, the Court has repeatedly reaffirmed the centrality of the President's removal power to his ability to perform his constitutional duty of exercising the "executive power" and "tak[ing] care that the laws be faithfully executed."  *See, e.g.*, *In re Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839); *Shurtleff v. United States*, 189 U.S. 311, 315 (1903); *Myers*, 272 U.S. at 161; *Bowsher*, 478 U.S. at 726; *Morrison*, 487 U.S. at 689-90.

The seminal Supreme Court case in this area is *Myers*, where the Court struck down a statute conditioning the President's removal of a postmaster on the advice and consent of the Senate.  Article II of the Constitution, explained the Court, "grants to the President the executive power of the government—*i.e.*, the general administrative control of those executing the laws, *including the appointment and removal of executive officers*."  272 U.S. at 163-64 (emphasis added).  And "his power of removing those for whom he cannot continue to be responsible," held the Court, is "*essential* to the execution of the laws by him."  *Id.* at 117 (emphasis added).

More recently, in *Bowsher v. Synar*, 478 U.S. 714 (1986), the Court invalidated a provision of the Gramm-Rudman-Hollings Act that made the Comptroller General removable by Congress.  "'Once an officer is appointed,'" the Court explained, "'it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.'"  *Id.* at 726 (quoting *Synar*, 626 F. Supp. at 1401).  By placing removal authority in the Congress, it was the Congress, and not the President, that the Comptroller General would "fear" and "obey."  This, the Court held, was constitutionally intolerable:  "The structure of our Constitution does not permit the Congress to execute the laws;

it follows that Congress cannot grant to an officer under its control what it does not possess." *Id.*
In short, because the Comptroller General exercised executive power, the Constitution demanded
that he be removable by the President.

To be sure, there are circumstances in which the Constitution does not require the
relevant officer to be removable *at will* by the President. Rather, as in *Morrison v. Olson*,
Congress may sometimes limit the President's removal authority by prohibiting removal except
"for cause." *Morrison* upheld the constitutionality of the independent counsel statute, which
authorized the President, acting "through" the Attorney General, to remove an independent
counsel "for good cause." 487 U.S. at 692. The Court concluded that where an official exercises
"limited jurisdiction and tenure" and "lack[s] policymaking or significant administrative
authority," *id.* at 691, a broad "for cause" removal provision might not unduly inhibit "the
President's need to control the exercise of [the official's] discretion." *Id.* At the same time,
however, *Morrison* makes clear that in many cases, "'purely executive' officials . . . *must* be
removable by the President *at will* if he is to be able to accomplish his constitutional role." *Id.* at
690 (emphasis added).

*Morrison* makes eminent sense. A for-cause removal provision, with "cause" broadly
defined, allows the President to remove a government official for, among other things, failure to
accept supervision. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 366 (1976) (noting that "discharge[]
for good cause" includes "insubordination or poor job performance"). Thus, an official subject
to a for-cause removal provision may be discharged for failure to obey a lawful order. *See
United States v. Perkins*, 116 U.S. 483, 485 (1886) (upholding statute that provided that a Navy
cadet could only be removed in peacetime pursuant to a court-martial); *Morrison*, 487 U.S. at
724 n.4 (Scalia, J., dissenting) (citing *Perkins* and stating that removal for cause "would include,

of course, the failure to accept supervision"). And where, as in *Morrison*, the official's duties are narrow and temporary, the "power to remove the counsel for 'good cause,' . . . provides the Executive with substantial ability to ensure that the laws are 'faithfully executed' by an independent counsel." *Morrison*, 487 U.S. at 696.

The Court, however, was equally clear that it *would* be unconstitutional for Congress to "completely strip[] from the President" "the power to remove an executive official, . . . thus providing *no means* for the President to ensure the 'faithful execution' of the laws." *Id.* at 692 (emphasis added). The Supreme Court has thus *never* endorsed a restriction upon the President's removal power more intrusive than a requirement that such removal be "for cause." *See id.* at 663 (independent counsel removable by the Attorney General "for good cause, physical disability, or any other condition that substantially impairs the performance of such independent counsel's duties" (internal quotation marks omitted)); *Humphrey's Executor v. United States*, 295 U.S. 602, 629 (1935) (Commissioners of the Federal Trade Commission removable by the President for "inefficiency, neglect of duty, or malfeasance in office").

In short, the bare constitutional minimum is that the President have broad "for cause" removal authority over all government officials who wield "executive power" on his behalf. For only if such officials "act for him under his direction in the execution of the laws," *Buckley*, 424 U.S. at 135, and "subject to his superintendence," *The Federalist* No. 72, will "all those who are employed in the execution of the law . . . be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." 1 Annals of Cong. 499 (remarks of Madison).

2.    **The PCAOB Exercises "Executive Power" That Must Be Subject To The President's Removal Authority**

The Board's insulation from Presidential removal and oversight obviously cannot be justified on the ground that the Board is somehow subordinate to another branch of government or performs a function other than execution of the law.  The President is the relevant constitutional actor to whom the Board must be subordinate, since it does not exercise authority that could reasonably be deemed supplemental to the "legislative" or "judicial" power.  Because the Board's power is neither legislative nor judicial, it must be "executive" or "administrative" and thus subject to supervision by the constitutional entity—the President—responsible for implementing the laws passed by Congress and interpreted by the Judiciary.

Fortunately, the prior potential semantic confusion caused by seeking to identify whether a particular governmental power is "executive" or "purely executive" or "quasi-judicial" or "quasi-legislative" (*Humphrey's Executor*, 295 U.S. at 628) is of little import in modern separation of powers analysis.  Rather, as *Morrison* makes clear, separation of powers analysis no longer "turn[s] on" such "rigid categori[zation]."  487 U.S. at 689.  In any event, it is clear here that the power exercised by the Board is not in aid of the judicial or legislative function, but is plainly an enforcement and implementation power that the President must be able to control. Even assuming that the Board's powers are not "purely executive" of the sort mandating at-will removal, they are plainly sufficiently executive to trigger the requirement that the President must be able to remove those exercising that power.  Specifically, the Board exercises far broader and more "executive" power than the Comptroller General in *Bowsher* and the FEC in *Buckley*.[4]

_____

[4] The PCAOB's powers in this respect are analogous to those of the traditional "independent agencies," the members or commissioners of which, unlike the PCAOB, *are* subject to the President's removal power.  *See, e.g.*, *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619 (2d Cir. 2004) ("the power to remove [SEC] Commissioners belongs to the President");

As discussed above, *Bowsher* invalidated the Gramm-Rudman-Hollings Act because it authorized Congress to remove the Comptroller General from office.  A necessary part of that conclusion was that the Comptroller General, at least in some of his functions, exercised "executive power."  *See Bowsher*, 478 U.S. at 732-34.  Indeed, if the Comptroller General's powers were legislative, then there would have been no constitutional infirmity at all, since Congress is perfectly free to retain removal authority over legislative officers.  But the Court concluded that the Comptroller General's functions were of an "executive nature" because they "plainly entail[ed] execution of the law in constitutional terms":

> Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of "execution" of the law.  Under [the Act], the Comptroller General must exercise judgment concerning facts that effect the application of the Act.  He must also interpret the provisions of the Act to determine precisely what budgetary calculations are required.  Decisions of that kind are typically made by officers charged with executing a statute.

*Id.* at 733.

*Buckley* is to like effect.  It involved a challenge to the composition of the Federal Election Commission, whose members had not been appointed in accordance with the Appointments Clause and thus could not qualify as "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  In light of this, the Court concluded that FEC commissioners could "properly perform duties only in aid of those functions that Congress may carry out by itself, or in an area sufficiently removed from the administration and enforcement of the public law."  *Buckley*, 424 U.S. at 139.  The duties of the FEC, however, plainly did not fall within these categories.

---

(continued…)

15 U.S.C. § 2053(a) (Consumer Product Safety Commission removable by President for "neglect of duty or malfeasance in office but for no other cause"); 12 U.S.C. § 242 (Federal Reserve Board members removable "for cause by the President"); 15 U.S.C. § 41 (FTC Commissioners removable "by the President for inefficiency, neglect of duty, or malfeasance in office").

They encompassed, rather, "broad administrative powers" that were not "appropriate legislative functions" and could be performed only by officials appointed by the President:

> All aspects of the [Federal Election Campaign] Act are brought within the Commission's broad administrative powers: rulemaking, advisory opinions, and determinations of eligibility for funds and even for federal elective office itself. These functions . . . are of kinds usually performed by independent regulatory agencies or by some department in the Executive Branch under the direction of an Act of Congress . . . . Yet each of these functions also represents the performance of a significant governmental duty exercised pursuant to a public law. While the President may not insist that such functions be delegated to an appointee removable at will, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), none of them operates merely in aid of congressional authority to legislate or is sufficiently removed from the administration and enforcement of public law to allow it to be performed by the present Commission.

*Id.* at 140-41.

Like the Comptroller General in *Bowsher*, the PCAOB is charged with "[i]nterpreting a law enacted by Congress to implement the legislative mandate" and with "exercising judgment concerning facts that affect the application of the act." *Bowsher*, 478 U.S. at 733. And like the FEC in *Buckley*, the PCAOB exercises "broad administrative powers," including rulemaking, investigatory, adjudicative, and enforcement powers. *Buckley*, 424 U.S. at 140-41. Indeed, the PCAOB's broad administrative powers are far greater than those exercised by the Comptroller General in *Bowsher* or even the FEC in *Buckley*.[5] It is therefore clear that, at a minimum, the President must have the broad authority to remove PCAOB Members "for cause."

---

[5] They are also far greater and more "executive" than the powers of the Federal Trade Commission at issue in *Humphrey's Executor*. In particular, the Commission's powers did not include rulemaking, as the FTC did not claim such authority until 1962. *See Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973); *Synar*, 626 F. Supp. at 1397 n.24. The FTC's functions at the time included the conduct of investigations on behalf of Congress, *see Humphrey's Executor*, 295 U.S. at 621, 628, individual adjudications, *see id.* at 620-21, 624, 628-29, and the performance of duties as a master in chancery, *see id.* at 621, 628, 630.

3.      **The Sarbanes-Oxley Act "Completely Strips" The President Of Removal Authority**

The removal provisions governing PCAOB Members are irreconcilable with these fundamental constitutional principles.  Unlike the statutes at issue in *Morrison* and *Humphrey's Executor*, and like the ones at issue in *Myers* and *Bowsher*, the President has no power to remove Members of the PCAOB, "for cause" or otherwise.  This is patently unconstitutional.

First, the President has no authority to remove PCAOB Members *at all*.  As explained above, Members of the PCAOB are both appointed and removable by the SEC.  Nor can the SEC stand in the President's shoes, as did the Attorney General in *Morrison*.  Whereas the Attorney General serves pursuant to the plenary authority of the President, the "independent regulatory agencies such as . . . the Securities and Exchange Commission" "are specifically designed *not* to have the quality . . . of being 'subject to the exercise of political oversight and sharing the President's accountability to the people.'"  *Freytag*, 501 U.S. at 916 (Scalia, J., concurring in the judgment) (citation omitted); *see also Lebron*, 513 U.S. at 398; *Mistretta v. United States*, 488 U.S. 361, 387 n.14 (1989) (comparing the Sentencing Board to "other independent agencies, such as the Securities and Exchange Commission"); *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 33 n.3 (D.C. Cir. 1987) (noting that "[t]he SEC . . . [is] an independent agency").

Second, even the SEC lacks the authority to remove PCAOB Members "for cause." Rather, PCAOB Members can be removed "for good cause shown," but *only* "in accordance with section 107(d)(3)" of the Act.  SOX § 101(e)(6), 15 U.S.C. § 7211(e)(6).  And Section 107(d)(3) authorizes removal only for what amounts to a willful abuse of power.  *See supra* pp. 7-8.  Thus, under Section 107(d)(3), the SEC could not remove a PCAOB Member for negligently abusing his authority—as, for example, the honest but overzealous regulator who launches deep and onerous investigations into what he erroneously perceives as violations of PCAOB rules.  Nor

- 22 -

could a PCAOB Member be removed for negligently violating the law.  Such misconduct, rather, must rise to the level of "willfulness" to warrant removal under Sarbanes-Oxley.  *Compare, e.g.*, *Black's Law Dictionary* (8th ed. 2004) (defining "negligence" as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation"), *with id.* (defining "willful" as "[v]oluntary and intentional, but not necessarily malicious").  This removal provision, therefore, imposes far greater restraints on the removal power than that approved by the Court in *Morrison* or *Humphrey's Executor*, and, as in *Myers* and *Bowsher*, unconstitutionally interferes with the President's exercise of executive power.

### B.    The PCAOB Taken As A Whole Violates Separation Of Powers

"[I]n a representative republic," our Founding Fathers recognized, it is the encroaching power of the Legislature that poses the greatest threat to liberty, because the Legislature's "constitutional powers [are] at once more extensive and less susceptible of precise limits."  *The Federalist* No. 48 (Madison).  As James Madison "presciently observed, the legislature 'can with greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments.'"  *Metro. Wash. Airports Auth.*, 501 U.S. at 277 (quoting *The Federalist* No. 48 (Madison)).  It was, therefore, "against the enterprising ambition of [the Legislative] department that the people ought to indulge all their jealousy and exhaust all their precautions."  *The Federalist* No. 48 (Madison).

This legislative encroachment can occur either when Congress "assumes a function that more properly is entrusted to another [branch]" or, as here, by "interfer[ing] impermissibly with [another branch's] performance of its constitutionally assigned function."  *INS v. Chadha*, 462 U.S. 919, 963 (1983) (Powell, J., concurring in judgment).  Congress could not, for example, either impermissibly interfere with the judiciary's ability to decide cases or controversies, *see,*

*e.g.*, *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995); *INS v. St. Cyr*, 533 U.S. 289, 300 (2001), or aggrandize unto *itself* the power to decide cases, *see, e.g.*, *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 76 (1982).  Thus, even where "a branch does not arrogate power to itself, the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties."  *Loving*, 517 U.S. at 757; *see also The Federalist* No. 70 (Hamilton).

Consequently, the question here is whether the statutory scheme "taken as a whole," impermissibly "reduc[es] the President's ability to control the [executive] powers wielded by" government officials, or otherwise "deprives the President of control over the [exercise of executive power as] to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws."  *Morrison*, 487 U.S. at 685, 693.  Here, the President is divested of all "ability to control the [executive] powers wielded by" the PCAOB.  *Id.* at 685; *see also supra* Part I.A.2 (PCAOB exercises executive power).  And the Act therefore impermissibly "interfer[es] with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II."  *Id.* at 690.

In *Morrison*, the Court held that the Ethics in Government Act, "taken as a whole," did not violate the separation of powers doctrine.  In so holding, however, the Court emphasized the Independent Counsel's "limited jurisdiction and tenure and lack[] [of] policymaking or significant administrative authority."  *Id.* at 692.  Indeed, throughout its opinion, the Court repeatedly relied upon the fact that the Independent Counsel was "empowered . . . to perform only certain, limited duties" and that her tenure was "limited in nature" and "'temporary' in the sense that an independent counsel is appointed to essentially accomplish a single task, and when that task is over the office is terminated."  *Id.* at 672; *see also id.* at 679 (describing the

independent counsel as "a temporary 'office' the nature and duties of which will by necessity vary with the factual circumstances").

In light of this temporary, limited authority, the Court held that "the Executive Branch [had] sufficient control over the independent counsel to ensure that the President [was] able to perform his constitutionally assigned duties." *Id.* at 696. Indeed, "the Act [gave] the Attorney General several means of supervising or controlling the prosecutorial powers that may be wielded by an independent counsel." *Id.* The first and "[m]ost important[]" of these means of "supervisi[on] and control[]" was, of course, the Attorney General's "power to remove the counsel for 'good cause,' a power that . . . provide[d] the Executive with substantial ability to ensure that the laws are 'faithfully executed' by an independent counsel." *Id.* Second, the Court noted that an independent counsel would have no power at all but for the action of the Attorney General, since "[n]o independent counsel [could] be appointed without a specific request by the Attorney General"—a decision "committed to [the Attorney General's] unreviewable discretion." *Id.* Third, the Attorney General had the power to shape the scope of the independent counsel's authority from the outset because "the jurisdiction of the independent counsel [was] defined with reference to the facts submitted by the Attorney General." *Id.*; *see also id.* at 679 (noting that "the jurisdiction that the [Special Division] decides upon must be demonstrably related to the factual circumstances that gave rise to the Attorney General's investigation and request for the appointment of the independent counsel"). And finally, "the Act requir[ed] that the [independent] counsel abide by Justice Department policy" unless it was literally "not 'possible' to do so." *Id.* at 696.

Here, the PCAOB exercises far greater power than did the independent counsel in *Morrison*. Whereas the independent counsel was tasked with investigating a single matter, the

- 25 -

PCAOB is charged with overseeing the entire accounting industry and, indeed, virtually every publicly traded company in America. Whereas the independent counsel's office was temporary, terminating upon the completion of the single task to which she was assigned, the PCAOB is a permanent agency created by law. And whereas the independent counsel lacked any policy making authority and any administrative authority (save that directly needed to conduct a single investigation), the PCAOB exercises broad policy-making, administrative, investigative and other regulatory authority on a permanent and ongoing basis.

Thus, the need to hold the PCAOB accountable for its exercise of governmental power is *far greater* than it was for the independent counsel. Yet the PCAOB is not subject to greater presidential supervision and control than was the independent counsel in *Morrison*, but, indeed, to *far less* supervision and control. Unlike the Independent Counsel statute, the Sarbanes-Oxley Act *completely divests* the President of *all* authority to control the PCAOB.

First, and dispositively, the President is stripped of the very removal power that the Court in *Morrison* deemed to be the "most important" means of supervision and control. *See supra* Part I.A. This absence of removal power, moreover, is compounded by the other restrictions on the President's ability to control the PCAOB. Neither the President nor any subordinate removable by him at will exercises any control or oversight of the PCAOB at all. To the extent that any entity has oversight authority, it is the SEC, an independent agency. *See supra* p. 22. Moreover, even the SEC's oversight is limited. The SEC, for example, does not exercise *any* day-to-day oversight of PCAOB activities. Rather, the PCAOB decides, on its own, how to conduct its regular inspections, whether to commence an investigation, how that investigation should proceed, and whether or not to seek sanctions for any violation of the applicable laws, rules and regulations. *See supra* p. 8. It is only after the PCAOB has effectively concluded its

investigation, and, most significantly, after it has decided whether to impose sanctions, that its enforcement operations are subject to any oversight. And then, such oversight is exercised not by the President or his subordinate, but by an independent agency. *See supra* pp. 9-10. This appellate-like review of the PCAOB's final decisions by an independent agency, however, simply does not amount to the "supervision and control" that the Constitution demands.

Even where the SEC exercises oversight authority, it does so through cumbersome procedures that cannot amount to "supervision and control" in any meaningful sense. For example, the SEC's oversight of PCAOB rulemaking, including its authority to approve or reject such rules, to amend them, and to rescind PCAOB authority, may be effected only through formalized notice and comment rulemaking. No one, however, would contend that the Secretary of State could effectively supervise and control her subordinates if she had to undergo notice and comment rulemaking every time she orders her desk officers to issue a State Department directive. The same, of course, is true of the SEC's inability to supervise the PCAOB.

Finally, the vast majority of even this oversight is under a statutory standard of review so deferential that it fails to impose any significant restraint upon the PCAOB's exercise of discretion. For example, the authority to establish auditing standards through rulemaking is essential to the PCAOB's mission. Yet the SEC must approve PCAOB rules so long as it finds them "consistent with the requirements of th[e] Act and the securities laws, *or* . . . necessary or appropriate in the public interest or for the protection of investors." SOX § 107(b)(3), 15 U.S.C. § 7217(b)(3) (emphasis added). Under a literal reading of this statute, even if a Board rule were *inconsistent* with the requirements of the Act and the securities laws, the SEC would have to approve it if it was nonetheless *appropriate in the public interest*. But at a minimum, the SEC must approve any rule that is "consistent" with these laws and appropriate in the public interest.

In either event, this standard of review is analogous to that applied by a federal court reviewing an agency's rules under *Chevron*, pursuant to which the court must defer to "the implementing agency's [reasonable] construction [of a statute]." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2769 (2005) (citing *Chevron U.S.A. Inc. v. Nat'l Res. Defense Council, Inc.*, 467 U.S. 837, 843-44 & n.11 (1984)). Yet no one would suggest that a federal court supervises and controls an agency's rule-making power by virtue of *Chevron* review.

Accordingly, in addition to the limitations on the President's removal authority— limitations that standing alone render the PCAOB unconstitutional—the PCAOB's structure "taken as a whole" unconstitutionally deprives the President of the ability to effectively supervise and control the PCAOB's exercise of governmental power.

## II.    THE PCAOB'S BOARD MEMBERS ARE APPOINTED IN VIOLATION OF THE APPOINTMENTS CLAUSE

The Appointments Clause is one of the Constitution's specific manifestations of the separation of powers principle. It is not mere "etiquette or protocol." *Ryder v. United States*, 515 U.S. 177, 182 (1995). Nor does it serve solely as "a bulwark against one branch aggrandizing its power at the expense of another branch." *Id.* Rather, as the Supreme Court has held, "it is more: it 'preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power.'" *Id.* The Clause thus provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.[6]  As the Supreme Court has explained, "[t]he Framers understood

. . . that by limiting the appointment power, they could ensure that those who wielded it were

accountable to political force and the will of the people."  *Freytag*, 501 U.S. at 884.  Thus, the

Clause requires that principal officers be appointed by the President with the advice and consent

of the Senate.  And with respect to inferior officers, "the Clause forbids Congress to grant the

appointment power to inappropriate members of the Executive Branch," *id.* at 880, limiting such

power to "the President alone, . . . the Courts of Law, or . . . the Heads of Departments."

By vesting extraordinary governmental power in an entity wholly immune from political

accountability, the PCAOB violates both the letter and spirit of this Clause.  Members of the

PCAOB are, as we shall explain, principal officers who must be, but are not, appointed by the

President with the advice and consent of the Senate.  But even assuming *arguendo* that PCAOB

Members are "inferior Officers," the Appointments Clause still demands political accountability

through appointment by a principal officer who is, in turn, accountable to the President.

### A.    PCAOB Members Are Principal Officers

The Supreme Court has made clear that the line demarcating principal and inferior

officers must be drawn in reference to the Appointments Clause's core purpose of preserving

political accountability.  An "inferior Officer" is therefore one who is subject to the ongoing

supervision and direction of a superior, including, importantly, the superior's authority to remove

his inferior from office for failure to accept supervision and to direct the inferior officer's

exercise of authority on an ongoing, day-to-day basis.  Indeed, while supervision can take

---

[6] PCAOB Members are clearly "officers of the United States" under the Appointments Clause.  Any "appointee [who] exercise[s] significant authority pursuant to the laws of the United States" "is an 'Officer of the United States.'"  *Buckley*, 424 U.S. at 126.  And the PCAOB's extensive investigatory, enforcement, rule-making, and other regulatory authority plainly amounts to "significant [governmental] authority."  *Id.*; *see also Bowsher*, 478 U.S. at 733.

different forms, the opinions of the Supreme Court and the Department of Justice make clear that these two elements are the *sine qua non* of effective supervision, and that absent them, subordinate officials are not subject to "supervision" under the "ordinary meaning" of that word. *Applicability of Executive Order 12674 to Personnel of Regional Fishery Management Councils*, 17 Op. Off. Legal Counsel 150, 155-57 (1993) ("*Regional Fishery Management Councils*"). Both of these basic elements of supervision, however, are absent with respect to the PCAOB.

In its earliest pronouncement on the issue, the Supreme Court described "inferior commissioners and bureau officers" as "mere aids and subordinates of the heads of the departments." *United States v. Germaine*, 99 U.S. 508, 511 (1879). And, more recently, the Court has explained that "in the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that 'inferior officers' are officers whose work is *directed and supervised* at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997) (emphasis added). At a minimum, therefore, an "inferior Officer" must be "directed and supervised" by an officer who is, in turn, appointed by the President and confirmed by the Senate. Only through such chain of command can the inferior officer's exercise of authority be democratically checked.

Effective supervision requires, at a minimum, two basic components. First, an inferior officer must be subject to effective discipline through the power of removal—a power that the Supreme Court has regularly described as the "most important" means and a "powerful tool" of supervision and control. *Edmond*, 520 U.S. at 664; *Morrison*, 487 U.S. at 671, 696; *see also Regional Fishery Management Councils*, 17 Op. Off. Legal Counsel at 155-57 (because of a "powerful[] constraint[] on the Secretary's removal authority" more restrictive than a for-cause

removal provision, Regional Fishery Management Council members were not "subject to the Secretary's supervision" within the "ordinary meaning of supervision").  Second, in order for an official to be an "inferior" one, a superior officer must have the authority to guide an inferior officer's actions at the outset, through ongoing, day-to-day supervision and direction of the inferior officer's execution of his duties.  It is, in other words, insufficient for the superior officer to merely have the power to "review" decisions already made; effective supervision requires that the superior officer also have the authority to "direct" the inferior officer's actions from the outset.  *See, e.g.*, *Edmond*, 520 U.S. at 664-65; *Morrison*, 487 U.S. at 671-79.

These core elements of effective supervision are apparent from both the Supreme Court's Appointments Clause opinions as well as the considered views of the Department of Justice.  In *Edmond*, for example, the Court held that Coast Guard judges, who were appointed by the Secretary of Transportation, were "inferior Officers."  Although the final decisions of these judges were subject to appellate review by the Court of Appeals for the Armed Forces, the Court did not rest its decision upon such review.  *See Edmond*, 520 U.S. at 664-65.  Instead, it emphasized (1) the removal authority of the Judge Advocate General, and (2) the Judge Advocate General's authority to direct the Coast Guard judges on an ongoing, day-to-day basis.  Thus, key to the Court's conclusion of "inferior" status was that the Judge Advocate General could "remove a Court of Appeals Judge from his judicial assignment *without cause*"— described by the Court as "a powerful tool for control."  *Id.* (emphasis added).  The Court likewise emphasized the Judge Advocate General's ongoing, day-to-day supervision of the Coast Guard Judges.  In particular, the Judge Advocate General: (1) "exercise[d] administrative oversight over" the court on which these judges sat, (2) was "charged with the responsibility to 'prescribe uniform rules of procedure' for the court," and (3) was required to "'meet periodically

[with other Judge Advocates General] to formulate policies and procedure in regard to review of court-martial cases.'" *Id.* at 664.  As Justice Souter explained, it "does not follow . . . that if one is subject to *some* supervision and control, one is an inferior officer." *Id.* at 667 (Souter, J., concurring in part and concurring in the judgment).  In *Edmond*, however, the Coast Guard judges were subject to significant daily oversight by the Judge Advocate General, including, significantly, the authority to discharge them "without cause."

　　*Freytag v. Commissioner of Internal Revenue* leads to the same conclusion.  There, the Court held that special trial judges on the Tax Court were "inferior officers."  Because the issue before the Supreme Court was whether these judges were "inferior officers" on the one hand, or mere "employees" on the other, the Court's decision does not address the extent to which the special trial judges were subject to supervision and direction.  501 U.S. at 880.  But the lower court opinion does.  And that opinion explains that the special trial judges were appointed by "[t]he chief judge of the Tax Court, a principal officer, [who] ha[d] the *authority to appoint and remove special trial judges without restriction*," and that "[t]he duties of the special trial judges [were] defined and limited by the order issued by the chief judge assigning a case to a special trial judge." *First W. Gov't Sec., Inc.  v. Comm'r of Internal Revenue*, 94 T.C. 549, 558 (1990), *aff'd*, 930 F.2d 975 (2d Cir. 1991); *see also id.* at 559 (noting that "special trial judges are appointed for an indeterminate time period and their employment may be terminated without cause, *e.g.*, lack of work for them to perform, budgetary limitations, and the like").

　　The independent counsel at issue in *Morrison*, an "inferior officer," likewise was subject to extensive supervision and direction by the Attorney General.[7]  Most significantly, the

---

[7] The Court concluded that the independent counsel was an "inferior officer" because (1) she could be "removed by the Attorney General" and, in that sense, was "to some degree 'inferior' in rank"; (2) she had "only certain, limited duties," which did "not include any

independent counsel was removable by the Attorney General "for good cause."  In addition, the

Attorney General had the unreviewable discretion to trigger the appointment of an independent

counsel in the first place; the Attorney General's decision to request an independent counsel

shaped the scope of the counsel's authority; and the independent counsel was required to abide

by Department of Justice policy unless it was literally impossible to do so.  *See supra* pp. 24-25.

Moreover, as noted, the independent counsel had only "certain, limited duties" for a temporary,

specific task, which is not remotely analogous to the Board's broad, wide-ranging rulemaking

and administrative policy-making authorities.  *Morrison*, 487 U.S. at 671; *see also United States

v. Eaton*, 169 U.S. 331, 343 (1898) (vice-consul serving as acting consul was still an inferior

officer because his "performance of the duty of the superior [was] for a limited time, and under

special and temporary conditions"); *United States v. Nixon*, 418 U.S. 683, 694 & n.8, 696 (1974)

(referring to Watergate Special Prosecutor as a "subordinate officer").

The Department of Justice too recognizes that the central component to effective

supervision is the power to discipline a subordinate through removal from office.  In *Regional

Fishery Management Councils*, for example, the Department of Justice concluded that members

of the Councils were not even Executive Branch "employees" because they were not

"supervised" by the Secretary of Commerce.  In reaching this conclusion,  the Department of

Justice relied heavily upon restrictions on the Secretary of Commerce's removal authority, which

placed far greater limits on the Secretary's removal authority than "traditional legislation in

which some form of 'cause' is all that is required before removal can occur."  17 Op. Off. Legal

---

(continued…)

authority to formulate policy for the Government" of "any administrative duties outside of those
necessary to operate her office"; (3) her office was "limited in jurisdiction"; and (4) her office
was "limited in tenure."  *Morrison*, 487 U.S. at 671-72.

Counsel 150, 157.  As the Justice Department recognized, these restrictions on that power were "designed to constrain narrowly the Secretary's ability to supervise and control the Council members he appoints."  *Id.* at 155 (citing *Morrison*, 487 U.S. at 694, 696).  In view of this "powerful[] constraint on the Secretary's removal authority," the Department of Justice concluded that Council members were not "subject to the Secretary's supervision" within the "ordinary meaning of supervision."  *Id.* at 157.  Thus, absent a robust removal power, a purportedly subordinate official is simply not subject to the "supervision" of a superior and, as a result, can be categorized as neither an "employee" nor, as here, an "inferior officer."

Measured against these standards, it is clear that PCAOB Members are not inferior officers.  Unlike the inferior officers at issue in *Edmond*, *Freytag*, and *Morrison*, here, PCAOB Members may only be removed for what is, in effect, the willful abuse of authority.  *See supra* pp. 7-8.  In addition, the SEC has virtually no authority to exercise meaningful supervision and control over the PCAOB's investigatory, enforcement, rule-making, and adjudicative authority.  Indeed, the breadth and independence of PCAOB Members is indistinguishable from the commissioners or members of other U.S. agencies with extensive regulatory powers over specialized subject matters, virtually all of whom are appointed by the President with the advice and consent of the Senate.[8]  The PCAOB exercises, in short, "massive power, unchecked power, *by design*."  148 Cong. Rec. at S6334 (statement of Sen. Gramm) (emphasis added).  This is the very definition of a principal officer who must be, but is not, appointed by the President with the advice and consent of the Senate.

---

[8]  *See, e.g.*, 42 U.S.C. § 2996c(a) (Legal Services Corporation); 49 U.S.C. § 24302(a) (Amtrak); 47 U.S.C. § 154(a) (Federal Communications Commission); 15 U.S.C. § 2053(a) (Consumer Product Safety Commission); *id.* § 41 (Federal Trade Commission); *id.* § 78d (Securities Exchange Commission); 12 U.S.C. §§ 2, 1812(a), 1462a(c)(1) (Federal Deposit Insurance Corporation); *id.* § 241 (Federal Reserve Board).

**B.    Appointment of PCAOB Members By the SEC Violates the Appointments Clause Even If Those Members Are Inferior Officers**

Even if PCAOB Members are inferior officers, the PCAOB still violates the Appointments Clause. Inferior officers must be appointed by the President, the courts of law, or, as relevant here, the "Heads of Departments." PCAOB Members are not, however, appointed by the "Head" of a "Department." First, the independent agencies like the SEC are not "Departments," which, in view of the core purpose of the Appointments Clause, the Supreme Court has said must be similar to the cabinet departments in the Executive Branch and, at a minimum, must be directly accountable to the President. Second, even if the SEC were a "Department," the Appointments Clause prohibits diffusion of the appointment power through appointment by committee—a process the Framers considered and rejected—instead requiring that power to be lodged in a single "Head."

**1.    The SEC Is Not A "Department"**

The Appointments Clause as a whole is intended to ensure political accountability: through the chain of command, the President will ultimately be accountable for the exercise of all executive power. The Supreme Court has thus consistently held that the "Departments" referenced in the Appointments Clause include only those entities that resemble the cabinet departments and, in particular, those entities that, like the cabinet departments, are directly accountable to the President. For only then, "[t]he Framers understood," could they ensure that "those who wielded [the appointment power] were accountable to political force and the will of the people." *Freytag*, 501 U.S. at 884.

It is true that the Excepting Clause authorizes Congress to lodge the appointment of inferior officers in the "Heads of Departments." But it is equally true that the Excepting Clause, like the Appointments Clause as a whole, is intended to ensure that those who exercise the

appointment power over policy-making offices are ultimately subject to the will of the people. Indeed, throughout most of the debates surrounding the adoption of the Appointments Clause, the draft under consideration required the President to appoint *all* officers of the United States with the advice and consent of the Senate.  The Excepting Clause was added only at the end of the debate as an administrative convenience, and in particular, to quell George Mason's fear that requiring Senate concurrence in the appointment of every government official would be so cumbersome as to prevent the Senate from doing anything else.  *See* 2 *Records*, *supra*, at 539.  It was "perfectly obvious . . . both from the relative brevity of the discussion [the Excepting Clause] received, and from the content of that discussion, that it was intended to make clear … that those officers appointed by the President with Senate approval could on their own appoint their subordinates, who would, of course, by chain of command still be under the direct control of the President."  *Morrison*, 487 U.S. at 720-21 (Scalia, J., dissenting).

In light of the historical underpinnings of the Appointments Clause, it is wholly unsurprising that the Supreme Court has, from its earliest pronouncements on the matter, recognized the limited scope of the "Heads of Departments" upon whom the appointment power could be devolved.  Thus, in *United States v. Mouat*, 124 U.S. 303 (1888), and subsequent cases, the Supreme Court has consistently explained that "the heads of Departments" consisted of "what are now called the members of the cabinet."  *Id.* at 307; *see also, e.g.*, *Germaine*, 99 U.S. at 510 (referring to the Executive "departments" as "a part or division of the executive government, as the Department of State, or of the Treasury" (internal quotation marks omitted)); *Cunningham v. Neagle*, 135 U.S. 1, 63, 64 (1890) ("The duties which are thus imposed upon [the President] he is further enabled to perform by the recognition in the constitution, and the creation by Acts of Congress, of executive departments, which have varied in number from four or five to

seven or eight, the heads of which are called 'cabinet ministers.' These aid him in the performance of the great duties of his office and represent him in a thousand acts to which it can hardly be supposed his personal attention is called, and thus he is enabled to fulfill the duty of his great department, expressed in the phrase that 'he shall take care that the laws by faithfully executed.'" (citation omitted)). In recent times, the Supreme Court has reaffirmed that "[t]he phrase 'Heads of Departments,' used as it is in conjunction with the phrase 'Courts of Law,' suggests that the Departments referred to are themselves in the Executive Branch or at least have some connection with that branch." *Buckley*, 424 U.S. at 127.

Even more recently, in *Freytag*, the Court embraced and explained at length the rationale for this understanding of "Department." There, the Court made clear that the *sine qua non* of a "Department"—the feature that was necessary (if not sufficient) to render an entity sufficiently similar to a cabinet department so as to qualify it as a "Department" under the Appointments Clause—is that the Department be directly accountable to the President and, through him, the People. At issue in *Freytag* was whether the Tax Court, an Article I court, was a "Department" under the Appointments Clause. In holding that it was not, the Court concluded that the term "Department" was confined only to those agencies that resemble a cabinet department and, most significantly, only those the "heads [of which] are subject to the exercise of political oversight and share the President's accountability to the people." 501 U.S. at 886. As the Court explained, "[c]onfining the term 'Heads of Departments' in the Appointments Clause to executive divisions like the Cabinet-level departments constrains the distribution of the appointment power . . . . The Cabinet-level departments are limited in number and easily identified. Their heads are subject to the exercise of political oversight and share the President's accountability to the people." *Id.*

Indeed, to hold otherwise, the Court explained, would frustrate "the Framers'

determination to limit the distribution of the power of appointment," *id.* at 884:

> The Appointments Clause prevents Congress from distributing power too widely by limiting the actors in whom Congress may vest the power to appoint. The Clause reflects our Framers' conclusion that widely distributed appointment power subverts democratic government. *Given the inexorable presence of the administrative state, a holding that every organ of the Executive Branch is a department would multiply indefinitely the number of actors eligible to appoint.* The Framers understood . . . that by limiting the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people.

*Id.* at 884-85 (emphasis added). Thus, "[e]ven with respect to 'inferior Officers,' the Clause allows Congress only limited authority to devolve appointment power on the President, *his* heads of department, and the courts of law." *Id.* at 884 (emphasis added).[9] And because, unlike the cabinet departments, the Tax Court was an independent agency beyond the President's supervisory control, "[t]reating the Tax Court as a 'Department' and its Chief Judge as its 'Head' would," the Court concluded, "defy the purposes of the Appointments Clause" and "the meaning of the Constitution's text." *Id.* at 888.

The Court's conclusion in *Freytag* was reinforced by other provisions in the Constitution, which likewise used the term "executive department" in reference to the cabinet departments, including the Opinion Clause, *see* U.S. Const. art. II, § 2, cl. 1 (The President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments"), and the Twenty-Fifth Amendment, *see id.* amend. XXV, § 4 (empowering the Vice President, together with a majority of the "principal officers of the executive departments," to declare the President

---

[9] *See also Weiss v. United States*, 510 U.S. 163, 187 (1994) (Souter, J., concurring) ("[A]lthough they allowed an alternative appointment method for inferior officers, the Framers still structured the alternative to ensure accountability and check governmental power: any decision to dispense with Presidential appointment and Senate confirmation is Congress's to make, not the President's, but Congress's authority is limited to assigning the appointing power to the highly accountable President or the heads of federal departments, or, where appropriate, to the courts of law.").

"unable to discharge the powers and duties of his office").  *See Freytag*, 501 U.S. at 886-87.

Here, it is clear that the SEC, the entity charged with appointing Members of the PCAOB, is not a "Department" within the meaning of the Appointments Clause because it was "specifically designed *not* to have the quality . . . of being 'subject to the exercise of political oversight and sharing the President's accountability to the people.'"  *Freytag*, 501 U.S. at 916 (Scalia, J., concurring in the judgment); *see also supra* p. 22.[10]  Indeed, independent agencies that occupy the "headless Fourth Branch" of our government are the diametrical opposites of the cabinet departments.  *Synar*, 626 F. Supp. at 1398; *see also Humphrey's Executor*, 295 U.S. at 628 (holding that an independent agency "cannot in any proper sense be characterized as an arm or an eye of the executive").  To conclude that such independent agencies are "Departments" within the meaning of the Appointments Clause would not only contravene *Freytag*; it would contravene the very purpose of the Appointments Clause, allowing the appointment power to be "diffused" across entities that are, by design, immune "to political force and the will of the people."  *Freytag*, 501 U.S. at 884.  Accordingly, even assuming *arguendo* that PCAOB Members are "inferior Officers," they are not appointed by the head of a "Department"; their appointment by the SEC therefore violates the Appointments Clause.

            2.      **The Five-Member SEC As A Whole Is Not The SEC's "Head"**

Even if the SEC were a "Department," Members of the PCAOB are not appointed by its

_____

[10] Although *Freytag* declined to address "any question involving an appointment of an inferior officer by the head of one of the principal agencies, such as the Federal Trade Commission, Securities and Exchange Commission, the Federal Energy Regulatory Commission, the Central Intelligence Agency, and the Federal Reserve Bank of St. Louis," *Freytag,* 501 U.S. at 887 n.4, read in context, it is clear that the Court was simply stating that the term "Department" was not "limit[ed] . . . to those departments named in 5 U.S.C. § 101."  *Id.* The Court did not, however, purport to limit its reasoning, which, as explained above, makes clear that the so-called independent agencies are not "Departments" within the meaning of the Appointments Clause.

"Head."  One of the primary purposes of the Appointments Clause is to prevent a "diffusion" of

the appointment authority.  *See Freytag*, 501 U.S. at 885-86.  That is why it requires that, at a

minimum, any appointment be made by the "Head" of a department—a single individual who

may ultimately be held accountable for a bad appointment.  The Sarbanes-Oxley Act, however,

diffuses the appointment power across a five-member body, insulating any single individual

from direct accountability.

The Appointments Clause was specifically designed to preclude appointments-by-

committee and the reduction in political accountability engendered thereby.  Thus, Alexander

Hamilton explained the benefits of lodging the appointment power in a single individual:

> The sole and undivided responsibility of one man will naturally beget a
> livelier sense of duty and a more exact regard to reputation.  He will, on
> this account, feel himself under stronger obligations, and more interested
> to investigate with care the qualities requisite to the stations to be filled,
> and to prefer with impartiality the persons who may have the fairest
> pretensions to them.  He will have *fewer* personal attachments to gratify,
> than a body of men who may each be supposed to have an equal number;
> and will be so much the less liable to be misled by the sentiments of
> friendship and affection.  *A single, well directed man by a single
> understanding, cannot be distracted and warped by that diversity of views,
> feelings, and interests, which frequently distract and warp the resolutions
> of a collective body.*

*The Federalist* No. 76 (emphasis added).  And he explained the particular dangers of lodging

such power in a collective body:

> The choice which may at any time happen to be made under such
> circumstances, will of course be the result either of a victory gained by
> one party over the other, or of a compromise between the parties.  In either
> case, the intrinsic merit of the candidate will be too often out of sight . . . .
> In the last, the coalition will commonly turn upon some interested
> equivalent—"Give us the man we wish for this office, and you shall have
> the one you wish for that."  This will be the usual condition of the bargain.
> And it will rarely happen that the advancement of the public service will
> be the primary object either of party victories or of party negotiations.

*Id.*  As Justice Story would later observe, "one man of discernment is better fitted to analyze and

estimate the peculiar qualities, adapted to particular offices, than any body of men of equal, or even superior discernment."  3 Joseph Story, *Commentaries on the Constitution* § 1522 (1833).[11]

The Framers intended the Appointments Clause as a whole, including the Excepting Clause, to further this purpose.  That is why they carefully limited the power to appoint inferior officers to "the *highly accountable* President or the *heads* of departments, or, where appropriate, to the courts of law."  *Weiss*, 510 U.S. at 186-87 (Souter, J., concurring) (emphases added); *see also Freytag*, 501 U.S. at 886 (noting that the "Heads of Departments . . . share the President's accountability to the people") (emphasis added); *id.* at 880 ("the [Excepting] Clause forbids Congress to grant the appointment power to inappropriate members of the Executive Branch").  Had the Framers wished to allow appointment by committee, they would almost certainly not have used the phrase "*Heads* of Departments," since a "head" was well-known to be "[a] chief; a principal person; a leader; a commander; *one* who has the *first* rank or place, and to whom others are subordinate; as the *head* of an army; the *head* of a sect or party."  Noah Webster, *An American Dictionary of the English Language* (New York, S. Converse 1828) (second and third emphases added).[12]

---

[11] These sentiments were echoed during the Federal Convention's debate over the appointment of judges.  *See* 1 *Records*, *supra*, at 119 (Wilson explained that "[a] principal reason for unity in the Executive was that officers might be appointed by a single, responsible person," and that "[e]xperience shewed the impropriety of such appointments. by numerous bodies."); 2 *Records*, *supra*, at 81 (Randolph "laid great stress on the responsibility of the Executive as a security for fit appointments."); *id.* at 80 (Madison explained that vesting such appointment power in the Congress would allow members to "hide their selfish motives under the number concerned in the appointment," whereas lodging it in the President "secured the responsibility of the Executive.").

[12] *See also* Samuel L. Johnson, *A Dictionary of the English Language* 121 (Baltimore, Fielding Lucas, Jr. 1814) (defining "head" as "a chief, principal; the top"); Noah Webster, *A Compendious Dictionary of the English Language* 140 (Philip B. Gove ed., facsimile 1970) (1806) (defining "head" as "a chief, the top, what contains the brain").

Indeed, the meaning of the phrase "Heads of Departments" was well known at the time of the framing. It was understood to encompass the cabinet secretaries—single individuals all— who would supervise their respective departments and answer directly to the President and, therefore, share his accountability. *See, e.g.*, *Mouat*, 124 U.S. at 307 ("In [*United States v. Germaine*], it was distinctly pointed out that, under the constitution of the United States, all its officers were appointed by the President, by and with the advice and consent of the senate, or by a court of law, or the head of a Department; *and the heads of the departments were defined in that opinion to be what are now called the members of the cabinet*."); *Cunningham*, 135 U.S. at 63 ("The duties which are thus imposed upon [the President] he is further enabled to perform by the recognition in the Constitution, and the creation by acts of congress, of executive departments, which have varied in number from four or five to seven or eight, *who are familiarly called 'cabinet ministers*.'" (emphasis added and citation omitted)). As the Court stated in *Myers*, "[e]ach head of a department is and must be the President's alter ego in the matters of that department where the President is required by law to exercise authority." 272 U.S. at 133. The notion of a cabinet departments ruled by committees unaccountable to the President would have been utterly foreign to our Founding Fathers.[13]

---

[13] It is true that in 1933, Attorney General Biggs stated that "the three Commissioners, who constitute the [Civil Service] Commission, are the 'head of a Department' in the constitutional sense." 37 Op. Att'y Gen. 227, 231 (1933). The entire substantive analysis of that opinion, however, was devoted to addressing the question whether the Civil Service Commission was a "Department" under the Appointments Clause. And in that regard, the Attorney General emphasized that the Commission had "certain independent executive duties to perform" and was "responsible only to the Chief Executive." *Id.* at 229. The Attorney General's conclusory observation that the three-member commission was, as a whole, the "head" of a department came only at the very end of his opinion and was not accompanied by any supporting analysis. *See id.* at 231. Subsequent Department of Justice opinions merely follow the 1933 opinion without further elaboration or analysis and so should similarly be accorded little if any weight. *See, e.g.*, 20 Op. Off. Legal Counsel at 151-152. Nor did the Ninth Circuit, in holding that the nine-member Board of Governors of the U.S. Postal Service was the "head" of that "department,"

Here, therefore, the five-member SEC as a whole cannot be considered the "*Head*" of the SEC. That collective body simply is not the "chief," "principal person," "leader," "commander," or "*one who has the first rank or place*" at the SEC. Nor is that collective body answerable to the President. Indeed, to hold that the five-member commission as a whole is its "head," would be to allow that which the Appointments Clause clearly forbids: the diffusion of the appointment power across a collective body that, as a whole, is virtually immune to any political accountability whatsoever. Accordingly, even assuming *arguendo* that the SEC is a "Department" under the Appointments Clause, the PCAOB Members are not appointed by the "head" of that department and, therefore, the PCAOB is unconstitutional.[14]

## III.    THE PCAOB EXERCISES LEGISLATIVE POWER IN VIOLATION OF THE NON-DELEGATION DOCTRINE

Finally, Congress has unconstitutionally delegated legislative powers to the PCAOB. The non-delegation doctrine gives effect to Article I, section 1 of the Constitution, which vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." U.S. Const. art. I, § 1. As the Supreme Court has repeatedly emphasized, this plain-spoken directive means what it says: "This text permits no delegation of [Congress's legislative] powers." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001); *see also Mistretta*, 488 U.S. at 371-72; *Field v.*

_____

(continued…)

undertake any analysis of the origins and purpose of the term "Heads of Departments" in the Appointments Clause. *See Silver v. U.S. Postal Serv.*, 951 F.2d 1033, 1038-39 (9th Cir. 1991).

[14] The Act also contravenes the Appointments Clause by requiring that two, but no more than two, PCAOB Members be members of the accounting profession, and requiring that appointments be made in consulation with the Chairman of the Board of Governors of the Federal Reserve System and the Secretary of the Treasury. *See* SOX § 101(e), 15 U.S.C. § 7211(e). These requirements amount to unconstitutional interference with the power to appoint. *See Public Citizen*, 491 U.S. at 466-67 (holding that interference with power to choose nominees raises serious constitutional questions, and construing statute to avoid them); *id.* at 483-89 (Kennedy, J., concurring in the judgment) (concluding that interference with power to choose nominees is unconstitutional).

*Clark*, 143 U.S. 649, 692 (1892).

The non-delegation doctrine has two important applications.  First, it strictly limits Congress's power to delegate authority to *private parties*.  *See, e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238, 310-11 (1936) (describing such a delegation as "legislative delegation in its most obnoxious form").  Most significantly, the Supreme Court has repeatedly explained that Congress may not engage a private party to promulgate rules constituting *criminal violations*. *See, e.g.*, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) (noting that such a delegation is "unknown to our law and utterly inconsistent with the constitutional prerogatives and duties of Congress"); *Mistretta*, 488 U.S at 373 n.7; *Fahey v. Mallonnee*, 332 U.S. 245, 249 (1947).

Second, the non-delegation doctrine prohibits Congress from granting even federal agencies *actual legislative power*.  While Congress may authorize the Executive Branch of the federal government to implement a law by, for example, promulgating rules to fill in statutory ambiguities, and while such authorizations can be broad, *see, e.g.*, *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409 (1928) (setting forth the "intelligible principle" standard), Congress may not delegate the *actual promulgation of law* to another government entity.  Even greater precision is required by Congress, moreover, when (as here) Congress purports to delegate away its authority to create criminal law.  *See Fahey*, 332 U.S. at 249; *Mistretta*, 488 U.S at 373 n.7; *Touby v. United States*, 500 U.S. 160, 165-66 (1991) (reserving the question whether more specific guidance than an intelligible principle is required "when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions").

In view of these limitations, an unconstitutional delegation is clearly at work here.  If, as the Sarbanes-Oxley Act suggests, the PCAOB is a private corporation, *see* SOX § 101(b),

- 44 -

15 U.S.C. § 7211(b), then Congress has run afoul of the first precept by granting a private entity the authority to define crimes. *See* SOX § 3(b), 15 U.S.C. § 7203(b); 15 U.S.C. § 78u. If, as Plaintiffs contend, the PCAOB is part of the federal government, then Congress has nevertheless violated the second precept, by granting the PCAOB actual lawmaking authority, including, among other things, the authority to promulgate and impose criminal sanctions and impose taxes on broad swaths of the American public. Either way, the law is unconstitutional.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment declaring unconstitutional the provisions of the Act creating and empowering the Board and enjoining the Board and its Members from carrying out any of the powers delegated to them by the Act.

Dated: July 25, 2006                                    Respectfully submitted,


                                                         /s/
                                                        _____
Viet D. Dinh (D.C. Bar No. 456608)          Michael A. Carvin (D.C. Bar No. 366784)
Wendy Keefer                                Noel J. Francisco (D.C. Bar No. 464752)
BANCROFT ASSOCIATES PLLC                    Christian G. Vergonis (D.C. Bar No. 483293)
601 13th St., N.W.                          JONES DAY
Suite No. 930 South                         51 Louisiana Avenue, N.W.
Washington, D.C. 20005                      Washington, D.C. 20001-2113
(202) 234-0090                              (202) 879-3939
(202) 234-2806 (fax)                        (202) 626-1700 (fax)

Sam Kazman (D.C. Bar No. 946376)            Kenneth W. Starr (D.C. Bar No. 273425)
Hans Bader (D.C. Bar No. 466545)            24569 Via De Casa
Competitive Enterprise Institute            Malibu, CA 90265
1001 Connecticut Avenue, N.W.               (310) 506-4621
Suite 1250
Washington, D.C. 20036                      *Attorneys for Plaintiffs Free Enterprise Fund*
(202) 331-1010 (fax)                        *and Beckstead and Watts, LLP*