# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ————————————————————— ) | |
| FREE ENTERPRISE FUND *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:06CV00217-JR |
| ) | |
| THE PUBLIC COMPANY ACCOUNTING ) | |
| OVERSIGHT BOARD *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ————————————————————— ) | |

## AMICUS CURIAE MEMORANDUM OF THE WASHINGTON LEGAL FOUNDATION IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Daniel J. Popeo (DC Bar 934711)
Paul D. Kamenar (DC Bar 914200)
Washington Legal Foundation
2009 Massachusetts Avenue, NW
Washington, DC 20036
TEL: 202.588.0302
FAX: 202.588.0386

Kathryn Comerford Todd (DC Bar 477745)
(*Counsel of Record*)
Thomas R. McCarthy (DC Bar 489651)
William S. Consovoy (DC Bar 493423)
Wiley Rein & Fielding LLP
1776 K Street, N.W.
Washington, DC 20006
TEL: 202.719.7000
FAX: 202.719.7049

August 22, 2006

### Attorneys for the Washington Legal Foundation

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... i

INTEREST OF AMICUS CURIAE ...................................................................................... 1

INTRODUCTION .................................................................................................................. 1

I.  CONGRESS'S VESTING OF CORE LEGISLATIVE POWERS IN THE
    PCAOB WORKS AN UNCONSTITUTIONAL DELEGATION OF
    LEGISLATIVE AUTHORITY ................................................................................. 2

    A.  Congress Delegated To The PCAOB Core Legislative Powers ........................... 6

    B.  The Constitution Prohibits The Delegation Of Core Legislative Powers ............ 10

    C.  To The Extent The PCAOB Is A Private Body, Congress Compounded Its
        Constitutional Error By Delegating Such Powers To A Private Entity ............... 12

II. THE IMPACT OF SARBANES-OXLEY AND THE BOARD'S ACTIONS ON
    AMERICAN ENTERPRISE DEMONSTRATES THE DANGERS OF
    CIRCUMVENTING THE CONSTITUTIONAL DESIGN AND POLITICAL
    ACCOUNTABILITY ............................................................................................... 14

CONCLUSION ..................................................................................................................... 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

*\* A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ............................ *passim*

*Bowsher v. Synar*, 478 U.S. 714 (1986)...............................................................................3

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ...................................................................20

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ........................................................5, 12, 13

*Chester C. Fosgate Co. v. Kirkland*, 19 F. Supp. 152 (S.D. Fla. 1937).......................5, 13

*Clinton v. New York*, 524 U.S. 417 (1998) ..........................................................................3

*Dahlberg v. Pittsburgh & L.E.R. Co.*, 138 F.2d 121 (3d Cir. 1943)............................5, 13

*Fahey v. Mallonee*, 332 U.S. 245 (1947)............................................................................11

*Industrial Union Department, AFL-CIO v. America Petroleum Institute*, 448 U.S. 607
     (1980).........................................................................................................................4, 12

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) ...............................3, 11

*Loving v. United States*, 517 U.S. 748 (1996) ..............................................................4, 15

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892).....................................................4, 11

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ..................................................8

*\* Mistretta v. United States*, 488 U.S. 361 (1989)...................................................*passim*

*Myers v. United States*, 272 U.S. 52 (1926)..................................................................2, 3

*Nevada v. Hall*, 440 U.S. 410 (1979)..................................................................................19

*\* Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) .................................5, 10, 11, 14

*Printz v. United States*, 521 U.S. 898 (1997)......................................................................9

*Public Citizen v. United States Department of Justice*, 491 U.S. 440 (1989) ...........3, 19

*R.H. Johnson & Co. v. SEC*, 198 F.2d 690 (2d Cir. 1952) ..............................................13

*Rochin v. California*, 342 U.S. 165 (1952).........................................................................10

i

## TABLE OF AUTHORITIES CONTINUED

*Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212 (1989) ....................................................11, 12

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) .........................................................8

*The Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004) .......................................5, 10, 13

*Todd & Co. v. SEC*, 557 F.2d 1008 (3d Cir. 1977).........................................................................13

*Touby v. United States*, 500 U.S. 160 (1991).........................................................................4, 11

*Turner v. United States*, 396 U.S. 398 (1970) ................................................................................9

*United States v. Dotterweich*, 320 U.S. 277 (1943)........................................................................9

*United States v. Lara*, 541 U.S. 193 (2004)..................................................................................19

*United States v. Munoz-Flores*, 495 U.S. 385 (1990) .....................................................................8

*Wayman v. Southard*, 23 U.S. 1 (1825) ..................................................................................5, 10

* *Whitman v. America Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) .....................................4, 6, 10

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................................................15

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 1....................................................................................................................3, 10

U.S. Const. art. I, § 7, cl. 1.................................................................................................................8

U.S. Const. art I, § 8, cl. 1...........................................................................................................8, 10

U.S. Const. art I, § 8, cl. 18.........................................................................................................9, 10

U.S. Const. art II ........................................................................................................................1, 2, 3

U.S. Const. art III, § 1 ........................................................................................................................3

## FEDERAL STATUTES

15 U.S.C. § 78a.................................................................................................................................9

## TABLE OF AUTHORITIES CONTINUED

15 U.S.C. § 78ff(a)..................................................................................................9

15 U.S.C. § 78s ......................................................................................................14

15 U.S.C. § 78u.......................................................................................................9

SOX § 3(a), 15 U.S.C. § 7202(a)........................................................................6, 9

SOX § 101(b), 15 U.S.C. § 7211(b) ................................................................12, 13

SOX § 104(d)(1), 15 U.S.C. § 7214(d)(1) .............................................................13

SOX § 105(c)(4), 15 U.S.C. § 7215(c)(4)..........................................................9, 13

SOX § 107(b)(3), 15 U.S.C. § 7217(b)(3) ..........................................................7, 14

SOX § 109(b), 15 U.S.C. § 7219(b) ...................................................................6, 7

## MISCELLANEOUS

148 Cong. Rec. S6334 ..................................................................................... *passim*

*Accounting Reform and Investor Protection Hearings Before the S. Comm. on Banking, Housing, and Urban Affairs*, 107th Cong. 44 (2002) ....................................................................15

American Electronics Association, *Sarbanes-Oxley Section 404: The 'Section' of Unintended Consequences and Its Impact on Small Business*, February 2005, *available at* http://www.aeanet.org/governmentaffairs/ AeASOXPaperFinal021005.asp ..........................................................................16

Bob Merritt, *The Sarbanes-Oxley Act: A Personal View*, Washington Legal Foundation Legal Opinion Letter, Vol. 15, No. 21 (Oct. 21, 2005)………… .....……………15-16, 18

David A. Kotler & Rick Swedloff, *Sarbanes-Oxley's Impact on State Corporate Governance*, Washington Legal Foundation Legal Opinion Letter, Vol.13, No. 16 (July 25, 2003) ....16

Ivy Xiying Zhang, *Economic Consequences of the Sarbanes-Oxley Act of 2002* (Paper, William E. Simon Graduate School of Business Administration, University of Rochester, February 2005), available at http://w4.stern.nyu.edu/accounting/docs/ speaker_papers/spring2005/Zhang_Ivy_Economic_Consequences_of_S_O.pdf .............17

J. Locke, *Second Treatise of Government* 87 (R. Cox ed. 1982)...............................3-4

## TABLE OF AUTHORITIES CONTINUED

Peter J. Wallison, *Sarbanes-Oxley and the Ebbers Conviction*, Financial Services Outlook, AEI Online, June 10, 2005, *available at* http://www.aei.org/publications/pubID.22648/pub_detail.asp.... .........................16, 17, 18

*Public Company Accounting Oversight Board; Order Approving Proposed Rules On Funding And Notice Of Filing And Order Granting Accelerated Approval Of Amendment No. 1 To The Proposed Rules On Funding, Exchange Act Release No. 48278*, 2003 WL. 21781678 (Aug. 1, 2003) ..........................................................7, 14

Robert Novak, *Threat of the Auditors*, CNN.com, April 7, 2005, *available at* http://www.cnn.com/2005/POLITICS/04/07/ threat.auditors…………......…………...16

*Sarbanes-Oxley:    A Price Worth Paying?*, The Economist, May 19, 2005, *available at* http://www.economist.com/business/displayStory.cfm?story_id=3984019...............17, 18

S. Rep. No. 107-205 (2002) .......................................................................................14

## INTEREST OF AMICUS CURIAE

The Washington Legal Foundation ("WLF") is a national non-profit public interest law and policy center based in Washington, D.C.  The interests of WLF are more fully set out in the accompanying Motion Of The Washington Legal Foundation For Leave To File Memorandum As Amicus Curiae In Support Of Plaintiffs' Motion For Summary Judgment.

Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment (filed July 25, 2006) ("Pls.' SJ Mem.") focuses primarily on the violations of the separation of powers and the Appointments Clause by the Public Company Accounting Oversight Board (the "Board" or "PCAOB").  Although WLF strongly supports Plaintiffs' position on those issues, WLF writes separately to elaborate on Congress's unconstitutional delegation of authority to the Board.  In addition, WLF seeks to assist the Court by explaining how the impact of Sarbanes-Oxley on, and the Board's regulation of, American businesses demonstrates the grave danger of disregarding the Constitution's structural safeguards.

## INTRODUCTION

In response to the Enron and WorldCom accounting scandals, Congress sought to create an entity with broad powers to regulate the auditing of public companies as a means of preventing similar incidents in the future.  And Congress wanted this entity to be wholly removed from the political process in order to shield it from external pressures.

In creating the PCAOB pursuant to the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002) ("Sarbanes-Oxley" or "SOX"), Congress was wildly successful on both counts.  Indeed, the PCAOB's defining characteristics are its broad, sweeping powers and its stunning lack of accountability to the people:

> This board is going to have *massive power, unchecked power*, by design . . . .  We are setting up a board with *massive power* that is going to make decisions that affect *all accountants and everybody they work for, which directly or indirectly is*

1

*every breathing person in the country.* They are going to have *massive unchecked powers.*

148 Cong. Rec. S6334 (daily ed. July 8, 2002) (statement of Sen. Gramm) ("Gramm Statement") (emphases added).

The problem here is a matter of first principles. In achieving its desired goal, Congress completely disregarded our Constitution's basic structure and its most fundamental protections of our liberty. Congress violated the separation of powers by stripping the President of his Article II powers to appoint (and remove) members of the Board and instead gave those powers to the Securities Exchange Commission ("SEC"); and it violated the nondelegation doctrine by vesting core legislative powers in the Board, which Congress created as a private entity. To disregard these fundamental principles is to court disaster: "[I]n the long run the improvisation of a constitutional structure on the basis of currently perceived utility will be disastrous." *Mistretta v. United States*, 488 U.S. 361, 427 (1989) (Scalia, J., dissenting). Amicus WLF asks this Court to preserve the Constitution's fundamental structure by declaring unconstitutional the provisions of Sarbanes-Oxley that create and empower the Board and by enjoining the Board and its members from carrying out the powers delegated to them under that Act.

## ARGUMENT

### I.    CONGRESS'S VESTING OF CORE LEGISLATIVE POWERS IN THE PCAOB WORKS AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE AUTHORITY.

The Framers built structural protections into the Constitution to preserve liberty. THE FEDERALIST No. 47 ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, . . . may justly be pronounced the very definition of tyranny."). Chief among these structural protections was (and is) the separation of powers: "[I]f there is a principle in our Constitution, indeed in any free Constitution more sacred than another,

it is that which separates the legislative, executive, and judicial powers." *Myers v. United States*, 272 U.S. 52, 116 (1926) (quoting 1 Annals of Congress, 581); *see also id.* ("Their union under the Confederation had not worked well, as the members of the convention knew. Montesquieu's view that the maintenance of independence, as between the legislative, the executive and the judicial branches, was a security for the people[,] had their full approval."); *Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J. concurring) ("It remains one of the most vital functions of this Court to police with care the separation of the governing powers. That is so even when . . . no immediate threat to liberty is apparent. When structure fails, liberty is always in peril.").[1]

Although the separation of powers most often protects against one coordinate branch of government actively encroaching upon the powers of another, *see, e.g.*, *Bowsher v. Synar*, 478 U.S. 714 (1986) (holding that Congress's granting itself removal power over an official entrusted with executive powers is unconstitutional), it also "is a breach of the national fundamental law if Congress *gives up* its legislative power." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928) (emphasis added); *see also Clinton v. N.Y.*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring) ("That a congressional cession of power is voluntary does not make it innocuous. . . . Abdication of responsibility is not part of the constitutional design."). Thus, the nondelegation doctrine is an offshoot of the separation of powers. Indeed, the Supreme Court has so recognized: "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta*, 488 U.S. at 371.[2] Thus,

---

[1]    *See* U.S. CONST. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States."); *id.* art. II, § 1 ("The executive Power shall be vested in a President of the United States of America."); *id.* art. III, § 1 ("The judicial Power of the United States shall be vested in one supreme court.").

[2]    The nondelegation doctrine's roots reach even deeper. In his *Second Treatise of*

just as Congress may not aggrandize its own powers at the expense of another coordinate branch, Congress may not delegate away its legislative power. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) ("In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency. Article I, § 1, of the Constitution vests '[a]ll legislative Powers herein granted . . . in a Congress of the United States.' This text permits no delegation of those powers."); *Loving v. United States*, 517 U.S. 748, 758 (1996) ("The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, U.S. Const. art. I, § 1, and may not be conveyed to another branch or entity."); *Touby v. United States*, 500 U.S. 160, 165 (1991) ("Congress may not constitutionally delegate its legislative power to another branch of Government."); *Mistretta*, 488 U.S. at 372 ("Congress generally cannot delegate its legislative power to another Branch."); *see id.* at 419 (Scalia, J., dissenting) ("Strictly speaking, there is *no* acceptable delegation of legislative power.").

This rule is "universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). The "nondelegation principle serves both to separate powers as specified in the Constitution, and to retain power in the governmental Departments so that delegation does not

---

(Continued . . .)

*Government*, John Locke explained:

> The power of the legislative, being derived from the people by a positive voluntary grant and institution, can be no other, than what that positive grant conveyed, which being only to make *laws*, and not to make *legislators*, the *legislative* can have no power to transfer their authority of making laws and place it in other hands.

*Mistretta*, 488 U.S. at 419-20 (Scalia, J., dissenting) (quoting J. Locke, *Second Treatise of Government* 87 (R. Cox ed. 1982)); *see also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 672-73 (1980) (Rehnquist, J., concurring) (quoting J. Locke, *Second Treatise of Civil Government, in the Tradition of Freedom*, ¶ 141, p. 244 (M. Mayer ed. 1957)).

frustrate the constitutional design." *The Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) (internal citation omitted).

Accordingly, "there are limits of delegation which there is no constitutional authority to transcend." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935). First and foremost, Congress may not abdicate its core legislative powers. *See id.* at 421 ("The Congress manifestly is not permitted to abdicate or transfer to others the *essential legislative functions* with which it is thus vested." (emphasis added)); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) (same); *Wayman v. Southard*, 23 U.S. 1, 42 (1825) ("It will not be contended that Congress can delegate to the Courts, or to any tribunals, *powers which are strictly and exclusively legislative*." (emphasis added)). Rather, "*core governmental power* must be exercised by the Department on which it is conferred and must not be delegated to others in a manner that frustrates the constitutional design." *Pittston*, 368 F.3d at 394 (emphasis added).

Furthermore, it is no less a constitutional violation where Congress delegates its powers to a private entity rather than another coordinate branch. Indeed, such a delegation is even more constitutionally problematic because it is "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *see also Schechter Poultry*, 295 U.S. at 537. Thus, "[t]here can be no valid delegation of governmental power to nongovernmental agencies." *Dahlberg v. Pittsburgh & L.E.R. Co.*, 138 F.2d 121, 123 (3d Cir. 1943); *see also Chester C. Fosgate Co. v. Kirkland*, 19 F. Supp. 152, 161 (S.D. Fla. 1937).

As discussed below, Congress, via Sarbanes-Oxley, has delegated the powers to tax and to create criminal laws—undoubtedly core legislative powers—to the PCAOB. This transfer of

Article I authority outside the halls of Congress works an unconstitutional delegation. To the extent that Congress can, by legislative fiat, render a body such as the PCAOB to be "non-governmental," then Congress has further compounded its constitutional error by ceding its legislative powers to a private entity. This Court should, therefore, declare that this extra-constitutional board is without authority to enforce the laws it, and not Congress, has promulgated.[3]

### A.    Congress Delegated To The PCAOB Core Legislative Powers.

Congress, through Sarbanes-Oxley, transferred core legislative powers to the Board. Chief among these are the power to tax and the power to define criminal acts. *First*, Sarbanes-Oxley empowers the PCAOB to lay and collect taxes on companies falling under its purview and to engage in other forms of revenue-raising. *See* SOX § 109(c)-(d); 15 U.S.C. § 7219(c)(1) (tying the Board's budget to "annual accounting support fees" "and other receipts"); *id.* § 7219(d) (ceding to the Board the authority to "establish . . . a reasonable annual accounting

---

[3]    Although courts regularly consider whether Congress set out an "intelligible principle" in connection with a delegation of authority, this is not the only mode of analysis. *See, e.g.*, *Am. Trucking*, 531 U.S. at 487 (Thomas, J., concurring) ("I am not convinced that the intelligible principle doctrine serves to prevent all cessions of legislative power. I believe that there are cases in which the principle is intelligible and yet the significance of the delegated decision is simply too great for the decision to be called anything other than 'legislative.'"); *Mistretta*, 488 U.S. at 416-20 (Scalia, J., dissenting) (concluding that the Sentencing Reform Act of 1984 improperly delegated legislative power to the U.S. Sentencing Commission even though the Act did not lack an intelligible principle). The fundamental question is always whether Congress has abdicated legislative power. *See Am. Trucking*, 531 U.S. at 472 ("In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency."). The lack of constraints on the PCAOB's authority assures that Sarbanes-Oxley would fail the "intelligible principle" test. *See, e.g.*, SOX § 3(a), 15 U.S.C. § 7202(a) (authorizing the Board to enact rules "as may be necessary or appropriate in the public interest for the protection of investors, and in furtherance of this Act"); *id.* § 7215(a) (authorizing the PCAOB to establish "fair procedures" for the investigation and disciplining of registered public accounting firms and associated persons of such firms); *id.* § 7219(d) (empowering the Board to set "a reasonable annual accounting support fee"). Amicus WLF focuses here on the more fundamental question because the powers to tax and to create criminal laws that Congress has delegated to the PCAOB are quintessential examples of core legislative powers.

support fee . . . as may be *necessary or appropriate* to establish and maintain the Board" (emphasis added)); *see also id.* § 7219(c)(2) (authorizing the creation of a scholarship program administered by the Board and funded by its "assessment of monetary penalties"). This tax is used to fund the PCAOB's annual budget, which it is authorized to establish on its own, without any statutory ceiling. SOX § 109(b), 15 U.S.C. § 7219(b). Recognizing the obvious legislative, governmental character of these acts, Congress attempts to declare that such monies "shall not be considered public monies of the United States." SOX § 109(c), 15 U.S.C. § 7219(c)(1). Indeed, rather than prescribe the precise formula or schedule for the tax, Congress instead erected a statutory barrier between its constitutional authority and the revenue-raising acts of the Board:

> Nothing in this section shall be construed to render . . . the Board . . . subject to procedures in Congress to authorize or appropriate public funds, or to prevent such organization from utilizing additional sources of revenue for its activities ….

SOX § 109(i), 15 U.S.C. § 7219(i). Thus, through the guise of a "[r]ule of construction," *id.*, Congress expressly abdicated its revenue-raising authority and bypassed its appropriations procedures and safeguards. Congress's intent to delegate its constitutional authority to the Board could not be more plain.

Pursuant to this statutory grant of authority, the PCAOB has promulgated a rule levying such a tax on public companies. *See* PCAOB Rule 7101. The Commission predictably voiced no disapproval with the Board's rule. *See generally Public Company Accounting Oversight Board; Order Approving Proposed Rules On Funding And Notice Of Filing And Order Granting Accelerated Approval Of Amendment No. 1 To The Proposed Rules On Funding*, Exchange Act Release No. 48278, 2003 WL 21781678 (Aug. 1, 2003) ("*Approval of PCAOB Rules*") (summarily approving the Board's proposed rules).[4] And, consistent with Congress's explicit

---

[4]     This lack of scrutiny over the Board's proposed rules is consistent with Congressional design: "The Commission shall approve a proposed rule, if it finds that the rule is consistent

direction to keep this function outside of congressional accountability and the protection of the Treasury, the Board levied the tax without consultation with (and origination in) the House or the approval of Congress.

It is beyond question that the authority to tax is a core legislative function. The power to tax is one of the powers expressly granted to Congress in Article I of the Constitution. *See* U.S. CONST. art. I, § 8, cl. 1 ("The Congress shall have the Power To lay and collect Taxes."); *see also Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 393 (1940) ("The power of taxation, *granted to Congress by the Constitution*, may be utilized as a sanction for the exercise of another power which is granted it." (emphasis added)). Indeed, the Constitution not only explicitly locates the power to tax within Congress's enumerated powers under Article I, but it further dictates precisely *how* any revenue-raising measure must originate in the Legislative Branch: "All Bills for raising Revenue shall originate in the House of Representatives." U.S. CONST. art. I, § 7, cl. 1; *see also United States v. Munoz-Flores*, 495 U.S. 385, 395 (1990) ("'This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure.'" (quoting The Federalist No. 58, p. 359 (C. Rossiter ed. 1961))). The Constitution is not ambiguous on this point and for good reason. In simple but timeless terms, "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819). Pursuant to Sarbanes-Oxley, the Board possesses both.

---

(Continued . . .)

with the requirements of this Act and the securities laws, or is necessary or appropriate in the public interest or for the protection of investors." SOX § 107(b)(3), 15 U.S.C. § 7217(b)(3).

*Second*, Sarbanes-Oxley empowers the Board to define criminal acts where none existed before, by authorizing the PCAOB to promulgate rules setting out criminal violations. SOX § 3(b), 15 U.S.C. § 7202(b); 15 U.S.C. § 78u. That is, beyond the Board's ability itself to discipline those who violate its rules and standards, SOX § 105(c)(4), 15 U.S.C. § 7215(c)(4),[5] federal prosecutors are authorized to enforce PCAOB's rules and requirements under federal criminal laws. SOX § 3(b), 15 U.S.C. § 7202(b). As to this authority of the Board, Congress does not even attempt to conceal the legislative force of the PCAOB's actions. Congress overtly declares that:

> A violation by any person of . . . any rule of the Board shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934 (15 U.S.C. 78a *et seq.*) . . . , and any such person shall be subject to the same penalties, and to the same extent, as for a violation of that Act or such rules or regulations.

*Id.* Accordingly, violators of the PCAOB's rules are subject to penalties that include criminal sanctions of up to 20 years' imprisonment and $5 million in fines. 15 U.S.C. § 78ff(a).

This power to create criminal laws is likewise a core legislative function: "Congress *alone* has the power to define a crime and to specify the offenders." *United States v. Dotterweich*, 320 U.S. 277, 287 (1943) (emphasis added); *see also Turner v. United States*, 396 U.S. 398, 429 (1970) ("Congress can undoubtedly create crimes and define their elements."). Indeed, this power to *define* crimes, which the Executive is then charged with *enforcing*, is the quintessential legislative function. This power arises from the Necessary and Proper Clause, U.S. CONST. art I, § 8, cl. 18, by which Congress has the "Power To . . . make all Laws which

---

[5]    To the extent that the Board's authority under Sarbanes-Oxley is better described as Executive in whole or in part, this delegation fares no better. As the Supreme Court recently explained, "[t]he insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known. That unity would be shattered, and the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him." *Printz v. United States*, 521 U.S. 898, 922-23 (1997) (citations omitted).

shall be necessary and proper for carrying into Execution" the other powers set out in Article I. *See Rochin v. California*, 342 U.S. 165, 168 (1952).   As the Supreme Court has made clear, "[t]he power to define crimes belongs to Congress *only* as an appropriate means of carrying into execution its limited grant of legislative powers."  *Id.* (emphasis added) (citing U.S. CONST. art I, § 8, cl. 18.).   Pursuant to Sarbanes-Oxley, the Board possesses this core legislative function as well.

### B.    The Constitution Prohibits The Delegation Of Core Legislative Powers.

Article I is quite clear.  It vests "'[a]ll legislative powers herein granted . . . in a Congress of the United States.'  This text permits no delegation of *those* powers."  *Am. Trucking*, 531 U.S. at 472 (emphasis added) (quoting U.S. CONST. art. I, § 1).    In other words, Congress cannot delegate those powers entrusted to it by Article I.   These are the core or essential legislative functions that Congress may not pass off on another entity.  *See Panama Refining*, 293 U.S. at 421 ("The Congress manifestly is not permitted to abdicate or transfer to others the *essential legislative functions* with which it is thus vested."  (emphasis added)); *Schechter Poultry*, 295 U.S. at 529 (same); *Wayman*, 23 U.S. at 42 ("It will not be contended that Congress can delegate to the Courts, or to any tribunals, *powers which are strictly and exclusively legislative*." (emphasis added)); *Pittston*, 368 F.3d at 394 ("*[C]ore governmental power* must be exercised by the Department on which it is conferred and must not be delegated to others in a manner that frustrates the constitutional design."  (emphasis added)).    Thus, Congress may not constitutionally delegate to another its taxing power, U.S. CONST. art I, § 8, cl. 1, or its power to create criminal laws under the Necessary and Proper Clause, *id.*, cl. 18.

Indeed, the Supreme Court has struck down delegations of authority to create crimes and repeatedly recognized that such delegations are constitutionally problematic.   In *Schechter Poultry*, the Court struck down Section 3 of NIRA, which granted to the President "the coercive

exercise of lawmaking power" to create codes of competition, the violation of which "are punishable as crimes." 295 U.S. at 529. Similarly, in *Panama Refining*, the Court considered Section 9(c) of NIRA, pursuant to which Congress delegated to the President the power to regulate the transportation in interstate and foreign commerce of petroleum products. The Court struck down Section 9(c), which "authorize[d] the President to pass a prohibitory law," and make the disobedience thereof "a crime punishable by fine and imprisonment." 293 U.S. at 414, 415. Although the Court has declined expressly to declare that the delegation of authority to create criminal laws requires heightened protections, *Touby*, 500 U.S. at 165-66, it has done so implicitly by emphasizing that *Panama Refining* and *Schechter* both "dealt with delegation of power to make federal crimes of acts that never had been such before and to devise novel rules of law in a field in which there had been no settled law or custom." *Fahey v. Mallonee*, 332 U.S. 245, 249 (1947); *Mistretta*, 488 U.S. at 373 n.7; *see also Fahey*, 332 U.S. at 252 (expressing doubt as to whether it would be permissible "to authorize creation of new crimes").

Here, Congress enacted sweeping legislation, delegating "massive power, unchecked power" to craft new rules, including criminal laws carrying penalties up to $5 million in fines and 20 years' imprisonment, to regulate "all accountants and everybody they work for, which directly or indirectly is every breathing person in the country." Gramm Statement, *supra*, p.2. Under the Constitution and controlling precedent, such sweeping delegation of core legislative powers cannot survive.[6]

---

[6]    It is true that the Supreme Court has upheld certain delegations of Congressional taxing power to the Executive. *See, e.g.*, *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212 (1989); *J.W. Hampton, Jr. Co. v. United States*, 276 U.S. 394 (1928); *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892). To the extent these cases were properly decided, however, they are distinguishable because the delegations at issue in those cases involved substantial and sometimes numerous political checks that are not present here: delegation to the President (or a high-ranking Executive official within his direct control), *see, e.g.*, *Marshall Field*, 143 U.S. 649,

C.     **To The Extent The PCAOB Is A Private Body, Congress Compounded Its Constitutional Error By Delegating Such Powers To A Private Entity.**

Congress designed the PCAOB to be private entity.  This is clear from the language of Sarbanes-Oxley.  Section 101(a) of SOX provides that "[t]he Board shall be a body corporate, operate as a nonprofit corporation, and have succession until dissolved by an Act of Congress." SOX § 101(a); 15 U.S.C. § 7211(a).  Likewise, Section 101(b) provides that "[t]he Board shall not be an agency or establishment of the United States Government," and that "[n]o member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent for the Federal Government by means of any service."  SOX § 101(b), 15 U.S.C. § 7211(b).  Although the separation of powers and the nondelegation doctrine tend to apply to interbranch disputes, it is no less a violation of the Constitution if Congress tries to pass off its authority to a private entity.  Indeed, this is "legislative delegation in its most obnoxious form." *Carter*, 298 U.S. at 311.  "Such a delegation of legislative power is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress."  *Schechter Poultry*, 295 U.S. at 537.  Thus, to the extent that the Court accepts Congress's word that the PCAOB is a private entity, *see* SOX § 101, 15 U.S.C. § 7211, the Board cannot be a

_____

(Continued . . .)

who is politically accountable to the people and who has some independent residuum of constitutional powers, *see Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 684 (1980) (Rehnquist, J., concurring); and other significant restrictions on the exercise of the taxing power.  *See, e.g.*, *Skinner*, 490 U.S. at 218 (highlighting the "multiple restrictions" limiting the Secretary of Transportation's discretion to "establish a schedule of fees based on the usage, in reasonable relationship to volume-miles, miles, revenues, or an appropriate combination thereof, of natural gas and hazardous liquid pipelines"—specific criteria for establishing fees; a limited group of parties from whom the fees were to be collected; constraints on the uses to which the fees could be directed; and a ceiling limiting the Secretary's budget and the amount of fees to be collected).  Here, whether or not the Court accepts Congress's word that the PCAOB is a private entity, Congress has delegated unconstrained taxing power to an entity that possesses no constitutional authority and is far removed from the political process.  *See generally* Pls.' SJ Mem. at 4-10.

constitutional repository of legislative power.[7]  *Carter*, 298 U.S. at 311; *Schechter Poultry*, 295 U.S. at 537 (1935); *see also Dahlberg*, 138 F.2d at 123; *Chester C. Fosgate*, 19 F. Supp at 161.[8]

Moreover, even to the extent that the Board is not a private entity, the lack of constraints on its authority exacerbates the unconstitutional delegation here.  The PCAOB has broad legislative authority, "massive powers," not simply advisory or ministerial powers.  *See* Gramm Statement, *supra*, p.2.  On this ground alone, there is an unconstitutional delegation.  That these are "unchecked powers," and the Board is not subordinate to a public agency that has full and independent review over its actions, renders its actions unconstitutional under any view of Congress's delegation authority.

The SEC has scant oversight or control over the PCAOB.  It has no control over the PCAOB's regular inspections, including the choice of which audits to inspect, SOX § 104(d)(1), 15 U.S.C. § 7214(d)(1); no supervision over which firms to investigate, SOX § 105(b)(1), 15 U.S.C. § 7215(b)(1); no oversight of demands for the production of documents or testimony, SOX § 105(b)(2), 15 U.S.C. § 7215(b)(2); and no power to impose sanctions on a target when the PCAOB has declined to do so.

To the extent the SEC reviews PCAOB action at all, it engages in highly deferential review.  SOX § 107(b)(3), 15 U.S.C. § 7217(b)(3).  The Commission's ability to amend PCAOB rules and review proposed PCAOB rules and standards is constrained by notice-and-comment

---

[7]     Indeed, as Congress is empowered to make laws, not legislators, *see supra* n.2, Congress is the only constitutional repository of its core powers.

[8]     To be certain, a few courts have permitted the delegation of authority to a private entity, but only where the entity was clearly subordinate to a public agency.  *Pittston*, 368 F.3d 385; *Todd & Co. v. SEC*, 557 F.2d 1008 (3d Cir. 1977); *R.H. Johnson & Co. v. SEC*, 198 F.2d 690 (2d Cir. 1952).  No court has held, however, that such delegations could be appropriate where the actions of the private entity are subject to anything less than full and independent review by a public entity.  And the Constitution does not countenance broad delegations of the types of core legislative functions at issue here to unaccountable private bodies.

procedures.  15 U.S.C. § 78s; SOX § 107(b), 15 U.S.C. § 7217(b).  Moreover, if the SEC wishes to *reject* a PCAOB rule or standard, further proceedings are necessary.  15 U.S.C. § 78s(b)(2).  *See generally* Pls.' SJ Mem. at 8-9.  Despite the apparent authority to "approv[e]" the taxes promulgated by the Board, for example, the Commission summarily rubber-stamped the Board's decision without any review.  *See generally Approval of PCAOB Rules*, 2003 WL 21781678.  In fact, had Congress intended the Commission's limited review of certain of the Board's actions to have any real force or effect, it would never have gone to such great lengths to characterize the Board as an independent, non-governmental body.  Congress's mandate to the Board and its members is to function independently of political pressures, S. Rep. No. 107-205, at 6 (2002) (emphasizing the Board's "independence"), and it is this very mandate that renders the Commission's checks illusory and the Board's authority unconstitutional.  Thus, whether or not this Court takes Congress at its word that the PCAOB is a private entity, the fact that the Board is so utterly lacking in public oversight makes the unconstitutional delegation of core legislative authority all the more egregious.

## II.     THE IMPACT OF SARBANES-OXLEY AND THE BOARD'S ACTIONS ON AMERICAN ENTERPRISE DEMONSTRATES THE DANGERS OF CIRCUMVENTING THE CONSTITUTIONAL DESIGN AND POLITICAL ACCOUNTABILITY.

In the wake of the Enron and WorldCom accounting scandals, Congress sought to pass legislation intended to supervise the auditing of American public companies as a means of preventing similar incidents in the future.  But, in doing so, Congress ignored the Supreme Court's warning that "[e]xtraordinary conditions do not create or enlarge constitutional power." *Schechter Poultry*, 295 U.S. at 528; *see also Panama Refining*, 293 U.S. at 430 ("The question is not of the intrinsic importance of the particular statute before us but of the constitutional processes of legislation which are an essential part of our system of government.").  Even during

a time of war, in conditions that are surely more extraordinary than is a crisis of public accounting, the Supreme Court has vigorously enforced the separation of powers. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952) ("The Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times."). In the case of Sarbanes-Oxley, rather than "allocating specific powers and responsibilities to a branch fitted to the task" thereby "allow[ing] the citizen to know who may be called to answer for making, or not making, those delicate and necessary decisions essential to governance," *Loving v. United States*, 517 U.S. 748, 757-58 (1996), Congress sought to create an entity that would be insulated from "the myriad of constituent pressures" of the political arena, *Accounting Reform and Investor Protection hearings Before the S. Comm. on Banking, Housing, and Urban Affairs*, 107th Cong. 44 (2002) (statement of former SEC Chief Accountant Michael H. Sutton), such as the "extraordinary amount of political pressure . . . brought to bear on the [SEC]" in its previous attempts to restrict the consulting work that auditors could perform. *Id.* (statement of former SEC Chairman Arthur Levitt).

Thus, Congress created the PCAOB—a purportedly independent private entity that is, by design, unchecked by the political branches and unresponsive and unaccountable to the public: "This board is going to have *massive power*, *unchecked power*, by design . . . . We are setting up a board with *massive power* that is going to make decisions that affect *all accountants and everybody they work for, which directly or indirectly is every breathing person in the country*. They are going to have *massive unchecked powers*." Gramm Statement, *supra*, p.2 (emphasis added).

The PCAOB, unchecked by political will, has run amok among the accounting industry and our nation's public companies. *See* Bob Merritt, *The Sarbanes-Oxley Act: A Personal View*,

Washington Legal Foundation Legal Opinion Letter, Vol. 15, No. 21 (Oct. 21, 2005) ("This under-supervised and overzealous group of bean counters [the PCAOB] has generated countless regulations and has taken a gun-and-badge attitude toward public company managements, their financial executives, and their auditors."). Sarbanes-Oxley's requirements have raised substantially the direct costs of public companies for accounting and auditing services. As an example, Yellow Roadway, the largest trucking company in the nation, was forced to divert 200 employees to work on Sarbanes-Oxley issues and to spend an additional $10 million on outside accountants and auditors. *See* Peter J. Wallison, *Sarbanes-Oxley and the Ebbers Conviction*, Financial Services Outlook, AEI Online (June 10, 2005), *available at* http://www.aei.org/publications/pubID.22648/pub_detail.asp.

In its first year alone, the PCAOB has inflicted almost immeasurable damage on the economy, costing American businesses some $35 billion. And this figure demonstrates that the SEC grossly underestimated the cost of the PCAOB. *See* American Electronics Association, *Sarbanes-Oxley Section 404: The 'Section' of Unintended Consequences and Its Impact on Small Business* (February 2005), *available at* http://www.aeanet.org/governmentaffairs/ AeASOXPaperFinal021005.asp ("The implementation cost is approximately $35 billion—more than 20 times greater than the SEC estimated in 2003."); Robert Novak, *Threat of the Auditors*, CNN.com (April 7, 2005), *available at* http://www.cnn.com/2005/POLITICS/04/07/ threat.auditors ("Non-government estimates put the cost for publicly traded companies at $35 billion."). These costs are likely to be passed on to public companies' customers and shareholders. *See* David A. Kotler & Rick Swedloff, *Sarbanes-Oxley's Impact on State Corporate Governance*, Washington Legal Foundation Legal Opinion Letter, Vol.13, No. 16 (July 25, 2003).

And these are just the direct costs. Market data demonstrates that the shareholder public envisioned the costs of Sarbanes-Oxley and the PCAOB as outweighing their benefits: the Dow Jones Industrial Average dropped 179 on the day when the president spoke on Wall Street and called for regulation and then fell another 283 points the next day when the Senate adopted the Sarbanes bill in a unanimous vote. *See* Wallison, *supra*, p.16.[9]

Market evidence demonstrates that the burden of the sharp increases in accounting and auditing expenses has fallen mostly on small businesses. Indeed, the burden of compliance has kept numerous companies from going public and has even compelled increasing numbers of public companies to go private. *See* Wallison, *supra*, p.16 (citing Ellen Engel, Rachel Hayes, & Xue Wang, *The Sarbanes-Oxley Act and Firms' Going-Private Decisions* (Paper, Graduate School of Business, University of Chicago, May 6, 2004)). In addition, "[s]ome non-American companies have threatened not to list in New York because of the cost of the legislation; others that have recently delisted from an American stock exchange are said to have done so partly because of Sarbanes-Oxley." *Sarbanes-Oxley: A Price Worth Paying?*, The Economist (May 19, 2005), *available at* http://www.economist.com/business/displayStory.cfm?story_id=3984019 ("*A Price Worth Paying?*"). Thus, Sarbanes-Oxley and the PCAOB may in fact be working against their goals: "It would be regrettable if a law intended to improve the quantity and quality of financial information available to investors led many companies to seek relatively unregulated

---

[9]     A study conducted by Ivy Xiying Zhang of the William E. Simon Graduate School of Business at the University of Rochester attempts to assess the effect on share value of the enactment of Sarbanes-Oxley. The Zhang study concludes that the cumulative effect of the President's July 9, 2002 speech on Wall Street; the Republican House abandonment of efforts to tone down the bill on July 18, 2002; and the Senate-House conference report on the bill on July 24, 2002 was a $1.4 trillion loss for shareholders of public companies. *See* Ivy Xiying Zhang, *Economic Consequences of the Sarbanes-Oxley Act of 2002* (Paper, William E. Simon Graduate School of Business Administration, University of Rochester, February 2005), available at http://w4.stern.nyu.edu/accounting/docs/speaker_papers/spring2005/Zhang_Ivy_Economic_Con sequences_of_S_O.pdf; *see* Wallison, *supra*, p.16 (discussing the Zhang study).

forms or jurisdictions—but that does seem to be happening." *Id*; *see* Merritt, *supra*, p.15-16 ("In the final analysis, the environment created by the Act and its implementation have resulted in a misallocation of managements' time and attention from real shareholder value creation to regulatory risk avoidance that will not improve the chances of avoiding future public company abuses and failures.").

In the same vein, the PCAOB has aided the very accounting firms it sought to restrain. Studies show that "despite the media and legislative clamor to 'get' the big accounting firms after Enron imploded, it's the Big Four accounting firms that have turned out to be the big winners from Sarbanes-Oxley." John Berlau, *A Tremendously Costly Law*, National Review, April 11, 2005; *see A Price Worth Paying?*, *supra*, p.17 ("[SOX] has provided a bonanza for accountants and auditors—a profession thought to be much at fault in the scandals that inspired the law, and which the statute sought to rein in and supervise."). Although Sarbanes-Oxley contains restrictions on the consulting work that can be performed by accounting firms, the Big Four accounting firms all reported double digit increases in profitability in 2004, largely because of substantial—reportedly, 78 to 134 percent—fee increases. *See* Wallison, *supra*, p.16 (arguing that Sarbanes-Oxley and the PCAOB are unnecessary and overly burdensome and that the longstanding threat of criminal conviction was sufficient to deter fraudulent accounting practices). By inflating the profitability of the Big Four, Congress has upset competition in the accounting industry.

Thus, the practical effect of Sarbanes-Oxley and the PCAOB has been to impair public companies, small businesses, shareholders—that is, the people—at the expense of the biggest accounting firms. And so Congress has crippled its intended beneficiaries while aiding its

intended targets.  This itself is bad enough.  But worse still is that the people have no recourse because Congress has ensured that the PCAOB is not politically accountable to anyone.

The Supreme Court has warned that disregard of structural first principles would lead to such disastrous results:  "To disregard structural legitimacy is wrong in itself—but since structure has purpose, the disregard also has adverse practical consequences." *Mistretta*, 488 U.S. at 421 (Scalia, J. dissenting).  "[I]n the long run the improvisation of a constitutional structure on the basis of currently perceived utility will be disastrous." *Id.* at 427; *see also Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J., concurring) ("It remains one of the most vital functions of this Court to police with care the separation of the governing powers.  That is so even when  . . . no immediate threat to liberty is apparent.  When structure fails, liberty is always in peril.").  The failure to vindicate structural principles here will allow the PCAOB to continue to wreak havoc on public companies, small businesses, and shareholders—indeed, on the economy as a whole—because the PCAOB remains unresponsive and unaccountable to the body politic.

*        *        *        *        *

The fundamental problem with Sarbanes-Oxley and the PCAOB is a matter of first principles.  The government derives its powers *from the People*:  "Governments are instituted among Men, deriving their just powers from the consent of the governed."  The Declaration of Independence para. 2 (U.S. 1776); *see also United States v. Lara*, 541 U.S. 193, 212 (2004) (Kennedy, J., concurring) ("The Constitution is based on a theory of original, and continuing, consent of the governed."); *Nevada v. Hall*, 440 U.S. 410, 426 (1979) ("In this Nation each sovereign governs only with the consent of the governed.").  It is clear that Congress lost sight of this basic, fundamental truth in enacting Sarbanes-Oxley.  Indeed, Congress went to great lengths

to ensure that the PCAOB was unaccountable to the people, granting it "massive powers" that would be "unchecked" by the political process.  Gramm Statement, *supra*, p.2.  But important policy decisions—not only those decisions relating to the PCAOB's focus and its operations, but its existence altogether—are to be made by the political branches.  *See Mistretta*, 488 U.S. at 415 (Scalia, J., dissenting) ("It is difficult to imagine a principle more essential to democratic government than that . . . the basic policy decisions governing society are to be made by the Legislature.").  This is so because Congress is accountable to the people, in whom power ultimately resides.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 620 (1973) (Douglas, J., dissenting) ("'[W]e the people' are the sovereigns, not those who sit in seats of the mighty.").

In designing the PCAOB with sweeping power and no political guardrails—Congress all but assured that Sarbanes-Oxley and the PCAOB would run roughshod over public companies, small businesses, and shareholders.  And the lack of political accountability ensures that the PCAOB's problems will not be corrected.  This Court should not hesitate to vindicate first principles, preserve the Constitution's sacred structure, and return power to where it belongs—with the coordinate branches to which the Constitution assigns it, and more importantly, with the People.

## CONCLUSION

For the reasons set forth herein, the Washington Legal Foundation respectfully requests that the Court grant the Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

Dated: August 22, 2006

WILEY REIN & FIELDING LLP

By: /s/ Kathryn Comerford Todd

Daniel J. Popeo (DC Bar 934711)
Paul D. Kamenar (DC Bar 914200)
Washington Legal Foundation
2009 Massachusetts Avenue, NW
Washington, DC  20036
TEL: 202.588.0302
FAX: 202.588.0386

Kathryn Comerford Todd (DC Bar 477745)
    (*Counsel of Record*)
Thomas R. McCarthy (DC Bar 489651)
William S. Consovoy (DC Bar 493423)
Wiley Rein & Fielding LLP
1776 K Street NW
Washington, DC  20006
TEL: 202.719.7000
FAX: 202.719.7049

*Attorneys for the Washington Legal Foundation*