IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FREE ENTERPRISE FUND, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. A. No. 06-217 (JR) |
| | ) |
| THE PUBLIC COMPANY ACCOUNTING | ) |
| OVERSIGHT BOARD, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF PROPOSED INTERVENOR UNITED STATES IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT**

Of Counsel:

BRIAN G. CARTWRIGHT
General Counsel

ANDREW N. VOLLMER
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

JOHN W. AVERY
Special Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

SUSAN K. RUDY
Assistant Director

ROBERT J. KATERBERG
 (D.C. Bar No. 466325)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 6112
Washington, D.C. 20001
Telephone:    (202) 616-8298
Facsimile:    (202) 616-8460

Attorneys for the United States

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.  THE PCAOB FULLY COMPORTS WITH THE APPOINTMENTS CLAUSE . . . 9

  A.  The Members of the PCAOB Are Inferior Officers . . . . . . . . . . . . . . . . . . . . 11

  B.  Congress May Vest Power to Appoint Inferior Officers in the SEC . . . . . . . . . 17

II.  THE PCAOB IS CONSISTENT WITH THE SEPARATION OF POWERS . . . . . 24

III.  TITLE I OF THE SARBANES-OXLEY ACT DOES NOT IMPROPERLY
      DELEGATE LEGISLATIVE POWER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

**CASES**                                                                 Page (s)

A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935) . . . . . . . . . . . . . . . . . . . 34

American Power & Light Co. v. SEC 329 U.S. 90 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Bowsher v. Synar, 478 U.S. 714 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Buckley v. Valeo, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20

Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837 (1984) . . . . . . . . . . . . . . 29

Collins v. United States, 14 Ct. Cl. 568 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cospito v. Heckler, 742 F.2d 72 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Cunningham v. Neagle, 135 U.S. 1 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

Edmond v. United States, 520 U.S. 651 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

First Jersey Securities, Inc. v. Bergen, 605 F.2d 690 (3d Cir. 1979),
      cert. denied, 444 U.S. 1074 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

FPC v. Hope Natural Gas Co., 320 U.S. 591 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Freytag v. Commissioner, 501 U.S. 868 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18, 19, 22

Gold v. SEC, 48 F.3d 987 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Humphrey's Executor v. United States, 295 U.S. 602, 621-22 (1935) . . . . . . . . . . . . . . . . . . . 32

In re Hennen, 38 U.S. (13 Pet.) 230 (1839) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re Sealed Case, 829 F.2d 50 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394 (1928) . . . . . . . . . . . . . . . . . . . . . . . 34

Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Lichter v. United States, 334 U.S. 742 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Morrison v. Olson, 487 U.S. 654 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Myers v. United States, 272 U.S. 52 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 29, 30

NASD v. SEC, 431 F.3d 803 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

National Broad. Co. v. United States, 319 U.S. 190 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . 35

Nat'l Fed'n of Fed. Employees v. United States, 905 F.2d 400 (D.C. Cir. 1990) . . . . . . . . . . . 34

New York Central Securities Corp. v. United States, 287 U.S. 12 (1932) . . . . . . . . . . . . . . . . 35

Panama Refining Co. v. Ryan, 293 U.S. 388 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

R.H. Johnson & Co. v. SEC, 198 F.2d 690 (2d Cir.),
    cert. denied, 344 U.S. 855 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Shultz v. SEC, 614 F.2d 561 (7th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Shurtleff v. United States, 189 U.S. 311 (1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Silver v. United States Postal Service, 951 F.2d 1033 (9th Cir. 1991) . . . . . . . . . . . . . . . . 21, 22

Staples v. United States, 511 U.S. 600 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381 (1940) . . . . . . . . . . . . . . . . . . . . . . . 39

Todd & Co., Inc. v. SEC, 557 F.2d 1008 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Arthur Young & Co., 465 U.S. 805 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Ehrlichman, 546 F.2d 910 (D.C. Cir. 1976)
    cert. denied, 429 U.S. 1120 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Gantt, 194 F.3d 987 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 23

United States v. Germaine, 99 U.S. 508 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17, 18

United States v. Grace, 778 F.2d 818 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Grimaud, 220 U.S. 506 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Hilario, 218 F.3d 19 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Mistretta, 488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34, 36

United States v. Mouat, 124 U.S. 303 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

United States v. Nixon, 418 U.S. 683(1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Perkins, 116 U.S. 483 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 29, 31

United States v. Salerno, 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Whitman v. Am. Trucking Ass'ns, 531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 35

Wonsover v. SEC, 205 F.3d 408 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Yakus v. United States, 321 U.S. 414 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## **STATUTES**

7 U.S.C. § 155 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

15 U.S.C. § 7202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

15 U.S.C. § 7211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

15 U.S.C. § 7212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 8

15 U.S.C. § 7213 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

15 U.S.C. § 7214 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 13, 27

15 U.S.C. § 7215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

15 U.S.C. § 7217 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

15 U.S.C. § 7219 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15, 37, 38

15 U.S.C. § 78d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

15 U.S.C. § 78ff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. § 546 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 672 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

47 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## **OTHER MATERIALS**

Authority of Civil Service Commission to Appoint a Chief Examiner,
    37 Op. Att'y Gen. 227 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18, 19, 22

The Constitutional Separation of Powers Between the President and Congress,
    20 Op. Off. Legal Counsel 124 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## INTRODUCTION AND SUMMARY

The United States respectfully submits this memorandum of points and authorities in opposition to plaintiffs' motion for summary judgment and in support of the United States' cross-motion for summary judgment.  After a series of devastating accounting scandals, Congress enacted the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, to restore public confidence in the securities markets by, among other things, instituting a new regime to govern public accounting firms.  This new regime involved the creation of a new entity, the Public Company Accounting Oversight Board ("PCAOB" or "Board"), subordinate to the Securities and Exchange Commission ("SEC").  Under the statute, the PCAOB is charged with registering public accounting firms, issuing auditing standards, inspecting public accounting firms, and disciplining such firms and their associated persons.  All of these functions are subject to the pervasive oversight of the SEC, which also appoints the members of the PCAOB and has authority to remove them for good cause shown.  For example, the proposed rules of the PCAOB and, if appealed, its disciplinary sanctions, do not even become effective until after approval by the SEC based on an independent review.  Further, the SEC is broadly empowered to relieve, by rule, the PCAOB of any of its enforcement responsibilities.

Plaintiffs challenge the constitutionality of the PCAOB on three grounds.  First, under the Appointments Clause of the Constitution, they urge that PCAOB members are "Principal" officers who must be appointed by the President.  Alternatively, assuming that Board members are "Inferior" officers, they argue that their appointment by the SEC is not appointment by the "Heads of Departments" within the meaning of the Appointments Clause.

These contentions are without doctrinal foundation.  As the Supreme Court has explained, "the term 'inferior officer' connotes a relationship with some higher ranking officer or

officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." Edmond v. United States, 520 U.S. 651, 662 (1997). The SEC's pervasive oversight authority leaves no doubt of the existence of a "superior/inferior" relationship for purposes of the Appointments Clause, and the degree of oversight is at least as significant as that involved in Edmond itself, where judges of the Coast Guard Court of Criminal Appeals were held to be "Inferior" officers. Plaintiffs similarly err in urging that the SEC should be treated as a headless non-Department. In many crucial respects, the SEC functions analogously to a Cabinet-level agency, and neither the text nor the purpose of the Appointments Clause requires that appointments be made by an individual head rather than by the governing Commissioners as a body.

Plaintiffs' second challenge, brought under the general separation-of-powers principle, fails for many of the same reasons as their Appointments Clause contentions. The SEC's broad and pervasive oversight renders implausible plaintiffs' insistence that the Board, by its nature, impermissibly derogates Executive Branch authority. Their arguments based on the provisions governing removal of Board members fare no better. The Constitution does not require that the President be able to remove "Inferior" officers, such as PCAOB members, directly; such officers may be removed by those who appointed them in the first instance. Nor does a requirement that removal of an "Inferior" officer be for good cause violate the relevant constitutional standards. At bottom, plaintiffs' argument offers little more than a series of unfounded speculations premised on unlikely readings of statutory terms. Their invitation to engage in this type of reasoning should be rejected.

Plaintiffs' third and final challenge is equally without merit. The non-delegation doctrine requires merely that Congress provide an "intelligible principle" in conferring discretionary authority, and the Supreme Court has "found the requisite 'intelligible principle' lacking" on only two occasions, both over seven decades ago. <u>Whitman v. Am. Trucking Ass'ns</u>, 531 U.S. 457, 474 (2001). Plaintiffs fail to distinguish any grant of authority vested in the PCAOB from the dozens of similar grants of authority upheld by the courts.

In sum, if the Court denies defendants' pending motion to dismiss,[1] it should grant the motion of the United States for summary judgment and deny plaintiffs' motion for summary judgment.

## STATUTORY BACKGROUND

In 2002, Congress passed and the President signed into law the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745. "The Act adopt[ed] tough new provisions to deter and punish corporate and accounting fraud and corruption, ensure justice for wrongdoers, and protect the interests of workers and shareholders." Statement on Signing the Sarbanes-Oxley Act of 2002, 38 Weekly Comp. of Pres. Docs. 1286 (July 30, 2002). The Act was a response to a series of devastating corporate scandals and implosions in 2001 and 2002 involving Enron, WorldCom, and other publicly traded companies. Many of these scandals involved aggressive and/or fraudulent accounting practices, and in several instances the audit firms were faulted for failing

---

[1] On June 2, 2006, the United States filed a Statement of Interest in support of defendants' motion to dismiss (dkt. no. 19). The United States continues to believe that this case must be dismissed because, among other things, plaintiffs have failed to bring their claims through the Sarbanes-Oxley Act's exclusive statutory review mechanism. Indeed, we believe that examination of the constitutional issues, as set forth herein, will underscore why pre-merits dismissal is appropriate.

to detect the underlying conduct.  As a result, many believed a central body with adequate

resources and independence from the profession was needed to oversee the audit profession.[2]

The Sarbanes-Oxley Act incorporated a number of different reforms in a variety of areas.

One of its significant components was Title I, which created and installed the PCAOB to fill the

previous void in regulation and oversight of public accounting firms.  Under the umbrella of the

SEC's authority, the PCAOB was vested with the functions of registration of public accounting

firms, promulgation of rules and standards relating to public company audits; periodic

inspections of registered accounting firms; and investigation and discipline of registered

accounting firms.  See 15 U.S.C. §§ 7212, 7213, 7214, 7215.  In situating the PCAOB as a

subordinate body reporting to the SEC, Congress drew on a longstanding model in securities

regulation of having specific regulatory functions carried out by industry bodies, known as "self-

regulatory organizations" ("SROs"), under the SEC's oversight and supervision.  See generally

NASD v. SEC, 431 F.3d 803, 804 (D.C. Cir. 2005) ("A statutory system authorizing self-

regulatory organizations to act as quasi-governmental agencies in disciplining members for

federal securities law violations has existed for almost 70 years.").

The SEC was given overarching supervisory authority over the PCAOB.  The SEC

appoints the PCAOB's members.  15 U.S.C. § 7211(e)(4)(A).  It approves the PCAOB's budget.

15 U.S.C. § 7219(b).  Replicating the SEC's authority over the SROs, the statute gives the SEC

---

[2]  The United States' system of securities regulation depends on the financial statements that publicly traded companies file with the Securities and Exchange Commission ("SEC") being audited by an independent certified public accountant in accordance with generally accepted auditing standards.  United States v. Arthur Young & Co., 465 U.S. 805, 810-11 (1984).  The Supreme Court has described independent auditors as "public watchdogs" who "owe[] ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public."  Id. at 817-18.

general "oversight and enforcement authority over the Board," including the authority to impose

recordkeeping requirements on the PCAOB and to examine those records at any time.  15 U.S.C.

§ 7217(a) (incorporating 15 U.S.C. §§ 78q(a)(1), (b)(1)).  The SEC must approve the conduct of

any litigation by the PCAOB.  15 U.S.C. § 7211(f)(1).  The PCAOB does not have its own

subpoena authority in its investigations; rather, it needs to seek issuance by the Commission of a

subpoena.  See 15 U.S.C. § 7215(b)(2)(D).  Nor may it refer an investigation to the Department

of Justice or state attorneys general except pursuant to the direction of the SEC.  See 15 U.S.C.

§ 7215(b)(4)(B)(iii).  The PCAOB is required to submit an annual report, including audited

financial statements, to the SEC.  See 15 U.S.C. § 7211(h).

The SEC is empowered to remove any member of the PCAOB "in accordance with

section 7217(d)(3) of this title, for good cause shown before the expiration of the term of that

member."  15 U.S.C. § 7211(e)(6).  Section 7217(d)(3) provides that the SEC may remove any

member of the PCAOB from office if it finds, on the record after notice and an opportunity for a

hearing, that the member "(A) has willfully violated any provision of this Act, the rules of the

Board, or the securities laws; (B) has willfully abused the authority of that member; or (C)

without reasonable justification or excuse, has failed to enforce compliance with any such

provision or rule, or any professional standard by any registered public accounting firm or any

associated person therewith."  15 U.S.C. § 7217(d)(3).  The SEC may also censure PCAOB

members for the same reasons and in the same manner.  Id.

Moreover, apart from its authority to remove individual PCAOB members outright or

censure them for the reasons described above, the SEC is empowered to "censure or impose

limitations upon the activities, functions, and operations of the Board" if it finds, on the record

after notice and an opportunity for a hearing, that the PCAOB "(A) has violated or is unable to comply with any provision of this Act, the rules of the Board, or the securities laws, or (B) without reasonable justification or excuse, has failed to enforce compliance with any such provision or rule, or any professional standard by any registered public accounting firm." 15 U.S.C. § 7217(d)(2). And, the SEC "by rule, consistent with the public interest, the protection of investors, and the other purposes of this Act and the securities laws, may relieve the Board of any responsibility to enforce compliance with any provision of this Act, the securities laws, the rules of the Board, or professional standards." 15 U.S.C. § 7217(d)(1).

Further, as previously explained in detail in the United States' Statement of Interest, the statute vests the SEC with specific review power over every final legal action the PCAOB takes. This is accomplished by making the pre-existing framework for SEC review over actions of SROs applicable to the PCAOB, with enhancements that give the SEC even greater power over the PCAOB than it possesses over the SROs. The PCAOB promulgates rules governing auditors of public company financial statements and internal controls and the conduct of public company audits, but all such proposed rules must be approved by the SEC, and do not go into effect until so approved. 15 U.S.C. § 7217(b). Such review includes the rules the PCAOB adopts to govern its own functions such as, for example, rules governing the registration of public accounting firms, 15 U.S.C. § 7212, rules governing the periodic inspections of accounting firms, 15 U.S.C. § 7214, rules governing the investigation, hearing, and disciplinary sanction process, 15 U.S.C.

§ 7215, and rules governing the process of allocating, assessing, and collecting annual support fees, 15 U.S.C. § 7219.[3]

The statute also gives the SEC supervisory authority over the PCAOB's conduct of regular inspections. If a registered accounting firm disagrees with the assessments contained in the PCAOB's final inspection report, after having previously responded to the PCAOB concerning the issues in question, the firm may seek review of the final inspection report by the SEC. 15 U.S.C. § 7214(h)(1)(A). A firm may also seek review if it disagrees with a determination of the Board that criticisms or defects identified in an inspection report have not been addressed to the satisfaction of the Board within 12 months of the date of the inspection report. 15 U.S.C. § 7214(h)(1)(B).

Likewise, any disciplinary sanction that the PCOAB imposes on an accountant must be reported to the SEC, 15 U.S.C. § 7217(c)(1), and is then subject to SEC review either on application of the disciplined person or on the SEC's own motion, 15 U.S.C. § 7217(c)(2) (incorporating 15 U.S.C. § 78s(d)(2)). Unlike the comparable provisions with regard to SEC review of SRO disciplinary sanctions, a PCAOB disciplinary sanction is automatically stayed upon the initiation of SEC review. 15 U.S.C. § 7215(e); compare 15 U.S.C. § 78s(d)(2). The SEC's review of a PCAOB disciplinary sanction is de novo. 15 U.S.C. § 7217(c) (incorporating 15 U.S.C. § 78s(e)(1)). In addition, upon making certain findings the SEC is empowered to

_____

[3] In addition to the SEC's automatic review of all proposed rules of the PCAOB as they come up, the SEC has separate authority at any time to abrogate, delete, or add to the rules of the PCAOB, by rule of the SEC, as it may deem necessary or appropriate "to assure the fair administration of the [PCAOB], conform the rules promulgated by [the PCAOB] to the requirements of title I of the Sarbanes-Oxley Act of 2002, or otherwise further the purposes of that Act, the securities laws, and the rules and regulations thereunder applicable to the [PCAOB]." See 15 U.S.C. § 7217(b)(5) (incorporating by reference 15 U.S.C. § 78s(c)).

"enhance, modify, cancel, reduce, or require the remission of [the] sanction," powers broader

than the comparable provision for SROs, which does not include enhancement authority and is

triggered by a narrower set of findings.  15 U.S.C. § 7217(c)(3); compare 15 U.S.C. § 78s(e)(2).

The SEC's review of PCAOB disciplinary sanctions also applies to any denial by the PCAOB of

registration of a public accounting firm, which is treated as a form of disciplinary sanction.  See

15 U.S.C. § 7212(c)(2).  Thus, between the provisions governing rules, those involving final

inspection reports, and those pertaining to disciplinary sanctions, the SEC is vested with review

of any final legal action that the PCAOB may take.  See generally Statement of Interest of the

United States (dkt. no. 19) at 4-8.[4]

Finally, the SEC possesses general rulemaking authority under the Sarbanes-Oxley Act.

See 15 U.S.C. § 7202(a) ("The Commission shall promulgate such rules and regulations, as may

be necessary or appropriate in the public interest or for the protection of investors, and in

furtherance of this Act.").  Such general rulemaking authority affords the SEC significant

additional means of control over the PCAOB.  For example, the SEC could adopt rules that

would enable it to take immediate action to require the PCAOB to stop or start a PCAOB

inspection, investigation, or disciplinary proceeding.  The statute also expressly states that

nothing in it detracts from the SEC's pre-existing authority over many of the same matters that

are the subject of the PCAOB's work.  See 15 U.S.C. § 7202(c).[5]  Thus, apart from the formal

_____

[4] As described more fully in the Statement of Interest, the statute also provides for judicial review of the orders of the SEC approving or disapproving PCAOB rules or disciplinary sanctions.  15 U.S.C. § 78y(a); see generally Statement of Interest at 4-8.

[5] 15 U.S.C. § 7202(c) provides as follows:

(continued...)

legal mechanisms through which the SEC directly exercises oversight over the PCAOB, the SEC fully retains its own authority to engage directly in regulation and oversight of public accounting firms.

## ARGUMENT

## I.    THE PCAOB FULLY COMPORTS WITH THE APPOINTMENTS CLAUSE

The statutory method for appointing the members of the PCAOB is consistent with the Appointments Clause because the members of the PCAOB are Inferior Officers who may be appointed by Heads of Departments, including the SEC.[6]  Therefore, plaintiffs' motion for

---

[5](...continued)
EFFECT ON COMMISSION AUTHORITY.  Nothing in this Act or the rules of the Board shall be construed to impair or limit --

(1) the authority of the Commission to regulate the accounting profession, accounting firms, or persons associated with such firms for purposes of enforcement of the securities laws;

(2) the authority of the Commission to set standards for accounting or auditing practices or auditor independence, derived from other provisions of the securities laws or the rules or regulations thereunder, for purposes of the preparation and issuance of any audit report, or otherwise under applicable law; or

(3) the ability of the Commission to take, on the initiative of the Commission, legal, administrative, or disciplinary action against any registered public accounting firm or any associated person thereof.

[6] A threshold concern in this case is whether the PCAOB is part of the government for Appointments Clause and other constitutional purposes.  The statute provides that "[t]he Board shall not be an agency or establishment of the United States Government" and that "[n]o member or person employed by, or agent for, the Board shall be deemed to be an officer or employee of or agent of the Federal Government by reason of such service."  15 U.S.C. § 7211(b).  While this provision is entitled to some weight, it is not dispositive for constitutional purposes.  Cf. Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 392-93 (1995) (holding that federally created corporation was subject to the restrictions imposed by the First Amendment where the government "creates a corporation by special law, for the furtherance of governmental objectives,
(continued...)

summary judgment on this claim should be denied and the United States' cross-motion for summary judgment should be granted.

The Appointments Clause provides in pertinent part:

> [The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 2.  In operation, the Clause divides all "Officers of the United States" into two categories:  Principal Officers and Inferior Officers.[7]  See United States v. Germaine, 99 U.S. (9 Otto) 508, 509 (1879).  Principal Officers must be appointed through nomination by the President with the advice and consent of the Senate.  See Buckley v. Valeo, 424 U.S. 1, 132 (1976).  However, Congress is permitted to make Inferior Officers appointable by the President alone, Courts of Law, or Heads of Departments.  Id.

The members of the PCAOB are appointed by the SEC.  See 15 U.S.C. § 7211(e)(4).  The constitutional validity of this method of appointment thus involves two questions:  (1) whether the members of the PCAOB are Inferior Officers, as opposed to Principal Officers; and (2)

---

[6](...continued)
and retains for itself permanent authority to appoint a majority of the directors of that corporation"). The Court need not resolve the question whether the PCAOB is a governmental entity for separation-of-powers purposes, because whether or not it is, the PCAOB is constitutional for the reasons set forth herein.

[7] We capitalize "Principal Officer(s)" and "Inferior Officer(s)" herein to make clear that the terms are used in their specialized constitutional sense.

whether the SEC constitutes a Department with its Commissioners as Head. Both questions should be answered in the affirmative.

### A.      The Members of the PCAOB Are Inferior Officers

Under the relevant Supreme Court precedents, the members of the PCAOB must be considered Inferior Officers.[8]

"The Constitution does not use the term 'inferior' 'in the sense of petty or unimportant' but in the sense of a subordinate to a principal officer." United States v. Gantt, 194 F.3d 987, 999 (9th Cir. 1999) (quoting Collins v. United States, 14 Ct. Cl. 568, 574 (1878)); see also Edmond v. United States, 520 U.S. 651, 663 (1997) (even Inferior Officers "exercise significant authority pursuant to the laws of the United States"). In Edmond, the Court articulated the standard as follows:

> Generally speaking, the term "inferior officer" connotes a relationship with some higher ranking officer of officers below the President: Whether one is an "inferior" officer depends on whether he has a superior. . . . [W]e think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

Id. at 662-63. Applying this standard, the Court held in Edmond that civilian judges of the Coast Guard Court of Criminal Appeals were Inferior Officers, and thus could be permissibly appointed by the Secretary of Transportation, because the work of those judges was supervised in two distinct respects. First, the Judge Advocate General for the Coast Guard, a subordinate of the Secretary of Transportation, had administrative oversight over the judges, prescribed the court's

---

[8] We assume arguendo that the members of the PCAOB are "Officers of the United States," as opposed to mere employees. If they were only employees, their appointments would plainly be constitutional. See Freytag v. Commissioner, 501 U.S. 868, 880 (1991).

rules of procedure, and could remove a judge from his judicial assignment without cause, albeit

not in a manner to influence the outcome of individual proceedings.  Id. at 664.  Second, the

Court of Appeals for the Armed Forces had substantive oversight over the judges' output:  they

reviewed decisions by the Court of Criminal Appeals (a) involving a death sentence, (b) where

the Judge Advocate General ordered such review, or (c) where the court granted review upon

petition of the accused.  Id. at 665.  That such review was less than plenary and did not include

reassessment of factual matters was of no moment; rather, "[w]hat is significant is that the judges

of the Court of Criminal Appeals have no power to render a final decision on behalf of the

United States unless permitted to do so by other Executive Officers."  Id.

        Under Edmond, the members of the PCAOB are Inferior Officers because "their work is

directed and supervised at some level," indeed, comprehensively, by the SEC, the members of

which "were appointed by Presidential nomination with the advice and consent of the Senate."

Edmond, 520 U.S. at 663.  The SEC has review power over every final legal action the PCAOB

takes.  Indeed, the PCAOB's rules and, if appealed, disciplinary sanctions do not even go into

effect without SEC approval.  See 15 U.S.C. § 7215(e) (disciplinary sanctions); 15 U.S.C.

§ 7217(b)(2) (rules).  Thus, as in Edmond, the PCAOB members "have no power to render a

final decision on behalf of the United States" unless permitted by the SEC.  Edmond, 520 U.S. at

665.  Moreover, the SEC approves the PCAOB's budget, has general "oversight and enforcement

authority" over the Board, including authority to impose recordkeeping requirements on the

PCAOB and to examine the PCAOB's records, and must approve the conduct of any litigation by

the PCAOB.  15 U.S.C. §§ 7211(f)(1), 7217(a) (incorporating 15 U.S.C. § 78q(a)(1), (b)(1)),

7219(b).  In conducting investigations, the PCAOB lacks its own subpoena authority and is

limited to applying to the SEC for a subpoena "in a manner established by the Commission," 15

U.S.C. § 7215(b)(2)(D), and is obligated to notify the Commission of any pending PCAOB

investigation involving a potential violation of the securities laws and thereafter coordinate as

necessary to protect any parallel SEC investigation, id. § 7215(b)(4)(A).  The SEC can "relieve

the Board of any responsibility to enforce compliance with any provision of this Act, the

securities laws, the rules of the Board, or professional standards,"  15 U.S.C. § 7217(d)(1), and

can "censure or impose limitations upon" its "activities, functions, and operations," 15 U.S.C.

§ 7217(d)(2).  And, significantly, the SEC has authority under the Sarbanes-Oxley Act to make

its own rules "as may be necessary or appropriate in the public interest or for the protection of

investors, and in furtherance of this Act," 15 U.S.C. § 7202(a), which would enable it adopt rules

providing an even greater degree of control over PCAOB activities than directly under the

statute.

Indeed, the level of supervision exercised by the SEC over the PCAOB not only meets,

but exceeds, the level of supervision exercised over the Coast Guard judges deemed sufficient in

Edmond.  Whereas the Court of Appeals for the Armed Forces reviewed only a subset of

decisions of the Coast Guard judges, Edmond, 520 U.S. at 665-66, the SEC reviews all PCAOB

rules and all appealed PCAOB disciplinary sanctions, as well as final PCAOB inspection reports

if duly challenged.  See 15 U.S.C. § 7217(b), (c); 15 U.S.C. § 7214(h).  Moreover, the SEC's

standard of review is significantly more probing than the Court of Appeals for the Armed Forces'

standard of review of decisions of the Coast Guard Court of Criminal Appeals.[9]  Indeed, the D.C.

_____

[9] To the extent plaintiffs question the SEC's standard of review of PCAOB actions, that
would only militate in favor of requiring plaintiffs' claims to be brought through the exclusive
(continued...)

Circuit recently described the SRO-review scheme, which the Sarbanes-Oxley Act incorporates and applies to the PCAOB (with some modifications that make SEC review of PCAOB sanctions even more rigorous), as follows:

> The congressional scheme, in short, establishes a system in which the Commission not only closely supervises and approves the processes by which NASD brings disciplinary action, but in which the Commission fully revisits the issue of liability, and can completely reject or modify NASD's decision as it deems appropriate. NASD's disciplinary process essentially supplants a disciplinary action that might otherwise start with a hearing before an ALJ. And NASD's authority to discipline its members for violations of federal securities law is entirely derivative. The authority it exercises ultimately belongs to the SEC, and the legal views of the self-regulatory organization must yield to the Commission's view of the law.

NASD v. SEC, 431 F.3d 803, 806 (D.C. Cir. 2005) (emphasis added). The Court of Appeals repeatedly used the word "plenary" to characterize the review of the SEC over "adjudications conducted by self-regulatory organizations like NASD." Id. at 807, 808; see also, e.g., Gold v. SEC, 48 F.3d 987, 990 (2d Cir. 1995) (interpreting same statutory scheme as providing for de novo SEC review of disciplinary sanctions imposed by the New York Stock Exchange); Shultz v. SEC, 614 F.2d 561, 568 (7th Cir. 1980) ("In reviewing a decision of the Exchange, the Commission makes a de novo determination of the facts and the law."); compare Edmond, 520 U.S. at 665 ("so long as there is some competent evidence in the record to establish each element of the offense beyond a reasonable doubt, the Court of Appeals for the Armed Forces [would] not

---

⁹(...continued)
review mechanism in the statute, which would give the Court a concrete record to show how the SEC conducted its review in a particular case. See generally Statement of Interest of the United States (dkt. no. 19).

-14-

reevaluate the facts").[10]  The SEC's supervision is also enhanced by the fact that all aspects of

supervision, as well as appointment power, are concentrated in the SEC, whereas in Edmond,

supervision of the work of the Coast Guard Court of Criminal Appeals judges was split between

the Judge Advocate General for the Coast Guard and the Court of Appeals for the Armed Forces,

and appointment power was vested in a third actor, the Secretary of Transportation.  Thus, to an

even greater extent than the Coast Guard Court of Criminal Appeals judges, the PCAOB is

supervised by superior officers.

        Plaintiffs' assertion that "the breadth and independence of PCAOB Members is

indistinguishable from the commissioners or members of other U.S. agencies with extensive

regulatory powers over specialized subject matters," such as the Federal Communications

Commission, Consumer Product Safety Commission, Federal Trade Commission, and others

(Pls' Mem. at 34 & n.8) rings hollow.  The distinctions are many and obvious.  None of those

agencies is subordinate to a supervising agency that may at any time rescind its enforcement

---

        [10] Moreover, the SEC is not limited to affirming or reversing the PCAOB's disciplinary
sanction; rather, its broad remedial powers include the ability to "enhance, modify, cancel,
reduce, or require the remission" of such a sanction.  15 U.S.C. § 7217(c)(3).  Further, the statute
gives the SEC various other tools for exerting its supervisory control over the PCAOB, from its
authority to abrogate, delete, or add to the PCAOB's rules as it deems necessary or appropriate,
15 U.S.C. § 7217(b)(5), to its power to "relieve the Board of any responsibility to enforce
compliance with any provision," 15 U.S.C. § 7217(d)(1), to its ability to "impose limitations
upon the activities, functions, and operations of the Board," 15 U.S.C. § 7217(d)(2), to its
approval power over the PCAOB's budget, 15 U.S.C. § 7219(b), to its general rulemaking
authority under the Sarbanes-Oxley Act, 15 U.S.C. § 7202(a).  Such capacious authority
reinforces that the PCAOB members are Inferior Officers.  Cf. United States v. Nixon, 418 U.S.
683, 696 (1974) (stating that the Special Prosecutor was a "subordinate office[r]" because the
President or the Attorney General could have removed him at any time, if by no other means than
amending or revoking the regulations defining his authority); In re Sealed Case, 829 F.2d 50, 56
(D.C. Cir. 1987) (noting that the Attorney General could rescind the regulation that delegated the
Independent Counsel his authority and "thereby abolish[] the Office of the Independent Counsel:
Iran/Contra").

authority in whole or in part.  None of those agencies must send its rules and challenged

disciplinary sanctions for review by a supervising agency in order for such actions to take effect.

None of those agencies is subject to being censured or having limitations imposed upon its

activities, functions, and operations by a supervising agency.  Equally without foundation is

plaintiffs' insistence that <u>Edmond</u> rested on the Judge Advocate General's "ongoing, day-to-day"

supervision of "significant daily oversight" of the Coast Guard judges.  <u>See</u> Pls' Mem. at 29, 31,

32.  <u>Edmond</u> is devoid of any such characterization, which is also belied by the statute the Court

cited to describe the relationship.  <u>See Edmond</u>, 520 U.S. at 664 (supervision consisted of (a)

authority to prescribe rules of procedure, (b) authority to consult with other JAGs to formulate

court-martial policies and procedures, and (c) removal power); 10 U.S.C. § 866(f).

 In both <u>Edmond</u> and the instant case, the officers in question are removable by officials

subordinate to the President.  It is true that the members of the PCAOB are removable for "good

cause shown," 15 U.S.C. § 7211(e)(6), while in <u>Edmond</u>, the Coast Guard Court of Criminal

Appeals judges could be removed by the Judge Advocate General from their judicial assignment

without cause (although such removal could not be used "to influence . . . the outcome of

individual proceedings"), <u>see Edmond</u>, 520 U.S. at 664.  This distinction, however, is not

controlling because removal without cause is not a <u>sine qua non</u> for Inferior Officer status.  In

<u>Morrison v. Olson</u>, 487 U.S. 654 (1988), all of the participating Justices agreed on this

proposition; even Justice Scalia, in dissent, apparently would have considered the independent

counsel an Inferior Officer if, even though removable only for good cause, she had been subject

to the Attorney General's supervision in the conduct of her duties.  <u>See id.</u> at 723-24 & n.4

(Scalia, J., dissenting); <u>compare id.</u> at 671 (majority opinion); <u>see also</u> <u>United States v. Perkins</u>,

116 U.S. 483, 484-85 (1886).  The scope of removal power is simply one factor relevant to whether the officer is "directed and supervised at some level" by Presidential appointees.  See Edmond, 520 U.S. at 663.[11]  Here, in light of all of the features of the statute that overwhelmingly and cumulatively demonstrate plenary control by the SEC over the PCAOB, the PCAOB members are plainly Inferior Officers.

**B.      Congress May Vest Power to Appoint Inferior Officers in the SEC**

Because the members of the PCAOB are Inferior Officers, Congress was permitted to vest their appointment "in the President alone, in the Courts of Law, or in the Heads of Departments."  The statute clearly complies with this provision because the SEC is a Department, with the Commissioners as its Head or Heads.  Plaintiffs challenge this conclusion, arguing that (1) the SEC is not a Department, and (2) a Head of a Department can only be an individual and therefore the Commissioners together cannot be a Head.  Neither argument withstands scrutiny.

1.  The SEC clearly is a Department within the meaning of the Appointments Clause. The word "Department" as used in the Appointments Clause "has reference to the subdivision of the power of the Executive into departments, for the more convenient exercise of that power."

---

[11] We recognize that in Morrison, the Court looked at a set of considerations that varied somewhat from those in Edmond in concluding that the independent counsel under the Ethics in Government Act of 1978 was an Inferior Officer.  487 U.S. at 671-72 (considering that (1) she was subject to removal by a higher officer; (2) she performed only limited duties, (3) her jurisdiction was narrow, and (4) her tenure was limited).  In Edmond, however, the Court clarified that these four factors were geared to the specific situation in Morrison and were not intended as universal criteria to govern every future Appointments Clause analysis.  See Edmond, 520 U.S. at 661-62 ("Morrison did not purport to set forth a definitive test for whether an office is 'inferior'").  For example, the fact that the third and fourth Morrison factors did not describe Coast Guard Court of Criminal Appeals judges did not cause the Edmond Court any hesitation in concluding that such judges were Inferior Officers.  Id. at 661.

United States v. Germaine, 99 U.S. 508, 510 (1879).  The SEC, whose members are appointed by the President by and with the advice and consent of the Senate, see 15 U.S.C. § 78d(a), is the principal federal agency charged with administration of the securities laws, and exercises governmental authority without being subordinated to any other broader unit within the Executive Branch.

Plaintiffs' theory that the SEC is constitutionally barred from appointing Inferior Officers is rooted in the notion that what they call "independent agencies like the SEC" cannot be "Departments" under the Appointments Clause.  See Pls' Mem. at 35.  But we are aware of no court that has adopted such a novel construction.[12]  The best that plaintiffs can muster is inferences from the five-Justice majority opinion in Freytag v. Commissioner, 501 U.S. 868 (1991), which held that the Tax Court, an Article I court, was a Court of Law, rather than a Department, for purposes of the Appointments Clause.  To be sure, the Freytag majority noted that "[c]onfining the term 'Heads of Departments' in the Appointments Clause to executive divisions like the Cabinet-level Departments constrains the distribution of the appointment power."  Id. at 886 (emphasis added).  However, the Freytag majority did not define exactly what agencies it considered "like" the Cabinet Departments, and expressly reserved the particular

---

[12] Plaintiffs cite several cases from the 19th century that treat the term "Departments" as generally coextensive with the Cabinet departments.  See Pls' Mem. at 36-37 (citing United States v. Mouat, 124 U.S. 303 (1888); Cunningham v. Neagle, 135 U.S. 1 (1890); and United States v. Germaine, 99 U.S. 508 (1879)).  These references, however, are merely descriptive of the historical fact that the Departments for Appointments Clause purposes during that era generally were the same as the Cabinet departments.  See Authority of Civil Service Commission to Appoint a Chief Examiner, 37 Op. Att'y Gen. 227, 230-31 (1933) (opining that Germaine and Mouat do not have "any controlling effect upon the present question" whether the Civil Service Commission was an agency capable of appointing Officers of the United States, because "the Civil Service Commission, which was the first independent establishment of the Government, was not in existence" at the time of Germaine).

question presented here: "We do not address here any question involving an appointment of an inferior officer by the head of one of the principal agencies, such as [inter alia] the Securities and Exchange Commission . . . ." Freytag, 501 U.S. at 887 n.4.

Meanwhile, the four concurring Justices in Freytag emphatically rejected an interpretation of Departments that would exclude agencies outside the Cabinet. See id. at 918-22 (Scalia, J., concurring in part and concurring in the judgment, joined by O'Connor, Kennedy, and Souter, JJ.). The concurring Justices instead construed "Departments" to encompass "all agencies immediately below the President in the organizational structure of the Executive Branch," including "all independent executive establishments." Id. at 918-19 (Scalia, J., concurring in part and concurring in the judgment). These Justices also noted that narrowly limiting "Departments" to Cabinet departments -- the construction urged by plaintiffs here -- would be problematic because it would "cast[] into doubt the validity of many appointments and a number of explicit statutory authorizations to appoint." Id. at 918 (Scalia, J., concurring in part and concurring in the judgment).[13]

_____

[13] The position espoused by the four concurring Justices in Freytag and reserved by the five-Justice majority is consistent with the longstanding interpretation of Congress and the Executive Branch. As Justice Scalia observed, "Congress has empowered non-Cabinet agencies to appoint inferior officers for quite some time," Freytag, 501 U.S. at 918 (Scalia, J., concurring in part and concurring in the judgment), as exemplified by the grant of authority to the SEC "to appoint . . . such officers . . . as may be necessary," 15 U.S.C. § 78d(b)(1). Similarly, in 1933, the Attorney General opined that the Civil Service Commission was a Department capable of receiving authority to appoint an inferior officer, even though it was "not a subordinate Commission attached to one of the so-called executive departments but is in itself an independent division of the Executive Branch of the Government with certain independent duties and functions." Authority of Civil Service Commission to Appoint a Chief Examiner, 37 Op. Att'y Gen. at 231. This reasoning has recently been reaffirmed. See The Constitutional Separation of Powers Between the President and Congress, 20 Op. Off. Legal Counsel 124, 152-53 (1996) ("[M]ost of the independent agencies are clearly analogous to major executive

(continued...)

-19-

It would, indeed, be "a most implausible disposition" to create a system where any Inferior Officers within non-Cabinet agencies could not be appointed by their immediate superiors, but instead "must be appointed by the President, the courts of law, or the 'Secretary of Something Else.'" Freytag, 501 U.S. at 919-20 (Scalia, J., concurring in part and concurring in the judgment). Without a firmer basis in precedent than plaintiffs have offered, the Court should not assume that the Appointments Clause demands such a major overhaul of the federal infrastructure.[14]

2. Similarly, the Commissioners are plainly the "Head" or "Heads" of the SEC.[15] See 15 U.S.C. § 78d (establishing SEC as headed by five individuals appointed by the President with the advice and consent of the Senate). Thus, the appointment power, like the various regulatory powers they hold under the securities laws, may permissibly be exercised by them on a collective

---

[13](...continued)
agencies. They exercise governmental authority without being subordinated to any broader unit within the executive branch, and Congress has implicitly characterized them as 'Departments' for Appointments Clause purposes by permitting their heads to appoint officials who plainly are inferior officers.").

[14] The passage plaintiffs cite (Pls' Mem. at 37) from Buckley v. Valeo, 424 U.S. 1 (1974), does not sustain their argument. This passage merely states that the Departments referred to in the Appointments Clause "are themselves in the Executive Branch or at least have some connection with that branch." Id. at 127 (emphasis added). The point the Court was making, as expressed in the very next sentence, was that Congress and its officers could not be considered Heads of Departments. See id. This passage therefore provides no support for carving non-Cabinet agencies, which, unlike Congress, surely "at least have some connection with [the Executive] branch," id., out of the scope of "Departments."

[15] It is worth noting that the Appointments Clause uses "Heads" in the plural. While the plural form might be read as merely agreeing with the plural form of the word "Departments," it is noteworthy that the syntax does not rule out that a Department could have multiple Heads even if the word "Head" in the singular is read as limited to a single individual. In any event, as discussed infra, there is ample reason to conclude that "Head" need not be read as limited to a single individual.

basis. Plaintiffs argue that the Constitution permits only an individual to be a "Head of a Department" constitutionally capable of receiving appointment authority. <u>See</u> Pls' Mem. at 39-43. But plaintiff cites no case authority so holding, and we are aware of none.

As with their argument that the SEC is not a Department, Plaintiffs cite dicta in two 19th century cases for the proposition that the phrase "Heads of Department" has been "understood to encompass the cabinet secretaries." Pls' Mem. at 42 (citing <u>United States v. Mouat</u>, 124 U.S. 303 (1888); and <u>Cunningham v. Neagle</u>, 135 U.S. 1 (1890)). But, again, this proves little. That the phrase has been understood to <u>encompass</u> the cabinet secretaries does not mean that it is <u>limited</u> to the cabinet secretaries. These opinions were written before the proliferation of regulatory agencies headed by multi-member boards or commissions, and so it is hardly surprising that the contemporary Court did not anticipate that category when speaking about "Heads of Departments."[16]

The one court that has addressed this issue has rejected the argument that the Appointments Clause precludes multi-member bodies from being "Heads of Departments." In <u>Silver v. United States Postal Service</u>, 951 F.2d 1033 (9th Cir. 1991), the court held that the appointment of the Postmaster General was proper because "within the corporate structure adopted by Congress, the [nine presidentially appointed Governors] are the head of the department." <u>Id.</u> at 1038. While the dissenting judge defined the group constituting the Head of

_____

[16] By 1923, in contrast, Congress was defining "the head of the department" for certain statutory purposes as "the officer <u>or group of officers</u> in the department who are not subordinate to or responsible to any other officer of the department." Classification Act of 1923, ch. 265, § 2, 42 Stat. 1488 (emphasis added). While not controlling for constitutional purposes, this definition belies plaintiffs' portrayal of the phrase "Heads of Departments" as having a universal, fixed meaning limited to individuals.

-21-

the Department slightly differently, he emphasized that there was no constitutional problem with a collective Head.  See id. at 1043-44 & n.3 (O'Scannlain, J., dissenting) ("Although the Supreme Court has never addressed the question of whether a group, as opposed to an individual, could be a department head, many independent regulatory agencies are headed by groups with no apparent constitutional infirmity, and the Attorney General determined as early as 1933 that groups could be 'Heads of Departments.'"); see also Authority of Civil Service Commission to Appoint a Chief Examiner, 37 Op. Atty. Gen. 227 (1933) (finding no obstacle to the three members of the Civil Service Commission collectively acting as the "Head of a Department" for Appointments Clause purposes).

The approach taken by the Ninth Circuit in Silver and reflected in consistent Executive Branch interpretations is sound.   As Judge O'Scannlain observed, regulatory agencies headed by multi-member bodies have functioned as an essential part of the federal government for many decades, Silver, 951 F.2d at 1044 (O'Scannlain, J., dissenting), and Congress has long empowered such agencies to appoint officers.[17]  Plaintiffs' interpretation of "Head" as confined to an individual ignores the reality of the current structure of the federal government and, no less than their artificially restrictive interpretation of "Departments," "casts into doubt the validity of many appointments and a number of explicit statutory authorizations to appoint."  Freytag, 501 U.S. at 918 (Scalia, J., concurring in part and concurring in the judgment).

---

[17]  See, e.g., 47 U.S.C. § 155(e) ("The [Federal Communications] Commission shall have a Managing Director who shall be appointed by the Chairman subject to approval of the Commission."); 7 U.S.C. § 2(a)(4) ("The [Commodity Futures Trading] Commission shall have a General Counsel, who shall be appointed by the Commission and serve at the pleasure of the Commission.").

-22-

Finally, plaintiffs' argument that the Framers considered it intolerable for a collective body to have appointing authority is contradicted by the Appointments Clause's provision allowing Inferior Officers to be appointed by "Courts of Law," which often consist of multiple members. The Judiciary Act of 1789 provided for the appointment of the Clerk of the Supreme Court by the Supreme Court, a body then consisting of six Justices. See Act of Sept. 24, 1789, §§ 1, 7, 1 Stat. 73, 76. Similarly today, many statutes provide for the Judges of a Court collectively to appoint officers.[18] For all of these reasons, plaintiffs' argument that the Constitution allows only individuals to be "Heads of Departments" should be rejected. Because the PCAOB members are Inferior Officers and the SEC is a permissible appointing authority, the Sarbanes-Oxley Act's provisions regarding the appointment of PCAOB members comply with the Constitution.[19]

---

[18] See, e.g., 28 U.S.C. §§ 671, 672 (Justices of the Supreme Court appoint Clerk and Marshal of Supreme Court); id. § 631(a) (Judges of each U.S. District Court appoint Magistrate Judges); id. § 152(a)(1) (Judges of each Court of Appeals appoint Bankruptcy Judges); id. § 751(a) (Judges of each U.S. District Court appoint Clerk of Court); id. § 546(d) (providing for appointment of U.S. Attorneys, Inferior Officers, by U.S. District Court to fill vacancies in certain circumstances); see also United States v. Hilario, 218 F.3d 19, 21, 26 (1st Cir. 2000) (sustaining 28 U.S.C. § 546(d) against Appointments Clause challenge); United States v. Gantt, 194 F.3d 987, 999-1000 (9th Cir. 1999) (same).

[19] In a footnote, plaintiffs object to the requirements that two, but no more than two, PCAOB members be accountants, and that appointments be made in consultation with the Secretary of the Treasury and the Chairman of the Board of Governors of the Federal Reserve System. Pls' Mem. at 43 n.14. Assuming arguendo that plaintiffs have standing to maintain these objections, but see Defs' Motion to Dismiss at 40-42, these provisions do not offend the Appointments Clause. "To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction, [and] the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees," Myers v. United States, 272 U.S. 52, 129 (1926) (emphasis added), provided that "the qualifications do not so limit selection and so trench upon executive choice as to be in effect legislative designation," id. at 128. Eligibility conditions relating to profession or expertise have been common throughout the

(continued...)

-23-

## II.     THE PCAOB IS CONSISTENT WITH THE SEPARATION OF POWERS

As we have shown, the PCAOB is fully consistent with the Appointments Clause because its members are "officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." Edmond, 520 U.S. at 663. Plaintiffs also urge, however, that the structure of the PCAOB violates the separation of powers, focusing in particular on the provisions regarding who can remove PCAOB members and in what circumstances. These arguments are no more persuasive than plaintiffs' contention that the SEC lacks authority to appoint PCAOB members in the first place.

At the outset, it is important to emphasize that this case "does not involve an attempt by Congress to increase its own powers at the expense of the Executive Branch." Morrison, 487 U.S. at 694; see Pls' Mem. at 23-24 (conceding this point). Nor, of course, does "the Act work any judicial usurpation of properly executive functions." Id. at 695 (emphasis in original). As the Court observed in United States v. Mistretta, 488 U.S. 361 (1989), separation of powers concerns are most clearly presented by such "encroachment and aggrandizement." Id. at 382. Here, in contrast, the only question is whether the overall statutory scheme "impermissibly undermines the powers of the Executive Branch or disrupts the proper balance between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally

_____

[19](...continued)
Nation's history. See, e.g., Act of Sept. 24, 1789, § 35, 1 Stat. 73, 92 (providing that Attorney General and U.S. Attorneys must have learning in the law). Here, the qualifications -- which ensure that the PCAOB will have some accounting expertise but not be dominated by accountants to the point where its independence from the industry is compromised -- are reasonable and relevant, and the pool of candidates is large enough that the requirements can hardly be said to constitute "legislative designation" of appointees. Nor is there anything constitutionally problematic about a Head of a Department consulting with other Executive Branch officials about an appointment.

assigned functions." Morrison, 487 U.S. at 695 (citations and internal quotation and alteration marks omitted).

The statute, taken as a whole, plainly does not undermine the powers of the Executive Branch or disrupt the proper balance between the coordinate branches. Plaintiffs attach much significance to the provisions of the statute regarding removal of members of the PCAOB. While removability is, indeed, an important consideration, it is significant not as an end in itself, but because it is a means of asserting control over what a subordinate does. Removal is a "powerful tool for control," Edmond, 520 U.S. at 664, but it is not the only tool, see Morrison, 487 U.S. at 689-90 ("The analysis contained in our removal cases is designed . . . to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II.").

Thus, the removal provisions of the statute cannot be considered at in isolation, but rather must be examined as one aspect of an overall statutory scheme that includes pervasive mechanisms for SEC control over the PCAOB at every turn. The SEC possesses broad authority over the PCAOB quite apart from its ability to remove PCAOB members. The PCAOB's rules and disciplinary sanctions alike do not become effective until approved by the SEC, and both may be changed by the SEC. 15 U.S.C. § 7215(e), 7217(b)(2), (b)(4), (b)(5), (c)(2), (c)(3). The PCAOB does not possess its own subpoena power. 15 U.S.C. § 7215(b)(2)(D). Thus, the coercive powers of the PCAOB are subject to pervasive, particularized checks. Furthermore, the SEC, "by rule, consistent with the public interest, the protection of investors, and the other purposes of this Act and the securities laws, may relieve the Board of any responsibility to

-25-

enforce compliance with any provision of this Act, the securities laws, the rules of the Board, or professional standards."  15 U.S.C. § 7217(d)(1); <u>see also</u> 15 U.S.C. § 7217(d)(2) (empowering SEC to "censure or impose limitations upon the activities, functions, and operations of the Board" in certain other circumstances).  Thus, the SEC could withdraw enforcement authority, in a class of cases or even a particular case, if it believed in the exercise of its regulatory oversight that the PCAOB was being too aggressive or not aggressive enough in its inspections, investigations, or disciplinary proceedings.  The SEC also has the ability, either through an amendment of the PCAOB's rules, <u>see</u> 15 U.S.C. § 7217(b)(5), or by promulgating its own rules under its general authority, <u>see</u> 15 U.S.C. § 7202(a), to direct the PCAOB to notify it about preliminary matters such as the institution of particular inspections, investigations, or disciplinary proceedings, and require the SEC's advance approval in order for the PCAOB to initiate or cease such an undertaking.[20]

This extensive power of the SEC to supervise and control the PCAOB's activities on a number of fronts refutes plaintiffs' depiction of the PCAOB as a rogue agency exercising unchecked power, even without taking into account the SEC's power to remove members of the PCAOB.  Plaintiffs generally challenge the adequacy of the various mechanisms through which the SEC has supervisory authority over the PCAOB.  <u>See</u> Pls' Mem. at 26-28.  But these attacks are not only misguided coming from plaintiffs who have circumvented those very mechanisms and thereby eluded any concrete test of their adequacy, they also are legally flawed.  For instance, plaintiffs decry the SEC's lack of "day-to-day" oversight of the PCAOB activities, complain that

---

[20]  Moreover, the PCAOB's enforcement authority is not exclusive and is not in derogation of the SEC's own enforcement authority.  <u>See</u> 15 U.S.C. § 7202(c).

the PCAOB can engage in certain inspection and investigatory activities "on its own," and

protest that the SEC's review of disciplinary sanctions is "appellate-like."  Pls' Mem. at 26.  But

such "day-to-day" oversight was not necessary to sustain the constitutionality of the independent

counsel statute in <u>Morrison</u>, where there was no requirement that the Attorney General, for

example, approve the independent counsel's issuance of a subpoena or filing of a motion.[21]

Plaintiffs likewise offer no reason why "appellate-like" oversight over disciplinary sanctions

cannot constitute effective control, particularly when the review is <u>de novo</u> and, if challenged, the

sanction remains non-public and does not take effect until ordered by the SEC, <u>see</u> 15 U.S.C.

§ 7215(e)(1), (d)(1)(C); <u>supra</u> at 13-14 (citing cases establishing that SEC review of disciplinary

sanctions is <u>de novo</u> and/or plenary).  In any event, the SEC has ample means available under the

_____

[21] Plaintiffs' assertions in this regard also are laden with embellishment.  They assert that "the PCAOB decides, on its own, how to conduct its regular inspections."  Pls' Mem. at 26.  The statute requires the PCAOB to conduct a program of inspections pursuant to rules it adopts.  15 U.S.C. § 7214; <u>see also</u> 15 U.S.C. § 7211(c)(3), (g).  Such rules are subject to approval of the SEC and do not become effective until so approved, 15 U.S.C. § 7217(b), and even after approved, can be changed by the SEC, 15 U.S.C. §§ 7217(b)(5), 78s(c).  Moreover, a final inspection report by the PCAOB in a particular case is reviewable by the SEC pursuant to 15 U.S.C. § 7214(h).  According to plaintiffs, the PCAOB likewise decides "on its own . . . whether to commence an investigation" and "how that investigation should proceed," but the statute itself provides that "[t]he Board shall notify the Commission of any pending Board investigation involving a potential violation of the securities laws, and thereafter coordinate its work with the work of the Commission's Division of Enforcement, as necessary to protect an ongoing Commission investigation," 15 U.S.C. § 7215(b)(4)(A), and the SEC would be free to expand on such requirements through its own rulemaking authority or its authority to amend the PCAOB's rules.  Moreover, as the PCAOB lacks its own subpoena authority, it must apply to the SEC "in a manner established by the Commission" to obtain a subpoena requiring testimony or production of documents.  15 U.S.C. § 7215(b)(2)(D).  And, the PCAOB is not even permitted to refer an investigation to the Department of Justice or state attorneys general except at the SEC's direction.  15 U.S.C. § 7215(b)(4)(iii).  These constraints are hardly emblematic of full independent investigative authority.  <u>Compare</u>, <u>e.g.</u>, <u>Morrison</u>, 487 U.S. at 662 (statute granted independent counsel "'full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice'").

statute by which it could institute a regime of "day-to-day" control, including, for example, requirements for advance notice and advance approval of particular PCAOB actions.

Plaintiffs complain that the SEC's automatic review of rules issued by the PCAOB is inadequate because it involves "cumbersome procedures." Pls' Mem. at 27. Given plaintiffs' professed concern about the PCAOB exercising unchecked authority to their detriment, however, this is an odd argument for them to be making. After all, the "cumbersome procedures" <u>delay</u> the effectiveness of a proposed rule of the PCAOB, 15 U.S.C. §7217(b)(2), and afford any "interested persons," such as affected accounting firms like plaintiff Beckstead and Watts, "an opportunity to submit written data, views, and arguments" before the SEC decides whether to approve the rule, 15 U.S.C. § 78s(b)(1). It is not uncommon for litigants challenging an exercise of regulatory authority to protest <u>not</u> being given an opportunity to comment on a proposed rule, but this may be the first time such a litigant complains that they <u>were</u> given such an opportunity. Moreover, to the extent the statutory procedures operate as a constraint on the SEC, they constrain both disapprovals and approvals of PCAOB rules alike.

Nor does plaintiffs' hyperbole about "the vast majority" of the SEC's oversight being under "so deferential" a standard "that it fails to impose any significant restraint upon the PCAOB's exercise of discretion" (Pls' Mem. at 27) withstand scrutiny. Plaintiffs ignore that the SEC's review of PCOAB disciplinary sanctions is indisputably <u>de novo</u>. <u>See</u> <u>supra</u> at 13-14. Likewise, as to the standard for SEC review of PCAOB proposed rules, plaintiffs merely speculate that the standard is implemented and applied in a deferential manner, and overlook entirely the SEC's independent authority to abrogate, delete, or add to the rules of the PCAOB, <u>see</u> 15 U.S.C. § 7217(b)(5), and its independent authority to make rules of its own under the

Sarbanes-Oxley Act, 15 U.S.C. § 7202(a), neither of which are governed by the standard for SEC direct review of PCAOB proposed rules.[22]

As we have emphasized, the separation of powers analysis looks at the totality of the circumstances, and does not turn on the removal provisions in isolation. Nonetheless, plaintiffs' challenge to those provisions is likewise without merit.

1.    Plaintiffs' first argument in this regard is that the statute is unconstitutional for not making the PCAOB members removable by the President himself. This argument fails because, as discussed above, the members of the PCAOB are Inferior Officers who are appointed by the SEC. See supra Section I.A. The general rule has long been that such officials are removable by the same subordinate officials who appointed them, rather than directly by the President himself. This is true because the power to remove is an incident of the power to appoint. See Myers v. United States, 272 U.S. 52, 119, 121, 126, 161 (1927). In 1839, the Supreme Court applied that maxim to hold that an Inferior Officer appointed by the Head of the Department was removable by that same Head, not by the President himself. See In re Hennen, 38 U.S. (13 Pet.) 230, 259-60 (1839) (noting that "the President has certainly no power to remove"); see also United States v. Perkins, 116 U.S. 483, 485 (1886).

That rule has been adhered to ever since. See Morrison, 487 U.S. at 689 n.27; see also id. at 724 (Scalia, J., dissenting) (describing as "established" the proposition that the President's

---

[22] There is no support for plaintiffs' ipse dixit comparison (Pls' Mem. at 9, 27-28) of the SEC's review of proposed PCAOB rules to the Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984), standard by which courts review administrative agencies' construction of laws they are entrusted with implementing. To the extent that Chevron is relevant to this case, it counsels that this Court should defer to the SEC's interpretations of the Sarbanes-Oxley Act, and thus undermines rather than supports plaintiffs' arguments. See Statement of Interest of the United States at 20-21.

power "to remove inferior officers who exercise executive power, and whose appointment

Congress [has] removed from the usual procedure of Presidential appointment with Senate

consent, could be restricted, at least where the appointment had been made by an officer of the

Executive Branch," citing <u>Perkins</u>).  In <u>Myers</u>, the seminal case affirming the President's inherent

authority to remove officers appointed directly by him, the Court emphasized that "[t]he

authority of Congress given by the excepting clause [of the Appointments Clause] to vest the

appointment of such inferior officers in the heads of departments carries with it authority

incidentally to invest the heads of departments with power to remove."  <u>Myers</u>, 272 U.S. at 161.

Other than repeating their contention that the PCAOB members are Principal Officers, which we

have already dealt with, <u>see</u> <u>supra</u> Section I.A, plaintiffs offer no valid reason to depart from this

longstanding principle.  Thus, their attack on <u>who</u> is vested with the power to remove PCAOB

members should be rejected.

      2.  Plaintiffs next assert that, regardless of who has the removal power, the scope of that

power is constitutionally insufficient because PCAOB members may only be removed for "good

cause shown."  As a threshold matter, and as both majority and dissent agreed in <u>Morrison</u>, the

fact that removal of an Inferior Officer is conditioned on good cause does not, in and of itself,

establish a violation of the separation of powers.  <u>See</u> <u>Morrison</u>, 487 U.S. at 691-92 ("we cannot

say that the imposition of a 'good cause' standard for removal by itself unduly trammels on

executive authority"); <u>id.</u> at 696 ("the power to remove the counsel for 'good cause' . . .  provides

the Executive with substantial ability to ensure that the laws are 'faithfully executed' . . . ."); <u>id.</u>

at 724 n.4 (Scalia, J., dissenting) (recognizing that it is sufficient to ensure presidential "control

over all exercises of the executive power" if Inferior Officers are simply "removable <u>for cause,</u>

-30-

which would include, of course, the failure to accept supervision" (emphasis in original)).  For example, in Perkins, the Court upheld a statute barring removal of an Inferior Officer except pursuant to court martial for the reasons specified by statute, such as failure to accept supervision.  116 U.S. at 485.

Moreover, the language in this statute establishing certain grounds for removability of PCAOB members, appropriately construed, does not "unduly trammel[] on executive authority," Morrison, 487 U.S. at 691, 692, particularly in light of the SEC's myriad other supervisory powers over the PCAOB.  Plaintiffs take issue with the adverb "willfully" in two of the three provisions describing situations that may trigger removal.  See 15 U.S.C. §§ 7217(d)(3)(A) ("has willfully violated any provision of this Act, the rules of the Board, or the securities laws"), (B) ("has willfully abused the authority of that member").  Plaintiffs contend that "willfully" sets the bar too high, theorizing that an "honest but overzealous regulator who launches deep and onerous investigations into what he erroneously perceives as violations of PCAOB rules" would be immune from removal because his abuse of authority would be merely "negligent."  Pls' Mem. at 22.

Plaintiffs' hypothetical scenario, however, is predicated on layers of supposition and disregards ordinary legal meanings.[23]  It depends on the proposition that a good-faith mistake of

---

[23] Among other things, plaintiffs' argument assumes that the SEC would be constrained to read the categories delineated in § 7217(d)(3) as implicitly defining the exclusive circumstances of "good cause shown" as that term is used in § 7211(e)(6).  While an argument to that effect could be made, it is also the case that the statute does not explicitly state that the § 7217(d)(3) categories are exclusive; § 7217(d)(3) does not use the term "good cause shown"; the qualifier "in accordance with section 7217(d)(3)" in § 7211(e)(6) need not be read as a matter of grammar to modify the term "good cause shown"; and it is at least "arguable" whether "the enumeration of certain specified causes of removal excludes the possibility of removal for other causes," Bowsher v. Synar, 478 U.S. 714, 729 (1986) (citing Shurtleff v. United States, 189 U.S. 311,

(continued...)

law negates the element of willfulness, but even in the criminal law, the general rule is to the

contrary.  See, e.g., United States v. Ehrlichman, 546 F.2d 910, 918-19 (D.C. Cir. 1976) (even

though offense contains specific intent requirement, "[a] mistake as to the legality of the

prohibited activity . . . is no defense" because "the mental state required for most 'specific intent'

offenses does not involve knowledge of illegality"), cert. denied, 429 U.S. 1120 (1977); Staples

v. United States, 511 U.S. 600, 622 n.3 (1994) (Ginsburg, J., concurring) ("The mens rea

presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it

conflict with the related presumption, deeply rooted in the American legal system, that,

ordinarily, ignorance of the law or a mistake of law is no defense to criminal prosecution."

(internal quotation marks omitted)).  Similarly, in construing the term "willfully" as used in

statutes regulating the conduct of primary actors under the securities laws, the D.C. Circuit has

long rejected a requirement of knowledge of illegality.  See, e.g., Wonsover v. SEC, 205 F.3d

408, 414 (D.C. Cir. 2000) ("'It is only in very few criminal cases that "willful" means done with

a bad purpose.  Generally, it means no more than that the person charged with the duty knows

what he is doing.  It does not mean that, in addition, he must suppose that he is breaking the

law.'" (quoting Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949))).  It is implausible to read

the statute as constraining the SEC, in implementing a civil statute involving removal from a

public office under its supervision, to interpret the term "willfully" as not only departing from its

---

[23](...continued)
315-16 (1903)); but see Humphrey's Executor v. United States, 295 U.S. 602, 621-22 (1935)
(distinguishing Shurtleff as applicable only to offices without fixed terms).  In any event, these
are issues that should appropriately be considered in the first instance by the SEC, which is
responsible for exercising the removal power in the Sarbanes-Oxley Act.

normal construction in the securities laws, but as setting a materially higher bar than is generally required for criminal prosecutions involving potential loss of liberty.

Even assuming arguendo that the SEC would be constrained to interpret the statute as plaintiffs do, plaintiffs' hypothetical is still overstated. A refusal to accept the statutorily prescribed supervision or comply with a lawful order of the SEC could reasonably be considered a willful abuse of authority. Since, by their very nature, regulatory acts such as issuing rules, commencing investigations, and imposing disciplinary are highly deliberative and considered acts, particularly when undertaken by a collective body, it is difficult to see how an abuse of authority in doing any of those things might be considered "negligent," a concept more suited to tort or criminal law. Moreover, even if a single, isolated abuse of authority might have been "negligent" in its very first occurrence, as a practical matter that description would likely be short-lived; upon the PCAOB member being apprised of the SEC's view of his actions, any continuation of such conduct would be in defiance of the SEC and indisputably willful. Construed with due regard for the canon of constitutional avoidance, the statute is thus easily read to permit removal of an "honest but overzealous regulator" who acts ultra vires by repeatedly opening investigations based on an overreaching interpretation of the law or otherwise fails to accept the SEC's supervision. This is a facial challenge, where in order to prevail, plaintiffs have the burden of showing "that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Plaintiffs cannot sustain this burden because they cannot show that there is no possible way the SEC could construe and apply its removal authority in a constitutionally sufficient manner.

-33-

In sum, plaintiffs' separation-of-powers challenge fails because the statute gives the SEC considerable oversight powers and thus places numerous, meaningful checks on the PCAOB's exercise of its functions, because the PCAOB members are Inferior Officers who may be removed by the same appointing authority that appointed them, and because the removal provision itself need not be read with the restrictive gloss that plaintiffs ascribe to it.

## III.    TITLE I OF THE SARBANES-OXLEY ACT DOES NOT IMPROPERLY DELEGATE LEGISLATIVE POWER

The final issue in this case, raised only in passing by plaintiffs (Pls' Mem. at 43-45) but developed more fully by amicus Washington Legal Foundation, is whether the Sarbanes-Oxley Act unconstitutionally delegates legislative power to the PCAOB. For the reasons described below, summary judgment should be granted in favor of the United States on this claim as well.

The non-delegation doctrine mandates that when Congress confers discretionary authority on administrative agencies, it must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." J.W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 409 (1928). As the D.C. Circuit has noted, "[t]he 'intelligible principle' test has not been a tough one." Nat'l Fed'n of Fed. Employees v. United States, 905 F.2d 400, 404 (D.C. Cir. 1990). In fact, as the cases have often emphasized, the Supreme Court has "found the requisite 'intelligible principle' lacking" on only two occasions, both over seven decades ago. Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 474 (2001) (citing Panama Refining Co. v. Ryan, 293 U.S. 388 (1935), and A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935)). The Court has "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or

-34-

applying the law.'" Id. at 474-75 (quoting Mistretta v. United States, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)).

For example, the Supreme Court has upheld against delegation challenges statutes that granted the FCC and ICC the authority to promulgate regulations in accordance with their views of the "public interest." National Broad. Co. v. United States, 319 U.S. 190 (1943) (FCC); New York Central Securities Corp. v. United States, 287 U.S. 12 (1932) (ICC). Likewise, a statute was upheld that granted an agency the authority to fix commodity prices that "in [the Administrator's] judgment will be generally fair and equitable and will effectuate the purposes of this Act" to stabilize prices and avert speculation. Yakus v. United States, 321 U.S. 414, 420, 424-27 (1944). See also Lichter v. United States, 334 U.S. 742 (1948) (upholding grant of authority to recoup "excess profits" without specification of how much profit was too much); American Power & Light Co. v. SEC 329 U.S. 90 (1946) (upholding grant of authority to SEC to modify holding company structures to ensure they are not "unduly or unnecessarily complicate[d]" and do not "unfairly or inequitably distribute voting power among security holders"); FPC v. Hope Natural Gas Co., 320 U.S. 591 (1944) (upholding grant of authority to FPC to determine "just and reasonable" rates); Whitman, 531 U.S. at 472-75 (upholding grant of authority to EPA to set air quality standards that "allowing an adequate margin of safety, are requisite to protect the public health").

The PCAOB performs a number of different functions, which are governed by a variety of intelligible principles set out in different parts of the statute. While we do not undertake to catalogue every one of them exhaustively here, a substantial majority of the provisions of the Act delegating authority to the PCAOB are bounded by the phrase "necessary or appropriate in the

public interest or for the protection of investors" or similar language.  See, e.g., 15 U.S.C.

§ 7213(a)(1), (b).[24]  This standard was not composed out of whole cloth for the PCAOB, but

rather is a mainstay of the securities laws, appearing dozens of times in the Securities Act of

1933 and Securities Exchange Act of 1934 to govern numerous grants of authority to the SEC

itself.[25]  It is comparable to, if not more specific than, the various standards (e.g., "public

interest," "fair and equitable," "just and reasonable," etc.) upheld in the cases cited above.

Thus, Title I of the Sarbanes-Oxley Act poses no delegation problem because it outlines

the policies which prompted establishment of the PCAOB, explains what the PCAOB should do

and how it should do it, and sets out specific directives to govern particular situations the

PCAOB may encounter in its work.  See Mistretta v. United States, 488 U.S. 361, 379 (1987)

(upholding statute delegating authority to the Sentencing Commission to promulgate sentencing

guidelines because "[t]he statute outlines the policies which prompted establishment of the

Commission, explains what the Commission should do and how it should do it, and sets out

---

[24] See also 15 U.S.C. § 7211(a) (PCAOB's overarching purpose is "to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports"), (b)(5) (PCAOB authorized to perform "other duties or functions . . . in order to protect investors, or to further the public interest"); 15 U.S.C. § 7212(b)(2)(H) (PCAOB may add to required contents of registration application "as necessary or appropriate in the public interest or for the protection of investors"); 15 U.S.C. § 7214(b)(2) (authorizing PCAOB to vary, by rule, frequency of inspections if "consistent with the purposes of this Act, the public interest, and the protection of investors"); 15 U.S.C. § 7216(a)(2) (authorizing PCAOB, by rule, to regulate certain foreign public accounting firms to whom the Act would otherwise not apply, if "necessary or appropriate, in light of the purposes of this Act and in the public interest or for the protection of investors"), (c) (authorizing PCAOB to exempt any foreign public accounting firm or class of firms from the Act if "necessary or appropriate in the public interest or for the protection of investors").

[25] See, e.g., 15 U.S.C. § 77b(10); 15 U.S.C. § 77c(b); 15 U.S.C. § 77g(a); 15 U.S.C. § 77j; 15 U.S.C. § 77zz-3; 15 U.S.C. § 78f(a); 15 U.S.C. § 78g; 15 U.S.C. § 77i(a)(6), (b), (c); 15 U.S.C. § 78j(a)(1), (b); 15 U.S.C. § 78n(a); 15 U.S.C. § 78s(a)(3), (b)(3)(B); 15 U.S.C. § 78u-1(c).

specific directives to govern particular situations") (internal quotation marks omitted).

While plaintiffs have generally eschewed challenging any particular act of the PCAOB, see, e.g., Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss (dkt. no. 20) at 8, for purposes of their non-delegation claim they focus on what they characterize as the PCAOB's "authority to promulgate and impose criminal sanctions and impose taxes on broad swaths of the American public." Pls' Mem. at 45; see also Amicus Curiae Mem. of the Washington Legal Found. (dkt. no. 33) at 6-11 ("WLF Amicus Mem."). Such rhetorical flourishes bear little relation to what the statute actually provides. By "taxes on broad swaths of the American public," plaintiffs are presumably referring to the accounting support fee on issuers of publicly traded securities provided for by 15 U.S.C. § 7219(d). Assuming arguendo that Beckstead and Watts, which does not purport to be an issuer of publicly traded securities, would somehow have standing to challenge an accounting support fee payable by others, plaintiffs fail to recognize that the accounting support fee owes its existence to the statute itself. The statute directs the PCAOB to set the amount of the fee or a formula for calculating such amount, in either case subject to the approval of the SEC. 15 U.S.C. § 7219(d)(1). In setting that amount or formula, the PCAOB is guided by the statutory commands that the fee be "reasonable" and "necessary or appropriate to establish and maintain the Board." Id. Further, the statute mandates that the rules for allocation, assessment, and collection of the accounting support fee be "equitable" and "in accordance with" a detailed market capitalization-based formula for the allocation of accounting support fees among issuers, spelled out in the statute itself. 15 U.S.C. § 7219(d)(2), (g). If plaintiffs and amicus do not see a sufficient "intelligible principle" in these provisions, they are not looking very hard.

Plaintiffs' rhetoric about the PCAOB creating criminal law and "impos[ing] criminal sanctions" and Congress "delegat[ing] away its authority to create criminal law" (Pls' Mem. at 44, 45) is equally overblown. The PCAOB does not have any power even to <u>refer</u> a matter to the Attorney General for possible criminal enforcement except at the direction of the SEC, <u>see</u> 15 U.S.C. 7215(b)(4)(B)(iii), let alone power to bring a criminal case or to develop substantive criminal law. Even to the extent the Court were to entertain in this facial civil challenge the hypothesis of a violation of a rule promulgated by the PCAOB being, through operation of 15 U.S.C. § 7202(b)(1) combined with 15 U.S.C. § 78ff(b), criminally prosecuted,[26] it is well-established that there would be no non-delegation problem associated with that situation. <u>See United States v. Grace</u>, 778 F.2d 818, 822 (D.C. Cir. 1985) (per curiam) ("categorically rejec[ting]" argument that criminal punishment for violations of National Park Service regulations constituted an "unlawful delegation of powers," because "[i]t is not the Park Service but the Congress that has criminalized violations of the Park Service regulations"); <u>see also United States v. Grimaud</u>, 220 U.S. 506, 521 (1911) ("[T]he authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense."). The PCAOB is not transformed into a maker of criminal law merely because Congress incorporates its rules into a general enforcement framework that includes criminal provisions.

---

[26] Of course, based on largely the same set of considerations urged in our Statement of Interest, there are serious questions whether plaintiffs have standing to make such a speculative and attenuated claim, and whether judicial consideration of such a claim would not be more appropriately reserved for a criminal case where it might be presented in a concrete fashion.

For the above reasons, the Court should reject plaintiffs' non-delegation challenge.[27]

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that, if defendants'

motion to dismiss is denied, plaintiffs' motion for summary judgment should be denied and

proposed intervenor United States' motion for summary judgment should be granted.

---

[27] While plaintiffs should not be permitted to switch horses midstream by treating the PCAOB as a private entity when their other arguments necessarily characterize it as governmental for constitutional purposes, see Pls' Mem. at 14 n.3; WLF Amicus Mem. at 12-14, the outcome of the non-delegation analysis would not be different if the PCAOB were treated as private. Plaintiffs cite old cases disapproving private delegations in certain circumstances, but ignore a countervailing body of precedent approving such delegations provided that the private body is substantially subject to the oversight and supervision of a government agency and the "intelligible principle" standard is otherwise met. See Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 399 (1940) (approving delegation to industry board because "[t]he members of the [industry board] function subordinately to the [governmental] Commission. It, not the [industry board] authorities, determines the prices. And it has authority and surveillance over the activities of these authorities."); Cospito v. Heckler, 742 F.2d 72, 89 (3d Cir. 1984) (approving Medicare/Medicaid laws' conferral of certain functions on private Joint Committee on Accreditation of Hospitals; "Since, in effect, all actions of JCAH are subject to full review by a public official who is responsible and responsive to the political process, we find that there has been no real delegation of authority to JCAH."). The courts have uniformly applied this principle to uphold the activities of SROs, such as the NASD and NYSE, which are supervised by the SEC. R.H. Johnson & Co. v. SEC, 198 F.2d 690, 695 (2d Cir.), cert. denied, 344 U.S. 855 (1952); Todd & Co., Inc. v. SEC, 557 F.2d 1008, 1012-13 (3d Cir. 1977); First Jersey Securities, Inc. v. Bergen, 605 F.2d 690, 697 (3d Cir. 1979), cert. denied, 444 U.S. 1074 (1980). As discussed above and in the United States' previous Statement of Interest, the SEC's oversight and review authority over the PCAOB is patterned after and, if anything, is greater than the SEC's oversight and review authority over these SROs. Thus, even treating the PCAOB as a private entity, there simply is no delegation problem here.

Dated: September 1, 2006                    Respectfully submitted,


                                           PETER D. KEISLER
Of Counsel:                                Assistant Attorney General

BRIAN G. CARTWRIGHT                         KENNETH L. WAINSTEIN
General Counsel                            United States Attorney

ANDREW N. VOLLMER                           SUSAN K. RUDY
Deputy General Counsel                     Assistant Director
                                           Federal Programs Branch

JACOB H. STILLMAN
Solicitor
                                            _/s/ Robert J. Katerberg_____
JOHN W. AVERY                              ROBERT J. KATERBERG
Special Counsel                             (D.C. Bar No. 466325)
                                           Trial Attorney
Securities and Exchange Commission         U.S. Department of Justice
100 F Street, N.E.                         Civil Division, Federal Programs Branch
Washington, D.C. 20549                     20 Massachusetts Avenue, N.W., Room 6112
                                           Washington, D.C. 20001
                                           Telephone:    (202) 616-8298
                                           Facsimile:    (202) 616-8460
                                           Robert.Katerberg@usdoj.gov

                                           Attorneys for the United States