**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FREE ENTERPRISE FUND, *et al.*,

                         Plaintiffs,

       -against-

THE PUBLIC COMPANY ACCOUNTING
OVERSIGHT BOARD, *et al.*,

                    Defendants.

Civil Action No. 1:06-cv-00217-JR
Judge Robertson

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, and for reasons explained more fully in the accompanying Memorandum of Points and Authorities, defendants respectfully move for summary judgment on all claims. Plaintiffs claim that the provisions of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, establishing the Public Company Accounting Oversight Board (the "Board") are inconsistent with the Appointments Clause, U.S. Const. art. II, § 2, separation-of-powers principles, and the non-delegation doctrine. All three claims are without merit.

      I.      Congress did not exceed its authority under the Appointments Clause by giving the Securities and Exchange Commission ("SEC") authority to appoint Board members. Under the Appointments Clause, Congress may vest the power to appoint inferior officers in the President, the heads of departments, or the courts. The Board's members are inferior officers subject to pervasive oversight and supervision by the SEC. The SEC is a "department" within the meaning of the Constitution. And the Commissioners are the department's head. Plaintiffs, moreover, lack standing to raise significant portions of their Appointments Clause challenge.

II.    The Act is fully consistent with separation-of-powers principles.    The Constitution does not require that the President have direct power to remove and supervise inferior officers such as Board members.  The SEC itself has more than adequate removal and supervisory authority over the Board.  And the President has constitutionally adequate authority by virtue of his authority over the SEC.

III.    The Act does not violate the non-delegation doctrine.  The Act provides both the SEC and the Board with binding, intelligible principles to guide their decisions.

IV.    In addition, plaintiff Free Enterprise Fund ("FEF") should be dismissed for lack of standing because it has failed to adduce evidence that one or more of its members would have standing to bring this action in its own right.

A proposed order is attached.


Dated: September 1, 2006

Respectfully submitted,

/s/  Joe Caldwell

| | |
|---|---|
| Lewis H. Ferguson  (D.C. Bar No. 176312) | Joe Robert Caldwell, Jr.  (D.C. Bar No. 965137) |
| J. Gordon Seymour  (D.C. Bar No. 450051) | James R. Doty  (D.C. Bar No. 416785) |
| Heidi E. Murdy  (D.C. Bar No. 474680) | Jeffrey A. Lamken  (D.C. Bar No. 440547) |
| PUBLIC COMPANY ACCOUNTING | Robert K. Kry (D.C. Bar No. 490545) |
|     OVERSIGHT BOARD | Joshua A. Klein  (D.C. Bar No. 489078) |
| 1666 K Street, N.W. | BAKER BOTTS, LLP |
| Washington, D.C. 20006 | 1299 Pennsylvania Avenue, N.W. |
| (202) 207-9162 (telephone) | Washington, D.C.  20004-2400 |
| (202) 862-8430 (facsimile) | (202) 639-7700 (telephone) |
| | (202) 639-7890 (facsimile) |

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FREE ENTERPRISE FUND, *et al.*,

                      Plaintiffs,

        -against-

THE PUBLIC COMPANY ACCOUNTING
OVERSIGHT BOARD, *et al.*,

                    Defendants.

Civil Action No. 1:06-cv-00217-JR
Judge Robertson

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT**
**OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Lewis H. Ferguson  (D.C. Bar No. 176312)
J. Gordon Seymour  (D.C. Bar No. 450051)
Heidi E. Murdy  (D.C. Bar No. 474680)
PUBLIC COMPANY ACCOUNTING
   OVERSIGHT BOARD
1666 K Street, N.W.
Washington, D.C. 20006
(202) 207-9162 (telephone)
(202) 862-8430 (facsimile)

Joe Robert Caldwell, Jr.  (D.C. Bar No. 965137)
James R. Doty  (D.C. Bar No. 416785)
Jeffrey A. Lamken  (D.C. Bar No. 440547)
Robert K. Kry (D.C. Bar No. 490545)
Joshua A. Klein  (D.C. Bar No. 489078)
BAKER BOTTS, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
(202) 639-7700 (telephone)
(202) 639-7890 (facsimile)

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT ..................................................................................................................... 2

    A.    Audit Regulation and the Sarbanes-Oxley Act ................................................ 2

    B.    SEC Oversight of the Board ............................................................................ 3

    C.    Procedural History .......................................................................................... 7

SUMMARY OF ARGUMENT ........................................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.    THE BOARD'S MEMBERS ARE APPOINTED IN CONFORMITY WITH THE
APPOINTMENTS CLAUSE........................................................................................ 10

    A.    The Board's Members Are At Most Inferior Officers ..................................... 11

        1.    The Board's Members Are Subject to Extensive SEC Supervision ......... 11

        2.    The Board Is Subject to Greater Supervision and Control than
Other Officers Held To Be "Inferior" by the Supreme Court.................. 14

        3.    Plaintiffs' Contrary Arguments Are Unavailing....................................... 16

    B.    The SEC Is a "Department"........................................................................... 22

    C.    A Multi-Member Body Can Be the "Head" of a Department ........................... 26

II.    THE ACT DOES NOT VIOLATE SEPARATION OF POWERS.................................. 27

    A.    Congress Did Not Violate Separation-of-Powers Principles by Granting
Removal Power to the SEC Rather than the President ..................................... 28

        1.    The President Has No Constitutional Authority To Remove
Inferior Officers Appointed by Department Heads ................................. 28

        2.    The President Has Ample Indirect Removal Authority Through His
Power To Remove Commissioners of the SEC ........................................ 32

    B.    Congress Did Not Exceed Its Authority To Limit the Grounds for Which
Inferior Officers May Be Removed by a Department Head ............................... 34

        1.    Congress Has Broad Discretion To Limit the Grounds for Removal
of Inferior Officers Appointed by Department Heads .............................. 34

2.    The Commission Has Broad Authority To Remove Board Members ........................................................................... 36

3.    If the Removal Restrictions Are Unconstitutional, They Should Be Severed ........................................................................... 38

C.    The Board "As a Whole" Does Not Violate Separation-of-Powers Principles ........................................................................... 39

III.    PLAINTIFFS' DELEGATION CLAIM LACKS MERIT ................................................. 41

IV.    FEF SHOULD BE DISMISSED FOR FAILURE TO PROVE STANDING ................... 43

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES[1]

*Action for Children's Television v. FCC*, 59 F.3d 1249 (D.C. Cir. 1995)......................................21

*Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38 (D.D.C. 1998) ..............................44

*Belenke v. SEC*, 606 F.2d 193 (7th Cir. 1979) ..............................................................................19

*Bowsher v. Synar*, 478 U.S. 714 (1986)...................................................................................31, 33

*Burnap v. United States*, 252 U.S. 512 (1920)...............................................................................29

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ...........................................................................42

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) ...........................................38

*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................................................................17

*Edmond v. United States*, 520 U.S. 651 (1997) ................................................................... *passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) ..............................................................................................36

*Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743 (2002) .......................................25

*Fernelius v. Pierce*, 138 P.2d 12 (Cal. 1943)................................................................................33

*First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690 (3d Cir. 1979)....................................................42

*Freytag v. Comm'r*, 501 U.S. 868 (1991) ........................................................................... *passim*

*Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581 (2004) .....................................................13

*In re Hennen*, 38 U.S. 230 (1839)...................................................................................8, 28, 29

*Hughes v. SEC*, 174 F.2d 969 (D.C. Cir. 1949).............................................................................37

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ................................25, 28, 35, 40

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ...............................................44

*Jalil v. Hampton*, 460 F.2d 923 (D.C. Cir. 1972) .........................................................................27

---

[1] Authorities on which we chiefly rely are marked by an asterisk.

*Keim v. United States*, 177 U.S. 290 (1900) .................................................................29

*Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) ....................................................17, 18

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) .......................................10

*Loving v. United States*, 517 U.S. 748 (1996) .............................................................42

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................................43

*MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136 (D.C. Cir. 1995).................................21

*MFS Sec. Corp. v. SEC*, 380 F.3d 611 (2d Cir. 2004) ............................22, 24, 32, 33

*Mistretta v. United States*, 488 U.S. 361 (1989)...................................................25, 28

*\*Morrison v. Olson*, 487 U.S. 654 (1988) ........................................................... passim

*\*Myers v. United States*, 272 U.S. 52 (1926)...............................27, 29, 30, 31, 35

*NAACP v. Alabama*, 357 U.S. 449 (1958)....................................................................44

*\*NASD v. SEC*, 431 F.3d 803 (D.C. Cir. 2005) .........................................13, 15, 18, 19

*NBC v. United States*, 319 U.S. 190 (1943)..................................................................42

*N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12 (1932) .......................................42

*Nader v. Bork*, 366 F. Supp. 104 (D.D.C. 1973) ........................................................35

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ...................16

*Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7 (D.D.C. 1999) ...........42

*\*Nat'l Treasury Employees Union v. Reagan*, 663 F.2d 239 (D.C. Cir. 1981) ................27, 29, 33

*Nebraska v. EPA*, 331 F.3d 995 (D.C. Cir. 2003)........................................................16

*Public Citizen v. FTC*, 869 F.2d 1541 (D.C. Cir. 1989) ..............................................44

*R.H. Johnson & Co. v. SEC*, 198 F.2d 690 (2d Cir. 1952) ..........................................42

*Reagan v. United States*, 182 U.S. 419 (1901) ............................................................29

*Regan v. Time, Inc.*, 468 U.S. 641 (1984)...................................................................38

iv

*Sampson v. Murray*, 415 U.S. 61 (1974) .................................................................29

*Sartain v. SEC*, 601 F.2d 1366 (9th Cir. 1979)...............................................15, 19

*In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987)......................................................21

*Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005)..............................................43

*Service v. Dulles*, 354 U.S. 363 (1957).....................................................................21

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ............................................................43

*Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987) ...................................19

*Shurtleff v. United States*, 189 U.S. 311 (1903)........................................................29

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) .................................................44

*Silver v. U.S. Postal Serv.*, 951 F.2d 1033 (9th Cir. 1991) ................................23, 26

*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212 (1989)..............................................43

*Sorrell v. SEC*, 679 F.2d 1323 (9th Cir. 1982) .........................................................42

*Sturm, Ruger & Co. v. Chao*, 300 F.3d 867 (D.C. Cir. 2002) .......................................44

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) ..................................42

*Synar v. United States*, 626 F. Supp. 1374 (D.D.C. 1986) ........................................36

*Todd & Co. v. SEC*, 557 F.2d 1008 (3d Cir. 1977)...............................................15, 19

*Touby v. United States*, 500 U.S. 160 (1991)............................................................43

*United States v. Allred*, 155 U.S. 591 (1895)...........................................................29

*United States v. Germaine*, 99 U.S. 508 (1879)................................................10, 11, 24

*United States v. Grimaud*, 220 U.S. 506 (1911) ........................................................43

*United States v. Hartwell*, 73 U.S. 385 (1868) .........................................................27

*United States v. Mouat*, 124 U.S. 303 (1888) ...........................................................24

*United States v. Perkins*, 116 U.S. 483 (1886) ..................................................9, 34, 36

*United States v. Richardson*, 418 U.S. 166 (1974) ........................................................13

*United States v. Salerno*, 481 U.S. 739 (1987) ....................................................16, 43

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ...............................................41

*Wiener v. United States*, 357 U.S. 349 (1958) ...............................................................35

*Wonsover v. SEC*, 205 F.3d 408 (D.C. Cir. 2000) ........................................................37

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................27

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. II, § 2 ......................................................................................... *passim*

5 U.S.C. § 553 ................................................................................................................20

5 U.S.C. § 4303 ..............................................................................................................21

5 U.S.C. § 7503 ..............................................................................................................21

5 U.S.C. § 7513 ..............................................................................................................21

10 U.S.C. § 2903 ............................................................................................................27

15 U.S.C. § 78d ........................................................................................................11, 22

15 U.S.C. § 78q .........................................................................................................6, 12

15 U.S.C. § 78s ......................................................................................................4, 5, 15

15 U.S.C. § 78ff ......................................................................................................42, 43

*Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 ...................................... *passim*

§ 2, 15 U.S.C. § 7201 ...........................................................................................6

§ 3, 15 U.S.C. § 7202 ................................................................................. *passim*

§ 101, 15 U.S.C. § 7211 ............................................................................. *passim*

§ 103, 15 U.S.C. § 7213 ................................................................................4, 35, 41

§ 104, 15 U.S.C. § 7214 ...............................................................................4, 12

§ 105, 15 U.S.C. § 7215 ........................................................................................... *passim*

§ 107, 15 U.S.C. § 7217 ........................................................................................... *passim*

§ 109, 15 U.S.C. § 7219 .................................................................................6, 13, 14, 43

16 U.S.C. § 469j ........................................................................................................27

28 U.S.C. § 596 .........................................................................................................33

Act of Feb. 20, 1792, ch. 7, 1 Stat. 232 ...................................................................23

Pub. L. No. 101-624, 104 Stat. 3359 (1990) (reprinted at 7 U.S.C.A. § 2011 note) ....................27

## LEGISLATIVE MATERIALS

Corporate and Auditing Accountability, Responsibility, and Transparency Act of 2002,
    H.R. 3763, 107th Cong. (2002) ........................................................................38

H.R. Rep. No. 107-414 (2002) ...................................................................................2

S. Rep. No. 94-75 (1975) .....................................................................................13, 19

S. Rep. No. 107-75 (2002) .........................................................................................2

*S. Rep. No. 107-205 (2002) ..............................................................................2, 3, 13

*1 Annals of Cong. (Joseph Gales ed., 1834) ......................................................30, 35

## EXECUTIVE MATERIALS

17 C.F.R. § 240.10b-5 ...............................................................................................43

*Amendments to the Informal and Other Procedures; PCAOB Budget Approval
    Process*, 71 Fed. Reg. 41,998 (July 24, 2006) ..........................................6, 13, 21

*Applicability of Executive Order No. 12674 to Personnel of Regional Fishery
    Management Councils*, 17 Op. Off. Legal Counsel 150 (1993) .................................37, 38

*\*Authority of Civil Service Commission To Appoint a Chief Examiner*, 37 Op. Att'y
    Gen. 227 (1933) ..................................................................................................22, 26

*Civil-Service Commission*, 13 Op. Att'y Gen. 516 (1871) ..........................................27

*\*The Constitutional Separation of Powers Between the President and Congress*,
    20 Op. Off. Legal Counsel 124 (1996) ...................................................... *passim*

*Jurisdiction of the Accounting Officers*, 5 Op. Att'y Gen. 630 (1852)........................................40

*Order Approving Proposed Rules on Funding*, 68 Fed. Reg. 47,111 (Aug. 7, 2003) ...................6

*Order Approving Proposed Rules Relating to Bylaws*, 68 Fed. Reg. 44,553 (July 29, 2003) ................................................................................................................6

*Order Approving Proposed Rules Relating to Inspections of Registered Public Accounting Firms*, 69 Fed. Reg. 31,850 (June 7, 2004) ......................................................4

*Order Approving Proposed Rules Relating to Investigations and Adjudications*, 69 Fed. Reg. 29,150 (May 20, 2004) ...............................................................................................4

*Order Regarding Section 101(d) of the Sarbanes-Oxley Act of 2002*, 68 Fed. Reg. 23,336 (May 1, 2003)....................................................................................................6

PCAOB Open Meeting (Nov. 22, 2005), *available at* http://www.pcaobus.org/News_and_Events/Webcasts.aspx#33 ......................................19

*\*The President and Accounting Offices*, 1 Op. Att'y Gen. 624 (1823) ...........................33, 39, 40

*Promotion of Marine Officer*, 41 Op. Att'y Gen. 291 (1956)........................................................27

*Relation of the President to the Executive Departments*, 10 Op. Att'y Gen. 527 (1863).............40

## MISCELLANEOUS

Max Farrand, The Records of the Federal Convention of 1787 (1911)...........................................22

The Federalist No. 48 (Madison) ...................................................................................................27

The Federalist No. 77 (Hamilton).................................................................................................30

GAO, The Accounting Profession: Major Issues: Progress and Concerns (1996) .........................2

*Inefficiency or Misconduct of Deputy or Subordinate As Ground for Removal of Public Officer*, 143 A.L.R. 517 (1943)...........................................................................................33

L. Loss & J. Seligman, Securities Regulation (3d ed. 1998) .........................................................2

Michael S. Luehlfing, *The Politics of Self-Imposed Regulations—Has a New Day Dawned?*, 9 Accounting Horizons 68 (1995) ...................................................................2

*Office of the Chief Accountant, at* http://www.sec.gov/about/offices/oca.htm..............................19

SEC, Annual Report 2003 (2004) ................................................................................19

*Joseph Story, Commentaries on the Constitution of the United States (1833)....11, 23, 29, 30, 34

Andrew J. Warmus, *Qualitative Disclosure Under Amended Form 8-K*,
    89 Marq. L. Rev. 881 (2006) ...........................................................................2

## INTRODUCTION

After serious audit failures cost many investors their life savings, Congress passed the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or the "Act").  Title I of the Act created the Public Company Accounting Oversight Board ("PCAOB" or the "Board") to oversee the audits of public companies.  The Act subjects the Board to pervasive supervision by the Securities and Exchange Commission ("SEC" or the "Commission").  The SEC appoints and may remove Board members; reviews Board decisions; controls the scope of the Board's enforcement authority; and supervises Board operations in countless other respects.

That structure is hardly revolutionary.  The Constitution expressly contemplates "inferior officers" who, like Board members, exercise authority subject to the supervision of other, principal officers, like the Commissioners of the SEC.  The Constitution permits Congress to vest appointment of such inferior officers in the heads of departments.  And when Congress does so, longstanding precedent also allows Congress to grant sole removal power to the appointing department head and to prescribe conditions for removal—precisely what Congress did here. Sarbanes-Oxley thus does not even come close to the constitutional limits on Congress's authority.

Plaintiffs' contrary arguments rest simultaneously on a sweeping vision of unlimited presidential power and a series of self-serving misconstructions of Sarbanes-Oxley.  Plaintiffs, for example, assert that the President must have broad power to remove and supervise *every* federal officer exercising executive power.  That novel claim defies 160 years of Supreme Court precedent making clear that the President has no power to remove inferior officers appointed by a department head.  While plaintiffs wax eloquent about separation of powers and offer broad, abstract quotations from the *Federalist Papers*, even a cursory review reveals their historical analysis to be superficial and their conclusions foreclosed by centuries of precedent.

Plaintiffs' revisionist attempt to portray the Board as a runaway agency with "unchecked" powers is impossible to reconcile with the statute's text, which expressly provides for pervasive oversight by the SEC. The legislative history confirms that Congress intended that control. Plaintiffs' repeated efforts to construe the SEC's oversight narrowly, moreover, are at war with their assertion, made in an effort to circumvent the Act's exclusive judicial review mechanism, that this is a *facial* challenge. A facial challenge must fail unless there is *no set of circumstances* under which the Act could operate constitutionally. Plaintiffs do not even cite that standard, much less meet it by showing that the Act is incapable of constitutional construction by the SEC.

## STATEMENT

### A.    Audit Regulation and the Sarbanes-Oxley Act

Since 1934, the SEC has been the primary regulator of the financial disclosures made by public companies. For many years, the SEC relied primarily on the accounting profession to establish its own accounting and auditing standards. *See* S. Rep. No. 107-75, at 17 (2002); 2 L. Loss & J. Seligman, Securities Regulation 734-35 (3d ed. 1998); GAO, The Accounting Profession: Major Issues: Progress and Concerns 2-4 (1996). Recurring audit scandals led to calls for reform and repeated attempts to improve audit oversight. *See* S. Rep. No. 107-75, at 17-19; Michael S. Luehlfing, *The Politics of Self-Imposed Regulations—Has a New Day Dawned?*, 9 Accounting Horizons 68 (1995).

In 2002, after a new rash of audit failures cost investors nearly half a trillion dollars, *see* Andrew J. Warmus, *Qualitative Disclosure Under Amended Form 8-K*, 89 Marq. L. Rev. 881, 881 (2006), Congress acted. Witnesses at congressional hearings acknowledged the "repeated failures" of prior reform efforts. S. Rep. No. 107-205, at 2, 6 (2002); *see also* H.R. Rep. No. 107-414, at 18 (2002). After considering at least 26 different bills and conducting 33 hearings, Congress enacted the Sarbanes-Oxley Act of 2002 by a vote of 423 to 3 in the House and 99 to 0

in the Senate.  Pub. L. No. 107-204, 116 Stat. 745 (codified in relevant part at 15 U.S.C. §§ 7201 *et seq.*).[1]  The President signed the bill into law on July 30, 2002.

Title I of the Act established the PCAOB to "oversee the audit of public companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest."  § 101(a), 15 U.S.C. § 7211(a).  The Board has specific duties: to register public accounting firms; to set auditing, quality control, ethics, independence, and other related standards for those firms; to conduct inspections of those firms; and to investigate and sanction specified violations by those firms or associated persons.  § 101(c), 15 U.S.C. § 7211(c).  The SEC appoints the Board's five members after consultation with the Federal Reserve and Treasury Department.  § 101(e)(4)(A), 15 U.S.C. § 7211(e)(4)(A).  Exactly two members must be accountants.  § 101(e)(2), 15 U.S.C. § 7211(e)(2).

## B.    SEC Oversight of the Board

The Act grants the SEC "oversight and enforcement authority over the Board."  § 107(a), 15 U.S.C. § 7217(a); *see also* S. Rep. No. 107-205, at 12 ("The Board is subject to SEC oversight and review . . . .").  The Act authorizes the SEC to promulgate rules in furtherance of that oversight.  § 3(a), 15 U.S.C. § 7202(a).  And it provides for supervision of every aspect of the Board's operations—from rulemaking, inspections, and sanctions to budget and administration.  Those review provisions incorporate and build on provisions governing SEC oversight of self-regulatory organizations ("SROs") such as the New York Stock Exchange and the National Association of Securities Dealers ("NASD").  The "rules for SEC oversight of the Board are generally the same as those that apply to SEC oversight of the National Association of Securities Dealers."  S. Rep. No. 107-205, at 12.  Indeed, in some respects, the SEC's oversight

---

[1] Throughout this memorandum, otherwise undesignated statutory citations refer to sections of Sarbanes-Oxley.  Relevant provisions appear in the Statutory Appendix to Defendants' Motion To Dismiss (May 15, 2006) (docket #17).

is much broader.  *See* p. 5, *infra*.

*SEC Authority over Board Rules.*  The Board sets auditing standards and other rules for public accounting firms, § 103, 15 U.S.C. § 7213, as well as rules for its own operations, § 101(g)(1), 15 U.S.C. § 7211(g)(1).  The Board's rules, however, have *no effect* unless approved by the SEC.  § 107(b)(2), 15 U.S.C. § 7217(b)(2).  The SEC approves a Board rule only if it finds the rule "is consistent with the requirements of th[e] Act and the securities laws, or is necessary or appropriate in the public interest or for the protection of investors."  § 107(b)(3), 15 U.S.C. § 7217(b)(3).  Except for certain transitional rules, the Act incorporates the notice-and-comment procedures governing SEC review of SRO rules.  *See* § 107(b)(4), 15 U.S.C. § 7217(b)(4) (incorporating 15 U.S.C. § 78s(b)(1)-(3)).  Moreover, the SEC on its own initiative may abrogate, delete, or add to Board rules at any time.  § 107(b)(5), 15 U.S.C. § 7217(b)(5).

*SEC Authority over Board Inspections.*  The Board's inspections of registered accounting firms are conducted pursuant to rules that must be approved by the SEC.  *See* § 104(c), 15 U.S.C. § 7214(c); *Order Approving Proposed Rules Relating to Inspections of Registered Public Accounting Firms*, 69 Fed. Reg. 31,850 (June 7, 2004).  Inspection reports are subject to SEC review.  § 104(h), 15 U.S.C. § 7214(h).

*SEC Authority over Board Investigations and Sanctions.*  The rules governing Board investigations and disciplinary proceedings also must be approved by the SEC.  *See* § 105(a), 15 U.S.C. § 7215(a); *Order Approving Proposed Rules Relating to Investigations and Adjudications*, 69 Fed. Reg. 29,150 (May 20, 2004).  The Board must notify the SEC of any investigation involving a potential violation of the securities laws, and thereafter coordinate its work with the SEC as necessary to protect any ongoing SEC investigation.  § 105(b)(4)(A), 15 U.S.C. § 7215(b)(4)(A).  If the Board imposes a sanction, it must notify the SEC.  § 107(c)(1),

15 U.S.C. § 7217(c)(1). The SEC can review the sanction either on its own motion or at the request of the sanctioned party. § 107(c)(2), 15 U.S.C. § 7217(c)(2) (incorporating 15 U.S.C. § 78s(d)(2)). Sanctions are automatically stayed pending any SEC review unless the SEC orders otherwise. § 105(e)(1), 15 U.S.C. § 7215(e)(1). The review procedures are similar to those for SRO sanctions. § 107(c)(2), 15 U.S.C. § 7217(c)(2) (incorporating 15 U.S.C. § 78s(d)(2), (e)(1)). The scope of review, however, is broader—the SEC may "enhance, modify, cancel, reduce, or require the remission of a [Board] sanction" if, "having due regard for the public interest and the protection of investors," it finds the sanction is "not necessary or appropriate in furtherance of this Act or the securities laws" or is "excessive, oppressive, inadequate, or otherwise not appropriate." § 107(c)(3), 15 U.S.C. § 7217(c)(3).

   *SEC Authority over Board Jurisdiction and Members.* The SEC can relieve the Board at any time of any responsibility to enforce the Act, if doing so is "consistent with the public interest, the protection of investors, and the other purposes of this Act and the securities laws." § 107(d)(1), 15 U.S.C. § 7217(d)(1). It can also censure Board members, censure the Board, or place limits on Board activities. § 107(d)(2)-(3), 15 U.S.C. § 7217(d)(2)-(3). It can impose additional duties or functions on the Board. § 101(c)(5), 15 U.S.C. § 7211(c)(5). The SEC not only chooses the Board's members, but may remove them "for good cause shown." § 101(e)(6), 15 U.S.C. § 7211(e)(6). Cause exists where a Board member "(A) has willfully violated any provision of this Act, the rules of the Board, or the securities laws; (B) has willfully abused the authority of that member; or (C) without reasonable justification or excuse, has failed to enforce compliance with any such provision or rule, or any professional standard by any registered public accounting firm or any associated person thereof." § 107(d)(3), 15 U.S.C. § 7217(d)(3).

   *SEC Authority over Board Budget and Administration.* The Board's budget is subject to

annual approval by the SEC.  § 109(b), 15 U.S.C. § 7219(b).  That process is now governed by detailed rules that allow the SEC to condition its approval on the Board's acceptance of SEC changes.  *See Amendments to the Informal and Other Procedures; PCAOB Budget Approval Process*, 71 Fed. Reg. 41,998, 42,000 (July 24, 2006).  The Board is funded primarily by an accounting support fee paid by public companies.  That fee, and the Board's rules for allocating it among companies and assessing it, are also subject to SEC approval.  § 109(d), 15 U.S.C. § 7219(d); *Order Approving Proposed Rules on Funding*, 68 Fed. Reg. 47,111 (Aug. 7, 2003).

The SEC may impose record-keeping and reporting requirements on the Board.  § 107(a), 15 U.S.C. § 7217(a) (incorporating 15 U.S.C. § 78q(a)(1)).  It may also conduct "periodic, special, or other examinations" of the Board's records at any time.  § 107(a), 15 U.S.C. § 7217(a) (incorporating 15 U.S.C. § 78q(b)(1)).  The Board's bylaws must be approved by the SEC.  §§ 2(a)(13), 101(g)(1), 15 U.S.C. §§ 7201(a)(13), 7211(g)(1); *Order Approving Proposed Rules Relating to Bylaws*, 68 Fed. Reg. 44,553 (July 29, 2003).  And the Board began operations only after the SEC found it was capable of doing so.  § 101(d), 15 U.S.C. § 7211(d); *Order Regarding Section 101(d) of the Sarbanes-Oxley Act of 2002*, 68 Fed. Reg. 23,336 (May 1, 2003).

Even the Board's ability to initiate or defend a lawsuit is subject to SEC approval. § 101(f)(1), 15 U.S.C. § 7211(f)(1).  In granting approval for the Board to defend this very suit, the SEC imposed conditions that effectively allow the Commission, through its general counsel, to oversee and consult on every aspect of the case—from approval of the Board's selection of outside counsel to approval of all filings.

*The SEC's Retained Authority.*  Finally, the SEC retains all pre-existing authority to regulate accountants and set accounting or auditing standards, including rules that effectively supersede the Board's.  § 3(c), 15 U.S.C. § 7202(c).  Because a violation of Board rules is

"treated for all purposes in the same manner as a violation of the Securities Exchange Act," § 3(b)(1), 15 U.S.C. § 7202(b)(1), the SEC also has independent authority to enforce Board rules.

### C.    Procedural History

Plaintiffs in this case are Beckstead & Watts, a registered accounting firm currently under Board investigation, Compl. ¶¶ 12, 79, and the Free Enterprise Fund ("FEF"), an organization claiming unspecified injuries to unspecified members, Compl. ¶ 11. Count I of the complaint alleges that the Act violates separation-of-powers principles by granting executive power to the Board while limiting the President's and SEC's authority to remove Board members and supervise the Board. Compl. ¶¶ 81-85. Count II claims the SEC's appointment of Board members violates the Appointments Clause, U.S. Const. art. II, § 2. Compl. ¶¶ 86-92. Finally, Count III claims the Act's grant of authority to the Board is an unconstitutional delegation of Congress's legislative power. Compl. ¶¶ 93-95.

On May 15, 2006, defendants filed a motion to dismiss, which remains pending. That motion argues that this suit impermissibly circumvents the exclusive judicial review mechanism established by Congress; that plaintiffs failed to exhaust administrative remedies; that FEF failed to allege standing; and that both plaintiffs lack standing to raise certain Appointments Clause claims. *See* Defendants' Memorandum in Support of Motion To Dismiss (May 15, 2006) (docket #17) [hereinafter Motion To Dismiss]. On July 25, 2006, plaintiffs moved for summary judgment.[2] Defendants now cross-move for summary judgment, and submit this memorandum both in opposition to plaintiffs' motion and in support of defendants' cross-motion.

---

[2] Citations to "Pl. Mem." are to plaintiffs' memorandum in support of their motion.

## SUMMARY OF ARGUMENT

**I.**    Congress did not exceed its authority under the Appointments Clause, U.S. Const. art. II, § 2, by giving the SEC authority to appoint Board members.  Congress may vest the appointment of inferior officers in the "heads of departments."  The Board's members are at most inferior officers, the SEC is a "department," and the Commission is its "head."

Inferior officers are officers who are subject to supervision and control at some level by a principal officer.  Congress subjected the Board to pervasive oversight by the SEC, which can review Board rules, sanctions, and inspection reports; control the Board's budget and operations; modify the Board's jurisdiction; and appoint and remove Board members.  The Board's members are subject to far more supervision than the officers held to be inferior in *Edmond v. United States*, 520 U.S. 651 (1997), and *Morrison v. Olson*, 487 U.S. 654 (1988).  Plaintiffs' arguments to the contrary are unpersuasive.  Day-to-day (or hour-to-hour) supervision is not a prerequisite for inferior-officer status, and the SEC in any event has authority to exercise extensive ongoing oversight.  Plaintiffs' claim that the statutory standards of review compel SEC deference to the Board's rulings ignores the plain text of the statute and the rules applicable to facial challenges.  The applicable procedural requirements pose no impediment to effective oversight.  And the removal restrictions do not render Board members principal officers.

The SEC is a "department" because it is a stand-alone administrative agency headed by principal officers who are subordinate only to the President.  And nothing in the Constitution prevents Congress from treating the five-person Commission as the agency's "head."

**II.**    Plaintiffs' separation-of-powers arguments are equally misguided.  The President does not have inherent power to remove every officer wielding executive power.  Rather, the power to remove is an incident of the power to appoint.  *In re Hennen*, 38 U.S. 230, 259-60 (1839).  Congress thus acted lawfully when it vested the sole power to remove Board members

in the SEC Commissioners who appointed them. In any event, the President can effect removal of Board members indirectly through his power to remove Commissioners of the SEC.

The restrictions on the SEC's removal authority are also lawful. When inferior officers appointed by a department head are at issue, Congress "may limit and restrict the power of removal as it deems best for the public interest." *United States v. Perkins*, 116 U.S. 483, 485 (1886). The SEC, in any event, has broad authority to remove Board members in appropriate circumstances. Even if the removal restrictions were invalid, they are severable.

Nor do the Act's oversight provisions considered as a whole offend separation of powers. The SEC has broad authority to supervise the Board. And the President can supervise the Board indirectly, by ensuring that the SEC properly discharges its own supervisory duties.

**III.**    The Act does not violate non-delegation principles. It sets forth an intelligible principle to guide the Board's and the SEC's discretion. That Congress made violation of Board rules a crime is no more impermissible than its decision to make violation of the SEC's own rules a crime. And even if the Board were a private entity, the delegation would be permissible because the SEC must approve all Board rules.

**IV.**    Finally, FEF must be dismissed because it failed to submit evidence that its members have suffered injury sufficient to confer standing.

### ARGUMENT

Plaintiffs' constitutional challenge to Sarbanes-Oxley is not only without merit but backwards as well. Plaintiffs begin by arguing that the Act violates separation-of-powers principles by limiting the President's ability to remove and supervise Board members. Only later do plaintiffs address whether the Board's members are inferior officers whose appointment may be vested in the SEC. That places the cart before the horse. The scope of the President's authority to remove and supervise depends on whether the Board's members are inferior officers

appointed by a department head.  Restrictions on the President's power over the officers *he appoints* may raise weighty constitutional concerns.  But, under the so-called "Excepting Clause," U.S. Const. art. II, § 2, Congress may vest appointment of *inferior* officers in the heads of departments.  When Congress does so, over a century of precedent allows it to grant removal power to the department head rather than the President; to prescribe conditions for removal; and to provide for supervision by the department head rather than the President.  Consequently, plaintiffs' claim that the *President* must have broad removal and supervisory authority is without foundation if Board members are inferior officers properly appointed by the SEC.

For that reason, we *first* address plaintiffs' Appointments Clause challenge, showing that the Board's members are inferior officers properly appointed by the Commissioners of the SEC. *Second*, we show that the Act's removal and supervision provisions do not even approach the separation-of-powers limits on Congress's broad authority to define inferior-officer positions appointed by department heads.  *Third*, we address plaintiffs' delegation claim.  *Finally*, we show that plaintiffs' current submissions—like their complaint—fail to prove FEF's standing.

## I.  THE BOARD'S MEMBERS ARE APPOINTED IN CONFORMITY WITH THE APPOINTMENTS CLAUSE

"The Constitution for purposes of appointment very clearly divides all its officers into two classes"—*principal* and *inferior*.  *United States v. Germaine*, 99 U.S. 508, 509 (1879).[3]

---

[3] The Appointments Clause applies only to officers of the United States, not private parties.  *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. Off. Legal Counsel 124, 145-46 (1996).  Sarbanes-Oxley provides that the Board is "not . . . an agency or establishment of the United States Government."  § 101(b), 15 U.S.C. § 7211(b).  That provision is "assuredly dispositive" of the Board's status for matters within Congress's control.  *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995).  As plaintiffs note (Pl. Mem. at 14 n.3), however, whether the Board is a government entity for constitutional purposes is a separate question.  *See Lebron*, 513 U.S. at 400.  Because the Board passes muster even under the standards applicable to government agencies, this Court should simply assume without deciding, for purposes of this motion, that the Board is a government entity under *Lebron*.

Principal officers must be appointed by the President "with the advice and consent of the Senate." U.S. Const. art. II, § 2; *Edmond v. United States*, 520 U.S. 651, 658-60 (1997). By contrast, "Congress may by law vest the appointment of such *inferior* officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments." U.S. Const. art. II, § 2 (emphasis added); *Edmond*, 520 U.S. at 660-63. Principal officers include the "heads of departments" immediately subordinate to the President. *See Freytag v. Comm'r*, 501 U.S. 868, 886 (1991); *id.* at 919 (Scalia, J., concurring in judgment). Inferior officers include a vast corps of officers with significant authority who work *under* the department heads. *See Edmond*, 520 U.S. at 662; *Germaine*, 99 U.S. at 510; 3 Joseph Story, Commentaries on the Constitution of the United States §§ 1529-1530, 1538, at 382-88, 397 (1833) [hereinafter Story].

Congress operated well within constitutional boundaries when it provided for the Commissioners of the SEC to appoint Board members. Because Board members are at most inferior officers, they may be appointed by a department head. The SEC is a "department." And the Commissioners are its "head."

### A.    The Board's Members Are At Most Inferior Officers

While all officers of the United States exercise "significant authority," *Edmond*, 520 U.S. at 662, the line that separates principal from inferior officers is supervision and control. "'[I]nferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* at 663. Board members are at most inferior officers because they are subject to pervasive oversight by the presidentially appointed Commissioners of the SEC. 15 U.S.C. § 78d(a).

### 1.    The Board's Members Are Subject to Extensive SEC Supervision

The SEC's ability to exercise control over the Board is apparent from the face of the Act. The Act grants the SEC "oversight and enforcement authority over the Board." § 107(a), 15

U.S.C. § 7217(a).  The SEC must approve every exercise of Board power with legally operative effect.  Board rules have *no effect* unless the SEC approves them.  § 107(b)(2), 15 U.S.C. § 7217(b)(2).  The SEC may abrogate, delete, or add to Board rules at any time.  § 107(b)(5), 15 U.S.C. § 7217(b)(5).  Board sanctions are without effect pending any SEC review unless the Commission orders otherwise.  § 105(e), 15 U.S.C. § 7215(e).  And the SEC may enhance, modify, cancel, reduce, or remit any sanction.  § 107(c)(3), 15 U.S.C. § 7217(c)(3).  Even Board inspection reports (which *lack* legally operative effect) are subject to SEC review upon request. § 104(h), 15 U.S.C. § 7214(h).

Moreover, the SEC by rule can relieve the Board of *any* responsibility to enforce the Act if doing so is "consistent with the public interest, the protection of investors, and the other purposes of this Act and the securities laws."  § 107(d)(1), 15 U.S.C. § 7217(d)(1).  The SEC can limit the activities of the Board.  § 107(d)(2), 15 U.S.C. § 7217(d)(2).  It can impose additional duties on the Board.  § 101(c)(5), 15 U.S.C. § 7211(c)(5).  And it can exercise its *own* authority to enforce the Board's rules.  § 3(b)-(c), 15 U.S.C. § 7202(b)-(c).

The SEC can also prescribe its own rules in furtherance of the Act.  § 3(a), 15 U.S.C. § 7202(a).  The SEC can impose record-keeping and reporting requirements on the Board. § 107(a), 15 U.S.C. § 7217(a) (incorporating 15 U.S.C. § 78q(a)(1)).  The SEC may conduct "periodic, special, or other examinations" of all the Board's records.  § 107(a), 15 U.S.C. § 7217(a) (incorporating 15 U.S.C. § 78q(b)(1)).  The Board must notify the SEC of any investigation involving a potential violation of the securities laws, and thereafter coordinate its work with the SEC as necessary to protect any ongoing SEC investigation.  § 105(b)(4)(A), 15 U.S.C. § 7215(b)(4)(A).  And the Board must notify the SEC of any sanction it imposes. § 107(c)(1), 15 U.S.C. § 7217(c)(1).

The Board's members are selected by the SEC. § 101(e)(4), 15 U.S.C. § 7211(e)(4). The SEC can censure Board members. § 107(d)(3), 15 U.S.C. § 7217(d)(3). And the SEC can remove Board members for cause. *Id.*

The SEC also wields the "ultimate weapon of enforcement"—"the 'power of the purse.'" *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974). The Board's annual budget is subject to SEC approval, as are the support fees that fund the Board's operations. § 109(b), (d), 15 U.S.C. § 7219(b), (d). The SEC's rules allow it to revise the Board's budget, giving it substantial control. 71 Fed. Reg. at 42,000.

The SEC's expansive authority was the product of deliberate design. As the Senate Report observes, the "rules for SEC oversight of the Board are generally the same as those that apply to SEC oversight of the [NASD]." S. Rep. No. 107-205, at 12. That oversight is plenary:

> [The NASD's authority] ultimately belongs to the SEC, and the legal views of the self-regulatory organization must yield to the Commission's view of the law. . . . "The self-regulatory organizations exercise authority subject to SEC oversight. They have no authority to regulate independently of the SEC's control."

*NASD v. SEC*, 431 F.3d 803, 806-07 (D.C. Cir. 2005) (quoting S. Rep. No. 94-75, at 23 (1975)). Plaintiffs' reliance on the floor statement of a single Senator for the contrary view—that the Board exercises "massive power, unchecked power, by design," Pl. Mem. at 4, 10, 34—is misplaced. The views of a single Senator certainly cannot overcome the statute's plain text. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 599 (2004). The Board is subject to comprehensive SEC oversight. It has "no authority to regulate independently of the SEC's control." *NASD v. SEC*, 431 F.3d at 807.[4]

---

[4] Furthermore, while plaintiffs cite references in the legislative history to the Board's "independence" (Pl. Mem. at 3-4 & n.1), most of the cited sources are referring to independence *from the accounting industry*, not from the SEC. *See, e.g.*, S. Rep. No. 107-205, at 6-7.

2.      *The Board Is Subject to Greater Supervision and Control than Other Officers Held To Be "Inferior" by the Supreme Court*

Given the pervasive SEC oversight provided for in the Act, there can be no doubt that Board members are inferior officers within the meaning of the Appointments Clause.  *Edmond v. United States*, 520 U.S. 651 (1997), makes that clear.  In *Edmond*, the Supreme Court concluded that the judges of the Coast Guard Court of Criminal Appeals were inferior officers, citing four factors also present here.  520 U.S. at 664-65.  First, the Supreme Court relied on the fact that the Coast Guard's Judge Advocate General "exercise[d] administrative oversight" over the judges.  *Id.* at 664.  Likewise here, the SEC exercises administrative oversight over the Board.  *See, e.g.*, § 107(a), 15 U.S.C. § 7217(a) (record-keeping and inspections); § 109(b), 15 U.S.C. § 7219(b) (budget approval).  Second, the Judge Advocate General could prescribe "rules of procedure." 520 U.S. at 664.  Here, the SEC may prescribe rules of both substance *and* procedure:  It reviews Board rules and bylaws, § 107(b)(2), 15 U.S.C. § 7217(b)(2), may rescind, modify, or add to those rules, § 107(b)(5), 15 U.S.C. § 7217(b)(5), and may promulgate its own rules to govern the Board, § 3(a), 15 U.S.C. § 7202(a).  Third, the Judge Advocate General could remove the judges. 520 U.S. at 664.   The SEC likewise can remove Board members.   § 107(d)(3), 15 U.S.C. § 7217(d)(3).  And fourth, the judges had "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers."  520 U.S. at 665.  The same is true here:  The Board's sanctions and rules are not effective unless the SEC permits them to become final, and they are *without effect* pending any SEC review.  §§ 105(e)(1), 107(b)(2), (c), 15 U.S.C. §§ 7215(e)(1), 7217(b)(2), (c).

Indeed, in the lattermost respect, the Act provides for the SEC to exercise far *more* oversight:  The statute in *Edmond* limited review of the Coast Guard judges' factual findings to whether there was "some competent evidence in the record to establish each element of the

offense." 520 U.S. at 665.  By contrast, Sarbanes-Oxley incorporates review provisions for SRO

decisions that courts have long construed to require *de novo* review.  § 107(c)(2), 15 U.S.C.

§ 7217(c)(2) (incorporating 15 U.S.C. §78s(e)(1)); *see NASD v. SEC*, 431 F.3d at 804; *Sartain v.

SEC*, 601 F.2d 1366, 1371 n.2 (9th Cir. 1979); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012 (3d Cir.

1977); pp. 19-20, *infra*.  And the SEC may reject Board rules and sanctions merely by finding

them not "appropriate."  § 107(b)(3), (c)(3), 15 U.S.C. § 7217(b)(3), (c)(3).[5]

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court held that the independent

counsel was an inferior officer even though she was subject to far less oversight than either the

judges in *Edmond* or the Board members here.  The independent counsel possessed, for all

matters within her jurisdiction, the "'full power and independent authority to exercise all

investigative and prosecutorial functions and powers of the Department of Justice.'" *Id.* at 662.

The Court conceded it was "undeniable that the Act reduces the amount of control or

supervision" that the Attorney General exercised over the independent counsel because he "is not

allowed to appoint the individual of his choice; he does not determine the counsel's jurisdiction;

and his power to remove a counsel is limited." *Id.* at 695-96.  Indeed, the Attorney General had

no authority to countermand the independent counsel's decisions to initiate and conduct

prosecutions, conduct grand jury proceedings, frame indictments, take appeals, and otherwise

handle "'all aspects of any case, in the name of the United States.'" *Id.* at 662.  Nonetheless, the

Court held that the independent counsel "clearly falls on the 'inferior officer' side of [the] line"

---

[5] Plaintiffs focus on the fact that the Judge Advocate General could remove judges without cause
(although *not* to influence the outcome in particular proceedings).  520 U.S. at 664.  That
difference is immaterial, however, because Congress has broad discretion to regulate the removal
of inferior officers.  *See* pp. 34-36, *infra*.  Moreover, the SEC has at least two additional powers
the Judge Advocate General did not:  It can withdraw the Board's enforcement authority
whenever it is in the public interest to do so, § 107(d)(1), 15 U.S.C. § 7217(d)(1); and it can
bypass the Board entirely by exercising its own regulatory powers, § 3, 15 U.S.C. § 7202.

because she was subject to the Attorney General's control to some degree. *Id.* at 671-73, 695-96.

The SEC's oversight of the Board is far more pervasive. Unlike the Attorney General, 487 U.S. at 695, the SEC can "appoint the individual[s] of [its] choice" to the Board, *see* § 101(e)(4), 15 U.S.C. § 7211(e)(4), and can "determine the [Board's] jurisdiction" by rescinding authority, *see* § 107(d)(1); 15 U.S.C. § 7217(d)(1); p. 5, *supra*. Unlike the independent counsel, the Board cannot prosecute crimes at all; it cannot even *refer* a case to the Attorney General unless the SEC so directs. § 105(b)(4)(B)(iii), 15 U.S.C. § 7215(b)(4)(B)(iii). Plaintiffs urge that, unlike in *Morrison*, the Board's jurisdiction is not limited to a single case. Pl. Mem. at 33. But the Board's jurisdiction is limited in other ways—it is restricted to a single, technical subject-matter, the regulation of public-company audits. And any difference in jurisdiction here pales next to the fact that the Board is subject to plenary supervision in *all* its activities while the independent counsel was subject to virtually *none*.

### 3.    Plaintiffs' Contrary Arguments Are Unavailing

Plaintiffs do not dispute that the SEC has oversight over the Board. Instead, they seek to distort the scope and effectiveness of that oversight. Their attempts to downplay the pervasiveness of the SEC's oversight rest on misconstructions of the Act and misreadings of precedent. To the extent there is ambiguity in the statute, moreover, plaintiffs cannot prevail. Plaintiffs have repeatedly described this suit as a "facial" challenge. *See, e.g.*, Plaintiffs' Memorandum in Opposition to Motion To Dismiss at 1, 2, 19 (June 5, 2006) (docket #20). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists* under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added); *Nebraska v. EPA*, 331 F.3d 995, 998 (D.C. Cir. 2003). If any sustainable SEC construction of the Act would save it, plaintiffs' suit must be rejected. *See Nat'l Mining Ass'n v. U.S. Army*

*Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998) (noting the "familiar proposition that a court should reject a facial challenge, either as unripe or meritless, when the challenger's success turns on the assumption that the agency will exercise its discretion unlawfully"). Similarly, the doctrine of constitutional avoidance requires courts to interpret a statute to avoid unconstitutional results whenever possible. *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Thus, even if the scope of the SEC's control is ambiguous, this Court must uphold the Act against a facial challenge.

*Oversight of Day-to-Day Operations.* Plaintiffs' principal argument—that Board members are principal officers because the SEC exercises no "day-to-day" supervision (Pl. Mem. at 26-27, 29-31)—is without merit. Oversight, not micromanagement, is the hallmark of inferior-officer status. Even inferior officers exercise significant authority: "The exercise of 'significant authority pursuant to the laws of the United States' marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather . . . the line between officer and nonofficer." *Edmond*, 520 U.S. at 662.

In *Edmond*, for example, the Coast Guard judges exercised substantial control over their cases. The Court of Appeals for the Armed Forces reviewed only final decisions, and the Judge Advocate General was specifically precluded from "attempt[ing] to influence . . . the outcome of individual proceedings." *Id.* at 664. That did not transform the Coast Guard judges into principal officers. What mattered was that they had "no power to render a *final decision*" unless their superiors permitted their decisions to stand. *Id.* at 665 (emphasis added). For similar reasons, administrative law judges have never been thought to be principal officers, even though superiors cannot direct their proceedings. *See Landry v. FDIC*, 204 F.3d 1125, 1130-34 (D.C. Cir. 2000).[6] What matters is that they have no power to render "[f]inal decisions"—only a

_____

[6] In fact, *Landry* held that the administrative law judges there were not officers at all but mere

"'*recommended* decision'" and a "'*proposed* order.'" *Id.* at 1133 (emphasis in original). Here too, the Board's sanctions and rules are subject to SEC review, and are *inoperative* pending any review—they are effectively *proposed* orders pending any review—unless the SEC directs otherwise. §§ 105(e)(1), 107(b)(2), (c), 15 U.S.C. §§ 7215(e)(1), 7217(b)(2), (c).

The independent counsel in *Morrison* was held inferior despite being subject to nothing remotely approaching day-to-day supervision. She could indict, prosecute, and appeal in the name of the United States without any superior's approval. She was subject to ongoing supervision only in the sense that she had to follow Department policies "to the extent possible." 487 U.S. at 672. The Board, by contrast, is subject to pervasive oversight and *must* follow both SEC rules and SEC-approved Board rules. §§ 3(a), 105(a), 15 U.S.C. §§ 7202(a), 7215(a). If the independent counsel was an inferior officer, the Board members' status cannot be in doubt.

In any event, the SEC *can and does* exercise ongoing oversight. It can prescribe rules in furtherance of the Act at any time. § 3(a), 15 U.S.C. § 7202(a). It can impose record-keeping and reporting requirements on the Board and may inspect those records at any time. § 107(a), 15 U.S.C. § 7217(a). It can modify the Board's rules at any time—including the rules governing inspections, investigations, and disciplinary proceedings. § 107(b)(5), 15 U.S.C. § 7217(b)(5); *cf. NASD v. SEC*, 431 F.3d at 806 (noting that the SEC "closely supervises and approves the processes by which NASD brings disciplinary action" and citing this as a factor establishing the SEC's pervasive control). The Board must notify the SEC of any investigation involving a potential violation of the securities laws, and thereafter coordinate its work with the SEC as necessary to protect any ongoing SEC investigation. § 105(b)(4)(A), 15 U.S.C. § 7215(b)(4)(A). And the SEC can expand or rescind the Board's authority in the public interest, or censure or

---

employees—a category below even inferior officers. *See* 204 F.3d at 1130-34.

remove Board members for cause, at any time.  §§ 101(c)(5), 107(d); 15 U.S.C. §§ 7211(c)(5),

7217(d).  The staffs of the SEC and the Board also work closely together on an informal basis,

heavily influenced by the myriad formal mechanisms giving the SEC ultimate control.[7]  To the

extent ongoing oversight is required, the Act amply provides for it.

   *Standards of Review*.  There is no merit to plaintiffs' claim that the SEC's review is "so

deferential that it provides no effective supervisory check."  Pl. Mem. at 9.  Plaintiffs assert that

SEC review of Board rules and sanctions is "circumscribed" and "analogous to that applied by a

federal court reviewing an agency's rules under *Chevron*,'" *id.* at 9, 28, but offer no supporting

authority.  The law is to the contrary:  As noted above,  p. 15, *supra*, the Act incorporates SRO

review provisions that have been uniformly interpreted to provide for *de novo* review.  *See NASD*

*v. SEC*, 431 F.3d at 804; *Sartain*, 601 F.2d at 1371 n.2; *Todd*, 557 F.2d at 1012; *see also Belenke*

*v. SEC*, 606 F.2d 193, 198 (7th Cir. 1979) ("independent determination"); *Shearson/Am.*

*Express, Inc. v. McMahon*, 482 U.S. 220, 233-34 (1987); S. Rep. No. 94-75, at 23 (1975).

   Plaintiffs offer no reason to believe the provisions here would be construed differently.

Indeed, to the extent the provisions differ, review of Board decisions is *more* expansive.  The

SEC may reject Board rules merely by finding them not "appropriate in the public interest,"

§ 107(b)(3), 15 U.S.C. § 7217(b)(3), and may reject Board sanctions merely by finding them

---

[7] For example, the Board has amended proposed rules in response to informal recommendations
from the SEC's staff in order to secure approval by the SEC.  *See* PCAOB Open Meeting (Nov.
22, 2005), *available at* http://www.pcaobus.org/News_and_Events/Webcasts.aspx#33; *see also,*
*e.g.*, SEC, Annual Report 2003, at 28 (2004) (noting that the SEC's Office of International
Affairs "worked with the [Board] to address the concerns of foreign authorities regarding the
international implications of the PCAOB's system for registering accounting firms"); *id.* at 66
(SEC's Office of Chief Accountant "[p]rovided extensive oversight of the formation and start-up
activities of the [Board]"); *id.* at 68 (SEC's Office of Chief Accountant "worked closely . . . to
develop the PCAOB's support fee and budget"); *id.* at 69 (describing collaborative effort to
develop certain Board standards); *Office of the Chief Accountant*, *at* http://www.sec.gov/about/
offices/oca.htm ("The Professional Practice group works closely with the [Board] to develop
auditing policies and procedures that promote . . . reliable financial reporting information.").

"not appropriate" to the violation, § 107(c)(3)(B), 15 U.S.C. § 7217(c)(3)(B).[8]    Far from compelling deference, those standards invite broad SEC discretion.

To the extent there is any ambiguity, it cannot help plaintiffs here. This is a *facial* challenge. The Act must be upheld if any reasonable construction by the SEC would validate it. *See* pp. 16-17, *supra*. Constitutional avoidance requires the same result. *See id.*[9]

*Notice and Comment.* Plaintiffs assail the notice-and-comment procedures that attend some SEC review of Board decisions as so "cumbersome" that review "cannot amount to 'supervision and control' in any meaningful sense." Pl. Mem. at 27. That is preposterous. First, Board rules are *not effective* unless approved by the SEC, § 107(b)(2), 15 U.S.C. § 7217(b)(2), and sanctions are *automatically stayed* unless the SEC orders otherwise, § 105(e)(1), 15 U.S.C. § 7215(e)(1). In most instances, therefore, the Act's procedures do not inhibit SEC control; they merely delay the *Board's* actions until the SEC approves them. Second, the SEC can forgo (and has forgone) notice and comment under the APA's well-known exceptions for rules of "agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), or when notice and comment would be "impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B); *see,*

---

[8] Plaintiffs argue that, under a "literal" reading of § 107(b)(3), the SEC would have to approve Board rules if they were *either* consistent with the securities laws *or* appropriate in the public interest. Pl. Mem. at 27. It seems unlikely that Congress intended the Commission to approve rules that are *not* consistent with the securities laws so long as they are in the public interest, or vice versa. SEC orders approving Board rules have typically found that the rules "are consistent with the requirements of the Act and the securities laws *and* are necessary and appropriate in the public interest and for the protection of investors." *See* Defendants' Statement of Material Facts Not in Genuine Dispute ¶ 13.

[9] Plaintiffs' arguments underscore why this Court should not permit them to bypass Congress's statutory review mechanism. *See* Motion To Dismiss at 15-37. Plaintiffs have advanced a tendentious interpretation of the statute (that the Board gets *Chevron* deference) in order to maximize the chance that it will be declared unconstitutional. But the Commission could construe the Act to require *de novo* review, and that *SEC* decision *would* receive *Chevron* deference. The Court should require plaintiffs to follow the statutory review scheme so that the SEC can address any ambiguities in the first instance.

*e.g.*, 71 Fed. Reg. at 42,000. Under these exceptions, for example, the SEC could rescind all Board enforcement authority by interim rule effective immediately, § 107(d)(1), 15 U.S.C. § 7217(d)(1), if delay would be contrary to the public interest.[10]

In any event, procedural requirements do not render supervision ineffective. *See In re Sealed Case*, 829 F.2d 50, 56 (D.C. Cir. 1987) (holding Iran/Contra independent counsel to be an inferior officer because regulations empowering his office could be rescinded "[s]ubject to generally applicable procedural requirements"). Mere *employees* are subject to civil-service protections. *See, e.g.*, *Service v. Dulles*, 354 U.S. 363 (1957); 5 U.S.C. § 4303 (procedures for "reduc[tion] in grade or remov[al] . . . for unacceptable performance," including written advance notice, opportunity for oral and written response, and appeal); 5 U.S.C. §§ 7503, 7513 (similar). Those procedural requirements do not transform government employees into principal officers beyond their superiors' oversight. In any event, notice-and-comment procedures *promote* transparency, public participation, and fairness in agency decisionmaking. *See MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1141 (D.C. Cir. 1995). Plaintiffs offer no explanation for why the Constitution would require significant SEC decisions regarding Board actions to be exempt from the procedures that ensure accountability in all other contexts.

*Removal Authority*. Finally, plaintiffs argue that the good-cause limitations on the SEC's removal authority render Board members principal officers. Pl. Mem. at 29-34. Nothing could be further from the truth. As we show below, the Supreme Court for more than a century has recognized Congress's broad authority to regulate the removal of inferior officers. *See* pp. 34-

---

[10] On a facial challenge, moreover, this Court cannot merely assume the SEC will be unable to invoke these mechanisms with sufficient dispatch to ensure effective control. *See Action for Children's Television v. FCC*, 59 F.3d 1249, 1259-60 (D.C. Cir. 1995) (rejecting, as inconsistent with the standard applicable to facial challenges, the claim that the FCC could not act with sufficient "dispatch" even though no prior case had "moved through the pipeline that quickly").

36, *infra*.  Those restrictions cannot possibly render Board members principal officers.

## B.   The SEC Is a "Department"

Plaintiffs also argue that the SEC is not a "department" that can appoint inferior officers.
Pl. Mem. at 35-39.   That claim too lacks merit.

1.   The Framers added the Excepting Clause to the Constitution to allow department

heads, themselves principal officers appointed by the President, to appoint their subordinates

without the cumbersome process of presidential nomination and Senate confirmation.  *See*

*Edmond*, 520 U.S. at 660 (1997); *Morrison*, 487 U.S. at 720-21 (Scalia, J., dissenting); 2 Max

Farrand, The Records of the Federal Convention of 1787, at 537-39, 627-28 (1911).  The five

SEC Commissioners are principal officers appointed by the President with the consent of the

Senate.  15 U.S.C. § 78d(a).  They answer only to, and are removable solely by, the President.

*MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619 (2d Cir. 2004).  Granting an agency like the SEC

authority to appoint its own subordinates—the inferior officers whose work it will oversee—is

"so obviously appropriate that [the] burden of [showing] that it violates the Appointments Clause

is indeed heavy."  *Freytag*, 501 U.S. at 883.  Plaintiffs cannot meet that burden.

In *Freytag*, a five-Justice majority declined to address whether independent agencies like

the SEC are "departments."  *Id.* at 887 n.4 ("We do not address here any question involving an

appointment of an inferior officer by the head of one of the principal agencies, such as the . . .

Securities and Exchange Commission . . . .").  The four concurring Justices who reached that

issue, however, concluded that they are.  *See id.* at 914-22 (Scalia, J., concurring in judgment,

joined by O'Connor, Kennedy, and Souter, JJ.).  The Executive Branch has agreed that Congress

may "vest the power to appoint inferior officers in the heads of the so-called independent

agencies" like the SEC.  *The Constitutional Separation of Powers Between the President and*

*Congress*, 20 Op. Off. Legal Counsel 124, 152 (1996); *see also Authority of Civil Service*

*Commission To Appoint a Chief Examiner*, 37 Op. Att'y Gen. 227 (1933) (finding the Civil Service Commission, an independent agency, to be a "department"). Congress routinely grants appointment authority to independent agencies. *See Freytag*, 501 U.S. at 918 (Scalia, J., concurring in judgment) (collecting statutes empowering the FTC, FCC, and CFTC to appoint subordinates). And courts of appeals have upheld such statutes. *See Silver v. U.S. Postal Serv.*, 951 F.2d 1033, 1036-38 (9th Cir. 1991) (holding that the Postal Service is a "department"). All three branches of government have thus agreed that independent agencies like the SEC are "departments." Plaintiffs offer no good reason for this Court to conclude otherwise.

       2.      Plaintiffs argue that "departments" include only cabinet departments or, at most, agencies "similar to a cabinet department." Pl. Mem. at 36-37. The former claim is clearly incorrect. Non-cabinet agencies have had authority to appoint inferior officers since the earliest days of the Republic. The Postmaster General was not a member of Washington's cabinet, *see Freytag*, 501 U.S. at 917 (Scalia, J., concurring in judgment), yet the 1792 statute establishing the post office gave him authority to appoint deputy postmasters, *see* Act of Feb. 20, 1792, ch. 7, § 3, 1 Stat. 232, 234, who were inferior officers, *see* 3 Story § 1530, at 387. That early practice is persuasive evidence of the Appointments Clause's meaning. *Cf. Edmond*, 520 U.S. at 663-64.

      *Freytag* is not to the contrary. That case did not involve an independent agency at all, but rather a legislative court. The majority opinion expressly refused to hold that only cabinet agencies could be departments. *See* 501 U.S. at 887 n.4. And while it suggested that *similarity* to a cabinet department was relevant, *see id.* at 886, an independent agency is far more similar to a cabinet agency than a legislative court is. Furthermore, the majority thought treating the Tax Court as a "department" would frustrate the "clear intent of Congress," which had passed a statute for the "express purpose" of making the Tax Court a legislative *court* rather than an

*agency*. *Id.* at 887-88. No comparable issue exists here.

Earlier cases like *Germaine* and *United States v. Mouat*, 124 U.S. 303 (1888), did in passing equate department heads with cabinet members. *See* Pl. Mem. at 36. But they did so only to make the point that lesser supervisors working *under* cabinet members could not appoint subordinates—because *subdivisions* of departments were not themselves "departments." *See Germaine*, 99 U.S. at 511 (requiring appointments "by the heads of those departments, and not by the heads of the *bureaus in* those departments" (emphasis added)); *Mouat*, 124 U.S. at 307 (citing *Germaine*). The reference to cabinet members was meant to distinguish department heads from middle management—not department heads in cabinet agencies from department heads in non-cabinet agencies. *See Freytag*, 501 U.S. at 917 (Scalia, J., concurring in judgment). The SEC is not a division of some other department; it is a department unto itself, headed by principal officers appointed by the President. Upholding the SEC's appointment power would not "multiply indefinitely the number of actors eligible to appoint," *id.* at 885 (majority opinion), as would granting appointment power to the myriad lesser functionaries *within* departments.

3.      Plaintiffs also argue that "departments" must be "*similar* to a cabinet department"—they must have "some connection with [the executive] branch" and be "directly accountable to the President." Pl. Mem. at 37 (internal quotation marks omitted; emphasis added). But if that is the test, it is met here. The SEC's Commissioners are appointed by the President and removable only by him. *See* p. 22, *supra*. The SEC is "similar" to a cabinet department in the sense that matters: It is a stand-alone administrative agency headed by principal officers who are subordinate only to the President.

That the President's power to remove SEC Commissioners is limited by a good-cause restriction, *MFS*, 380 F.3d at 619, does not affect that result. Plaintiffs do not challenge the

SEC's constitutionality. And the Supreme Court has upheld limits on the President's power to remove heads of independent agencies. *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935); *cf. Mistretta v. United States*, 488 U.S. 361, 424 (1989) (Scalia, J., dissenting) ("*Humphrey's Executor* has come in general contemplation to stand for [the proposition that Congress may create] an 'independent agency' in the sense of an agency *within* the Executive Branch . . . independent of the control of the President.").[11] It makes no sense to endorse the concept of independent agencies while denying them basic tools—such as appointing subordinates—that all other agencies possess.

The consequences of plaintiffs' position would be astounding. Independent agencies are replete with inferior officers appointed by those agencies. *See Freytag*, 501 U.S. at 918 (Scalia, J., concurring in judgment). Under plaintiffs' theory, all those officers would have to be appointed by the President. That would create precisely the problems of wasted time that motivated the Framers to include the Excepting Clause. *See* p. 22, *supra*. Or those officers would have to be appointed by some *other* department head—a result so strange it cannot be what the Framers meant. "It makes no sense to create a system in which the inferior officers of [an agency] . . . must be appointed by the President, the courts of law, or the 'Secretary of Something Else.'" *Freytag*, 501 U.S. at 919-20 (Scalia, J., concurring in judgment).

---

[11] Independent agencies like the SEC are sometimes colloquially referred to as part of a "headless Fourth branch." But independent agencies, like classic "Executive Branch" agencies whose heads are removable at will by the President, are still part of the executive branch in the broader sense that they perform executive functions and have heads appointed by, and removable for cause by, the President. *Cf. Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 773 (2002) (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsburg, JJ.) ("[A]gencies, even 'independent' agencies, are more appropriately considered to be part of the Executive Branch." (citing *Freytag*, 501 U.S. at 910 (Scalia, J., concurring in judgment))); *Mistretta*, 488 U.S. at 424 (Scalia, J., dissenting) (similar).

### C.      A Multi-Member Body Can Be the "Head" of a Department

Plaintiffs' final argument—that Congress cannot vest appointment authority in the five Commissioners as the "head" of the SEC (Pl. Mem. at 39-43)—is unsupported by any relevant precedent and contravenes decades of contrary authority.

For at least seventy years, it has been commonly understood that Congress may treat a multi-member commission as the "head" of its agency for Appointments Clause purposes.  In 1933, the Attorney General concluded that "the three Commissioners, who constitute the [Civil Service] Commission, are the 'head of a Department' in the constitutional sense."  37 Op. Att'y Gen. at 231; *see also* 20 Op. Off. Legal Counsel at 152 (finding this opinion "persuasive").  And in 1991, the Ninth Circuit held that the nine governors of the Postal Service were the collective "head" of that department.  *Silver*, 951 F.2d at 1038-39.

Plaintiffs cite no contrary precedent.  Their quotations from the *Federalist Papers* and Story's *Commentaries* (Pl. Mem. at 40-41) merely explain why the Framers thought *principal* officers should be appointed by a *single President* rather than a *plural Congress* (and expressly so provided in the Constitution).  They do not prove the Framers had any preference with respect to *inferior* officers, who wield much less power.[12]   The fact that the Excepting Clause by its terms allows appointment by "courts of law" (not "chief judges of the courts of law") shows the Framers were not averse to inferior-officer appointments by multi-member bodies.   *Cf. Morrison*, 487 U.S. at 661 n.3 (upholding appointment by a three-judge panel).   Plaintiffs' dictionary definitions (Pl. Mem. at 41) likewise do not prove that a multi-member committee cannot be the "head" of a department, or that a department cannot have more than one "head."

Even if this Court were to accept plaintiffs' unprecedented argument that only the

---

[12] Plaintiffs' observation that cabinet secretaries were historically individuals (Pl. Mem. at 42) is also beside the point.  There is no evidence the Framers made that a *constitutional* requirement.

Chairman may be the head of the SEC, plaintiffs still would be entitled to no relief: The five Board members were in fact appointed by the Chairman because he concurred in each of the Commission's votes. *See* Defendants' Statement of Material Facts Not in Genuine Dispute ¶ 3. That is sufficient to constitute "appointment." *See Nat'l Treasury Employees Union v. Reagan*, 663 F.2d 239, 246 n.9 (D.C. Cir. 1981) ("approval" of another person's selection sufficient to constitute appointment); *see also United States v. Hartwell*, 73 U.S. 385, 393 (1868) (upholding appointment made by subordinate with "approbation" of the department head). For similar reasons, plaintiffs lack standing to raise this claim. *See* Motion To Dismiss at 42-43 & n.28.[13]

## II. THE ACT DOES NOT VIOLATE SEPARATION OF POWERS

The Constitution's provisions for separation of powers are a blueprint for governance, not a straightjacket that stifles all necessary innovation. "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see also* The Federalist No. 48 (Madison) (noting that separation of powers "does not require that the legislative, executive, and judiciary departments should be wholly unconnected"). The Supreme Court accordingly has often taken a "pragmatic, flexible

---

[13] Plaintiffs also contend that the Act violates the Appointments Clause because it requires exactly two Board members to be accountants and requires the Commission to consult the Federal Reserve and Treasury Department before making appointments. Pl. Mem. at 43 n.14. That argument, relegated to a footnote, is meritless. "[Q]ualifications for office" are permissible so long as they "do not so limit selection . . . as to be in effect legislative designation" of an appointee. *Myers v. United States*, 272 U.S. 52, 128 (1926); *see also Jalil v. Hampton*, 460 F.2d 923, 926 (D.C. Cir. 1972); *Civil-Service Commission*, 13 Op. Att'y Gen. 516, 520 (1871). Congress has prescribed professional qualifications for federal officers since the Nation's founding. *See Myers*, 272 U.S. at 267 & n.43 (Brandeis, J., dissenting) (collecting statutes dating back to 1789). Congress also routinely imposes consultation requirements. *See, e.g.*, 10 U.S.C. § 2903(a); 16 U.S.C. § 469j(d)(1); Pub. L. No. 101-624, tit. XVII, § 1778(a)(1), 104 Stat. 3359, 3814 (1990) (reprinted at 7 U.S.C.A. § 2011 note). So long as any advice is not binding, there is no constitutional problem. *Cf. Promotion of Marine Officer*, 41 Op. Att'y Gen. 291, 293 (1956).

view" when Congress designs novel solutions to pressing social problems. *Mistretta*, 488 U.S. at 381; *see also Morrison*, 487 U.S. 654; *Humphrey's Executor*, 295 U.S. 602. That flexibility is beside the point here, however, because there is nothing novel about Sarbanes-Oxley. Congress created five inferior-officer positions under the five principal officers of the SEC. It granted the principal officers sole authority to appoint, remove, and supervise their new inferiors, prescribing how each function was to be carried out. Congress's power to do all that is so well and so long established, it is hard to believe it is still questioned at this late date.

### A. Congress Did Not Violate Separation-of-Powers Principles by Granting Removal Power to the SEC Rather than the President

#### 1. The President Has No Constitutional Authority To Remove Inferior Officers Appointed by Department Heads

a.    Plaintiffs repeatedly claim that the Constitution requires the President to have "broad . . . removal authority over all government officials who wield 'executive power.'" Pl. Mem. at 18; *see also id.* at 12, 14, 22. But that has never been the rule. Ever since the Constitution's framing, the power to remove has been an incident of the power to appoint. Where the *President* appoints an officer, he also has authority to remove. But when Congress "vest[s] the appointment of such inferior officers, as they think proper, in the . . . heads of departments," U.S. Const. art. II, § 2, the appointing department head—not the President—has the sole power to remove.

The Supreme Court acknowledged that principle over 150 years ago in *In re Hennen*, 38 U.S. 230 (1839). *Hennen* involved a court clerk (an inferior officer) appointed by a district court. The Supreme Court held that, "[i]n the absence of all constitutional provision, or statutory regulation, it would seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment." *Id.* at 259. The Court specifically stated that the same rule applied to *executive* officers appointed by department heads: "[P]ower is given to the

secretary, to appoint all necessary clerks; and although no power to remove is expressly given, yet there can be no doubt, that these clerks hold their office at the will and discretion of the head of the department." *Id.* (citation omitted). Critically, the Court made clear that the department head's removal authority was exclusive: "*the President has certainly no power to remove*." *Id.* at 260 (emphasis added). Thus, "all inferior officers . . . must hold their office at the discretion of the appointing power." *Id.* The Supreme Court has repeatedly reaffirmed that rule.[14]

Other authorities are to the same effect. In *National Treasury Employees Union v. Reagan*, 663 F.2d 239 (D.C. Cir. 1981) (*NTEU*), the D.C. Circuit held:

> [T]he power to remove is held by the appointing authority, *and only by the appointing authority*. Absent relevant legislation, this continues to be the rule to the present day. . . . The only one authorized to revoke an appointment is one authorized to make it. *Hennen*, 13 Pet. at 259. Thus, for example, an appointment authorized to be made by the Secretary of Defense and, in fact, made by the Secretary of Defense, *cannot be revoked by the President*.

*Id.* at 247 (emphasis added). In 1996, the Office of Legal Counsel ("OLC") recited *Hennen*'s holding—"that inferior officers appointed by a department head were *not removable by the President* (absent statutory authorization to do so) but by the secretary who appointed them"— and opined that "*Hennen* . . . remain[s] good law." 20 Op. Off. Legal Counsel at 166. Because the removal power vests in the appointing officer *even if a statute is silent*, Congress could not have violated the Constitution by providing for that result expressly here.

        b.      Not one of plaintiffs' authorities is to the contrary. The legislative "decision of

---

[14] *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 70 n.17 (1974); *Myers*, 272 U.S. at 119; *Burnap v. United States*, 252 U.S. 512, 515 (1920); *Shurtleff v. United States*, 189 U.S. 311, 316 (1903); *Reagan v. United States*, 182 U.S. 419, 424 (1901); *Keim v. United States*, 177 U.S. 290, 293 (1900); *United States v. Allred*, 155 U.S. 591, 594 (1895). The rule is also confirmed by framing-era practice: The Postmaster General had exclusive authority to appoint *and remove* inferior officers in the post office. *See* 3 Story § 1530, at 387 ("[T]he postmaster general . . . is invested with the sole and exclusive authority to appoint, and remove all deputy post-masters . . . ."); *Myers*, 272 U.S. at 188-90 (McReynolds, J., dissenting).

1789" (Pl. Mem. at 15) addressed removal of a *principal* officer—the Secretary of Foreign Affairs—appointed by the President and confirmed by the Senate. *See* 1 Annals of Cong. 383-99, 473-614 (Joseph Gales ed., 1834) [hereinafter Annals]. The issue was whether the President's power to remove was, like his appointment power, subject to Senate confirmation. Congress's conclusion that the Senate need not consent was consistent with the rule—acknowledged more than twenty times in the debate[15]—that the power to remove follows the power to appoint. Because the *President* appoints principal officers, he can remove them. The Senate merely *confirms* his appointees, so it has no role in removal.[16] The decision of 1789 thus undermines plaintiffs' claim: Where the President appoints, he has power to remove. But where a *department head* appoints, the department head—not the President—has power to remove.[17]

*Myers v. United States*, 272 U.S. 52 (1926) (Pl. Mem. at 16), likewise offers plaintiffs no support. *Myers* involved a *presidentially appointed* inferior officer. All four opinions agreed that, *if* Congress had vested appointment authority in a department head, it could vest removal

---

[15] *See* 1 Annals 388-89, 396-97 (Bland); *id.* at 389, 508, 577 (Jackson); *id.* at 391, 473, 485, 537-38 (White); *id.* at 393, 584 (Sylvester); *id.* at 395-96, 596 (Gerry); *id.* at 396, 566 (Livermore); *id.* at 484 (Vining); *id.* at 502-03 (Lawrence); *id.* at 510-11 (Sherman); *id.* at 511-12 (Stone); *id.* at 526 (Benson); *id.* at 542 (Sedgwick); *id.* at 548 (Boudinot); *id.* at 561 (Ames). *But see, e.g.*, *id.* at 579 (Baldwin).

[16] *See Myers*, 272 U.S. at 119 ("It was agreed . . . [that] the power of appointment carried with it the power of removal. . . . Does [the Senate's confirmation power] make the Senate part of the removing power? And this . . . is the real point which was considered and decided . . . ."); 1 Annals 484 (Vining) ("The Senate do not appoint; their judgment only is required to acquiesce in the President's nomination."); *id.* at 502 (Lawrence) ("The constitution gives an advisory power to the Senate, but it is considered that the President makes the appointment."); *id.* at 526 (Benson) ("No member of the Senate has power to offer an original [appointment]."); *id.* at 541-42 (Sedgwick) ("[T]he President . . . expressly nominates and appoints . . . ."); *id.* at 561 (Ames) ("The President, I contend, has expressly the power of nominating and appointing . . . .").

[17] Plaintiffs also rely on the *Federalist Papers*. Pl. Mem. at 13, 18. But that work *expressly stated* that principal officers could only be removed with the consent of the Senate. *See* The Federalist No. 77 (Hamilton) ("The consent of [the Senate] would be necessary to displace as well as to appoint."). Although that view did not prevail, *see* 1 Annals 474 (Smith (S.C.)); 3 Story §§ 1533-1534, at 390-92; *Myers*, 272 U.S. at 136-37, it shows that the *Federalist* did not see universal removal authority as essential to the President's executive power.

authority in someone other than the President.[18]  The debate was only over whether Congress could do the latter (vest removal outside the presidency) without having done the former (vest appointment outside the presidency).  *Myers*' statement of the general rule that Article II "grants to the President . . . the power of appointment and removal of executive officers," 272 U.S. at 163-64 (Pl. Mem. at 14-15, 16), was obviously subject to the exception that every member of the Court expressly acknowledged.  *See* p. 31 n.18, *supra*.

*Bowsher v. Synar*, 478 U.S. 714 (1986) (Pl. Mem. at 16-17), is even more inapposite. Plaintiffs describe the case as holding that, because the officer there exercised executive power, "the Constitution demanded that he be removable by the President."  Pl. Mem. at 17.  But *Bowsher* said nothing of the sort.  It said only that Congress could not "reserve for *itself* " the power to remove.  478 U.S. at 726 (emphasis added).  The separation-of-powers violation was that Congress had attempted to "participat[e] in the removal of executive officers"; the Court expressly distinguished arrangements where Congress by law had merely limited the President's removal power without arrogating removal power to itself.  *See id.* at 724-25 & n.4.[19]

---

[18]  *See Myers*, 272 U.S. at 159-62 (majority opinion) ("[a]ssuming" authority to divest the President of removal power "incidental to [Congress's] exercise of its constitutional power to vest appointments of inferior officers in the heads of departments"); *id.* at 238 (McReynolds, J., dissenting) ("[I]t is definitely settled that [the President] cannot remove those whom he has not appointed—certainly they can be removed only as Congress may permit."); *id.* at 242 (Brandeis, J., dissenting) ("It is settled that if Congress had, under clause 2 of section 2, art. 2, vested the appointment in the Postmaster General, it could have limited his power of removal . . . ."); *id.* at 295 (Holmes, J., dissenting); *see also Morrison*, 487 U.S. at 689 n.27 ("*Myers* itself expressly distinguished cases in which Congress had chosen to vest the appointment of 'inferior' executive officials in the head of a department.").

[19]  Indeed, plaintiffs cite *no case* striking down legislation restricting removal where Congress had merely regulated the executive's removal power without attempting to exercise that power itself.  *Myers* and the decision of 1789, like *Bowsher*, both involved attempts by Congress to assume removal power *for itself* by requiring Senate consent.  *See Myers*, 272 U.S. at 161 (for Congress to "draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power . . . would be . . . to infringe the constitutional principle of the separation of governmental powers"); *see also Morrison*, 487 U.S. at 686 ("Unlike both

Plaintiffs finally rely on *Morrison v. Olson*, 487 U.S. 654 (1988) (Pl. Mem. at 17-18), which *upheld* an independent counsel statute that granted removal authority to the Attorney General, not the President. *Id.* at 663. Nothing in that case undermines the rule that Congress may grant sole removal power over inferior officers to department heads. While the Court stated that "there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role," *id.* at 690 (Pl. Mem. at 17), it did not say that *inferior officers appointed by department heads* were among them. And while the Court observed that "[t]his is not a case in which the power to remove an executive official has been completely stripped from the President," *id.* at 692 (Pl. Mem. at 18), it did not purport to overrule *Hennen* or hold that a statute granting sole removal power to a department head would be unconstitutional.[20] It is far too much to read into an opinion *upholding* the independent counsel statute an intent to overrule 150 years of precedent allowing Congress to vest sole removal power over inferior officers in the department heads who appointed them.

> 2.    *The President Has Ample Indirect Removal Authority Through His Power To Remove Commissioners of the SEC*

Even assuming, *arguendo*, that the President must have some means of removing inferior officers, the Act provides a more than adequate method. Board members are removable by the SEC. § 107(d)(3); 15 U.S.C. § 7217(d)(3). And SEC Commissioners are removable by the President. *MFS*, 380 F.3d at 619. If a Board member engaged in sufficiently serious misconduct and the Commissioners nevertheless refused to remove him, the President could remove the SEC

---

*Bowsher* and *Myers*, this case does not involve an attempt by Congress itself to gain a role in the removal of executive officials . . . .").

[20] Furthermore, when the Supreme Court spoke of "completely stripp[ing]" the President's removal authority, it was plainly referring to the elimination of both direct authority and indirect authority exercised through supervision of other officials. The Court upheld the statute even though only the Attorney General could remove the independent counsel. *See Morrison*, 487 U.S. at 663; p. 33, *infra*.

Commissioners. The Act thus does not "completely strip[]" the President of removal authority. *Morrison*, 487 U.S. at 692. Rather, as with other inferior officers, the President has *indirect* authority through his power to remove the department head to which the inferior officer reports.

That indirect form of removal authority is no different from the sort upheld in *Morrison*. As noted, the statute there granted removal authority to the Attorney General, not the President. *Morrison*, 487 U.S. at 663; 28 U.S.C. § 596(a)(1). The President's sole means to effect removal if the Attorney General refused was to fire the Attorney General. The Supreme Court found that sufficient. *See id.* at 692; *cf. NTEU*, 663 F.2d at 247-48 ("The President can, of course, order the Secretary of Defense to revoke the appointment, and can fire the Secretary of Defense if he refuses to revoke it, but the President cannot revoke the appointment himself.").

The Attorney General served at will, whereas the Commissioners of the SEC have been understood to be removable only for "inefficiency, neglect of duty or malfeasance in office." *MFS*, 380 F.3d at 619 (internal quotation marks omitted). But that difference does not mean the President's ability to remove Board members has been "completely stripped." *Morrison*, 487 U.S. at 692. Refusal to remove a Board member for sufficiently serious misconduct could constitute "cause" for a Commissioner's own removal. *See Bowsher*, 478 U.S. at 729 (noting that the terms "inefficiency," "neglect of duty," and "malfeasance" are "very broad and . . . could sustain removal . . . for any number of actual or perceived transgressions"); *Fernelius v. Pierce*, 138 P.2d 12, 14 (Cal. 1943) ("[T]he power to suspend or discharge . . . subordinates from duty and to start proceedings for their removal . . . carries with it the correlative duty to vigilantly exercise the power . . . ."); *The President and Accounting Offices*, 1 Op. Att'y Gen. 624, 626 (1823) (failure to rectify a "corrupt appointment" constitutes "violation" of duty justifying supervisor's removal); *Inefficiency or Misconduct of Deputy or Subordinate As Ground for*

33

*Removal of Public Officer*, 143 A.L.R. 517 (1943). Thus, even if the Constitution did require the President to have some effective authority to remove Board members, he has that power here.

### B.  Congress Did Not Exceed Its Authority To Limit the Grounds for Which Inferior Officers May Be Removed by a Department Head

Plaintiffs also complain that the *SEC's* power to remove Board members is too limited because § 107(d)(3) specifies only three particular grounds for removal. 15 U.S.C. § 7217(d)(3) (Pl. Mem. at 22-23). In plaintiffs' view, a general authority to remove "for cause" is required. Pl. Mem. at 17-18. Plaintiffs misread precedent and misconstrue the SEC's removal power.

#### 1.  Congress Has Broad Discretion To Limit the Grounds for Removal of Inferior Officers Appointed by Department Heads

Whatever the rule for *presidentially appointed* officers, it has been clear for over a century that Congress has broad discretion to regulate the removal of inferior officers appointed by department heads. In *United States v. Perkins*, 116 U.S. 483 (1886), the Secretary of the Navy challenged a statute providing that " 'no officer in the military or naval service shall in time of peace be dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect.' " *Id.* at 484. The Court upheld that restriction in no uncertain terms:

> We have no doubt that when congress, by law, vests the appointment of inferior officers in the heads of departments, *it may limit and restrict the power of removal as it deems best for the public interest*. The constitutional authority in congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed.

*Id.* at 485 (emphasis added). Justice Story took the same view a half-century earlier: "As far as congress constitutionally possess[es] the power to . . . delegate the appointment of 'inferior officers,' so far they may prescribe the term of office, the manner in which, and the persons by whom, the removal . . . shall be made." 3 Story § 1531, at 388; *see also* 3 *id.* § 1538, at 397 ("[I]n regard to 'inferior officers,' . . . the remedy for any permanent abuse [of executive removal

power] is still within the power of congress . . . ."); 1 Annals 569 (Smith (S.C.)) ("[T]he constitution ha[s] left it in the power of the Legislature to establish [inferior officers] on what terms they pleased; consequently, to direct their appointment and removal.").

Perkins has been repeatedly reaffirmed. The Executive Branch has endorsed its holding—that "when Congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest"—and confirmed that it "remain[s] good law." 20 Op. Off. Legal Counsel at 166. Myers acknowledged Perkins and merely held it inapplicable to inferior officers appointed by the President. See 272 U.S. at 159-62. And Morrison followed Perkins, relying largely on the independent counsel's "inferior officer" status to uphold the removal restrictions there. 487 U.S. at 689-93 & nn.27, 29; see also Nader v. Bork, 366 F. Supp. 104, 107-08 (D.D.C. 1973).

Removal restrictions are particularly appropriate here because of the functions the Board performs. In Morrison, the Court observed that there is a "spectrum" (relevant but not dispositive) between "purely executive" officers and those exercising "quasi-judicial" or "quasi-legislative" functions, for whom removal restrictions are more appropriate. 487 U.S. at 689-91. The Court has upheld removal restrictions even for principal officers who perform quasi-judicial or quasi-legislative duties. See Humphrey's Executor v. United States, 295 U.S. 602 (1935); Wiener v. United States, 357 U.S. 349 (1958). The Board is not engaged in core executive functions such as criminal prosecution or diplomacy. It conducts rulemaking and adjudicatory proceedings, much like an independent agency. See §§ 103, 105, 15 U.S.C. §§ 7213, 7215. Congress could conclude the Board would perform those duties more effectively if its members were removable only for cause. Cf. Humphrey's Executor, 295 U.S. at 628-32.

Plaintiffs contend that Sarbanes-Oxley's cause standard is too restrictive because it does

not reach some negligent misconduct. Pl. Mem. at 22-23. Even if true, that is immaterial. The Constitution does not require any particular "cause" standard where inferior officers appointed by department heads are at issue. Rather, Congress "may limit and restrict the power of removal *as it deems best for the public interest.*" *Perkins*, 116 U.S. at 485 (emphasis added).[21]

## 2. The Commission Has Broad Authority To Remove Board Members

In any event, the SEC has more than enough authority to ensure that Board members are removed in appropriate circumstances. Sarbanes-Oxley permits removal "for good cause shown," § 101(e)(6), 15 U.S.C. § 7211(e)(6), which exists whenever a Board member "(A) has willfully violated any provision of this Act, the rules of the Board, or the securities laws; (B) has willfully abused the authority of that member; or (C) without reasonable justification or excuse, has failed to enforce compliance with any such provision or rule, or any professional standard by any registered public accounting firm or any associated person thereof." § 107(d)(3), 15 U.S.C. § 7217(d)(3). Plaintiffs argue that, because subsections (A) and (B) of § 107(d)(3) refer only to "willful[]" misconduct, the SEC could not remove a Board member for "negligently abusing his authority." Pl. Mem. at 22-23. Not so: In securities cases, "willful" means " 'no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he

---

[21] The Act's standard is *more* expansive than the one upheld in *Perkins*, which allowed removal only if the officer had been *convicted by a court-martial*. 116 U.S. at 484. Plaintiffs contend that good-cause removal restrictions must define "cause" broadly to include any failure to accept supervision. Pl. Mem. at 17-18. But none of the authorities they cite supports that extreme claim. *Elrod v. Burns*, 427 U.S. 347, 366 (1976) (plurality opinion), holds only that a state *may* discharge employees for "good cause, such as insubordination or poor job performance," a far cry from holding that Congress *must* define "good cause" that way. *Perkins* holds that Congress "may limit and restrict the power of removal as it deems best for the public interest." 116 U.S. at 485. And footnote 4 in Justice Scalia's *Morrison* dissent did not purport to reflect prevailing law; Scalia himself earlier acknowledged, while sitting on a district court, that the position was contrary to binding precedent. *See Synar v. United States*, 626 F. Supp. 1374, 1398-99 (D.D.C. 1986) *(per curiam)* (recognizing that the "removal for cause permitted under the statute upheld [in *Humphrey's Executor*] did not include removal because of the appointee's failure to accept presidential instructions" and that lower courts were bound by *Humphrey's Executor*).

must suppose that he is breaking the law.'" *Wonsover v. SEC*, 205 F.3d 408, 413-15 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)). Under that standard, negligent abuses of authority—that is, negligent misinterpretations about the scope of one's legal authority—*could* be "willful." Moreover, whether or not the "willful[]" standard of subsections (A) and (B) covers negligent misconduct, subsection (C), which permits removal for failure to enforce "without reasonable justification or excuse," clearly does. 15 U.S.C. § 7217(d)(3)(C).

In any event, the SEC is well equipped to address negligent abuses of authority, such as the "overzealous regulator who launches deep and onerous investigations into what he erroneously perceives as violations." Pl. Mem. at 22. The SEC could *sua sponte* amend the Board's rules to clarify whatever ambiguity gave rise to the erroneous perception, and if the Board member persisted, remove him for willful misconduct. § 107(b)(5), (d)(3)(A)-(B), 15 U.S.C. § 7217(b)(5), (d)(3)(A)-(B). The SEC could amend the Board's rules governing investigations. § 107(b)(5), 15 U.S.C. § 7217(b)(5). Or the SEC could rescind the Board's authority and take over the investigation itself. § 107(d)(1), 15 U.S.C. § 7217(d)(1). All that is in addition to the SEC's power to review any sanction imposed. § 107(c), 15 U.S.C. § 7217(c).

Tellingly, plaintiffs cite *no case* in which a court has struck down restrictions on the removal of a department-head-appointed inferior officer as too restrictive. Plaintiffs' sole authority is an OLC opinion addressing whether certain fishery council members were "supervis[ed]" by the Secretary of Commerce for purposes of an executive order. *Applicability of Executive Order No. 12674 to Personnel of Regional Fishery Management Councils*, 17 Op. Off. Legal Counsel 150 (1993) (Pl. Mem. at 30, 33-34). But the statute in that case prohibited the Secretary from removing council members unless two-thirds of the council first recommended it—thus giving the council a veto over the Secretary's decisions. *Id.* at 155. The

OLC expressly distinguished that "unusual" law from "more traditional legislation in which some form of 'cause' is all that is required before removal can occur." *Id.* at 157. If Sarbanes-Oxley allowed the SEC to remove Board members only with the Board's consent, the OLC's *Fishery Management Councils* opinion might have plausible relevance. But the Act does no such thing. It merely prescribes what the OLC opinion expressly recognizes as permissible— that "some form of 'cause'" must exist "before removal can occur." *Id.*

> 3.    *If the Removal Restrictions Are Unconstitutional, They Should Be Severed*

Finally, even if plaintiffs were correct that the removal provisions are too restrictive— and they are not—the proper remedy would be to sever § 107(d)(3) and the cross-reference in § 101(e)(6), 15 U.S.C. §§ 7211(e)(6), 7217(d)(3), not to strike down Title I in its entirety. Severability "is largely a question of legislative intent, but the presumption is in favor of severability." *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984). Even absent a severability clause, the presumption is overcome only by "strong evidence indicating that Congress would not have enacted the statute had it known it could not include the unconstitutional provision." *City of New Haven v. United States*, 809 F.2d 900, 905 (D.C. Cir. 1987).

Here, there can be no doubt Congress was more concerned with restoring the integrity of audited financial statements than with the particular cause standard. The legislative history is replete with calls for audit oversight by a body independent of the accounting industry. *See* p. 2, *supra*. By contrast, it is virtually devoid of discussion of the removal standard. Indeed, the original House draft included no removal provisions at all. *See* Corporate and Auditing Accountability, Responsibility, and Transparency Act of 2002, H.R. 3763, 107th Cong. (2002). Severing § 107(d)(3) would leave the Commission with general "for cause" removal authority under § 101(e)(6) similar to that upheld in *Morrison*, 487 U.S. at 692-93, while working only a modest change (if any) to the SEC's authority. 15 U.S.C. §§ 7211(e)(6), 7217(d)(3). By

contrast, striking down Title I in its entirety would utterly frustrate Congress's effort to achieve needed audit reform. Congress plainly would have preferred the former option.

###    C.    The Board "As a Whole" Does Not Violate Separation-of-Powers Principles

After challenging the Act's restrictions on *removal* of Board members, plaintiffs also challenge the restrictions on *supervision of the Board in general*. Pl. Mem. at 23-28. They claim that the Board "as a whole" is unconstitutional both because the SEC's authority to supervise is inadequate, *id.* at 26-28, and because the President cannot directly supervise the Board, *id.* at 23-26. Those generalized separation-of-powers challenges are unpersuasive.

With respect to the *SEC's* oversight, plaintiffs argue (again) that the SEC does not exercise day-to-day oversight over the Board, that the notice-and-comment procedures are too cumbersome, and that the standards of review are too deferential. For the reasons given above, those claims are without foundation. The Act gives the SEC extensive, plenary, and pervasive control. *See* pp. 17-19, *supra*. The notice-and-comment procedures are no impediment to effective oversight. *See* pp. 20-21, *supra*. And nothing in the statute compels deference to the Board. *See* pp. 19-20, *supra*.

With respect to the *President's* oversight, plaintiffs' argument rests on the assumption that the President must be able to supervise the Board directly. That assumption is mistaken. The Act requires only that the President supervise the Board in the same way he customarily supervises all inferior officers—by supervising the principal officers to whom they report. In *The President and Accounting Offices*, 1 Op. Att'y Gen. 624 (1823), for example, the Attorney General explained that, when a principal officer has supervisory duties, the President should not discharge those duties himself but should "take care" that the principal officer does so:

> [If] the postmaster should make a corrupt appointment, . . . the power of
> correction which the President holds is not to supersede such appointment by one
> made by himself; for the law gives him no such power of appointment. He is to

> take care, in such a case, that the Postmaster General be punished for this violation of the law: he has power to remove him—to appoint a successor; and through the medium of such successor, and by his instrumentality, to remove the deputy, and to see that his place be honestly supplied.

*Id.* at 626; *see also* 20 Op. Off. Legal Counsel at 166 (citing this opinion with approval); *Relation of the President to the Executive Departments*, 10 Op. Att'y Gen. 527, 528 (1863) ("[T]he President ought not to entertain appeals from the heads of bureaus and other inferior officers of the departments. For the theory which subjects the heads of the departments to the official direction and control of the President, also subordinates the heads of bureaus to their respective departmental chiefs."); *Jurisdiction of the Accounting Officers*, 5 Op. Att'y Gen. 630, 635-39 (1852) (collecting authorities). The President, in other words, does not supervise inferior officers directly. He supervises the principal officers to whom they report.

If the Board flouted the law and the SEC refused to take appropriate corrective action—by overturning the Board's decision, amending its rules, rescinding its authority, and so on—the President could "take care that the laws be faithfully executed" by removing the Commissioners for neglect of duty. That is no less true of the SEC's general oversight over the Board than of its more specific power to remove Board members. *See* pp. 32-34, *supra*.

*Humphrey's Executor* allows Congress to create independent agencies whose principal officers are appointed by the President but removable by him only for cause. 295 U.S. at 631-32. Those officers have sole power to appoint their own subordinates to carry out the agency's goals, *see* pp. 22-25, *supra*, and sole power to remove those subordinates if need be, *see* pp. 28-32, *supra*. It is absurd to suppose that the President himself may nevertheless supervise the day-to-day work of an independent agency's subordinates. The power to create independent agencies must include the power to create inferior officers within those agencies who report to the *agency*, not the President. *Humphrey's Executor* would be meaningless if Congress could establish

independent agencies but not the inferior officers necessary to carry out their work.

Rather than creating the Board, Congress could have required the *SEC itself* to implement the Act's provisions. The SEC would have relied on its own subordinate staff to carry out that mandate. Surely that would have been constitutional, even though the SEC's staff would report to the SEC rather than the President, and the President would have no greater control over them than he has over the Board.

Ultimately, the question here is not merely whether the Act "reduces the amount of [the President's] control or supervision," but whether it "unduly interfer[es] with the role of the Executive Branch." *Morrison*, 487 U.S. at 693, 695. The Act does not diminish the President's traditional executive power in the slightest. And it certainly does not unduly interfere with the role of the Executive Branch. Congress has not reserved executive powers to itself. Nor has it interfered with executive functions that are uniquely presidential, such as the command of the Nation's armed forces. Rather, Congress created a specialized entity with jurisdiction in one narrow, technical field. It then gave the SEC comprehensive supervisory authority over that new entity. To say that this modest arrangement threatens the President's role as Chief Executive is to ignore history and precedent and to defy reality.

## III. PLAINTIFFS' DELEGATION CLAIM LACKS MERIT

Plaintiffs' remaining claim—that the Act's grant of rulemaking authority to the Board is an unconstitutional delegation of legislative power (Pl. Mem. at 43-45)—likewise has no merit. Delegations of rulemaking authority to agencies are permissible so long as Congress provides an "intelligible principle" to guide the agency's discretion. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-76 (2001). The Board's auditing, attestation, quality control, and ethics standards must either be "required by [the] Act or the rules of the Commission" or "necessary or appropriate in the public interest or for the protection of investors." § 103(a)(1), 15 U.S.C.

§ 7213(a)(1). That standard is at least as intelligible as others upheld by the Supreme Court—some of which required only that the agency regulate in the "public interest." *See NBC v. United States*, 319 U.S. 190, 225-26 (1943) ("public interest, convenience, or necessity"); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 20 n.1, 24-25 (1932) ("public interest").

Plaintiffs urge a more stringent standard because the Board is a statutorily private entity. *See* Pl. Mem. at 44-45; p. 10 n.3, *supra*. They do not explain why this Court should treat the Board as a government agency for Appointments Clause and separation-of-powers purposes while treating it as a private entity for the delegation claim alone. But the Act is constitutional in all events. The Constitution allows delegations to private parties "so long as [a] federal agency or official retains final reviewing authority." *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 19 (D.D.C. 1999); *compare Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940), *with Carter v. Carter Coal Co.*, 298 U.S. 238, 310-11 (1936). Board rules take effect only if approved by the SEC. *See* § 107(b)(2), 15 U.S.C. § 7217(b)(2). For similar reasons, courts have uniformly rejected—in a raft of decisions plaintiffs wholly ignore—analogous delegation challenges to SROs. *See Sorrell v. SEC*, 679 F.2d 1323, 1325-26 (9th Cir. 1982); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979); *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952).

Plaintiffs nevertheless contend (Pl. Mem. at 44-45) that the delegation is unconstitutional because § 3(b)(1) of the Act, 15 U.S.C. § 7202(b)(1), declares violations of Board rules to be violations of the Exchange Act, which in turn may be prosecuted as criminal offenses, 15 U.S.C. § 78ff. The Supreme Court, however, has "upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal, so long as Congress makes the violation of regulations a criminal offense and fixes the punishment." *Loving v.*

*United States*, 517 U.S. 748, 768 (1996); *see also Touby v. United States*, 500 U.S. 160, 165-67 (1991); *United States v. Grimaud*, 220 U.S. 506, 517-22 (1911). In such cases, the conduct "is made a crime, not by the [agency], but by Congress." *Grimaud*, 220 U.S. at 522. That is precisely the sort of delegation at issue here: Congress, not the Board, determined that violations of Board rules "shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act," § 3(b)(1), 15 U.S.C. § 7202(b)(1); and Congress, not the Board, fixed the penalties for such violations, *see* 15 U.S.C. § 78ff. Indeed, since Board rules take effect only if approved by the SEC, Congress's delegation to the Board is no more objectionable than the SEC's own longstanding authority to promulgate rules whose violation is a criminal offense. *See, e.g.*, 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78ff.

In any event, plaintiffs have not been criminally prosecuted or threatened with prosecution for any violation of a Board rule. Nor, to the Board's knowledge, has any other accounting firm. Plaintiffs lack standing to challenge the largely theoretical possibility of a criminal prosecution. *See Seegars v. Gonzales*, 396 F.3d 1248, 1255 (D.C. Cir. 2005). They also cannot prevail on a *facial* challenge, since the Act remains capable of constitutional application in all non-criminal contexts. *See Salerno*, 481 U.S. at 745.[22]

## IV.    FEF SHOULD BE DISMISSED FOR FAILURE TO PROVE STANDING

On summary judgment, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' " establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see also Shays v. FEC*, 414 F.3d 76, 84 (D.C.

---

[22] Plaintiffs also argue in passing that Congress impermissibly delegated its authority to "impose taxes." Pl. Mem. at 45. Even if support fees were taxes rather than regulatory fees, "the delegation of discretionary authority under Congress' taxing power is subject to no constitutional scrutiny greater than that . . . applied to other nondelegation challenges." *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 223 (1989). And the fees, like the Board's budget, are subject to the SEC's oversight and approval. *See* § 109(b), (d), 15 U.S.C. § 7219(b), (d).

Cir. 2005); *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).  FEF has failed to establish by affidavit or other evidence that one of its members would have standing to sue in its own right, an element critical to FEF's standing as an association.  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977); Motion To Dismiss at 39-40.  FEF must "identify[] the member or members . . . that have [suffered], or will suffer, harm" from the Act.  *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 50-51 (D.D.C. 1998).[23]  Notwithstanding a direct challenge to its standing in the motion to dismiss, FEF still refuses to do so.[24]

---

[23] This is not a case where disclosure would threaten harm to the plaintiff's members.  *Cf. NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (refusing disclosure given "uncontroverted showing that on past occasions revelation of the identity of [plaintiff's] rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility").  Nor is it a case where disclosure would be impossible.  *Cf. Public Citizen v. FTC*, 869 F.2d 1541, 1551-52 (D.C. Cir. 1989) (refusing to require disclosure because the nature of the injury alleged—lack of information—made it impossible to identify affected members, and standing was otherwise apparent).

[24] Moreover, if any of FEF's members are, like Beckstead & Watts, subjects of an ongoing Board investigation or disciplinary proceeding, this Court might lack jurisdiction for that reason as well.  *See Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 876 (D.C. Cir. 2002); Motion To Dismiss at 34-35.  Evidence of FEF's membership is therefore necessary for this Court to assure itself of jurisdiction.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment should be denied and defendants' cross-motion granted.

Dated: September 1, 2006                    Respectfully submitted,

                                            /s/  Joe Caldwell
Lewis H. Ferguson  (D.C. Bar No. 176312)    Joe Robert Caldwell, Jr.  (D.C. Bar No. 965137)
J. Gordon Seymour  (D.C. Bar No. 450051)    James R. Doty  (D.C. Bar No. 416785)
Heidi E. Murdy  (D.C. Bar No. 474680)       Jeffrey A. Lamken  (D.C. Bar No. 440547)
PUBLIC COMPANY ACCOUNTING                   Robert K. Kry (D.C. Bar No. 490545)
    OVERSIGHT BOARD                         Joshua A. Klein  (D.C. Bar No. 489078)
1666 K Street, N.W.                         BAKER BOTTS, LLP
Washington, D.C. 20006                      1299 Pennsylvania Avenue, N.W.
(202) 207-9162 (telephone)                  Washington, D.C.  20004-2400
(202) 862-8430 (facsimile)                  (202) 639-7700 (telephone)
                                            (202) 639-7890 (facsimile)

                    *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 1, 2006, a true and correct copy of the foregoing was served by the court's electronic case filing system on all parties subscribing thereto, and by overnight express mail upon the following:

| | |
|---|---|
| Michael A. Carvin<br>Noel J. Francisco<br>Christian G. Vergonis<br>JONES DAY<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001 | Viet D. Dinh<br>Wendy Keefer<br>BANCROFT ASSOCIATES PLLC<br>601 13th St., N.W.<br>Suite No. 930 South<br>Washington, D.C. 20005 |
| Sam Kazman<br>Hans Bader<br>COMPETITIVE ENTERPRISE INSTITUTE<br>1001 Connecticut Avenue, N.W.<br>Suite 1250<br>Washington, D.C. 20036 | Kenneth W. Starr<br>24569 Via De Casa<br>Malibu, CA 90265 |
| Robert J. Katerberg<br>U.S. DEPARTMENT OF JUSTICE<br>20 Massachusetts Avenue, N.W.<br>Washington, D.C. 20001 | Kathryn Comerford Todd<br>WILEY, REIN & FIELDING LLP<br>1776 K Street, N.W.<br>Washington, DC 20006 |

   /s/ Joshua Klein

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FREE ENTERPRISE FUND, *et al.*,

                    Plaintiffs,

        -against-

THE PUBLIC COMPANY ACCOUNTING
OVERSIGHT BOARD, *et al.*,

                    Defendants.

Civil Action No. 1:06-cv-00217-JR
Judge Robertson

## DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56.1 of the Rules of this Court, defendants respectfully submit this statement of material facts about which there is no genuine issue or dispute.

1. Congress enacted the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, by a vote of 423 to 3 in the House of Representatives, and 99 to 0 in the Senate. The Act was signed into law by the President on July 30, 2002.

2. Title I of the Act established the Public Company Accounting Oversight Board "to oversee the audit of public companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports for companies the securities of which are sold to, and held by and for, public investors." § 101(a), 15 U.S.C. § 7211(a).

3. As required by § 101(e)(4)(A), 15 U.S.C. § 7211(e)(4)(A), the members of the Board were appointed by the Commissioners of the Securities and Exchange Commission

("Commission" or "SEC"), after consultation with the Chairman of the Federal Reserve and the Secretary of the Treasury. The SEC Chairman concurred in each appointment. Morris Decl. ¶ 3. As required by § 101(e)(2), 15 U.S.C. § 7211(e)(2), exactly two members of the Board are present or former certified public accountants.

4.       On April 25, 2003, the SEC determined that the Board met the requirements of § 101(d), 15 U.S.C. § 7211(d), in that it was "organized and has the capacity to carry out the requirements of" Title I of the Act. *Order Regarding Section 101(d) of the Sarbanes-Oxley Act of 2002*, 68 Fed. Reg. 23,336 (May 1, 2003).

5.       On that same date, pursuant to § 103(a)(3)(B), 15 U.S.C. § 7213(a)(3)(B), the SEC approved the Board's initial and transitional auditing and other standards based on the existing standards of the American Institute of Certified Public Accountants (AICPA). *Order Regarding Section 103(a)(3)(B) of the Sarbanes-Oxley Act of 2002*, 68 Fed. Reg. 23,335 (May 1, 2003).

**General Oversight and Control**

6.       Pursuant to § 109(b), 15 U.S.C. § 7219(b), the Board's budget (including Board member salaries) must be approved annually by the SEC. Each year since 2003, the SEC has reviewed the Board budget and the Board's proposed accounting support fee (or the formula for the computation thereof).[1]  The SEC has adopted detailed rules governing future reviews of Board proposed budgets. *Amendments to the Informal and Other Procedures; PCAOB Budget Approval Process*, 71 Fed. Reg. 41,998 (July 24, 2006).

---

[1] *Order Approving PCAOB Budget and Annual Accounting Support Fee for Calendar Year 2003*, 68 Fed. Reg. 47,110 (Aug. 1, 2003); *Order Approving PCAOB Budget and Annual Accounting Support Fee for Calendar Year 2004*, (Feb. 26, 2004); *Order Approving PCAOB Revised Budget and Annual Accounting Support Fee for Calendar Year 2005*, 70 Fed. Reg. 11,720 (Mar. 9, 2005); *Order Approving PCAOB Budget and Annual Accounting Support Fee for Calendar Year 2006*, 71 Fed. Reg. 20,143 (Apr. 19, 2006).

7.     The Board operates under bylaws, which must be approved by the SEC. § 2(a)(13), 15 U.S.C. § 7201(a)(13); § 101(g)(1), 15 U.S.C. § 7211(g)(1); *Order Approving Proposed Rules Relating to Bylaws*, 68 Fed. Reg. 44,553 (July 29, 2003).  The Act also grants the SEC authority to impose record-keeping and reporting requirements on the Board, § 107(a), 15 U.S.C. § 7217(a) (incorporating 15 U.S.C. § 78q(a)(1)), and to conduct "periodic, special, or other examinations" of the Board's records at any time, § 107(a), 15 U.S.C. § 7217(a) (incorporating 15 U.S.C. § 78q(b)(1)).

8.     The Act also gives the SEC authority to relieve the Board of its enforcement responsibilities under the Act, § 107(d)(1), 15 U.S.C. § 7217(d)(1); to censure Board members, censure the Board, or place limits on Board activities, § 107(d)(2)-(3), 15 U.S.C. § 7217(d)(2)-(3); to impose additional duties or functions on the Board, § 101(c)(5), 15 U.S.C. § 7211(c)(5); and to remove Board members "for good cause shown," § 101(e)(6), 15 U.S.C. § 7211(e)(6); *see also* § 107(d)(3), 15 U.S.C. § 7217(d)(3).

**Registration**

9.     Pursuant to Section 102 of the Act, accounting firms that wish to conduct audits on public companies must register with the Board.  § 102(a), 15 U.S.C. § 7212(a).  Approval of registration applications is governed by the "rules of the Board."  § 102(c)(1), 15 U.S.C. § 7212(c)(1).  Under § 107(b)(2), 15 U.S.C. § 7217(b)(2), those rules became effective only after approval by the SEC.  *See Order Approving Proposed Rules Relating to Registration System*, 68 Fed. Reg. 43,242 (July 21, 2003).

10.     The Board's decision to deny registration to an applicant is "treated as a disciplinary sanction" under the Act, subject to SEC and judicial review.  § 102(c)(2), 15 U.S.C. § 7212(c)(2); *see generally* ¶ 18, *infra*.

11.     The Board has approved the overwhelming majority of applications.   As of December 31, 2005, the Board had registered a total of 1,591 accounting firms, PCAOB, 2005 Annual Report, at 6, available at http://www.pcaob.org/About_the_PCAOB/Annual_Reports/ 2005.pdf.  It had denied registration to only 18 applicants.  *Id.* at 8 (13 applications denied in 2005); PCAOB, 2004 Annual Report, at 8, available at http://www.pcaob.org/About_the_ PCAOB/Annual_Reports/2004.pdf (five applications denied in 2004).   Some of those disapprovals have been pursuant to Offers of Settlement between the Board and the applicant.[2] In some cases, applicants denied registration at one point have been granted registration on subsequent applications.[3]

**Rules and Standards**

12.     Pursuant to § 101(g)(1), 15 U.S.C. § 7211(g)(1), and "subject to the approval of the Commission," § 101(g), 15 U.S.C. § 7211(g), the Board adopts rules governing its own operation and administration.  Pursuant to § 103(a)(1), 15 U.S.C. § 7213(a)(1), the Board adopts rules setting "auditing and related attestation standards," "quality control standards," and "ethics standards" to govern registered public accounting firms in the preparation and issuance of audit reports for public companies.  Those Board rules and standards do not become effective "without prior approval of the Commission."  § 107(b)(2), 15 U.S.C. § 7217(b)(2).  The Commission has

---

[2] *See, e.g.*, *In re Registration Application of Henry Schiffer, CPA, AAC*, PCAOB Release No. 2004-010 (Oct. 14, 2004), available at http://www.pcaob.org/Registration/Disapproval_Notices/ 2004/Henry_Schiffer.pdf.

[3] *Compare, e.g.*, *In re Registration Application of Kushner, Smith, Joanou & Gregson, LLP*, PCAOB Release No. 2004-016, available at http://www.pcaob.org/Registration/ Disapproval_Notices/2004/Kushner%20Smith%20Joanou%20%20Gregson%20LLP.pdf (disapproving registration pursuant to Offer of Settlement), *with Registered Public Accounting Firms With the Public Company Accounting Oversight Board as of Thursday, August 10, 2006*, at 24 (listing same firm as registered as of August 10, 2006), available at http://www.pcaob.org/Registration/Registered_Firms.pdf (last visited Aug. 28, 2006).

authority to abrogate, delete, or add to Board rules and standards.  § 107(b)(5), 15 U.S.C. § 7217(b)(5).

13.    The Commission approves Board rules and standards only on a finding that they are "consistent with the requirements of title I of the Sarbanes-Oxley Act of 2002, and the rules and regulations issued thereunder applicable to such organization," and that they are "necessary or appropriate in the public interest or for the protection of investors."  § 107(b)(4)(A), 15 U.S.C. § 7217(b)(4)(A); *see, e.g.*, *Order Approving Proposed Auditing Standard No. 4*, 71 Fed. Reg. 7,082, 7,083 (Feb. 10, 2006) (approving Board standards based on finding that they "are consistent with the requirements of the Act and the securities laws *and* are necessary and appropriate in the public interest and for the protection of investors." (emphasis added)).  The Commission's decisions on Board rules and standards are subject to judicial review in the Courts of Appeals under Section 25 of the Exchange Act, 15 U.S.C. § 78y(a), (b).

14.    The Board has, on numerous occasions, proposed new rules and standards, or modifications to existing rules and standards.  With limited exceptions, the SEC has approved those rules, standards, and modifications only after publishing the proposals in the Federal Register and on the SEC website, and inviting public comment.  *See generally* http://sec.gov/rules/pcaob.shtml.  The SEC sometimes has adopted Board proposals without modification.  *E.g., Order Approving Proposed Rule and Amendment No. 1 Amending Bylaws*, 70 Fed. Reg. 7,780 (Feb. 15, 2005).  It approved one set of Board proposed rules while specifying that a particular component of the proposal could not be implemented without further approval from the Commission.  *Order Approving Proposed Rules Relating to Investigations and Adjudications*, 69 Fed. Reg. 29,150, 29151 (May 20, 2004).  In another case, it approved a standard while issuing instructions for the Board to take specific subsequent steps.  *Order*

5

*Approving Proposed Auditing Standard No. 4, Reporting on Whether a Previously Reported Material Weakness Continues to Exist*, 71 Fed. Reg. 7,082, 7,083 (Feb. 10, 2006) (approving proposed standard, but adding that "to facilitate implementation of the standard, the Commission expects the PCAOB, within 90 days of the issuance of this order, to issue a clear and concise outline of the affirmative audit steps set forth in the standard").

**Inspections**

15.     The Act requires the Board to conduct "a continuing program of inspections" of registered public accounting firms.  § 104(a), 15 U.S.C. § 7214(a).  Pursuant to § 104(c), the Board must conduct these inspections "in accordance with" Board rules that have been approved by the SEC under § 107(b)(2), 15 U.S.C. § 7217(b)(2).  *See Order Approving Proposed Rules Relating to Inspections of Registered Public Accounting Firms*, 69 Fed. Reg. 31,850 (June 7, 2004).  Inspected firms are given an opportunity to review and respond to draft inspection findings, § 104(f), 15 U.S.C. § 7214(f), and may petition the Commission for review of the Board's final inspection report, § 104(h), 15 U.S.C. § 7214(h).  The Board has stated that "Board inspections are not intended to result in conclusive findings, based solely on the inspection, that there has been a violation of law, rules, or professional standards.  Such violations cannot be considered to be established for legal purposes other than through the Board's disciplinary process (which includes a hearing with an opportunity to defend and a right to seek review by the Commission and the court of appeals) or through the relevant processes of other regulators or the courts."  *Statement Concerning the Issuance of Inspection Reports*, PCAOB Release No. 104-2004-001, at 8-9 (Aug. 26, 2004), available at http://www.pcaob.org/inspections/statement_concerning_inspection_reports.pdf.

**Investigations and Discipline**

16.     Under § 105(b)(1), 15 U.S.C. § 7215(b)(1), the Board conducts investigations of registered public accounting firms (and their associated persons) that are suspected of violating, among other things, Board rules or standards and the audit-related provisions of the federal securities laws.  The law requires such investigations to proceed according to Board rules establishing "fair procedures for the investigation and disciplining of registered public accounting firms and associated persons of such firms."  § 105(a), 15 U.S.C. § 7215(a).  As required by the Act, § 107(b)(2), 15 U.S.C. § 7217(b)(2), those rules became effective only after approval by the SEC.  *See Order Approving Proposed Rules Relating to Investigations and Adjudications*, 69 Fed. Reg. 29,150 (May 20, 2004).

17.     The Act requires the Board to "notify the Commission of any pending Board investigation involving a potential violation of the securities laws, and thereafter coordinate its work with the work of the Commission's Division of Enforcement, as necessary to protect an ongoing Commission investigation."  § 105(b)(4), 15 U.S.C. § 7215(b)(4).

18.     Where a Board investigation and hearing reveal violations, the Board may impose sanctions pursuant to § 105(c)(4), 15 U.S.C. § 7215(c)(4).  Such sanctions must be reported to the SEC, § 107(c)(1), 15 U.S.C. § 7217(c)(1), which can then review the sanctions on its own motion or at the request of the sanctioned party.  Exchange Act § 19(d)(2), 15 U.S.C. § 78s(d)(2) (incorporated by § 107(c)(2), 15 U.S.C. § 7217(c)(2)).  When such review is pending, the sanction is automatically stayed.  § 105(e)(1), 15 U.S.C. § 7215(e)(1).  The Commission has power to "enhance, modify, cancel, reduce, or require the remission" of the sanction, § 107(c)(3), 15 U.S.C. § 7217(c)(3), and the Commission's decision, in turn, is reviewable in the Courts of Appeals under Section 25 of the Exchange Act, 15 U.S.C. § 78y(a).

**This Lawsuit**

19.     Plaintiff Beckstead & Watts, LLP, is registered with the Board as a public accounting firm.  Compl. ¶ 12.  In 2004, the Board inspected Beckstead & Watts pursuant to § 104 of the Act, 15 U.S.C. § 7214.  Compl. ¶ 74.  By Beckstead & Watts' own account, the inspection found "numerous auditing deficiencies with respect to Beckstead and Watts's audits of its clients."  Compl. ¶ 75.

20.     The Board issued its final inspection report on September 28, 2005, and, pursuant to Section 104(g)(2) of the Act, 15 U.S.C. § 7214(g)(2), posted a redacted version on its website, *Inspection of Beckstead & Watts, LLP*, PCAOB Release No. 104-2005-082, available at http://www.pcaob.org/Inspections/Public_Reports/2005/Beckstead_and_Watts.pdf.   The report noted "deficiencies of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuers' financial statements."  *Id.* at 3.

21.     Beckstead & Watts did not seek SEC review of the inspection report under § 104(h), 15 U.S.C. § 7214(h).

22.     The complaint alleges that, upon issuing the inspection report, the Board also initiated a disciplinary investigation, and that the investigation is "currently ongoing."  Compl. ¶ 79.[4]

23.     Plaintiff Free Enterprise Fund ("FEF") is a non-profit association with offices in the District of Columbia.  FEF has not submitted any evidence or affidavits identifying specific members that have been injured by the Board or the Act, or identifying the particular injuries

---

[4] The Board customarily does not publicly identify the subjects of its investigations.  For purposes of this motion, it accepts as undisputed the complaint's allegation that Beckstead & Watts is subject to an "ongoing" investigation.  Compl. ¶ 79.

they have suffered.  FEF also has not submitted evidence or affidavits identifying whether such

members are currently the subjects of Board investigatory or disciplinary proceedings.


Dated: September 1, 2006                    Respectfully submitted,

                                           /s/  Joe Caldwell

Lewis H. Ferguson  (D.C. Bar No. 176312)   Joe Robert Caldwell, Jr.  (D.C. Bar No. 965137)
J. Gordon Seymour  (D.C. Bar No. 450051)   James R. Doty  (D.C. Bar No. 416785)
Heidi E. Murdy  (D.C. Bar No. 474680)      Jeffrey A. Lamken  (D.C. Bar No. 440547)
PUBLIC COMPANY ACCOUNTING                  Robert K. Kry (D.C. Bar No. 490545)
    OVERSIGHT BOARD                         Joshua A. Klein  (D.C. Bar No. 489078)
1666 K Street, N.W.                        BAKER BOTTS, LLP
Washington, D.C. 20006                     1299 Pennsylvania Avenue, N.W.
(202) 207-9162 (telephone)                 Washington, D.C.  20004-2400
(202) 862-8430 (facsimile)                 (202) 639-7700 (telephone)
                                           (202) 639-7890 (facsimile)

                        *Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

FREE ENTERPRISE FUND, *et al.*,

                    Plaintiffs,

      -against-

THE PUBLIC COMPANY ACCOUNTING
OVERSIGHT BOARD, *et al.*,

                Defendants.

Civil Action No. 1:06-cv-00217-JR
Judge Robertson

---

**DEFENDANTS' STATEMENT OF
MATERIAL FACTS GENUINELY IN DISPUTE**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56.1 of the Rules of this Court, defendants respectfully submit this statement of material facts about which there is a genuine issue or dispute. Defendants maintain that there are no material, disputed facts requiring litigation. To the extent plaintiffs' statement does contain factual assertions, defendants dispute those assertions and point out plaintiffs' material omissions as follows:

1.      Defendants do not dispute facts asserted in ¶ 1. They note, however, that plaintiffs' description of Congress' motivation for enacting the Sarbanes-Oxley Act is incomplete.

2.      Defendants dispute facts asserted in ¶ 2, and note the following material omissions:

      a.    The budget of the Public Company Accounting Oversight Board ("PCAOB" or the "Board") must be submitted annually to the Securities and Exchange Commission ("SEC" or "Commission") for approval. *See* § 109(b), 15 U.S.C.

§ 7219(b).  The SEC has promulgated rules governing that process.  *Amendments to the Informal and Other Procedures; PCAOB Budget Approval Process*, 71 Fed. Reg. 41,998 (July 24, 2006).  Those rules allow the SEC to condition its approval on the Board's acceptance of SEC changes.  *See id.* at 42,000.  Finally, where the Board's actual spending will deviate from the Commission-approved budget, SEC rules require the Board to seek approval of a supplemental budget.  *Id.*

    b.   The Board has no independent authority to promulgate binding standards and rules.  The standards and rules promulgated by the Board do not become effective unless they are approved by the Commission.  *See* § 107(b)(2), 15 U.S.C. § 7217(b)(2).

3.    Defendants do not dispute facts asserted in ¶ 3, but note Plaintiffs' omission of the following material fact: The Chairman of the SEC has concurred in each appointment to the Board, and no Board member has ever been appointed over objection of the SEC Chairman.  *See* Defendants' Statement of Material Facts Not in Genuine Dispute ¶ 3.

4.    Defendants do not dispute facts asserted in ¶ 4(i), (ii), (iii), and (v).  Defendants dispute  facts stated in ¶ 4(iv) and note a material omission from plaintiffs' statement.  The Board has statutory authority to submit a proposed budget to the SEC, but the SEC has exclusive authority to approve or disapprove that budget.  *See* § 109(b), 15 U.S.C. § 7219(b).

5.    Defendants do not dispute facts asserted in ¶ 5.

6.    Defendants do not dispute facts asserted in ¶ 6.  Defendants note that Beckstead and Watts was given the opportunity to review and comment on the report, as well as the opportunity to seek review before the SEC.  § 104(f), (h), 15 U.S.C. § 7214(f), (h).  Beckstead

and Watts chose not to do so.  Defendants also note that the redacted version of the inspection report to which plaintiffs refer was made public pursuant to § 104(g)(2), 15 U.S.C. § 7214(g)(2).

7.    Defendants dispute ¶ 7.  Plaintiffs have introduced no evidence regarding the goals and activities of plaintiff Free Enterprise Fund ("FEF").  As a result, those facts are not established for purposes of summary judgment.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (at summary judgment stage, plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence, 'specific facts' establishing standing"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (summary judgment appropriate *against* party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

8.    Defendants dispute ¶ 8.  Plaintiffs have introduced no evidence regarding FEF's membership, or the effect of the Board's rules on FEF's members.  As a result, those facts are not established for purposes of summary judgment.  *See Defenders of Wildlife, supra*; *Celotex, supra*.


Defendants also note the following relevant points:

A.    Defendants maintain that the Commission's actual practices for reviewing Board proposed rules, sanctions, and other actions are not relevant in this facial challenge to the constitutionality of the Act.  *See* Defendants' Memorandum of Points and Authorities at 16-17.  To the extent the Court determines otherwise, however, the standard of review employed by the SEC in reviewing Board actions would be a genuine issue of material fact.

B.    Defendants maintain that plaintiffs' contentions as to the meaning and legal effect

of various provisions of the Sarbanes-Oxley Act constitute legal conclusions, not issues of fact.

Dated: September 1, 2006                    Respectfully submitted,

                                            /s/  Joe Caldwell

Lewis H. Ferguson  (D.C. Bar No. 176312)    Joe Robert Caldwell, Jr.  (D.C. Bar No. 965137)
J. Gordon Seymour  (D.C. Bar No. 450051)    James R. Doty  (D.C. Bar No. 416785)
Heidi E. Murdy  (D.C. Bar No. 474680)       Jeffrey A. Lamken  (D.C. Bar No. 440547)
PUBLIC COMPANY ACCOUNTING                   Robert K. Kry (D.C. Bar No. 490545)
    OVERSIGHT BOARD                         Joshua A. Klein  (D.C. Bar No. 489078)
1666 K Street, N.W.                         BAKER BOTTS, LLP
Washington, D.C. 20006                      1299 Pennsylvania Avenue, N.W.
(202) 207-9162 (telephone)                  Washington, D.C.  20004-2400
(202) 862-8430 (facsimile)                  (202) 639-7700 (telephone)
                                            (202) 639-7890 (facsimile)

                        *Counsel for Defendants*