# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FREE ENTERPRISE FUND *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD *et al.*,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:06CV00217-JR |

### MEMORANDUM OF POINTS AND AUTHORITIES OF AMICI CURIAE THE COUNCIL OF INSTITUTIONAL INVESTORS, THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, THE CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, THE LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION, THE PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, THE SACRAMENTO COUNTY EMPLOYEES' RETIREMENT SYSTEM, AND THE TEACHERS INSURANCE AND ANNUITY ASSOCIATION-COLLEGE RETIREMENT EQUITIES FUND IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

*Of Counsel*

Ira M. Millstein
Harvey J. Goldschmid
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
[Tel.] 202-310-8000
[Fax] 202-310-8007

Gregory S. Coleman
Christian J. Ward
WEIL, GOTSHAL & MANGES LLP
8911 Capital of Texas Highway, Suite 1350
Austin, Texas  78759
[Tel.] 512-349-1930
[Fax] 512-527-0798

M. Jarrad Wright
D.C. Bar No. 493727
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
[Tel.] 202-682-7000
[Fax] 202-857-0940

Jeffrey P. Mahoney
D.C. Bar No. 420965
General Counsel
COUNCIL OF INSTITUTIONAL INVESTORS
888 17th Street, NW, Suite 500
Washington, D.C.  20006
[Tel.] 202-261-7081
[Fax] 202-822-0801

ATTORNEYS FOR THE COUNCIL OF INSTITUTIONAL INVESTORS
(ADDITIONAL COUNSEL LISTED ON NEXT PAGE)

LIST OF ADDITIONAL COUNSEL

Damon A. Silvers
D.C. Bar No. 469722
Associate General Counsel
AMERICAN FEDERATION OF LABOR AND
   CONGRESS OF INDUSTRIAL ORGANIZATIONS
815 16th Street, NW
Washington, D.C.  20006
[Tel.] 202-637-3953
[Fax] 202-639-6219

ATTORNEY FOR THE AMERICAN FEDERATION OF
   LABOR AND CONGRESS OF INDUSTRIAL
   ORGANIZATIONS

Peter Mixon
General Counsel
CALIFORNIA PUBLIC EMPLOYEES'
   RETIREMENT SYSTEM
400 Q Street
Sacramento, California  95814
[Tel.] 916-795-3829
[Fax] 916-795-3410

ATTORNEY FOR THE CALIFORNIA PUBLIC
   EMPLOYEES' RETIREMENT SYSTEM

Christopher W. Waddell
General Counsel
THE CALIFORNIA STATE TEACHERS'
   RETIREMENT SYSTEM
7667 Folsom Boulevard
Sacramento, California  95829
[Tel.] 916-229-3766

ATTORNEY FOR THE CALIFORNIA STATE TEACHERS'
   RETIREMENT SYSTEM

David L. Muir
Chief Counsel
THE LOS ANGELES COUNTY EMPLOYEES
   RETIREMENT ASSOCIATION
300 North Lake Avenue, Suite 620
Pasadena, California  91101
[Tel.] 626-564-2340
[Fax] 626-564-2336

ATTORNEY FOR THE LOS ANGELES COUNTY
   EMPLOYEES RETIREMENT ASSOCIATION

Gregory W. Smith
General Counsel
THE PUBLIC EMPLOYEES' RETIREMENT
   ASSOCIATION OF COLORADO
1300 Logan Street
Denver, Colorado  80203
[Tel.] 303-837-6222
[Fax] 303-863-3815

ATTORNEY FOR THE PUBLIC EMPLOYEES'
   RETIREMENT ASSOCIATION OF COLORADO

James G. Line
General Counsel
THE SACRAMENTO COUNTY EMPLOYEES'
   RETIREMENT SYSTEM
980 9th Street
Sacramento, California  95812
[Tel.] 916-874-5706
[Fax] 916-874-6060

ATTORNEY FOR THE SACRAMENTO COUNTY
   EMPLOYEES' RETIREMENT SYSTEM

TABLE OF CONTENTS

Table of Contents .................................................................................................. i

Table of Authorities ............................................................................................. ii

Interest of Amici Curiae ....................................................................................... 1

Introduction .......................................................................................................... 3

Argument .............................................................................................................. 4

I.      The History of Self Regulation Demonstrates That the Investing Public Needs the
        PCAOB to Protect Its Interests. ............................................................. 4

II.     To Restore and Maintain Justified Investor Confidence in the Securities Markets,
        the PCAOB Must Be a Strong, Industry-Independent, and Accountable Oversight
        Authority. ............................................................................................... 9

        A.      The PCAOB Is Carefully Designed to Have the Necessary Independence
                from the Industry It Regulates. ................................................. 9

        B.      The PCAOB Remains Accountable to the SEC and the Investing Public. .......... 11

        C.      The PCAOB's Rulemaking Authority Will Provide the Framework for
                Meaningful Reform. ................................................................. 16

        D.      The PCAOB's Inspection and Enforcement Powers Will Make Reform a
                Reality for Investors. ............................................................... 18

Conclusion ........................................................................................................... 22

Certificate of Service ........................................................................................... 26

TABLE OF AUTHORITIES

**Cases**

*Humphrey's Ex'r v. United States,*
    295 U.S. 602 (1935)............................................................................13

*Mistretta v. United States,*
    488 U.S. 361 (1989)............................................................................13

*Morrison v. Olson,*
    487 U.S. 654 (1988)............................................................................14

*Wiener v. United States,*
    357 U.S. 349 (1958)............................................................................13

**Statutes**

5 U.S.C. §4802(b) ..............................................................................14

7 U.S.C. §4a(c) ..................................................................................14

15 U.S.C. §42 ....................................................................................14

15 U.S.C. §77s(b)(1) ..........................................................................14

15 U.S.C. §78d(a) ..............................................................................13

15 U.S.C. §78d(b) ..............................................................................14

15 U.S.C. §7211(b) ............................................................................14

15 U.S.C. §7211(e)(4)(A) ....................................................................13

15 U.S.C. §7211(g) ............................................................................13

15 U.S.C. §7214 ................................................................................21

15 U.S.C. §7214(a) ............................................................................19

15 U.S.C. §7214(b) ............................................................................19

15 U.S.C. §7214(d) ............................................................................20

15 U.S.C. §7214(d)(2) ........................................................................19

15 U.S.C. §7215 ................................................................................21

15 U.S.C. §7215(4) ............................................................................22

15 U.S.C. §7215(b)(1) ..................................................................................................21

15 U.S.C. §7215(b)(2) ..................................................................................................21

15 U.S.C. §7215(b)(3) ..................................................................................................21

15 U.S.C. §7215(b)(4) ..................................................................................................21

15 U.S.C. §7217 ...........................................................................................................22

15 U.S.C. §7217(a) .......................................................................................................12

15 U.S.C. §7217(c) ................................................................................................13, 22

15 U.S.C. §7219 ...........................................................................................................14

15 U.S.C. §7219(b) ................................................................................................10, 13

15 U.S.C. §7219(c) .......................................................................................................10

15 U.S.C. §7219(d) .......................................................................................................10

47 U.S.C. §155(f) ..........................................................................................................14

**Other Authorities**

Accounting Reform and Investor Protection Issues Raised by Enron and Other Public
    Companies: Hearings Before the Senate Comm. on Banking, Housing, and
    Urban Affairs, 107th Cong. (2002)............................................................4, 7, 8

Lawrence A. Cunningham, *The Sarbanes-Oxley Yawn: Heavy Rhetoric, Light
    Reform (And It Just Might Work)*, 35 CONN. L. REV. 915 (2003)...............................11, 17

*Executives on Trial: Scandal Scorecard*, Wall St. J., October 3, 2003 .........................9

Final Annual Report of the Public Oversight Board (2001) .................................. *passim*

Framework for Enhancing the Quality of Financial Information Through
    Improvement of Oversight of the Auditing Process, Securities Act Release
    No. 8109, Exchange Act Release No. 46,120, 67 Fed. Reg. 44,964 (July 5,
    2002) ................................................................................................6, 10, 16, 22

Daniel L. Goelzer, Board Member, Public Company Accounting Oversight Board,
    Remarks at the Subcommittees on Accounting and Accounting Systems
    Committee on Economic Law; Lessons from Enron, The Importance of
    Proper Accounting Oversight (July 27, 2006) ..................................................20

Joan McLeod Heminway, *Rock, Paper, Scissors: Choosing the Right Vehicle for Federal Corporate Governance Initiatives*, 10 FORDHAM J. CORP. & FIN. L. 225 (2005)......................................................................................................13

ARTHUR LEVITT, TAKE ON THE STREET (2002) ...............................................21

Richard A. Oppel, Jr., *Corporate Conduct: The Overview; Negotiators Agree on Broad Changes in Business Laws*, N.Y. Times, July 25, 2002 ...........................12

*Oversight of the Public Company Accounting Oversight Board:   Hearing Before the H. Subcomm. on Capital Markets, Insurance and Government Sponsored Enterprises of the Comm. on Financial Services*, 108th Cong. (2004) ......................18, 19

P&I Daily, August 31, 2006 .....................................................................................2

Panel on Audit Effectiveness, Report and Recommendations available at http://www.pobauditpanel.org (Aug. 31, 2000)....................................................17

A.C. Pritchard, *The Irrational Auditor and Irrational Liability*, 10 LEWIS & CLARK L. REV. 19 (2006)...................................................... *passim*

Sidney A. Shapiro, *Outsourcing Government Regulation*, 53 DUKE L.J. 389 (2003) ..................18

*Spotlight on Sarbox*, Corporate Financing Week, July 28, 2003 ..............................15

Randall S. Thomas, Stewart J. Schwab, & Robert G. Hansen, *Megafirms*, 80 N.C.L. Rev. 115 (2001) ......................................................................................7

Lynn Turner, SEC Chief Accountant, Shifting Paradigms in Self-Regulation: Address at the 27th Anniversary Securities Regulation Institute (Jan. 27, 2000), available at http://www.sec.gov/news/speech/spch340.htm....................................5

U.S. Gen. Accounting Office, GAO-02-411, The Accounting Profession: Status of Panel on Audit Effectiveness Recommendations to Enhance the Self-Regulatory System (2002) ........................................................................................6

*Watching the Watchers*, Wash. Post, May 21, 2002 ..............................................16, 21

Elliot J. Weiss, *Some Thoughts on an Agenda for the Public Company Accounting Oversight Board*, 53 DUKE L. J. 491 ...................................................10, 17, 20

Stephen A. Zeff, *How the U.S. Accounting Profession Got Where It Is Today: Part I*, No. 3, Vol. 17 Acct. Horizons, Sept. 1, 2003 ........................................................5

### INTEREST OF AMICI CURIAE

The Council of Institutional Investors is an organization of large public, labor, and corporate pension funds. The Council's membership includes more than 130 pension funds, with assets exceeding $3 trillion, and more than 130 nonvoting members from a broad range of industries. The Council's member funds have fiduciary obligations to the millions of Americans whose retirement savings are invested through them. Accordingly, the Council seeks to address investment issues that affect the size or security of plan assets. The additional amici curiae joining this memorandum include pension fund members of the Council and an institutional investor that is a nonvoting member of the Council.

The American Federation of Labor and Congress of Industrial Organizations is a labor federation comprised of 53 member unions representing approximately 9 million workers. Union-sponsored pension funds have approximately $400 billion in assets, and union members participate in benefit plans with over $5 trillion in assets. The vast majority of these assets are invested in securities traded in the public markets. Through its Capital Stewardship Program, the AFL-CIO advocates for workers' interests as investors and was actively involved in the legislative process that led to the adoption of the Sarbanes-Oxley Act.

The California Public Employees' Retirement System (CalPERS) is the largest public-employee retirement system in the United States, with over 1.4 million beneficiaries, and assets exceeding $200 billion.

The California State Teachers' Retirement System (CalSTRS) is the second largest public pension plan and the largest teachers' retirement fund in the United States. CalSTRS had a total membership of approximately 775,917 and assets of $142.75 billion as of June 2006.

The Los Angeles County Employees Retirement Association (LACERA) is a $35 billion California public pension fund providing retirement, death, and disability benefits to eligible Los

1

Angeles County employees and beneficiaries.    LACERA distributed approximately $1.7 billion in benefit payments during the last fiscal year.

The Public Employees' Retirement Association of Colorado (Colorado PERA) manages a defined benefit retirement program for over 380,000 current and former public servants of Colorado with assets in excess of $36 billion.    Colorado PERA actively manages more than 60 percent of these assets internally, without the services of outside money managers, and thus is directly dependent on transparency in the public securities markets and the accuracy of corporate financial disclosure.

The Sacramento County Employees' Retirement System (SCERS) is responsible for investing $5.4 billion in pension plan assets on behalf of over 15,800 active and deferred members of Sacramento County and pays benefits to over 7,000 retirees and beneficiaries.

The Teachers Insurance and Annuity Association-College Retirement Equities Fund (TIAA-CREF) is a national financial services organization with over $380 billion of combined assets under management.    As a leader in corporate governance, TIAA-CREF is an advocate for transparent financial markets and the accuracy and integrity of financial statements of the public companies that it invests in.

As major shareowners, the Council's members have a keen interest in the health and integrity of the American securities market.[1]    The Council and its fellow amici file this memorandum in support of the Public Company Accounting Oversight Board (PCAOB or the Board), as established by the Sarbanes-Oxley Act of 2002, because of that organization's vital role in restoring and maintaining the confidence of the investing public in financial reporting.

---

[1] *See, e.g.*, P&I Daily, August 31, 2006 ("Earnings from investment income accounted for 63% of state and local pension system revenue for the 22 years ended Dec. 31, 2004." (citing Keith Brainard, research director for the National Association of State Retirement Administrators)).

Plaintiffs' motion asks the Court to invalidate as unconstitutional the legislative provisions by which Congress created and empowered the PCAOB and defendants cross-move for summary judgment in favor of the Board. Plaintiffs' memorandum in support of that motion and the memorandum by plaintiffs' amicus the Washington Legal Foundation include assertions and argument regarding the Board's creation and powers. As explained in the Board's response to plaintiffs' motion and cross-motion, the PCAOB sits firmly and comfortably within the long-established constitutional framework of the modern administrative state. By this memorandum, amici curiae seek to provide further information to the Court—in particular, from the perspective of the investing public—regarding the history that led to the creation of the PCAOB, the reality of the Board's operation under the oversight of the Securities and Exchange Commission, and the importance of the PCAOB as structured by Congress to reinstating and preserving investor confidence in the American securities market.

## INTRODUCTION

Investors rely heavily on honest and accurate financial statements in determining whether to invest in public corporations and how to allocate their capital. Beginning in late 2001, the investing public's confidence was badly shaken by massive corporate scandals involving household names like Enron and WorldCom. With the disclosure of wrongs by corporate senior executives and widespread auditing failures involving some members of the accounting profession, investors no longer trusted the information coming from issuers.

The widespread failure by auditors to detect serious management fraud, which shocked American financial markets, occurred in large part because no one was watching the watchers. The scandals demonstrated the inadequacy of accounting industry self-regulation.

As crises often do, the scandals focused the attention of the body politic on the need for fundamental reform. The intense effort of investors, shareowners, other stakeholders,

regulators, and legislators culminated in the passage of the Sarbanes-Oxley Act. The centerpiece of that legislation is the PCAOB—the industry-independent, SEC-accountable, and serious regulator that the accounting industry had long needed and always lacked.

The PCAOB's independence from the industry it is charged with regulating is key to its effectiveness. So is its accountability to the SEC and the investing public. The PCAOB's essential powers to promulgate auditing and other rules, to inspect accounting firms to assure quality audits, and to sanction improper auditor conduct are dependent on both its independence and accountability.

ARGUMENT

I.    **THE HISTORY OF SELF REGULATION DEMONSTRATES THAT THE INVESTING PUBLIC NEEDS THE PCAOB TO PROTECT ITS INTERESTS.**

Sarbanes-Oxley and the PCAOB incorporate the lessons learned through decades of experience with a deficient system of self-regulation in the accounting profession. The system that the new legislation replaced has been described as a "positively Byzantine structure of accounting disciplinary bodies which generally lack[ed] adequate and assured financial support, clear and undivided responsibility for discipline, and an effective system of SEC oversight." *Accounting Reform and Investor Protection: Hearings Before the S. Comm. on Banking, Housing, and Urban Affairs*, 107th Cong. 532 (2002) [hereinafter *Accounting Reform Hearings*] (testimony of Joel Seligman, then Dean and Ethan A. H. Shepley Univ. Professor, Washington Univ. Sch. of Law and now President of the University of Rochester).

During the twentieth century, widespread improper accounting practices first came to the attention of the investing public after the 1929 stock market crash. Final Annual Report of the Public Oversight Board 2001 at 40 [hereinafter POB Final Annual Report 2001]. "Until 1933, the contents of financial statements included in public companies' prospectuses and annual

4

reports were regulated only by some state laws and stock exchanges' listing agreements." A.C. Pritchard, *The Irrational Auditor and Irrational Liability*, 10 LEWIS & CLARK L. REV. 19, 28 (2006). Action by the New York Stock Exchange in 1932 and congressional action beginning with the Securities Act of 1933 required public companies to have annual financial statements certified or audited by independent accountants. POB Final Annual Report 2001, *supra*, at 39-40. "With the adoption of the federal securities laws in 1933 and 1934, auditing of public companies in the United States was placed under the supervision of the Securities and Exchange Commission." Pritchard, *supra*, at 28-29. Oversight of the accounting industry, however, remained entirely the province of the industry's own trade association, the American Institute of Certified Public Accountants (AICPA). POB Final Annual Report 2001, *supra*, at 40; *see also, e.g.*, Pritchard, *supra*, at 29 (noting the SEC's delegations of authority to the AICPA). In 1939, the AICPA's Committee on Auditing Procedure (CAC) issued its first statement setting forth auditing procedure. POB Final Annual Report 2001, *supra* at 40.

The self-regulatory system instituted in the 1930s continued virtually unchanged for more than four decades, until a new wave of audit failure scandals spurred reexamination in the 1970s. *Id.* In 1970, the market was shocked by the collapse, amid financial scandals, of Penn Central Transportation, the largest bankruptcy since the Great Depression. *See, e.g.*, Stephen A. Zeff, *How the U.S. Accounting Profession Got Where It Is Today: Part I*, No. 3, Vol. 17 ACCT. HORIZONS, Sept. 1, 2003, at 189. Similar financial frauds also brought down companies like Equity Funding and Continental Vending. *See id.* In 1974, congressional investigations brought to light further widespread abuses: "unrecorded slush funds, secret bank accounts, and other devices to hide bribes and kickbacks by over 200 major companies. And the cry went out, 'Where were the auditors'?" Lynn Turner, then SEC Chief Accountant, Shifting Paradigms in

Self-Regulation: Address at the 27th Anniversary Securities Regulation Institute (Jan. 27, 2000), available at http://www.sec.gov/news/speech/spch340.htm.

Those events led to a revamping of the regulatory structure in 1977, but it remained a fragmented, self-regulatory system in which the regulators and structure were under the control of the accounting industry itself. The AICPA established the SEC Practice Section (SECPS) and the Quality Control Inquiry Committee (QCIC). Framework for Enhancing the Quality of Financial Information Through Improvement of Oversight of the Auditing Process, Securities Act Release No. 8109, Exchange Act Release No. 46,120, 67 Fed. Reg. 44,964, 44,967, 45,010 app. A (July 5, 2002) [hereinafter Framework]; *see also* U.S. Gen. Accounting Office, GAO-02-411, The Accounting Profession: Status of Panel on Audit Effectiveness Recommendations to Enhance the Self-Regulatory System 7 (2002). The SECPS was charged with overseeing the peer review of auditing firms, and the QCIC investigated allegations of audit failure. Framework, *supra*, at 45,010 app. A. An AICPA member firm that performed audits for public companies was required to join the SECPS, meet its standards, and submit to periodic peer reviews. *Id.* Also in 1977, the AICPA established the Public Oversight Board (POB). *Id.* On paper, the POB was charged with overseeing the activities of the SECPS and the system of peer review. *Id.* The POB, however, depended entirely on voluntary dues paid by AICPA-member firms that audited public companies and that belonged to the SECPS for its funding. *Id.* at 44,970. "In addition, the POB lacked the ability to organize and implement its own quality control reviews. And, the POB was not given any authority to sanction auditors for deficiencies or incompetence noted during quality control reviews." *Id.*

After more than two decades, the industry-funded POB and the rest of the self-regulatory regime creaked toward the new century as nominal overseers of an accounting profession that

was radically transformed since 1977.    Between 1977 and 2000, the Big Eight accounting firms merged into the Big Five and fees from auditing and accounting, as a percentage of those firms' revenue, decreased from 70 percent to 30 percent.    Randall S. Thomas, Stewart J. Schwab, & Robert G. Hansen, *Megafirms*, 80 N.C.L. REV. 115, 153-55 (2001).    That shift reflected the trend by the big auditing firms toward a one-stop-shopping model of providing diverse financial services.    *See id.* at 154-56.    The lucrative mix of services that audit firms now offered for sale—and the pressure on audit partners to cross-sell technology and financial products—was perceived to pose a large, new threat to auditor objectivity.

Moreover, auditing standards were still being set by the industry itself, through the AICPA's Auditing Standards Board (ASB), successor to the CAC.    That group, composed predominantly of practicing accountants, has been criticized for crafting standards that observers perceived as geared more toward protecting its members' own interests than the investing public. For example, Lynn Turner, former Chief Accountant at the SEC, testified:

> One of the problems with that part of the system today is, when they go through that drafting process, since it is all being done by the firms themselves, in fact, their legal counsels get involved in editing those very standards themselves, those standards tend to be written to protect the accounting firms in case they get in trouble on an audit, sometimes probably which is deserved and, quite frankly, sometimes which is not deserved.
>
> \*\*\*
>
> It is not drafted with the public interest in mind. . . . "As long as you leave that standard setting process in the hands of the firms and of the firm's legal counsel, you are going to get standards written to protect them in court, as opposed to standards written to ensure that they do audits that will protect the public."

*Accounting Reform Hearings*, *supra*, at 217 (testimony of Lynn Turner, SEC Chief Accountant, 1998-2001).

Especially in this changed and charged environment, it became clear to most observers that peer review under the oversight of the POB was not meeting the stated objective of

zealously protecting investors' interests in reliable, transparent financial statements.[2]   In 1999 the SEC felt compelled to end its endorsement of the peer review process in its Annual Reports to Congress.

Events beginning in 2000 confirmed beyond any doubt the inability of the 1977-vintage self-regulatory structure to effectively supervise the twenty-first century accounting industry, in particular highlighting the need for a truly industry-independent regulator with real power to inspect auditors and enforce compliance.   According to the POB, thousands of violations uncovered at Pricewaterhouse Coopers LLP prompted suspicion that similarly widespread noncompliance likely remained to be discovered in other large firms.   POB Final Annual Report 2001, *supra*, at 48.   Reacting to this crisis of confidence, the POB prepared to undertake intensive special reviews of the Big Five firms.   *Id.*   But the SECPS, under pressure from member firms, stopped the special-review plan in its tracks by cutting off funding to the POB. *Id.*   When the POB then tried to undertake more limited special reviews, that effort was also thwarted by a lack of cooperation.   *Id.*   "This bullying greatly undermined the argument that the POB was independent and could therefore be trusted to carry out the accounting industry's self-regulatory responsibilities in the interest of investors."   Pritchard, *supra*, at 31.

Then came Enron.   And WorldCom.   And Adelphia, Qwest, Rite Aid, Global Crossing, Tyco, Xerox, and other major business frauds and scandals that reflected massive audit failures

---

[2] *See, e.g., Accounting Reform Hearings, supra,* at 76 (prepared statement of Harold M. Williams, Former SEC Chairman) ("To my knowledge, there has never been a negative review of a major firm. . . . [P]eer review in its present form becomes too incestuous."); *id.* at 1116 (prepared statement of Harvey L. Pitt, SEC Chairman) ("It appears that the current system of firm-on-firm peer reviews, overseen by [the POB] . . . has not produced a credible result."); *id.* at 1035 (prepared statement of Howard M. Metzenbaum, Chairman, Consumer Fed'n of Am. and former U.S. Senator) ("The POB . . . is notable for having never sanctioned a major accounting firm in its 25 years of existence, even when peer reviews have uncovered serious short comings in a firm's audit procedures."); *id.* at 533 (testimony of Joel Seligman, Dean and Ethan A. H. Shepley Univ. Professor, Washington Univ. Sch. of Law) ("[E]ven at its best, [peer review] involves competitors reviewing competitors.   The temptation to go easy on the firm you review lest it be too critical of you is an unavoidable one.").

and, in some cases, undetected accounting misconduct and that justifiably shook the confidence of the American investing public to the core.    *See, e.g., Executives on Trial: Scandal Scorecard,* WALL ST. J., October 3, 2003, at B1.    From those ashes rose the legislative will to enact Sarbanes-Oxley, with the industry-independent yet publicly accountable PCAOB as the centerpiece of a reconstructed regulatory regime.    *See, e.g.,* Pritchard, *supra*, at 32-33.    The new structure draws on the many lessons to be deduced from decades of attempts to allow the accounting industry to regulate itself and the demonstrated failings of that system.

II.    **TO RESTORE AND MAINTAIN JUSTIFIED INVESTOR CONFIDENCE IN THE SECURITIES MARKETS, THE PCAOB MUST BE A STRONG, INDUSTRY-INDEPENDENT, AND ACCOUNTABLE OVERSIGHT AUTHORITY.**

Congress concluded that the key lesson learned from the failure of self-regulation is that independence from the accounting industry is the most vital aspect for any regulatory authority if it is going to be effective at protecting the investing public from accounting fraud or rule violations that fall short of fraud.    In contrast to the self-regulatory system it replaces, many features of the PCAOB ensure the needed independence from the regulated industry.    Through the oversight by the SEC and other controls, however, the Board remains accountable to the investing public it is obligated to serve.

A.    **The PCAOB Is Carefully Designed to Have the Necessary Independence from the Industry It Regulates.**

"The most important tool given to the SEC was the PCAOB."    Pritchard, *supra*, at 33. A foundation of the PCAOB's industry independence is its status as an entity created by act of Congress.    The Board's statutorily authorized role gives it legitimacy.    The legislative origin of the PCAOB follows the reform recommendations of the POB, one of its predecessor bodies. In one of its final statements before terminating its existence, the POB called for legislative action to replace the system of which it had been a part, explaining that it was "essential that all

critical elements of regulation—including all standard setting, inspections and reviews of accounting firms, enforcement and discipline, and other functions—be placed under the aegis of a single regulator operating under statutory authority." POB Final Annual Report 2001, *supra*, at 51. Without that statutory authority, the PCAOB would be hampered by the same reliance on voluntary cooperation that undermined the accounting industry's self-regulatory scheme and the POB's effectiveness.

Another crucial element of the PCAOB's industry independence is the requirement that two—and only two—of its members be accountants. That structure ensures that the Board will have the benefit of accounting professionals' expertise, *see* Framework, *supra*, at 44,976, yet not be dominated by members of the profession. Aside from avoiding *de facto* control by the accounting industry, the non-accountant majority members bring to the Board creative perspectives that are less likely to come from those members who are steeped in the culture of the regulated industry. *Cf.* Elliot J. Weiss, *Some Thoughts on an Agenda for the Public Company Accounting Oversight Board*, 53 Duke L. J. 491, 497 (noting that, to achieve important objectives like increasing auditor independence, accuracy, and transparency, "the PCAOB will need to think outside the box and promulgate auditing and ethical standards that address the very issues the accounting profession traditionally has chosen not to address").

Finally, and perhaps most important to long-term independence from the industry it helps to supervise, is a funding mechanism for the PCAOB that does not depend on the largesse of the regulated industry. Subject to approval by the SEC, which for accountability reasons is a matter of great consequence, the PCAOB is empowered to establish its own annual budget. 15 U.S.C. §7219(b). And it is empowered to fund that budget by collecting—again subject to all-important SEC approval—accounting support fees from issuers. 15 U.S.C. §7219(c), (d).

Removing the regulator's purse strings from the hands of the regulated was vital to the Board's continued autonomy.    *See, e.g.*, Pritchard, *supra*, at 34 ("The PCAOB's independence from the accounting industry is further bolstered by its funding sources."); Lawrence A. Cunningham, *The Sarbanes-Oxley Yawn: Heavy Rhetoric, Light Reform (And It Just Might Work)*, 35 CONN. L. REV. 915, 919 (2003) (in an article generally critical of other aspects of Sarbanes-Oxley, acknowledging that the replacement of the AICPA as regulator with the PCAOB "which is to be funded by public companies and led mostly by non-CPAs" is the Act's "principal silver bullet"). The dangers inherent in relying on a regulatory mechanism funded by the very industry being regulated—obvious enough in theory—were dramatically illustrated in practice by the industry's cut-off of funding to the POB in May 2000.    The POB viewed that defunding as the industry's direct response to the POB's attempt to undertake a special review of the largest accounting firms after concerns about widespread auditor independence violations came to the fore.    POB Final Annual Report 2001, *supra*, at 48.    The planned special reviews were stopped, and SEC Chairman Arthur Levitt noted that the funding cut-off was "a significant setback to self-regulation and independent oversight" that raised "serious questions as to the profession's commitment to self-regulation."    *Id.* (quoting Arthur Levitt).    Experiences like the May 2000 defunding made clear that the PCAOB needed more financial insulation from industry caprice and self-interest if it was to be a more effective governing body than those it replaced.

### B.    The PCAOB Remains Accountable to the SEC and the Investing Public.

Just as vital as the PCAOB's independence from the industry it regulates is the accountability that the PCAOB has to the SEC and the investing public.    That counterbalance—a regulator that is not beholden to the regulated but is accountable to the investors it is charged with protecting—is essential if real reform of the accounting profession is to take place.    Indeed, the PCAOB, and the Sarbanes-Oxley Act of which it is a prominent part, were the outcome of a

11

political process in which public shareowners and other stakeholders provided extensive input. Numerous witnesses testified in several days of public hearings before the Senate adopted Sarbanes-Oxley as its preferred solution.    Additional hearings were held in the House on related reform legislation proceeding in that body.    And, as the legislative history reveals, Congress had the benefit of voluminous reports detailing the troubled history of self-regulation and prescriptions for meaningful reform.

Ignoring the vast bulk of the Act's legislative history and extensive political input into the design of the Board, plaintiffs and their amicus seize on an isolated soundbite from a single Senator, who, as a member of the Senate Committee on Banking, Housing, and Urban Development, was an outspoken critic of the bill.    *See* Richard A. Oppel, Jr., *Corporate Conduct: The Overview; Negotiators Agree on Broad Changes in Business Laws*, N.Y. TIMES, July 25, 2002, at A1.    Constant repetition of phrases like "massive power, unchecked power by design," *e.g.*, Pls.' Mem. of P. & A. in Supp. of Their Mot. for Summ. J. 4, 18, 42 (emphasis added in original omitted), does not make it so.    The PCAOB's power is indeed carefully checked—by design—through its accountability to the SEC and, through that entity, to the Executive Branch and the investing public.    *See, e.g.*, 15 U.S.C. §7217(a) ("The Commission shall have oversight and enforcement authority over the Board, as provided in this Act."); Pritchard, *supra*, at 35.    The PCAOB—although carefully designed to avoid encroachments on its authority through capture by the regulated industry—is accountable to the SEC and the public it is charged with protecting.    No amount of plaintiff hyperbole or repeated quotation of an isolated snippet by a PCAOB opponent can change this fact.

By design and in practice, the PCAOB exercises its regulatory authority over the accounting profession while itself under the supervision of the SEC.    The SEC, which is

"appointed by the President by and with the advice and consent of the Senate," 15 U.S.C. §78d(a), appoints the members of the PCAOB "after consultation with the Chairman of the Board of Governors of the Federal Reserve System and the Secretary of the Treasury." 15 U.S.C. §7211(e)(4)(A). The Board's budget and rules are subject to approval by the SEC. 15 U.S.C. §§ 7211(g), 7219(b). "In addition to appointing the PCAOB's members, the SEC has extensive oversight authority over the Board analogous to that exercised by the Commission over the [self-regulatory organizations]." Pritchard, *supra*, at 34. For example, the Commission may review any disciplinary action taken by the Board on its own motion or upon request, and it "may enhance, modify, cancel, reduce, or require the remission of a sanction imposed by the Board upon a registered public accounting firm or associated person thereof." 15 U.S.C. §7217(c). Through this structure the PCAOB, although an industry-independent body with sufficient flexibility and authority to address fundamental problems in the accounting industry, remains directly responsible to the SEC and ultimately subject to control by the Executive, and, generally, accountable to the investing public. *See, e.g.*, Joan McLeod Heminway, *Rock, Paper, Scissors: Choosing the Right Vehicle for Federal Corporate Governance Initiatives*, 10 FORDHAM J. CORP. & FIN. L. 225, 319 (2005).

Congress's authority to vest regulatory power in independent agencies like the SEC is well established. *See Mistretta v. United States*, 488 U.S. 361, 412 (1989) (holding that the separation of powers doctrine was not violated by Congress's establishment of the Federal Sentencing Commission as an independent agency situated in the judicial branch); *Wiener v. United States*, 357 U.S. 349, 355-56 (1958) (upholding implied congressional limitations on presidential power to remove members of the War Claims Commission); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 631-32 (1935) (upholding a provision limiting the President's

power to remove members of the Federal Trade Commission to a showing of cause); *cf.*
*Morrison v. Olson*, 487 U.S. 654, 670-97 (1988) (upholding the constitutionality of the office of
independent prosecutor).    And, by longstanding practice, Congress has frequently endowed
those agencies, including the SEC, with the power to appoint officers who are necessary to an
agency's fulfillment of its congressional mandate.    *See, e.g.*, 47 U.S.C. §155(f) (Federal
Communications Commission—managing director); 5 U.S.C. §4802(b) (SEC—"such officers . . .
as may be necessary") (formerly codified at 15 U.S.C. §78d(b)); 15 U.S.C. §42 (Federal Trade
Commission—secretary); 7 U.S.C. §4a(c) (Commodity Futures Trading Commission—general
counsel).    Plaintiffs do not question Congress's authority to locate regulation of the accounting
industry in the SEC or, in broad fashion, the subordination of related duties to independent
entities under the SEC's oversight.    *Cf.* 15 U.S.C. §§77s(b)(1), 7219 (formalizing the SEC's
reliance on an independent entity like the Financial Accounting Standards Board (FASB) to
promulgate Generally Accepted Accounting Principles).    To the extent the PCAOB can be said
to exercise governmental authority, it does so—by congressional design—only subject to the
approval of the SEC.    And the SEC's power to appoint the PCAOB members is entirely
consistent with that independent agency's longstanding authority to appoint officers under its
control.    To the extent that Congress's declaration that "the Board shall not be an agency or
establishment of the United States Government," 15 U.S.C. §7211(b), must be respected, the
SEC's reliance on the PCAOB to carry out particular oversight functions is no different than the
SEC's long-established coordination with and supervision of entities like the NASD, NYSE and
other SROs and the FASB in its supervision of the securities markets.    Indeed, the SEC
exercises much greater control over the PCAOB than it has over any of those entities.    In short,

the PCAOB is no less accountable than is the independent agency under whose auspices it operates.

The practical effect of the PCAOB's public accountability was illustrated early in the Board's existence when a public response compelled the resignation of the PCAOB's first chairman and the SEC chairman who sponsored him. *See, e.g.*, *Spotlight on Sarbox*, CORPORATE FINANCING WEEK, July 28, 2003, at 6. That event demonstrates the ability of the body politic to exert meaningful influence over the SEC and PCAOB to curb even an appearance of impropriety that could shake investor confidence in the new regulating authority.

Additional controls provide further assurance that the PCAOB will remain an effective yet accountable body. As with any entity created and empowered by federal statute, Congress retains the power to limit or dissolve the PCAOB. In short, the Board has been carefully designed with sufficient authority to fulfill its mission effectively while subject to sufficient checks to preserve the public's confidence that it is pursuing that mission with their interests at heart. *See* Pritchard, *supra*, at 35 ("In sum, there can be no doubts about the PCAOB's independence from the accounting industry. The new accounting regulator is squarely under the thumb of the SEC's oversight and control. Better yet, from the perspective of vigorous regulation, the PCAOB's funding has been guaranteed by Congress for the foreseeable future.").

The PCAOB's carefully crafted balance of industry independence and political accountability promises to benefit the investing public in a number of ways. The concentration of oversight functions that were previously fragmented across various divisions of the accounting industry itself should promote coherence and transparency in rulemaking, with an emphasis on rules that are more likely to protect the investing public.

Further, the Board's independence from the industry it is overseeing has resulted in more intensive inspections and more stringent enforcement.   Such a shift provides an important boost for investor confidence in contrast to the old peer-review system that, as noted by observers like Professor William Allen, many perceived as an "I scratched your back, you scratch my back organization."   Framework, *supra*, at 44, 971 n. 63 (quoting statement of William Allen, New York University Law School); Editorial, *Watching the Watchers*, WASH. POST, May 21, 2002, at A16.   More rigorous and effective inspections along with more vigorous enforcement will give investors justified confidence not only that large-scale abuses will be caught and punished, but also that many will be averted through earlier correction or prevention and deterrence.

### C.    The PCAOB's Rulemaking Authority Will Provide the Framework for Meaningful Reform.

The PCAOB's clearly delineated authority to establish auditing, attestation, quality control, and independence standards, subject to SEC approval, is providing the necessary structure around which a reformed American investment market is being built.   In contrast to the patchwork, voluntary system it replaces, concentrating those governing functions in a single, authoritative body promises greater clarity for auditors and issuers regarding the rules under which they must operate and enhances the investing public's understanding of the rules that are followed in generating the statements on which those investors must rely.   Further, the PCAOB's rulemaking process, especially in conjunction with the PCAOB's independence from the accounting industry, provides investors with more of a voice than they have ever previously had in formulating the rules that are supposed to protect their interests.

Fundamental to the PCAOB's mission is its power to set Generally Accepted Auditing Standards (GAAS).   "For generations, establishing GAAS had been the province of the AICPA. It has used various arms and structures to exercise this authority . . . . The total mix produced a

situation that threatened the independence and objectivity of the entire process of promulgating GAAS and supervising the public auditing industry." Cunningham, *supra*, at 943. "The PCAOB has taken up the task, issuing standards on audits of internal controls, audit documentation, and the evaluation of efforts to correct weaknesses in internal controls." Pritchard, *supra*, at 37 (footnote omitted). Shifting the authority to promulgate auditing standards from the accountants' own trade association to the industry-independent body that is directly accountable to the SEC (and indirectly to the investing public) restores the fact and perception of needed objectivity to the process. Both because the PCAOB starts its rulemaking process from a position of independence from the regulated industry and because that process invites participation by affected shareowners and other stakeholders, the outcome is likely to be standards that better protect investors' interest in the accuracy of the financial statements on which they rely.

For example, one commentator counsels the PCAOB to "consider amending GAAS to require registered accounting firms to do a better job of identifying the companies most likely to engage in earnings management (and fraud), to question vigorously all important accounting judgments and estimates made by the managers of those companies, and to bring to the attention of the audit committees of client companies any estimates or judgments about which the accountants continue to be concerned." Weiss, *supra*, 53 DUKE L. J. at 506. The POB's Panel on Audit Effectiveness made similar recommendations in its 2000 report, but itself lacked the authority to reform GAAS. *See* Panel on Audit Effectiveness, Report and Recommendations 87-92, available at http://www.pobauditpanel.org (Aug. 31, 2000).

Moreover, the confluence of rulemaking, inspection, and enforcement authority in the new body means that standards are more likely to evolve quickly and effectively to meet real-

world needs.   As former PCAOB Chairman William McDonough has explained, "for the first time, those developing auditing standards—[the PCAOB] Members and staff—will have access to robust empirical and anecdotal evidence from inspections and enforcement activities to set priorities and to identify needs to develop or amend standards." *Oversight of the Public Company Accounting Oversight Board:   Hearing Before the H. Subcomm. on Capital Markets, Insurance and Government Sponsored Enterprises of the Comm. on Financial Services*, 108th Cong. 45 (2004) [hereinafter *Oversight Hearing*] (testimony of William J. McDonough, Chairman, Public Company Accounting Oversight Board); *see also* Sidney A. Shapiro, *Outsourcing Government Regulation*, 53 DUKE L.J. 389, 409 (2003) ("The addition of the PCAOB addresses the problem of asymmetrical information, because it places an independent entity, with the necessary expertise to review auditing and accounting standards, in between the SEC and the adoption of industry-generated standards.").

## D.    The PCAOB's Inspection and Enforcement Powers Will Make Reform a Reality for Investors.

The best rules in the world do investors no good if they are not put into practice.   Again drawing on the lessons from the history of the accounting industry's voluntary self-regulatory regime, Congress endowed the PCAOB with the necessary and appropriate enforcement tools to fulfill its mission to the investing public.   *See, e.g.*, Pritchard, *supra*, at 35-36.   Those tools include the registration requirement, inspection authority, investigatory powers, and recourse to significant sanctions.   All of these subject generally to SEC oversight.

"Registration of public accounting firms that audit public companies is the foundation of the Board's authority.   Since October 22, 2003, it has been illegal for any U.S. public accounting firm to prepare, issue, or play a substantial role in the preparation or issuance of, an audit report on the financial statements of a U.S. public company unless it is registered with the

Board." *Oversight Hearing*, *supra*, at 38 (testimony of William J. McDonough, Chairman, Public Company Accounting Oversight Board).    Recognizing the fundamental importance of registration to its overall effectiveness, the Board "chose to fashion a dynamic, relational registration database under an aggressive development schedule." *Id.*    A key focus of the PCAOB's registration process has been to gather relevant data that can be used to support the Board's other programs.    *Id.* at 5.    As explained by former Chairman McDonough, in its first eleven months of operation the PCAOB's system successfully processed nearly 1,000 applications, many of which contained large amounts of data.    *Id.*    The informative registration process "is consistent with the Board's responsibilities to protect investors and to further the public interest in the preparation of informative, accurate, and independent audit reports." *Id.* at 5.    After a firm is registered, the data gathered during registration continues to be useful in the PCAOB's inspection risk assessment process.    *Id.*

Registered firms are subject to inspection by the PCAOB.    15 U.S.C. §7214(a).    Large firms—defined as those that audit more than 100 public companies—are inspected at least annually.    15 U.S.C. §7214(b).    Smaller firms must be inspected at least once every three years. *Id.*    And the Board may conduct special inspections as needed, either at the request of the SEC or on its own motion.    *Id.*    In addition to being more frequent than inspections under the former peer review system, the PCAOB inspections dig deeper and produce more meaningful results.    *Oversight Hearing*, *supra*, at 41-42 (testimony of William J. McDonough, Chairman, Public Company Accounting Oversight Board).    The PCAOB's inspections go beyond reviewing auditors for technical compliance and delve into the broader business context of a firm's audit practices and the influences on those practices.    *Id.*; *see* 15 U.S.C. §7214(d)(2) (requiring the Board to "evaluate the sufficiency of the quality control system of the firm, and

the manner of the documentation and communication of that system by the firm"); *cf.* Weiss, *supra*, at 501-02 (advising the PCAOB, in addressing the problem of auditor independence, to consider "principal-agent tensions that exist within" each accounting firm and "abandon[] the notion—now implicit in the accounting profession's ethical standards and rules on independence—that it is appropriate to view each accounting firm as a 'black box' that can and should be regulated as an entity").   The increased regularity and rigor of inspections will greatly improve the odds of detecting violations of auditing standards or auditor-independence rules and of excising minor problems before they metastasize into major ones.

Further adding to the PCAOB's ability to detect and correct violations in a timely manner is the lifting of any restraint on inspection of audit engagements that are the subject of litigation or other ongoing controversy.  *See* 15 U.S.C. §7214(d) ("In conducting an inspection of a registered public accounting firm under this section, the Board shall—(1) inspect and review selected audit and review engagements of the firm (which may include audit engagements that are the subject of ongoing litigation or other controversy between the firm and 1 or more third parties).")   Under the peer review regime, reviews of such engagements were delayed—if they took place at all—until after a litigation or other dispute was resolved.   *See* Daniel L. Goelzer, Board Member, Public Company Accounting Oversight Board, Remarks at the Subcommittees on Accounting and Accounting Systems Committee on Economic Law; Lessons from Enron, The Importance of Proper Accounting Oversight (July 27, 2006).   Under that system, years could pass from the time a violation was committed to when it was caught and punished, if at all. Clearly the PCAOB's new flexibility to review engagements even while a lawsuit or controversy is pending provides for more swift and certain correction of violations, furthering the interest of

investors in removing the financial reporting process from the hands of incompetent or unethical auditors.

In addition to its inspection duties, the PCAOB has tools to investigate and discipline violations, again subject to control and review by the SEC. The Board may promulgate rules requiring cooperation with requests for document or testimony production and may request the SEC to subpoena witnesses and documents. 15 U.S.C. §7215(b)(1)-(2). The Board must coordinate investigations involving potential violations of securities laws with the SEC, and may—subject to SEC review—discipline individuals or firms who refuse to cooperate with its investigations. 15 U.S.C. §7215(b)(3)-(4).

As described above, the POB's frustrated attempt to conduct effective independence reviews in 2000, *see* pp. 6-7, *supra*, illustrates why an effective oversight body needs the inspection authority like that granted in 15 U.S.C. §7214, investigatory and enforcement tools like those in 15 U.S.C. §7215 , and the financial independence from the accounting industry that the Act provides the PCAOB. "The lesson of this episode is crystal clear: self-regulation by the accounting profession is a bad joke . . . . The firms would never subject themselves to scrutiny unless forced to do so." ARTHUR LEVITT, TAKE ON THE STREET 127 (2002). Because of the Board's funding independence, duty to conduct regular inspections, and ability to undertake necessary investigations, investors can be assured that the PCAOB will not be hampered in its enforcement efforts by the structural obstacles that prevented the POB from pursuing effective independence reviews.

Critically also, the Act imposes an enforcement regime with teeth. Unlike the AICPA self-regulatory structure it replaced, the PCAOB is empowered to impose meaningful, proportionate sanctions on violators. *Cf., e.g.*, Editorial, *Watching the Watchers*, WASH. POST,

May 21, 2002, at A16 ("[T]he [POB] was a peerless paper tiger, and no major auditor was ever sanctioned as a result of its reviews."). But those enforcement powers are all exercised subject to SEC review. 15 U.S.C. §7217. In its 2002 Framework report, the SEC identified ineffective discipline as "[a] primary criticism" of the old, voluntary self-regulatory system, noting that "[t]he strongest sanction issued by the AICPA is expulsion from that organization, which does not remove the individual or firm from practice before the Commission." Framework, *supra*, at 44,964. The PCAOB, by contrast, has the discretion, subject to SEC review, to choose from a broad array of sanctions for a rule violation, ranging from censure or requiring professional education through permanent disbarment or civil monetary penalties of up to $750,000 for an individual or $15 million for a firm for intentional, knowing, or reckless misconduct. 15 U.S.C. §7215(4). The Board must notify the SEC of any final sanction imposed, and "[t]he Commission may enhance, modify, cancel, reduce, or require the remission of a sanction imposed by the Board." 15 U.S.C. §7217(c). Thus, once again, Congress has provided the PCAOB with the tools to do its regulatory job and with the agency oversight to ensure the Board's public accountability.

## CONCLUSION

For the reasons detailed above, the Council and other amici urge the Court to recognize the enormous importance that the success of the PCAOB has for the investing public. Acting within the constitutional framework, Congress has carefully designed a body with the necessary industry independence, accountability, and authority to restore the public's trust in auditing and its confidence in the financial reports of public companies. In the interest of protecting American investors, the PCAOB should be permitted to continue doing the job Congress has charged it with doing.

Respectfully submitted,

M. Jarrad Wright
D.C. Bar No. 493727
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW, Suite 900
Washington, D.C. 20005
[Tel.] 202-682-7000
[Fax] 202-857-0940

Jeffrey P. Mahoney
D.C. Bar No. 420965
General Counsel
COUNCIL OF INSTITUTIONAL INVESTORS
888 17th Street, NW, Suite 500
Washington, D.C.  20006
[Tel.] 202-261-7081
[Fax] 202-822-0801

*Of Counsel*

Ira M. Millstein
Harvey J. Goldschmid
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
[Tel.] 202-310-8000
[Fax] 202-310-8007

Gregory S. Coleman
Christian J. Ward
WEIL, GOTSHAL & MANGES LLP
8911 Capital of Texas Highway, Suite 1350
Austin, Texas  78759
[Tel.] 512-349-1930
[Fax] 512-527-0798

ATTORNEYS FOR THE COUNCIL OF INSTITUTIONAL
INVESTORS
Damon A. Silvers
D.C. Bar No. 469722
Associate General Counsel
AMERICAN FEDERATION OF LABOR AND

23

CONGRESS OF INDUSTRIAL ORGANIZATIONS
815 16th Street, NW
Washington, D.C.    20006
[Tel.] 202-637-3953
[Fax] 202-639-6219

ATTORNEY FOR THE AMERICAN FEDERATION OF
   LABOR AND CONGRESS OF INDUSTRIAL
   ORGANIZATIONS

Peter Mixon
General Counsel
CALIFORNIA PUBLIC EMPLOYEES'
   RETIREMENT SYSTEM
400 Q Street
Sacramento, California    95814
[Tel.] 916-795-3829
[Fax] 916-795-3410

ATTORNEY FOR THE CALIFORNIA PUBLIC
   EMPLOYEES' RETIREMENT SYSTEM

Christopher W. Waddell
General Counsel
THE CALIFORNIA STATE TEACHERS'
   RETIREMENT SYSTEM
7667 Folsom Boulevard
Sacramento, California    95829
[Tel.] 916-229-3766

ATTORNEY FOR THE CALIFORNIA STATE TEACHERS'
   RETIREMENT SYSTEM

David L. Muir
Chief Counsel
THE LOS ANGELES COUNTY EMPLOYEES
   RETIREMENT ASSOCIATION
300 North Lake Avenue, Suite 620
Pasadena, California    91101
[Tel.] 626-564-2340
[Fax] 626-564-2336

ATTORNEY FOR THE LOS ANGELES COUNTY
   EMPLOYEES RETIREMENT ASSOCIATION

Gregory W. Smith
General Counsel
THE PUBLIC EMPLOYEES' RETIREMENT

24

ASSOCIATION OF COLORADO
1300 Logan Street
Denver, Colorado    80203
[Tel.] 303-837-6222
[Fax] 303-863-3815

ATTORNEY FOR THE PUBLIC EMPLOYEES'
   RETIREMENT ASSOCIATION OF COLORADO

James G. Line
General Counsel
THE SACRAMENTO COUNTY EMPLOYEES'
   RETIREMENT SYSTEM
980 9th Street
Sacramento, California    95812
[Tel.] 916-874-5706
[Fax] 916-874-6060

ATTORNEY FOR THE SACRAMENTO COUNTY
   EMPLOYEES' RETIREMENT SYSTEM

CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing memorandum of points and authorities was sent in by hand delivery on September 1, 2006, for filing with the Court and that it was served by First Class mail, Federal Express, and electronic transmission on all counsel of record:

Viet D. Dinh (D.C. Bar No. 456608)
Wendy Keefer
BANCROFT ASSOCIATES PLLC
601 13th Street, N.W.
Suite 930 South
Washington, D.C. 20005
(202) 264-0090
(202) 234-2806 (fax)

Sam Kazman (D.C. Bar No. 946376)
Hans Bader (D.C. Bar No. 466545)
COMPETITIVE ENTERPRISE INSTITUTE
1001 Connecticut Avenue, N.W.
Suite 1250
Washington, D.C. 20036
(202) 331-1010 (fax)

Joe Robert Caldwell, Jr.
Stephen L. Braga
Jeffrey Lamken
BAKER BOTTS LLP
The Warner Building
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 639-7700
(202) 585-1075 (fax)

Kathryn Comerford Todd
WILEY, REIN & FIELDING LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-3583
(202) 719-7049

Robert J. Katerberg
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 616-8298
(202) 616-8460 (fax)

Michael A. Carvin (D.C. Bar No. 366784)
Noel J. Francisco (D.C. Bar No. 464752)
Christian G. Vergonis (D.C. Bar No. 483293)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939
(202) 626-1700 (fax)

Kenneth W. Starr (D.C. Bar No. 273425)
24569 Via De Casa
Malibu, California 90265
(310) 506-4621

Heidi E. Murdy
PUBLIC COMPANY ACCOUNTING
    OVERSIGHT BOARD
1666 K Street, N.W.
Washington, D.C. 20006
(202) 207-9162

M. Jarrad Wright