**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| FREE ENTERPRISE FUND *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:06CV00217-JR |
| ) | |
| THE PUBLIC COMPANY ACCOUNTING ) | |
| OVERSIGHT BOARD *et al.*, ) | |
| ) | |
| Defendants ) | |
| _____) | |

**MEMORANDUM OF POINTS AND AUTHORITIES OF AMICUS CURIAE
FORMER CHAIRMEN OF THE SECURITIES AND EXCHANGE COMMISSION IN
SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Richard H. Pildes
40 Washington Sq. So.
Vanderbilt Hall Room 507
New York, NY 10014
(212) 998-6377

Roderick M. Hills  (D.C. Bar # 247031)
Hills, Stern & Morley LLP
Hills Program on Governance, CSIS
901 15th St. NW
Washington, D.C.  20005
(202) 822-1611

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* .................................................................................. 1

INTRODUCTION ..................................................................................................... 2

STATEMENT ........................................................................................................... 4

    1. The Regulatory Regime for U.S. Securities Markets ..................................... 4

    2. Defects in Auditing Regulation ...................................................................... 6

    3. The Sarbanes-Oxley Act of 2002: The Legislative Process ........................ 10

    4. The Board ...................................................................................................... 11

SUMMARY OF ARGUMENT .................................................................................. 15

ARGUMENT ........................................................................................................... 18

I.  CONGRESS' CREATION OF A REGULATORY UNIT THAT FUNCTIONS
    UNDER THE CONTROL AND OVERSIGHT OF THE SEC, SUCH AS THE
    PCAOB, DOES NOT VIOLATE THE SEPARATION OF POWERS ................................ 18

    A. Board Members Are "Employees" Or, At Most, "Inferior Officers" of the
       United States. ................................................................................................ 18

    B. The SEC-Board Structure Does Not Violate the Separation of Powers. ...................... 21

II.  THE CONSTITUTION DOES NOT FORBID CONGRESS FROM CHOOSING TO
    VEST IN THE SEC THE APPOINTMENT OF INFERIOR OFFICERS, SUCH AS
    BOARD MEMBERS, WHO FUNCTION UNDER THE OVERSIGHT AND
    CONTROL OF THE SEC ITSELF ....................................................................... 35

III. CONGRESS CAN CHOOSE TO DEFINE THE SEC COMMISSIONERS AS THE
    "HEAD" OF THE SEC ....................................................................................... 43

CONCLUSION ........................................................................................................ 44

## TABLE OF AUTHORITIES

### CASES

*Belenke v. S.E.C.*, 606 F.2d 193 (7th Cir. 1979)..............................................................32

*Bowsher v. Synar*, 478 U.S. 714 (1986)..................................................................2, 21

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................................................18, 21

*Business Roundtable v. S.E.C.*, 905 F.2d 406 (D.C. Cir. 1990)................................5, 32

*Chevron U.S.A. Inc. v. Nat'l Res. Defense Council, Inc.*, 467 U.S. 837 (1984) .....................30, 32

*Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119 (9th Cir. 2005) .............................5

*Edmond v. United States*, 520 U.S. 651 (1997) .......................................................17, 20

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988)................................................................................30

*Ex Parte Hennen*, 38 U.S. (13. Pet.) 230 (1839) ..........................................................24

*F.E.C. v. N.R.A. Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993) ...................................28, 43

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) ........................................... *passim*

*Gordon v. N.Y.S.E., Inc.*, 425 U.S. 659 (1975) .............................................................5, 6

*Hamdam v. Rumsfeld*, 126 S. Ct. 2749 (2006)..............................................................26

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) .............................................. *passim*

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) .....................................................................21

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) .................................................37

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991)................................................................................21

*Morrison v. Olson*, 487 U.S. 654 (1988) ................................................................... *passim*

*Myers v. United States*, 272 U.S. 52 (1926) ................................................................ *passim*

*Nat'l Ass'n of Sec. Dealers, Inc. (N.A.S.D.) v. S.E.C.*, 431 F.3d 803 (D.C. Cir. 2005) ..................................................................................................................6, 20

*Nat'l Cable & Telecomms. Assoc. v. Brand X Internet Servs.*, 125 S. Ct. 2688 (2005) ........................................................................................................................32

*Perkins v. United States*, 20 Ct. Cl. 438, 444 (1885)..............................................24

*R.H. Johnson & Co. v. S.E.C.*, 198 F.2d 690 (2d Cir.) ........................................32, 33

*S.E.C. v. Blinder, Robinson & Co., Inc.*, 855 F.2d 677 (9th Cir. 1988) .....................25

*Schultz v. S.E.C.*, 614 F.2d 561 (7th Cir. 1980)....................................................6, 20

*Silver v. United States Postal Serv.*, 951 F. 2d 1033 (9th Cir. 1991) .....................36, 44

*Sorrell v. S.E.C.*, 679 F.2d 1323 (9th Cir. 1982) .......................................................32

*Stone v. Comm'r*, 865 F.2d 342 (D.C. Cir. 1989) ......................................................33

*Todd & Co. v. S.E.C.*, 557 F.2d 1008 (3d Cir. 1977)..................................................32

*United States v. Germaine*, 99 U.S. 508 (1879) .......................................................39

*United States v. Mouat*, 124 U.S. 303 (1888) ...........................................................39

*United States v. Perkins*, 116 U.S. 483 (1886) .............................................17, 24, 29, 43

*Wiener v. United States*, 357 U.S. 349 (1958) ..........................................................24

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...........................26, 37

## STATUTES

U.S. Const. Art. II, § 2, cl. 2 .................................................................................17, 20, 24

2 U.S.C. § 437c ...........................................................................................................23

15 U.S.C. § 78o-4 .........................................................................................................6

15 U.S.C. § 78s .......................................................................................................5, 6, 33

15 U.S.C. § 78y .......................................................................................................19, 33

iii

15 U.S.C. § 2053 ..................................................................................................23

15 U.S.C. § 7202 ..................................................................................................20

15 U.S.C. § 7211 ............................................................................................ *passim*

15 U.S.C. § 7215 ............................................................................................14, 19

15 U.S.C. § 7217 ............................................................................................ *passim*

15 U.S.C. § 7219 ......................................................................................14, 19, 20

30 U.S.C. § 803 ....................................................................................................23

42 U.S.C. 5841 .....................................................................................................23

## MISCELLANEOUS

20 Op. Off. Legal Counsel 124 (1996) ...............................................................36

38 Weekly Comp. Pres. Doc. 1283 (Aug. 5, 2002) ...........................................11

46 C.F.R. § 501.5(a) (2006) ................................................................................23

*Accounting Reform and Investor Protection Issues Raised by Enron and Other*
    *Public Companies: Hearings Before the Senate Comm. on Banking,*
    *Hous., and Urban Affairs*, 107th Cong. 532 (2002) ................................. *passim*

*Authority of Civil Service Commission to Appoint a Chief Examiner*, 37 Op. Att'y
    Gen. 227 (1933) ........................................................................................36, 44

Breyer, Stewart, Sunstein, Vermeule, *Administrative Law and Regulatory Policy*
    (6th ed. 2006) ....................................................................................................39

Commission Statement of Policy on the Establishment and Improvement of
    Standards Related to Auditor Independence, Release No. 33-7507, 66
    S.E.C. Docket 1110 (Feb. 18, 1998) ..................................................................5

*The Financial Accounting Standards Board Act: Hearing Before the House*
    *Subcomm. on Commerce, Trade and Consumer Protection of the House*
    *Energy & Commerce Comm.*, 107th Cong. 52 (2002) .......................................8

H.R. Conf. Rep. No. 107-610 (2002) ...................................................................11

iv

Robert A. Prentice, *The Inevitability of a Strong SEC,* 91 Cornell L. Rev. 775
(2006)...................................................................................................................4, 14

Marshall Breger & Gary Eldes, *Established By Practice: The Theory and
Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111
(2000)..........................................................................................................................23

Charles R. Morris, *Money, Greed, and Risk: Why Financial Crises and Crashes
Happen* (1999) ...........................................................................................................4

Donna M. Nagy, *Playing Peekaboo with Constitutional Law: The PCAOB and its
Public/Private Status,* 80 Notre Dame L. Rev. 975 (2005) ...........................................8, 13

In the Matter of Nat'l Assoc. of Sec. Dealers, Exchange Act Release No. 37538,
[1996-1997 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 85,825 (Aug. 8,
1996) .........................................................................................................................31

Order Approving PCAOB Budget and Annual Support Fee for Calendar Year
2006, 33 Act Release No. 8676, 2006 WL 985305 (Apr. 13, 2006) .................................19

SEC Statement of Policy on Establishment and Improvement of Accounting
Principles and Standards, Release No. 34-10552, 39 Fed. Reg. 1260 (Dec.
20, 1973) ......................................................................................................................8

S. Rep. No. 94-75, at 23 (1975) ............................................................................................5

S. Rep. No. 107-205, at 2 (2002) ....................................................................... *passim*

Statement by President George W. Bush Upon Signing H.R. 3763, 2002
U.S.C.C.A.N. 543 (July 30, 2002)...................................................................................11

Strauss, Rakoff, Farina, *Gellhorn and Byse's Administrative Law: Cases and
Comments* 174 (rev. 10th ed. 2003)...........................................................................40, 41

## INTEREST OF AMICI CURIAE

*Amici curiae* are seven former Chairmen of the Securities and Exchange Commission (SEC) who reflect four decades of SEC leadership under Presidents of both political parties: G. Bradford Cook (1973), Roderick M. Hills (1975-77), Harold M. Williams (1977-81), David S. Ruder (1987-89), Arthur Levitt, Jr. (1993-2001), Harvey L. Pitt (2001-03) and William Donaldson (2003-05). Former Chairmen Hills and Ruder are members of the Advisory Council to the PCAOB. Collectively, *amici* represent decades of experience in the administration of the federal securities laws, including oversight of the numerous self-regulatory and private-sector regulatory bodies that function under the SEC's authority. Five (Chairmen Hills, Williams, Ruder, Levitt and Pitt) testified during hearings that led to the adoption of the Sarbanes-Oxley Act (the Act) of 2002, and Congress cited their testimony frequently to support and explain the Act's response to the corporate abuses and financial reporting frauds that made the Act necessary. Two (Chairmen Pitt and Donaldson) were directly responsible for implementing the Act's requirements, including the creation and staffing of the Public Company Accounting Oversight Board (PCAOB or the Board).

Based on their expertise, *amici* believe, as did Congress and the President, that major structural defects existed in the pre-Sarbanes-Oxley regulatory system for overseeing the financial reporting by, and audits of, public companies, and that Congress' creation of the Board, functioning under the legal control and authority of the SEC, is essential to remedying those defects. Given the importance of the Act to the integrity of U.S. capital markets, these former SEC Chairmen respectfully submit this brief to assist the Court.

1

**INTRODUCTION**

The Plaintiff's substantive claims in this case amount to little more than thinly disguised attacks on the constitutionality of independent administrative agencies per se. But, at least since *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), the Supreme Court has consistently affirmed the constitutionality of independent agencies. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654 (1988); *Bowsher v. Synar*, 478 U.S. 714, 725 n.4 (1986). This challenge is particularly inappropriate in the context of national regulation of the U.S. capital markets, where the SEC has served since the 1930s as the congressionally-designated regulatory overseer over an array of private, public, and mixed public-private regulatory structures, including entities such as the NYSE (New York Stock Exchange), the NASD (National Association of Securities Dealers), the MSRB (Municipal Securities Rulemaking Board), and the CBOE (Chicago Board of Options Exchange). This unique and integrated regulatory system, working collaboratively but subject to the plenary power of the SEC, has successfully protected investors worldwide as to the integrity of U.S. capital markets.

In the wake of the massive corporate accounting and auditing scandals of the last decade, Congress determined that the auditing function in this regulatory system had become compromised through excessive dependency on the regulated entities, the accounting firms. As a result, and building on the history of regulatory institutions in this field, Congress in 2002 enacted the Sarbanes-Oxley Act (the Act). As its foundation, the Act created a regulatory body, the Public Company Accounting Oversight Board (PCAOB or "the Board"), modeled on the NYSE and NASD, to help supervise the accounting and auditing profession, under the direct legal oversight and control of the SEC.

Congress considered a number of institutional alternatives to restore the credibility and reliability of public company financial statements. Ultimately, with bipartisan and virtually unanimous support, Congress and the President concluded that the most effective way to do so was to create the PCAOB as an entity that was not beholden to the accounting profession and that would function under the oversight of the SEC. Nothing in the Constitution denies Congress and the President the power to make that choice.

The Act does not give Congress any power to appoint Board members. The Act does not give Congress any power to remove Board members. Members of Congress do not sit on the Board. Nor does Congress directly participate in making or vetoing Board policy. In no way does the Act give Congress itself the power to participate directly in the execution and implementation of federal law. For purposes of constitutional law, that is the end of the matter. Neither the separation of powers nor the Appointments Clause requires any more. Absent impermissible congressional participation *itself* in one of these constitutionally prohibited ways, Congress has ample constitutional power to create independent agencies, like the SEC, as well as subunits, such as the Board, that operate under the control and oversight of the SEC.

Properly understood, the Plaintiffs' complaint is not with the Board. It is with Supreme Court decisions that for generations have recognized the constitutionality of the numerous independent agencies that Congress has created. Because Congress has the power to create independent agencies, like the SEC, it has the lesser power of creating units within these agencies that function under the control and oversight of the SEC and that are staffed by employees or inferior officers whom the SEC appoints.

**STATEMENT**

The structure that Congress and the President chose for the PCAOB is best understood in light of the overall regulatory system that has made regulation of the U.S. securities markets perhaps the greatest regulatory success in modern administrative governance.[1]  Since the 1930s, the SEC has sat atop that system.  Under the umbrella authority of the SEC, Congress and the SEC have relied on an innovative array of institutional arrangements – some involving purely private self-regulatory bodies (SROs), some involving more mixed public-private governance structures, and some involving direct SEC regulation – that, working together, have collectively succeeded in ensuring investor confidence in the integrity of U.S. markets.  The PCAOB is the logical outgrowth of these prior structures, as Congress responded to the accounting scandals and financial crises of the last decade.

1.    *The Regulatory Regime for U.S. Securities Markets.*  In the wake of the 1929 market crash, Congress concluded that the absence of reliable corporate financial reports and adequate regulatory oversight of capital markets required legislative response.  Over the next decade, Congress enacted the six core statutes that comprised the original federal securities laws.[2]

---

[1]*See, e.g.,* Charles R. Morris, *Money, Greed, and Risk: Why Financial Crises and Crashes Happen* 78 (1999) ("The securities regulatory system that evolved through the 1930s . . . has proven itself the most successful in the world.").  Indeed, nearly all European countries today are attempting to replicate the structure and function of the SEC.  *See* Robert A. Prentice, *The Inevitability of a Strong SEC,* 91 Cornell L. Rev. 775, 833 (2006) ("In recent years, every EU member has created its own version of the SEC, not because of requirements, but because of the obvious success of American capital markets operating under the SEC's protective umbrella.").

[2]The Securities Act (1933), the Securities Exchange Act (1934), the Public Utility Holding Company Act (1935), the Trust Indenture Act (1939), and the Investment Company and Investment Advisors Acts (1940).

Reliable accounting and auditing is at the foundation of this system. These acts require, and give the SEC the power to compel, "that financial statements filed with the Commission by public companies, investment companies, broker/dealers, public utilities, investment advisors, and others, be certified (or audited) by independent accountants."[3]

From the outset, private SROs, such as the NYSE and the NASD, have played a central role in this regulatory regime. These SROs have broad reach; in general, for example, broker-dealers must be registered, by statute, with the NASD. Pursuant to the Securities Exchange Act, as amended in 1975, all rulemaking and disciplinary actions of these SROs take place under the umbrella of the SEC. *See Gordon v. N.Y.S.E., Inc.,* 425 U.S. 659 (1975). By statute, these SROs "exercise authority subject to SEC oversight" and "have no authority to regulate independently of the SEC's control." S. Rep. No. 94-75, at 23 (1975).[4] These SROs must file notice of any proposed rule with the SEC; after publishing the rule for public comment, the SEC must then approve or reject it, subject to judicial review. 15 U.S.C. § 78s(b)(2) (2006). *See also Business Roundtable v. S.E.C.*, 905 F.2d 406, 408 (D.C. Cir. 1990) (discussing this structure). The SEC may also, on its own initiative, abrogate, add to, or delete any SRO rule. 15 U.S.C. § 78s(c). Precisely because the SEC must approve the rules of these SROs before they become effective, SRO rules are federal law that preempt conflicting state law. *Credit Suisse First Boston Corp. v. Grunwald,* 400 F.3d 1119, 1121 (9th Cir. 2005).

---

[3]Commission Statement of Policy on the Establishment and Improvement of Standards Related to Auditor Independence, Release No. 33-7507, 66 S.E.C. Docket 1110 (Feb. 18, 1998).

[4]These 1975 Amendments to the Exchange Act of 1934 were designed to ensure the SEC had general power to "review and amend *all* self-regulatory organization rules." *Business Roundtable v. S.E.C.*, 905 F.2d 406, 409 (D.C. Cir. 1990) (emphasis added).

Similarly, federal law requires SROs to discipline those over whom they exercise regulatory powers for violations of SRO rules, SEC rules, or the securities laws.  As with rulemaking, SRO disciplinary actions take place under the umbrella of "plenary" or *de novo* SEC review.  *See Nat'l Assoc. of Sec. Dealers, Inc. (N.A.S.D.) v. S.E.C.*, 431 F.3d 803, 804 (D.C. Cir. 2005); *Schultz v. S.E.C.*, 614 F.2d 561, 568 (7th Cir. 1980).  Once an SRO imposes a final disciplinary sanction, it must file notice with the SEC, which on its own motion or application, may or must review the sanction.  The SEC must make an independent determination of whether a violation occurred and may remit or cancel any sanction that is "excessive or oppressive."  15 U.S.C. § 78s(e)(1) & (2).  Again, judicial review of the SEC's decision is available.  Thus, as the D.C. Circuit recently noted, "[t]he authority [NASD] exercises ultimately belongs to the SEC . . . ."  *N.A.S.D. v. S.E.C.*, 431 F.3d at 806.  So complete is the SEC's "scrutiny and approval" of SROs that the Supreme Court has held SRO rules exempt from the antitrust laws.  *Gordon v. N.Y.S.E.*, 425 U.S. at 689.  Other SROs under the umbrella of the SEC include the Municipal Securities Rulemaking Board (MSRB), which the Securities Acts Amendments of 1975 directed the SEC to establish.  As it later did with the PCAOB, Congress authorized the MSRB to write rules, conduct inspections, and fund its operations through a fee it imposed on members.[5]

The Sarbanes-Oxley Act drew directly on these prior congressional structures in creating the PCAOB and defining the SEC's legal authority and power over the Board.

2.  *Defects in Auditing Regulation.*  The regulatory structures and relationships in the accounting and auditing arena drew on a somewhat different mix of institutions, given the absence of pre-existing entities in this arena with the status of the NYSE.  The initial securities

---

[5]*See* Exchange Act § 15B(b)(1) and (2), 15 U.S.C. § 78o-4(b)(1) and (2).

laws authorized the SEC to dictate how financial statements filed with it should be prepared and audited. But the SEC quickly determined to defer, instead, to authoritative private sector bodies in the first instance. By the time of the corporate scandals of the last decade, however, the regulatory oversight system of the accounting profession was viewed as an ineffective, confusing, and inefficient mix of state, SEC, and private-sector standard setters. Experts testified that the system had become a "positively Byzantine structure of accounting disciplinary bodies which generally lack adequate and assured financial support, clear and undivided responsibility for discipline, and an effective system of SEC oversight."[6] Other witnesses described it as "a veritable alphabet soup of organizations provid[ing] governance" and "a bewildering array of monitoring groups."[7]

For accounting standards, the SEC initially deferred to a private board created by the American Institute of Certified Public Accountants ("the Institute"), the main group representing a majority of the accounting profession. In 1973, the SEC supported the establishment of the Financial Accounting Services Board (FASB), a private-sector, standard-setting body, and announced that the SEC would treat FASB accounting "principles, standards, and practices" as having "substantial authoritative support," while those contrary to FASB would be treated as

---

[6]*Accounting Reform and Investor Protection Issues Raised by Enron and Other Public Companies: Hearings Before the Senate Comm. on Banking, Hous., and Urban Affairs*, 107th Cong. 532 (2002) [hereinafter *Accounting Reform Hearing*] (testimony of Joel Seligman, Dean and Ethan A. H. Shepley Univ. Professor, Washington Univ. Sch. of Law).

[7]*Accounting Reform Hearing*, *supra* note 6 (prepared statement of Shaun O'Malley, Chair, Public Oversight Bd. and Former Chair, Price Waterhouse LLP.) and *id.* (prepared statement of John Biggs, Chairman, President, and CEO, TIAA-CREF).

7

lacking such support.[8]  Nonetheless, FASB's funding mechanism was insecure and, in the wake

of the corporate scandals of the last decade, came to be viewed as compromising FASB's

integrity.  FASB received two thirds of its funding from subscriptions and sales of FASB

publications and one third from voluntary industry contributions.  As a leading expert testified to

Congress during the Sarbanes-Oxley hearings, this funding mechanism caused FASB to be "less

than optimally independent or objective" because it constantly placed FASB "in the role of a hat-

in-hand supplicant soliciting the industry for charity."[9]

        For auditing standards, the SEC deferred for many years to the Auditing Standards Board

(ASB), a private-sector, standard-setting body that the Institute created, funded, and whose

members the Institute selected.  Overseen by the SEC, the ASB was the primary actor

responsible for setting and interpreting the General Accepted Auditing Standards (GAAS).  But

ASB members were predominantly practicing accountants, many of them partners in the major

accounting firms.  "The self-interest endemic to the ASB's structure drew particularly harsh

criticism during the Enron congressional hearings."  Donna M. Nagy, *Playing Peekaboo with*

*Constitutional Law: The PCAOB and its Public/Private Status,* 80 Notre Dame L. Rev. 975, 990

(2005).  As a former Chief Accountant at the SEC testified, for example, the standards tended "to

be written to protect the accounting firms in case they get in trouble on an audit . . . it's not

_____

        [8]SEC Statement of Policy on Establishment and Improvement of Accounting Principles
and Standards, Release No. 34-10552, 39 Fed. Reg. 1260 (Dec. 20, 1973).

        [9]*The Financial Accounting Standards Board Act: Hearing Before the House Subcomm.
on Commerce, Trade and Consumer Protection of the House Energy & Commerce Comm.*,
107th Cong. 52 (2002) [hereinafter *FASB Act Hearing*] (prepared statement of John C. Coffee,
Jr., Adolf A. Berle Professor of Law, Columbia Univ. Law Sch.).

drafted with the public interest in mind."[10]

Finally, while governance of the accounting profession had been a focus of the securities laws since the 1930s, the setting of auditing standards for the accounting profession did not become a major public concern until the 1970s. Massive financial scandals at companies like Penn Central Railway prompted congressional hearings and demands for more effective oversight of auditing, which Congress concluded at that time should remain a system of self-regulation. In response, the private sector, in consultation with the SEC, created the Public Oversight Board (POB), with peer review of one accounting firm by another as its foundation. But the POB lacked sanctioning authority and was funded by the Institute, which made the POB dependent on voluntary contributions from the firms it was overseeing. By 1999, in its Annual Reports to Congress, the SEC reported that it no longer considered the POB system effective. Indeed, the next year the Institute refused to increase the POB's funding in the wake of the POB's announced decision to examine the major accounting firms' compliance with the relevant standards for auditor independence.

When Congress re-visited this system in the Sarbanes-Oxley hearings in 2002, numerous witnesses, including former and current SEC Chairmen, testified that the system of peer review itself was fundamentally flawed and that the design of the POB had numerous structural flaws. Experts characterized peer review as "too incestuous,"[11] because it involved "competitors

---

[10] *Accounting Reform Hearing, supra* note 6 (statement of Lynn Turner, former Chief Accountant, Sec. & Exch. Comm'n).

[11] *Accounting Reform* Hearing, *supra* note 6 (prepared statement of Harold M. Williams, Former Chairman, Sec. & Exch. Comm'n).

9

reviewing competitors,"[12] and had "not produced a credible result."[13]  Indeed, one former SEC

Chairman testified that "to my knowledge, there has never been a negative review of a major

firm."[14]  Thus matters stood on the eve of the Enron collapse.

    3.  *The Sarbanes-Oxley Act of 2002: The Legislative Process*.  During 2002, as the crisis

in U.S. capital markets mounted, the Senate Committee on Banking, Housing, and Urban Affairs

heard testimony from 36 witnesses over 10 days.  This testimony centered on "the systemic and

structural weaknesses affecting our capital markets which were revealed by repeated failures of

audit effectiveness and corporate and financial and broker-dealer responsibility in recent months

and years."  S. Rep. No. 107-205, at 2 (2002).  Among those testifying were five former SEC

Chairmen and the then current SEC Chairman; Paul Volcker, Chairman of the Trustees of the

International Accounting Standards Board; the Comptroller General of the United States; three

former SEC Chief Accountants; members of the Public Oversight Board; representatives of the

accounting profession; and academic experts on corporate and securities regulation.  Similarly,

19 witnesses testified before the House Committee on Financial Services.

    Nearly all who testified concluded that the system of self-regulation for the accounting

profession required major revision.  Most supported creation of a new, more effective, and more

independent entity to oversee auditing.  And most agreed that this new entity should not be

dependent on the accounting profession for financing.  As one former SEC Chairman testified:

---

    [12] *Id.* (prepared statement of Joel Seligman, Dean and Ethan A. H. Shepley Univ.
Professor, Washington Univ. Sch. of Law).

    [13] *Id.* (prepared statement of Harvey L. Pitt, Chairman, Sec. & Exch. Comm'n).

    [14] *Id.* (prepared statement of Harold M. Williams, Former Chairman, Sec. & Exch.
Comm'n).

"We need a truly independent oversight body that has the power not only to set the standards by which audits are performed, but also to conduct timely investigations that cannot be deferred for any reason and to discipline accountants." S. Rep. No. 107-205, at 10 (quoting Arthur Levitt, Jr.) Even the POB, which had been established to oversee the prior self-regulatory process, concluded by early 2002 that it could not effectively perform this role. As the POB Chairman testified, "a new regulatory structure" was "essential," but to be effective, "it must be totally independent of the accounting profession and it must be based on the foundation of congressional action . . . ."[15]

The House and Senate, agreed on the need for more effective oversight, passed bills that nonetheless differed. Thus, Congress and its committees deliberated still further on the appropriate structure of the Act, after which a Conference Committee reconciled the differences largely by adopting and strengthening the Senate version. *See* H.R. Conf. Rep. No. 107-610 (2002). With overwhelming, bipartisan support, the Sarbanes-Oxley Act of 2002 then passed: 423-4 in the House and 99-0 in the Senate. In signing the bill into law, President George W. Bush endorsed it as one of "the most far reaching reforms of American business practice since the time of Franklin Delano Roosevelt." 38 Weekly Comp. Pres. Doc. 1283 (Aug. 5, 2002). The President's signing statement expressed no concern that the Act interfered with the Executive Branch, constitutionally or otherwise, in any of the ways Plaintiffs assert. Statement by President George W. Bush Upon Signing H.R. 3763, 2002 U.S.C.C.A.N. 543 (July 30, 2002).

4. *The Board.* A centerpiece of the Act was the creation of the PCAOB, to be located,

---

[15]*Accounting Reform Hearings, supra* note 6 (Prepared Statement of Charles A. Bowsher, Chairman, Pub. Oversight Bd. and former Comptroller Gen. of the United States).

like numerous other entities in the securities-regulation regime, under the legal authority and control of the SEC. Congress concluded that the "successful operation of the Board depends upon its independence and professionalism." S. Rep. No. 107-205, at 6. By independence, Congress meant independence from the entities being regulated, the accounting firms. Thus, Congress paid close attention to structuring the conditions, constraints, and appointments methods for members of the Board.

Congress required that each of the five Board members "must have a demonstrated commitment to the interests of investors, as well as an understanding of the financial disclosures required of public companies, and the responsibilities for those disclosures, under the federal securities laws." 15 U.S.C. § 7211(e)(1). Board members serve full-time, for five-year staggered terms, with a two-term limit. § 7211(e)(5). To further assure their independence, Board members may not engage in other business activities of any nature or receive any payments from any accounting firms (except for standard retirement payments) during Board service. § 7211(e)(3). For one year after their terms end, Board members may not practice before the Board. § 7211(g)(3). Further, Congress specified that two members, neither more nor less, should be or have been certified public accountants (CPAs), and, to ensure sufficient distance from the regulated firms, that the Chair, if a CPA, should not have been a practicing CPA for at least five years prior to Board service. § 7211 (e)(2). To attract the highest quality personnel, the Act also "makes it plain" that "the Board is to provide for staff salaries that are fully competitive with those for comparable private-sector self-regulatory, accounting, technical, supervisory, or related staff or management positions." *See* §7211 (f)(4); S. Rep. No. 107-205, at 7. The SEC appoints the five Board members, after consultation with the Chairman of the

12

Board of Governors of the Federal Reserve System and the Secretary of the Treasury. § 7211 (e)(4).

Pursuant to the Act, the Board has four principal duties: to register public accounting firms; to adopt rules ensuring "informative, accurate, and independent" audit reports; to conduct inspections of registered public accounting firms; to conduct investigations and disciplinary proceedings concerning such firm and associated persons, and to impose appropriate sanctions when justified. § 7211(a) and (c). As with the SROs, the Board exists under the umbrella of the SEC and is subject to even more extensive SEC oversight and control. Section 107 of the Act provides several pages of provisions governing SEC oversight of the Board, provisions that draw directly from, and even expand upon, Congress' long-established provisions for SEC oversight of other independent bodies under the SEC's authority. As the Senate Committee Report specifically states, the "rules for SEC oversight of the Board are generally the same as those that apply to SEC oversight of the National Association of Securities Dealers, under section 19 of the Securities Exchange Act." S. Rep. No. 107-205, at 12.[16]

Board rules and disciplinary actions have no legal effect unless and until the SEC approves them. Before Board proposed rules take effect, they must be filed with the SEC, published by the SEC for public comment, and approved by the SEC. The SEC may directly abrogate, amend, or disapprove Board rules. Similarly, for proposed disciplinary action by the Board, an application to the SEC for review, or institution of review by the SEC itself,

---

[16]*See* 15 U.S.C. § 7217(a) (2003); *see also* Nagy, 80 Notre Dame L. Rev. at 1018 ("Section 107 establishes a system of SEC oversight for the PCAOB that parallels the record keeping, rulemaking, and disciplinary review procedures currently in place for the NASD and other SROs.").

automatically stays such disciplinary action, unless and until the SEC determines to dissolve the stay. 15 U.S.C. § 7215(e)(1). The SEC may "enhance, modify, cancel, reduce, or require the remission of a sanction imposed by the Board." § 7217(c)(3). More broadly, the SEC "may relieve the Board of any responsibility to enforce compliance with any provision of this Act, the securities laws, the rules of the Board, or professional standards." § 7217(d)(1). The Board cannot issue subpoenas on its own, but may seek SEC issuance of a subpoena; similarly, the Board cannot bring or defend litigation without SEC approval. § 7215 (b)(2)(D). The SEC also has the power to appoint and remove Board members.

Congress also concluded that the two entities that, under the SEC, oversee the accounting profession should not have their budgets and operations held hostage to the willingness of the profession to make voluntary financial contributions. *See, e.g.*, S. Rep. No. 107-205, at 13 ("The Committee's witnesses overwhelmingly agreed that both the Board and the FASB required guaranteed sources of funding, in order to protect their independence."). Thus, the Act required that the primary funding for *both* the Board and the private body, FASB, come from "accounting support fees" paid by public companies. 15 U.S.C. § 7219(c)(1). Both the Board and FASB are required to allocate these fees based on a congressionally-mandated formula that rests on a public company's market capitalization. § 7219(g)(1). The Board's budget must be approved by the SEC, § 7219(b), and the SEC must also approve the Board-assessed fees. § 7219(d)(1).[17]

In sum, Congress concluded that the prior system of profession-dependent self-regulation of auditing had contributed to the corporate financial scandals and debacles of the recent past.

---

[17]Unlike the legal requirement that the SEC "approve" Board-assessed fees, the SEC "reviews" FASB-assessed fees. 15 U.S.C. § 7219(e)(1).

Rather than continue to rely on purely private self-regulation, Congress chose to create a Board independent of the accounting profession, characterized as a nonprofit, private corporation, that functions under even more extensive SEC legal oversight and control than the SROs that have long played a major role, under the SEC's oversight and control, in regulating the securities markets. Nothing in the Constitution denies Congress the power to make the policy judgments reflected in the Act's design of the Board-SEC relationship.

## SUMMARY OF ARGUMENT

The Constitution permits Congress to create administrative agencies with diverse structures, including independent agencies and entities that function under the control and authority of these agencies. The separation of powers and the Appointments Clause limit Congress in only one particular way: Congress cannot retain any legal right to participate *itself* directly in the appointment or removal of officials who execute and implement federal law, nor can Congress retain any right to veto (or in any other way directly participate in) an agency's policymaking or adjudication decisions. Because Congress has granted itself none of these powers over the Board or the SEC, the Act is constitutional.

The Plaintiffs invoke abstract and general propositions about the separated powers system, but ignore this essential principle. The Supreme Court has rarely invalidated the structure of administrative agencies. In each and every case, the Court did so because Congress had attempted to insert *itself* directly into the appointment or removal process or to directly control the agency's decisions through a veto-like power. Plaintiffs do not identify – and cannot, because none exists – a single Supreme Court decision that constitutionally invalidates an administrative agency structure when Congress has not directly inserted itself into the

15

administrative process in one of these specific ways.  For this fundamental reason, plaintiffs' constitutional claims must fail.

In addition, Board members are "employees" or, at most, "inferior officers" of the United States.  The Board functions under the direct and full legal oversight and control of the SEC. The SEC has plenary power over both Board rules and sanctions. Neither Board rules nor Board disciplinary sanctions have any legal effect unless and until the SEC adopts them.  Beyond these specific powers, the SEC has broad authority over the Board's functions, including the power to relieve the Board of any responsibility to enforce compliance with the Act or the securities laws. The SEC appoints Board members and may censure or remove them from office.  The Board's budget cannot take effect unless and until the SEC approves it.  Similarly, the SEC must also approve Board-proposed subpoenas and must permit the Board to litigate in court. Given the array of powers the SEC has over the Board, Board members are at most "inferior officers" of the United States.

Moreover, the President has all the power over the SEC constitutionally required.  The President nominates the SEC Commissioners, who are principal officers of the United States, and the President can remove them for justified cause.  The Commissioners serve fixed terms of office, after which the President again has the power to nominate new Commissioners.  This President-principal-inferior structure – with no direct congressional participation in appointment or removal of Board or SEC members – has long been constitutional.

In light of these principles and the structure of the Act, the Plaintiffs' specific claims are without constitutional foundation.  First, to the extent Plaintiffs claim that the President must have more direct power over Board members, the Constitution provides no basis for such a

claim. The "separation of powers" most emphatically does not require that the President have personal removal power over all the inferior officers who exercise administrative authority in the United States. Congress, which creates these offices, can define the terms under which inferior officers serve and the conditions upon which they can be removed. *See, e.g., Morrison v. Olson*, 487 U.S. 654, 691 (1988) (holding there is no "constitutional impediment to congressionally imposed restrictions on the President's removal powers over [inferior officers]."); *United States v. Perkins*, 116 U.S. 483 (1886) (first recognizing this principle). The Constitution requires only that Congress itself not participate in the removal process. To the extent Plaintiffs instead complain that the SEC itself does not have enough power to oversee the Board, the structure and text of the Act belie such a claim.

Second, the Appointments Clause permits Congress to give independent agencies, such as the SEC, the power to appoint their inferior officers. No court has held otherwise. Were the law otherwise, much of the organizational structure of the independent agencies would be unconstitutional. By statute, numerous independent agencies appoint their inferior officers. Nothing in the Constitution or any Supreme Court decision requires the illogical conclusion that Congress cannot give an agency the power to appoint its own legal subordinates. The SEC is a "Department" within the meaning of U.S. Const. Art II., § 2, cl. 2 (and the SEC Commissioners are properly the "Head" of this Department).

17

**ARGUMENT**

I.    **CONGRESS' CREATION OF A REGULATORY UNIT THAT FUNCTIONS UNDER THE CONTROL AND OVERSIGHT OF THE SEC, SUCH AS THE PCAOB, DOES NOT VIOLATE THE SEPARATION OF POWERS**

    A.  *Board Members Are "Employees" Or, At Most, "Inferior Officers" of the United States.*

For purposes of this brief, we assume that the Board is a governmental body under the Appointments Clause, even though Congress expressly created the Board to be a non-governmental, non-profit corporation.  15 U.S.C. §7211(b) (2006).  Even so, Board members are either "employees" under the Constitution, or at most, "inferior officers."

"Employees" are "lesser functionaries subordinate to officers of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976).  "Inferior officers" are those "whose work is directed and supervised at some level by others who were appointed by presidential nomination with the advice and consent of the Senate."  *Edmond v. United States*, 520 U.S. 651, 662-63 (1997).

Board members are indeed subordinate to the SEC Commissioners, who are themselves principal officers appointed by presidential nomination and Senate confirmation. The Board has no legal power to enact rules or impose sanctions itself.  The Board, in essence, proposes rules and sanctions to the SEC.   For proposed rules, the Act provides that no Board proposal "shall become effective without prior approval of the Commission."  15 U.S.C. § 7217(b)(2).  The Act authorizes the SEC to approve proposed rules only if the SEC finds that "the rule is consistent with the requirements of this Act and the securities laws" or that the rule "is necessary or appropriate in the public interest or for the protection of investors."  § 7217(b)(3).  The courts review the rules and orders of the SEC, because only these have binding legal effect – not the

rules or orders of the Board itself. *See* 15 U.S.C. § 7217(b)(4), (c) (provisions of Exchange Act of 1934 govern review); 15 U.S.C. § 78y(a), (b).

For proposed Board sanctions, the SEC has the power to "enhance, modify, cancel, reduce or require the remission" of the sanction to the Board, if the SEC determines the sanction is not "necessary or appropriate" or if it is "excessive, oppressive, inadequate, or otherwise not appropriate to the finding or the basis on which the sanction was imposed." § 7217(c)(3). Upon judicial review, it is the findings of fact of the SEC – not the Board – that are conclusive if supported by substantial evidence. 15 U.S.C. § 78y(a)(4).

In addition, the SEC has the power to rescind or limit any of the Board's powers. The SEC may "relieve the Board of any responsibility to enforce compliance with any provision of this Act, the securities laws, the rules of the Board, or professional standards." § 7217(d)(1). The SEC also has the power to "censure or impose limitations upon the activities, functions, and operations of the Board" under specific circumstances. § 7217(d)(2). The SEC, of course, appoints Board members. In addition, the SEC must approve the budget of the Board before that budget can go into effect. Similarly, the SEC must approve a "reasonable annual accounting support fee" that the Board proposes "as may be necessary or appropriate to establish and maintain the Board." § 7219(d)(1). In practice, the SEC has actively overseen the Board's budget and fees. *See* Order Approving PCAOB Budget and Annual Support Fee for Calendar Year 2006, 33 Act Release No. 8676, 2006 WL 985305 (Apr. 13, 2006). The SEC must also approve Board decisions to seek subpoenas, §7215(b)(2)(D), as well as to "sue and be sued, complain and defend" in the courts. § 7211(f)(1). In addition, the Act makes explicit that nothing in it "shall be construed to impair or limit" the authority of the SEC to, among other

19

matters, "regulate the accounting profession, accounting firms, or persons associated with such firms for purposes of enforcement of the securities laws." § 7202(c).

This array of statutory provisions in the Act governing SEC oversight of the Board must also be read in conjunction with the history and past practice of the SEC's oversight of the various SROs. With respect to proposed rules and sanctions of the Board, the Act directly borrows from the Securities Exchange Act of 1934 to give the SEC the same oversight and control that the SEC has over rules and sanctions of the various SROs that function under the SEC umbrella. The courts of appeals have characterized these powers as "plenary." *See N.A.S.D. v. S.E.C.*, 431 F.3d 803, 804 (D.C. Cir. 2005); *Schultz v. S.E.C.*, 614 F.2d 561, 568 (7th Cir. 1980).

The Board is designed to be independent of the accounting industry, but subordinate to the SEC's legal authority. The fact that the Board is authorized by statute to impose "accounting support fees" on public companies, under a congressionally-mandated formula, gives the Board no more power than has the FASB, which has similar congressional authorization. *See* 15 U.S.C. § 7219(d)(1). Yet no one would contend that members of the FASB are "inferior officers" of the United States.

The Supreme Court has issued few decisions clarifying the distinction between "employees," whose appointment Congress can assign at will, and "inferior officers," whose appointment Congress must assign in accordance with Art. II., § 2, cl.2, of the Constitution. This Court need not resolve that issue here. For at most, Board members are inferior officers. Based on the array of powers the SEC exercises over the Board, the Board members are certainly actors "whose work is directed and supervised at some level by others who were appointed by

20

presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. at 662-63 (1997). The Board is legally subordinate to the SEC. If Board members are "employees," even the Plaintiffs do not challenge the constitutionality of the Act. But even if Board members are considered "inferior officers," the Act is constitutional, as the next Sections demonstrate.

> B.  *The SEC-Board Structure Does Not Violate the Separation of Powers.*

The Plaintiffs' primary claim, that the PCAOB violates the separation of powers, is difficult even to decipher. At times, the claim appears to be that the President must *himself* have the power directly to remove PCAOB members for cause. At other times, the claim appears to be that the *SEC* must have more expansive powers than the Act purportedly provides to remove Board members. Regardless of this confusion, Supreme Court precedent has resoundingly rejected both of these theories for many decades.

1.  First, the only cases in which the Supreme Court has held the structure of an administrative agency unconstitutional are rare cases in which Congress has attempted to insert itself directly into the appointment or removal process or to control directly an agency's decisions through a veto-like power. *See, e.g., Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991) (direct congressional participation in agency decision-making); *Bowsher v. Synar*, 478 U.S. 714 (1986) (direct congressional involvement in removal process); *I.N.S. v. Chadha*, 462 U.S. 919 (1983) (direct congressional veto over agency decisions); *Buckley v. Valeo* 424 U.S. 1 (1976) (per curiam) (direct congressional participation in appointment process); *Myers v. United States*, 272 U.S. 52 (1926) (direct Senate participation in removal). None of those features is present here. The Supreme

Court has never held the design of an administrative agency unconstitutional when Congress has *not* inserted itself directly into the administrative process in one of these three specific ways. *See*, *e.g., Morrison v. Olson*, 487 U.S. 654, 686 (1988) (upholding office of independent counsel because, "[u]nlike both *Bowsher* and *Myers*, this case does not involve an attempt by Congress itself to gain a role in the removal of executive officials other than its established powers of impeachment and conviction.").  The Act does not insert Congress directly in any of these ways, or in any other way, into Board and SEC administration of the Act.

2.  The claim that the President must have direct "for cause" removal power over Board members is the claim that the President must have "for cause" removal power over all government officials who act as "inferior officers" of the United States.  But such a principle would be radically inconsistent with longstanding political practice, as well as Supreme Court precedent.  Indeed, such a principle is at odds with the basic practice and legal understanding of the administrative state.  This claim goes well beyond even an attack on independent agencies alone: it is an attack on the structure of nearly all administrative agencies, both those whose heads serve at the pleasure of the President (purely executive agencies) and those whose heads the President can remove only for cause (independent agencies).  For generations, the President has not had, and has not been constitutionally required to have, the direct power to remove inferior officers of the United States, for cause or under any other standard.

The independent agencies, for example, appoint numerous inferior officers.  As Justice Scalia has noted, Congress has given the FCC the power to appoint its managing director; the SEC, the power to appoint "such officers . . . as may be necessary;" the FTC, the power to appoint its secretary; the CFTC, the power to appoint its general counsel.  *Freytag v. Comm'r of*

22

*Internal Revenue*, 501 U.S.868, 918 (1991) (Scalia, J., concurring in the judgment).  Nearly all

other independent agencies have similar powers, by statute, to select their own inferior officers.

Thus, the Consumer Product Safety Commission appoints its general counsel and various

executive and associate executive directors, 15 U.S.C. § 2053(g)(1)(A); the Federal Election

Commission appoints its general counsel, 2 U.S.C. § 437c(f)(1); the Federal Maritime

Commission, 46 C.F.R. § 501.5(a) (2006), and Federal Mine Safety and Health Review

Commission, 30 U.S.C. § 803(b)(2), appoint key agency officials; the Nuclear Regulatory

Commission appoints the heads of its various administrative units, 42 U.S.C. § 5841(a)(4), and

so on.  *See generally* Marshall Breger and Gary Eldes, *Established By Practice: The Theory and

Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1236-1282 (2000).

Executive agencies, like the EPA or the IRS, are statutorily empowered to appoint their own

inferior officers as well, as are agencies throughout the government.

    None of these statutes, as far as *amici curie* are aware, authorizes or permits the President

directly to fire any of these inferior officers, for cause or under any other standard.  In *Freytag*,

for example, the Court held that special trial judges of the Tax Court were "inferior officers" of

the United States. *See Freytag*, 501 U.S. at 868.  Congress gave the Chief Judge of the Tax Court

the power to appoint and remove these special trial judges.  Neither the statute nor the Court's

opinion suggested the President has the power himself to fire special trial judges, for cause or

any other reason – let alone that the Constitution *requires* that the President have such power.

Indeed, no court has suggested such a presidential power is constitutionally required.

    Instead, for over a century the Supreme Court has made clear that Congress has the

constitutional power to set the terms under which inferior officers of the United States hold their

23

positions.  As the Court held in *United States v. Perkins*:

> We have no doubt that when Congress, by law, vests the appointment of inferior
> officers in the heads of departments it may limit and restrict the power of removal
> as it deems best for the public interest.  The constitutional authority in Congress
> to thus vest the appointment implies authority to limit, restrict, and regulate the
> removal by such laws as Congress may enact in relation to the officers so
> appointed.

116 U.S. 483, 485 (1886) (quoting *Perkins v. United States*, 20 Ct. Cl. 438, 444 (1885)).  In

*Perkins*, Congress had provided that naval officers could be dismissed only under specified

conditions.  The Secretary of Navy, who had the power to appoint such officers, claimed that the

congressional restriction on removal violated the "constitutional prerogative of the executive"

Branch.  *Id.* at 484.  The Court firmly rejected that position.  In doing so, *Perkins* reflected

principles suggested years earlier in *Ex Parte Hennen*, 38 U.S. (13. Pet.) 230 (1839), which had

also made clear that Congress has the power to define the conditions under which inferior

officers serve and can be removed.  *See, e.g., Ex Parte Hennen,* 38 U.S. at 260 (noting that "the

President has certainly no power to remove" inferior officers in the face of congressional

constraints).

Here, Congress gave the power to the SEC to appoint Board members, as well as the

power to remove them. That is the common and longstanding practice by which inferior officers

in administrative agencies, independent as well as purely executive, are appointed and removed.

The Constitution hardly denies Congress the power to create such familiar structures.

The basic structure of administrative government is that principal officers of the United

States must be nominated by the President and confirmed by the Senate.  Even with respect to

these principal officers, Congress can decide to limit the President to a good-cause removal

power.  *See Wiener v. United States*, 357 U.S 349, 351-56 (1958); *Humphrey's Executor v.*

24

*United States*, 295 U.S. 602, 629-32 (1935).[18]  Congress can also choose, instead, to permit the President to remove such officers at will.  With respect to inferior officers, Congress can vest the appointment power in the President, the Courts of Law, or in the Heads of Departments, Art. II, § 2, cl.2, and Congress can fix the terms on which those inferior officers hold their positions – including by denying the President the power to remove those officers at will or for cause.  Even *Myers* itself, in which Plaintiffs invest so much weight, expressly recognized this principle: the authority of Congress "to vest the appointment of such inferior officers in the heads of departments carries with it authority incidentally to invest the heads of department with power to remove."  272 U.S. at 161.  *Myers* held the removal scheme at issue unconstitutional only because Congress had given *itself* the right to participate in the removal of the inferior officers involved.  *See id.*  (the Constitution does not permit Congress to "draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power.").

Here, the President can remove SEC Commissioners under what the courts consider a "for cause" standard.  *See S.E.C. v. Blinder, Robinson & Co., Inc.*, 855 F.2d 677, 681 (9th Cir. 1988).  In turn, the SEC appoints, oversees, controls, and has removal power over its inferior officers, such as members of the Board.  For separation of powers purposes, that suffices.  Congress is free to decide such a structure best protects investor confidence and most effectively ensures proper regulation of the capital markets.

---

[18]Plaintiffs note that the Supreme Court has never endorsed a restriction on the President's removal power over principal officers more intrusive than "for cause."  Plaintiffs do not, however, put this assertion in context by acknowledging that the Supreme Court has *never* been *asked* to uphold a more intrusive restriction, nor has the Court ever actually *invalidated* a restriction on presidential removal power for being more intrusive than good cause.  Of course, the issue is irrelevant to this case, since Board members are, at most, inferior officers of the United States, not principal ones.

Were it otherwise, the President would have the power to remove for cause every inferior officer in the United States: agency general counsels, FTC investigators, special trial judges in the Tax Court, and all others. If anything would lead to a "[c]oncentration of power [that] puts personal liberty in peril," *Hamdam v. Rumsfeld*, 126 S. Ct. 2749, 2800 (2006) (Kennedy, J., concurring in part), it would be that. Instead, the Constitution "diffuses power the better to secure liberty." *Youngstown Sheet v. Sawyer*, 343 U.S. 579, 635 (1952). The Constitution has never been understood to require that the President have direct removal power over all the inferior officers of the United States.

The particular history and structure of governmental regulation of the capital markets makes this the least apt arena to create a new constitutional rule that the President must have for-cause removal power over inferior officers, such as Board members. As noted above, this system has relied for decades on a unique combination of public-private institutional relationships under the umbrella and oversight of the SEC. In conjunction with the SEC, the various SROs exercise a form of governmental power. Rules of the NASD approved by the SEC, for example, are federal law and preempt conflicting state law. Yet the President has no power to appoint or remove NASD directors or, similarly, the head of the NYSE. In determining that more effective regulation of accounting and auditing was necessary to restore confidence in the markets in the wake of the corporate scandals of the last decade, Congress similarly could have given those powers to the preexisting private organizations, FASB or ASB. As with the NYSE and the NASD, had Congress done so, the President would not have had inherent constitutional power to remove the heads of FASB or ASB. Instead, Congress determined to replace the industry-controlled self-regulatory system of auditing with a new

26

Board located, like the SROs, under the umbrella and oversight of the SEC.   Indeed, the SEC

has far *more* power over the Board than it does over the NYSE or NASD, or than it did over the

Board's predecessors, such as ASB.   The SEC, for example, appoints Board members.   The SEC

must approve the Board's budget, but not that of the SROs.   It would be perverse to conclude

that Congress, by creating a subunit of the SEC under even greater SEC control than other parts

of this integrated regulatory system, such as the SROs, was then constitutionally barred from

authorizing the SEC to remove Board members only for specified reasons.   Nothing in the

Constitution or Supreme Court decision requires such a nonsensical result.

      Plaintiffs try to avoid the force of all this history and doctrine by misrepresenting a pre-

New Deal case, *Myers v. United States*, 272 U.S. 53 (1926).   That so much of the Plaintiffs' brief

rests on *Myers* is telling.   Perhaps wishfully, but with great inaccuracy, Plaintiffs characterize

*Myers* as a "seminal" decision.   But as is well known, *Humphrey's Executor* – truly the seminal

decision of the modern administrative state – long ago limited *Myers* to the latter's specific

holding and facts.   *See Humphrey's Executor*, 295 U.S. 602 (unanimous decision).   As the Court

recently emphasized yet again, it "expressly disapprove[s] of any statements in *Myers* that 'are

out of harmony' with the views expressed in *Humphrey's Executor*."   *Morrison*, 487 U.S. at 687

n.24.   *Myers* involved a postmaster whom Congress had precluded the President from removing

without the Senate's consent.   Because the Senate directly participated in the removal process,

*Myers* held this statute unconstitutional.   But in limiting *Myers* to the specific context of statutes

in which Congress seeks to insert itself directly into the removal process, *Humphrey's Executor*

expressly concluded that *Myers* "cannot be accepted as controlling" when it comes to modern

administrative agencies. *Humphrey's Executor*, 295 U.S. at 627; *see also Morrison*, 487 U.S. at

687 n.24  ("We recognized that the only issue actually decided in *Myers* was that 'the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress.'").  By contrast, as *Humphrey's Executor* put it, modern administrative agencies "cannot in any proper sense be characterized as an arm or an eye of the executive." 295 U.S. at 628.  Referring to the FTC, at issue there, the Court characterized the agency as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed . . . ." *Id.*

Similarly, the SEC and the Board are administrative bodies created by Congress to carry into effect legislative policies embodied in statute.  As *Humphrey's Executor* makes clear, *Myers* has no application to such administrative agencies.  *See also F.E.C. v. N.R.A. Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (holding there is no "vitality to the claim" that Congress cannot restrict the President's removal power over even principal officers of independent agencies, such as the Federal Election Commission).  *Myers* assuredly does not stand for the proposition that the President, in defiance of congressional statute, has inherent constitutional power to remove for cause all inferior officers of the United States, including those throughout the government who exercise administrative powers in the agencies.

The final prop in Plaintiffs' argument is an attempt to turn the Court's decision upholding the Independent Counsel Act, *Morrison v. Olson*, 487 U.S. 654 (1988), on its head. *Morrison* limited *Myers* even further.  Some had suggested that the statute invalidated in *Myers* had two relevant flaws, not one: in addition to inserting the Senate into the removal process, *Myers* had also suggested there might be some narrow category of officials, who, unlike administrative agency officials, exercised only "core" executive branch functions and thus were

28

constitutionally required to serve at the President's will.  *Morrison* put this latter notion to rest. If any official exercises "core" executive functions, it was the independent counsel, whose function was solely to investigate and prosecute federal crimes.  But even so, *Morrison* held that Congress had sufficient justification to insulate the independent counsel from the President's direct control and removal power.  In so holding, *Morrison* dispensed with the scholastic effort to categorize an official's functions as "executive, or "core executive, or "quasi-legislative," or "quasi-judicial."  *Id.* at  689-91.  Regardless of these labels, Congress can insulate officials from serving at the President's will, as long as Congress does not itself participate in the removal process.  As *Morrison* put it, "the essence of the decision in *Myers*" was that Congress cannot participate in the removal process. *Id.* at 686.  The Sarbanes-Oxley Act does not permit Congress to do so.  Thus, the Act is clearly constitutional, under *Morrison*, *Humphrey's Executor*, and *Perkins* – indeed, even under *Myers* itself[19] – even though the Act does not give the President the direct power to remove Board members.

    3.  At other times, Plaintiffs' "separation of powers" challenge seems to rest on the theory that the Act is unconstitutional because Congress has given the *SEC* too little power to remove Board members.  But for two reasons at least, this theory misunderstands the Act and has no legal support in the statute's text or history.

---

[19]Even *Myers* itself, in which Plaintiffs invest so much weight, expressly recognized this principle: the authority of Congress "to vest the appointment of such inferior officers in the heads of departments carries with it authority incidentally to invest the heads of departments with power to remove."  272 U.S. at 161.  *Myers* held the removal scheme at issue unconstitutional only because Congress had given *itself* the right to participate in the removal of the inferior officers involved.  *Id.* (the Constitution does not permit Congress to "draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of that power.").

First and most importantly, as explained in detail above, the SEC has a broad array of oversight authority and control over the Board.  To the extent the specific design of the SEC's removal power is relevant, those removal provisions cannot be assessed, constitutionally or practically, by abstracting them from the rest of the statutory structure.  The removal power is one *means* through which a superior can exercise effective control over an inferior, but the ultimate question that is relevant is whether the principal can exercise effective control.  In this case, the SEC has numerous means of control and oversight of the Board, in addition to the removal power.  Taken as a whole, these powers leave no doubt that the SEC has ample legal authority and power to effectively control the Board.

Apart from "plenary" power over the most important legal actions of the Board – the issuances of rules or sanctions – the SEC has general powers far more expansive than the mere power to remove Board members.  Even assuming the Constitution would require the SEC to have effective oversight powers over every other action of the Board, in addition to Board rules and sanctions, the Act gives the SEC the practical power to do just that.  The SEC's powers fully to rescind the Board's authority and to approve the Board's budget, as well as to take over the regulatory process itself at any moment, for example, give the SEC effective, practical control over all of the Board's activities.  The SEC can also leverage its power over Board rules and sanctions to supervise the Board's other activities.  These are far greater powers, in fact, than the SEC has over the SROs that also function under its supervision.  On top of all this, the SEC also has power to remove Board members.[20]  Though Plaintiffs try to present the Board as a free-

---

[20]In the face of all these other sources of power that effectively give the SEC the ability to oversee and control the Board, the precise legal standard under which the SEC is empowered to remove Board members is not critical to the Act's constitutionality.  Section 101(e)(6) of the

wheeling, unchecked agent, the Act makes clear that the Board, even more so than the SROs and related entities in the securities regulatory regime, functions under the legal authority and control of the SEC.[21]

Second, the Plaintiffs misrepresent the legal relationship between the SEC and the Board. The text of the Act, its legislative history, and the history of SEC oversight of SROs, upon which Congress based the analogous provisions in the Act, do not support the Plaintiffs' positions.

---

Act authorizes the SEC to remove Board members for "good cause." 15 U.S.C. § 7211 (e)(6). Section 101 also states that this removal must be done "in accordance with section 107(d)(3)." The latter specifies the required *procedures* for both censure and removal: the SEC must make the required findings on the record after notice and opportunity for a hearing. But § 107(d)(3), which applies to *both* censure and removal, also states that the SEC can "remove or censure" for three specific reasons, including willful violation of the Act, rules of the Board, or the securities laws; or willful abuse of authority; or failure to enforce compliance with various legal provisions and rules. The Senate Committee Report, the most authoritative Committee report from the legislative process, given the Senate's role in creation of the Board, states that the SEC can remove Board members "for cause." *See* S. Rep. No. 107-205, at 12 (2002) ("The SEC can relieve the Board of any responsibility to enforce any provision of the bill, or censure or limit operations of the Board, or remove a Board member, for cause.") (describing Section 107 of the Act).

The proper reconciliation of these provisions, as well as the proper meaning of "willful" violations or abuses of authority, should await a concrete case in which they are actually at issue. To the extent these removal provisions are ambiguous, *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837 (1984), would require the courts to defer to the SEC's reasonable construction of the Act. Moreover, if the constitutionality of the Act were to turn on the specific standard for removal the Act creates, the courts would be obligated to interpret the Act to avoid such constitutional concerns, to the extent the text of the Act so permits. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Particularly in facial challenges to Acts of Congress on separation of powers grounds, "it is the duty of federal courts to construe a statute in order to save it from constitutional infirmities." *Morrison*, 487 U.S. at 682.

[21]With respect to the SROs, the SEC has censured the NASD, for example, for its failure to regulate properly the quotation practices of NASD market makers. *See* In the Matter of Nat'l Assoc. of Sec. Dealers, Exchange Act Release No. 37538, [1996-1997 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 85,825 (Aug. 8, 1996).

Plaintiffs assert, without foundation, that the SEC must give *Chevron*-type deference to the Board's construction of the Act.  But nothing in the Act, past SEC practice, or general administrative law and practice, supports this odd claim.  No Board rule or sanction has legal effect unless and until the SEC approves it; in essence, the Board proposes rules and sanctions, which only the SEC has the legal authority to adopt.  The courts review the Commission's rules and orders, not those of the Board.  15 U.S.C. § 78y.  Thus, the agency that implements the Act, and to which the courts would give *Chevron* deference, is the SEC, not the Board.  *See, e.g.*, *Nat'l Cable & Telecomms. Assoc. v. Brand X Internet Servs.,* 125 S. Ct. 2688, 2699 (2005) (noting that *Chevron* requires courts to defer to "the implementing agency's [reasonable] construction [of a statute]") (citing *Chevron U.S.A. v. Natural Res. Defense Council,* 467 U.S. 837, 843-44 (1984)); *Business Roundtable*, 905 F.2d at 408 (deferring to the SEC under *Chevron*); *Belenke v. S.E.C.*, 606 F.2d 193, 197, 199 (7th Cir. 1979) (deferring to SEC's interpretation of the securities laws, not to that of the SRO, the CBOE, whose proposed rule change the SEC had approved).   Nor has the SEC given *Chevron*-style deference to the legal interpretations of the SROs or similar entities it has overseen for many years.  *See, e.g.*, *Sorrell v. S.E.C.*, 679 F.2d 1323, 1326 n. 2 (9th Cir. 1982) (holding that SEC engages in "independent" and "*de novo*" "review of NASD decisions"); *Todd and Co. v. S.E.C.*, 557 F.2d 1008, 1012-13 (3d Cir. 1977) (holding that SEC engages in "full review" of NASD rules and "must base its [the SEC's] decision on its own findings"); *Belenke*, 606 F.2d at 198 (SEC makes an independent determination that an SRO's proposed rules are consistent with the securities laws); *R.H. Johnson & Co. v. S.E.C.*, 198 F.2d 690 (2d Cir. 1952).

Yet the SEC has even greater statutory power over Board sanctions, for example, than it

32

does over those of the NASD.  For the latter, the SEC has no power to enhance an NASD-proposed penalty, but is limited to affirming, remanding, or, in certain circumstances, modifying it.  *See*  15 U.S.C. § 78s(e).  But the SEC has the additional statutory power to "enhance" any Board-proposed sanction, § 7217(c)(3), and can disapprove a Board-proposed sanction because, among other factors, it is "inadequate." *Id.*

Similarly, Plaintiffs assert, equally without support in the text of the Act, that the SEC exercises only "appellate-like review" of the Board's final decisions.  But the SEC has the power, among others, to "enhance" or "modify" agency sanctions, as well as to rescind the Board's authority altogether or to take over regulating areas the Board regulates.  It is the findings of the *Commission* as to facts that are conclusive if supported by substantial evidence.  § 78y(a)(4); *see also R.H. Johnson & Co.*, 198 F.2d at 694 (holding under the 1934 Securities Exchange Act that courts review orders of the Commission only, not those of the NASD, which the SEC must approve before they have legal effect).  Unlike the relationship of an administrative agency to a court, the Board functions as a subunit under the legal authority and control of its parent, the SEC.

Moreover, even if the SEC *were* limited to appellate-like review over certain aspects of Board proceedings, such as Board sanctioning decisions, the Constitution would not be violated.  Like Board members, for example, special trial judges in the Tax Court are inferior officers of the United States.  *See Freytag*, 501 U.S. at 882.  Yet these special trial judges have greater legal powers than do Board members.  Special trial judges have the power to issue legally binding, final decisions in certain classes of cases, *id.*, and in addition, their superiors, the Tax Court judges, cannot overturn special trial judge findings of fact unless those findings are clearly

33

erroneous.  *See Stone v. Comm'r*, 865 F.2d 342 (D.C. Cir. 1989).  The Tax Court-special trial

judge relationship *is* akin to appellate-like review.  Nonetheless, though the President has no

direct removal power over special trial judges, and the Chief Judge of the Tax Court appoints

these inferior officers, this structure poses no threat to the separation of powers.  *Freytag*, 501

U.S. at 888-92.  By contrast to special trial judges in the Tax Court, Board members do not have

even the power to enter final, legally binding decisions of the SEC in *any* class of case.

4.  Finally, Plaintiffs apparently claim that, over and above their challenges to the Act's

removal and appointments provisions, the Act somehow violates the "separation of powers"

when "taken as a whole."  But this rhetoric adds nothing to Plaintiffs' other claims.  If the

structure by which Board members can be appointed and removed is constitutional, as it is, then

how an agency's structure could still, nonetheless, violate the separation of powers is mysterious.

Plaintiffs offer no theory, nor any coherent principle, over and above their removal and

appointments challenges, as to what Congress would have to do to correct any such nebulous

constitutional violation as one resting on the structure of the Act "taken as a whole."  The

President-principal officer-inferior officer structure is routine and fully suffices for separation of

powers purposes.  Nothing more about an Act of Congress, "taken as a whole," is

constitutionally required.

Plaintiffs rely only on *Morrison,* 487 U.S. at 685, 693, for their language about the Act

"taken as a whole."  But this language has meaning, if at all, only in that exceptional context, not

in the context of administrative agencies in general.  In *Morrison*, Congress had created an

independent counsel's office, tasked with investigating and potentially prosecuting the President

and the President's closest aides.  *See id.* at 660 n.2.  These independent counsels performed the

34

most core executive functions – the investigation and prosecution of criminal cases – in areas of the greatest separation of powers sensitivity, where the ability of the President and his top aides to function effectively was at stake.  Even so, the Court upheld the statute in an 8-1 decision. But *Morrison*'s understandable concern for the separation of powers risks involved when Congress creates a mechanism to investigate or prosecute criminally the President and his closest aides has little bearing on Congress' routine creation of independent administrative agencies or subunits, such as the Board, that function under the oversight and control of such agencies.  As long as the appointments and removal structure for an independent agency and its subunits are constitutional, there is nothing further about the enabling Act, "taken as a whole," that is relevant for separation of powers analysis.

## II.    THE CONSTITUTION DOES NOT FORBID CONGRESS FROM CHOOSING TO VEST IN THE SEC THE APPOINTMENT OF INFERIOR OFFICERS, SUCH AS BOARD MEMBERS, WHO FUNCTION UNDER THE OVERSIGHT AND CONTROL OF THE SEC ITSELF

Plaintiffs argue that because the SEC is an independent administrative agency, Congress cannot choose to give the SEC the power to appoint its own inferior officers.  The Supreme Court has never decided whether the independent agencies of the United States, such as the FCC, FMC, FRB, FTC, ICC, NLRB, NRC, FERC, or the SEC, are "Departments" within the meaning of the Appointments Clause.  *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 887 n.4 (1991) (reserving the question); *id.* at 916-17 (Scalia, J., concurring in part and concurring in the judgment).  But all other sources of legal authority, the longstanding practices and traditions of American government, the enactments of Congress in numerous statutes, and common sense support the principle that independent agencies are such "Departments," in the same way that the purely executive agencies are as well.

35

First, no federal court has ever held, as far as the *amici curiae* is aware, that an independent agency's appointment of an inferior officer within that agency violates the Appointments Clause. The Plaintiffs do not point to any such case. The Supreme Court and lower courts have held, though, that the appointments power can be given to Art. I courts, such as the Tax Court, *id*. at 892, to the Governors of the Postal Service, *Silver v. United States Postal Serv.*, 951 F. 2d 1033, 1038 (9th Cir. 1991), and to a special division of a court of appeals created for the purpose of appointing independent counsels, *Morrison v. Olson*, 487 U.S. 654 (1988).

Second, in a comprehensive and recent analysis, the Department of Justice's Office of Legal Counsel (OLC) concluded that independent agencies are Departments for purposes of the Appointments Clause. *See* 20 Op. Off. Legal Counsel 124 (1996), *reprinted in* 63 Law and Contemp. Problems 514, 543 (2000) (footnote omitted). That 1996 OLC memorandum itself drew directly upon an important, earlier formal opinion of the Attorney General. See Authority of Civil Service Commission to Appoint a Chief Examiner, 37 Op. Att'y Gen. 227 (1933). In that opinion, the Attorney General concluded that Congress could authorize the Civil Service Commission to appoint an inferior officer. The 1996 OLC opinion found the earlier Attorney General's analysis "persuasive" and reaffirmed it. No Justice has taken issue with this 1933 opinion, let alone rejected it.

Third, in addition to this longstanding DOJ understanding of the Appointments Clause, Congress has acted for many decades on the understanding that independent agencies are "Departments." As Justice Scalia has catalogued, many statutes give the independent agencies the power to do so. And as noted above, there are many other inferior officers whom the heads

36

of independent agencies appoint beyond the ones Justice Scalia used as examples.  A well established, systemic practice of the political branches of government, like this one, to which neither Congress nor the Executive has objected, is yet additional reason for the courts to recognize the constitutionality of such a practice.  With respect to the separation of powers and issues concerning the structure of government, the Supreme Court has recognized that longstanding political practice should play a significant role in determining the meaning of the Constitution.  This judicial recognition has played a major role in some of the most important cases in constitutional history involving the structure and organization of government.  *See, e.g., McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819) (noting that, where the structure of government is at issue, any constitutional issues "if not put at rest by the practice of the government, ought to receive a considerable impression from that practice"); *see also Youngstown Sheet v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents who have also sworn to uphold the Constitution, making as it were such exercise of power part of the structure of our government, may be treated as a gloss on 'executive power' vested in the President by Sec. 1 of Art. II.").

Fourth, the practical consequences of concluding that the Constitution permits Congress to create independent agencies, but forbids Congress from assigning to these agencies the power to appoint their inferior officers, argues against any such illogical conclusion.  Not only would such a principle require dismantling longstanding structures of administrative organization, it could create a system of administration organized at cross-purposes with itself.  Congress created the PCAOB to function under the oversight and control of the SEC, much as the SEC oversees

37

many other entities, including the SROs.  This system enables the SEC to bring its expertise to bear on a comprehensive and integrated system of regulating the securities and capital markets. If Congress could not lodge the appointments power for Board members in the SEC, but instead were constitutionally required to place it elsewhere, Congress would be obligated to locate the appointments power with, for example, the Secretary of the Treasury.  But the Secretary of Treasury has no legal power to oversee the SEC, nor would he or she have any further, ongoing power to oversee the acts of Board members.  It is the SEC, not the Secretary, who can remove or censure Board members, abolish functions of the Board, and which must approve Board rules or sanctions to give them legal effect.  If the Secretary appointed Board members who did not share the legal understandings and policy positions of the SEC, this system would be a recipe for institutional paralysis and constant internal institutional conflict.[22]

The courts should require such a nonsensical organization of government only if the Constitution's text, history, past political practices, and judicial precedent unequivocally require it.  But far from requiring such a bizarre structure, these sources have long been understood to permit Congress to do the obvious:  to conclude that government will function more efficiently and effectively if the heads of administrative agencies, including the independent agencies, are permitted to appoint their inferior officers, such as PCAOB members.

The Plaintiffs' arguments to the contrary rest on two sources.  First, Plaintiffs quote from a few late nineteenth century cases that, in passing, refer to "Heads of Departments" as "members of the cabinet."  These cases arose before Congress created the first major

---

[22]Indeed, the Appointments Clause frowns upon "interbranch appointments," precisely because of the various distortions in government functioning that would ensue.  *See Freytag*, 501 U.S. at 883; *Morrison*, 487 U.S. at 675-77.

administrative agency, the ICC in 1887, and hence before the basic structures of modern administrative government.  *See* Breyer, Stewart, Sunstein, Vermeule, *Administrative Law and Regulatory Policy* 16 (6th ed. 2006).  It is unsurprising, therefore, that these late nineteenth century cases would invoke cabinet members as exemplary heads of departments.

But even this language merely recognized cabinet status as sufficient, not necessary, for "Department" status.  None of these cases (or any other) invalidated a statute's appointment structure on the grounds that *only* members of the cabinet were "Heads of Departments."  *See United States v. Mouat,* 124 U.S. 303 (1888); *United States v. Germaine,* 99 U.S. 508 (1879). These cases merely held that the phrase "Heads of Departments" does not include "the inferior commissioners and bureau officers, who are themselves the mere aids and subordinates of the heads of the departments."  *United States v. Germaine,* 99 U.S. at 511.  *Amici curiae* agree with and accept that principle.  But the SEC Commissioners are not subordinate to the head of any *other* department; SEC Commissioners are not "within" some other department.  They are principal officers of the United States, nominated by the President and confirmed by the Senate. For several reasons, then, the passing language in these nineteenth century cases has no bearing on whether independent agencies, or even purely executive agencies not part of the Cabinet, are "Departments" under the Appointments Clause.

Second, Plaintiffs argue that *Freytag* should be read to preclude Congress from vesting the appointments power in independent agencies.  Plaintiffs are wrong, but this issue requires more extensive discussion.  *Freytag* upheld Congress' power to give the Tax Court the right to appoint its inferior officers, much like the power the SEC has here.  But the Court differed 5-4 over whether the Tax Court should be considered one of the "Courts of Law" or one of the

39

"Departments." *See Freytag*, 501 U.S. at 888-92 (Tax Court is one of the "Courts of Law."); *id.*
at 901-22 (Scalia, J., concurring) (Tax Court is a "Department"). The Court also expressly
reserved the question whether the SEC, and other independent agencies, were Art. II
"Departments." *See id.* at 887 n.4.

The five-member majority concluded that the Tax Court could not be a Department
because it was a Court of Law: "[t]he Tax Court exercises judicial power to the exclusion of any
other function. It is neither advocate nor rulemaker." *Id.* at 891. As the majority put it, the Tax
Court's powers are "quintessentially judicial in nature" and "the Tax Court exercises its judicial
power in much the same way as the federal district courts exercise theirs." *Id.* Indeed, Congress
had specifically transformed the Tax Court *from* an executive agency, as were its predecessors,
*to* a court. *Id.* at 887-88. Congress' intent to create the Tax Court as a Court was critical to the
Supreme Court's analysis. *Id.* For these reasons, the majority concluded the Tax Court was not
a "Department," but rather a "Court of Law," under the Appointments Clause.

None of this reasoning, of course, applies to the SEC. Far from being a court exercising
nothing but judicial power, the SEC is a classic administrative agency that exercises the
conventional agency mix of rulemaking, investigative, and adjudicatory powers. The SEC is not
a "Court of Law," nor, conversely, are the reasons that the Tax Court *is* a "Court of Law" and
*not* a "Department" applicable to the SEC.

Beyond this holding, the majority made a number of additional statements, upon which
Plaintiffs attempt to build a case, to explain further why the Tax Court is not a "Department."
These statements emphasize concern that the appointments power not become excessively
diffused to "every organ in the Executive Branch." *Id.* at 885. But it is crucial not to

40

misunderstand these statements, as numerous administrative law scholars have cautioned.[23]

First, the majority would not limit "Departments" in Art. II to only Cabinet-level departments.

Such a position would make little sense, given that the Constitution does not create or recognize

a Cabinet and that Congress can move, and historically has moved, departments inside and

outside the Cabinet.  Instead, the majority recognized (as do the Plaintiffs) that at least entities

the majority characterized as "like the Cabinet-level departments" can be given appointments

power.[24]  *See Id.* at 886.  Second, at the same time, the majority provided no guidance as to what

makes an administrative agency "like" the Cabinet-level departments.  Third, the majority also

expressly reserved the question whether the SEC, and similar independent agencies, met

whatever standard might be used to judge this question.  *See id.* at 887 n.4.

Writing for himself and Justices O'Connor, Kennedy, and Souter, Justice Scalia -- a

former administrative law scholar -- concluded that "Departments" had to be understood

expansively.  In the view of these Justices, Art. II uses the word "Departments" "not to connote

size or function (much less Cabinet status), but separate organization . . .".  *Id.* at 920 (Scalia, J.,

concurring).  Put in other terms, "Departments" includes "all independent establishments" and

"all independent executive establishments."  *Id.* at 918-19.  As these Justices explained

_____

[23]See, e.g., Strauss, Rakoff, Farina, *Gellhorn and Byse's Administrative Law:  Cases and Comments* 174 (rev. 10th ed. 2003) (noting that, if misread, *Freytag* would "unsettle[] a broad range of existing agency appointments practices").  The courts of appeals have resisted misreading *Freytag* in this way, rejecting claims that *Freytag* makes unconstitutional agency appointment of inferior officers.  *Id.* at 176 (citing *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) and *Silver v. Postal Service*, 951 F.2d 1033 (9th Cir. 1991)).

[24]See Plaintiffs' Memorandum in Support of Motion for Summary Judgment at p.37 (accepting that "Department" is not confined to the Cabinet, but includes "those agencies that resemble a cabinet department").  The EPA, the CIA, and the Federal Reserve Banks, for example, "have long appointed personnel that surely qualify as 'inferior officers' . . ."  Strauss, Rakoff, Farina, *supra* note 23, at 175.

41

concisely: "the chain of appointment and supervision that [Art. II] envisions" is clear: "Principal officers could be permitted by law to appoint their subordinates.  That should subsist, however much the nature of federal business or of federal organizational structure may alter."  *Id.* at 920. There is no doubt that the SEC is a "separate organization" and an "independent establishment." It has final authority to adopt rules and issue orders that have the full effect of federal law without the further approval of any other department.  There is also no doubt that SEC Commissioners are principal officers.   Under this analysis, there is thus also no doubt that the SEC is a "Department" to which Congress may give the power to appoint the SEC's inferior officers.

Though the majority reserved express judgment on whether independent agencies were "Departments," the four concurring Justices strongly suggested that these agencies must be so considered.  *See id.* at 918-21. Justice Scalia, in particular, has long been concerned about the existence of independent agencies and the correctness of *Humphrey's Executor*.  But as long as *Humphrey's Executor* remains the law, even Justice Scalia accepts that it follows that independent agencies must have the power, if Congress so decides, to appoint their inferior officers – and that independent agencies are therefore "Departments."  *See id.* at 920.  As he put it, "adjusting the remainder of the Constitution to compensate for *Humphrey's Executor* is a fruitless endeavor."  *Id.* at 921.  That is precisely the principle upon which Plaintiffs' Appointments Clause claim must fall: given the constitutionality of independent agencies, they necessarily are "Departments," permitted to appoint their own inferior officers.

Not only would any other conclusion unsettle decades of administrative government, by denying Congress the logical power to permit principal officers the power to appoint their

inferiors, but such a conclusion would also create administrative and regulatory dysfunction and inefficiency by requiring that inferior officers be appointed by someone *other than* their superiors.  For these reasons, Plaintiffs' misunderstanding of *Freytag* must be rejected.  The SEC is clearly not a "Court of Law."  Instead, the SEC must be understood as a "Department" under the Appointments Clause.

## III.    CONGRESS CAN CHOOSE TO DEFINE THE SEC COMMISSIONERS AS THE "HEAD" OF THE SEC

Plaintiffs also claim that, even if the SEC is a Department, only the SEC Chairman, not the five-member Commission, can be the "Head" of that Department under the Appointments Clause.  Plaintiffs' standing to raise this claim on behalf of the Chairman of the SEC is questionable.  *See F.E.C. v. N.R.A. Political Victory Fund*, 6 F.3d 821, 825 (D.C. Cir. 1993). But in any event, the lack of constitutional logic in this position is clear.  Congress can choose whether to create independent agencies in the first place.  It can create an independent agency with a single head or, as Congress has in fact done, independent agencies structured as multi-headed commissions, like the SEC.  Congress need not create the position of Commission Chair at all.  Thus, Congress has the power to decide that the SEC acting as a Commission is the "Head" of the SEC.  Given that the legal position of Chair exists only to the extent Congress creates and recognizes it, and that Congress could abolish the position of Chair at any time, no other conclusion makes sense of the Constitution's structural provisions.

In addition, Congress can decide that only the Commissioners, acting as a whole, can remove any SEC inferior officer.  Congress has complete power to determine the conditions for removal of inferior officers.  *See United States v. Perkins*, 116 U.S. 483, 485 (1886)*; see also Morrison* 487 U.S. at 689 n.27 (citing *Perkins*).  Under Plaintiffs' view, the Constitution would

43

require Congress to give the Chair appointment power, while permitting Congress to authorize the Commission to turn around and fire those whom the Chair appointed.  The Constitution does not require such an illogical and dysfunctional system of administrative organization.   That is why, as Defendant's brief establishes, the courts and the Department of Justice have understood the "Head" of a Department to include multi-member bodies.  *See Morrison*, 487 U.S. at 661 n.3; *Silver v. United States Postal Service* , 951 F.2d 1033, 1035-41 (9th Cir. 1991); 37 Op. Att'y Gen. 227 (1933).

Once again, Plaintiffs' real complaint is with the existence of independent agencies per se.  Once Congress is recognized to have constitutional power to create independent agencies at all, headed by multi-member commissions, it follows that Congress has the discretion to treat those commissions as "Heads" of the agencies Congress has created.

## CONCLUSION

Constitutionally, Plaintiffs lost their battle many decades ago in the Supreme Court, when it recognized the constitutionality of independent agencies and the modern structure of government administration.  In the Sarbanes-Oxley Act of 2002, Congress built upon a longstanding, integrated system of successful regulation for U.S. financial markets that relies on SEC oversight of numerous entities, public and private, including the Board.  Because the Board acts under the legal authority and control of the SEC, and Board members are, at most, inferior officers, the Act is constitutional.

Respectfully submitted,


___/s/ Richard H. Pildes_____
Richard H. Pildes
40 Washington Sq. So.
New York, NY 10014
(212) 998-6377


___/s/ Roderick M. Hills_____
Roderick M. Hills  (D.C. Bar # 247031)
Hills, Stern & Morley LLP
Hills Program on Governance, CISIS
901 15th St. NW
Washington, D.C.  20005

45

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2006, I caused a true and correct copy of the foregoing to be served by overnight express mail upon the following:

Lewis H. Ferguson
J. Gordon Seymour
Heidi E. Murdy
PUBLIC COMPANY ACCOUNTING
    OVERSIGHT BOARD
1666 K Street, N.W.
Washington, D.C. 20006

Joe Robert Caldwell, Jr.
James R. Doty
Jeffrey A. Lamken
Robert K. Kry
Joshua A. Klein
BAKER BOTTS, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400

Michael A. Carvin
Noel J. Francisco
Christian G. Vergonis
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

Viet D. Dinh
Wendy Keefer
BANCROFT ASSOCIATES PLLC
601 13th St., N.W.
Suite No. 930 South
Washington, D.C. 20005

Sam Kazman
Hans Bader
COMPETITIVE ENTERPRISE INSTITUTE
1001 Connecticut Avenue, N.W.
Suite 1250
Washington, D.C. 20036

Kenneth W. Starr
24569 Via De Casa
Malibu, CA 90265

Robert J. Katerberg
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, D.C. 20001

Kathryn Comerford Todd
WILEY, REIN & FIELDING LLP
1776 K Street, NW
Washington, DC 20006

    /s/ Richard H. Pildes
Richard H. Pildes

46