# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )

FREE ENTERPRISE FUND *et al.*,     )

                                       )

                       Plaintiffs,     )

                                       )

        v.                        )        Case No. 1:06CV00217-JR

                                       )

THE PUBLIC COMPANY ACCOUNTING     )

OVERSIGHT BOARD *et al.*,     )

                                       )

                     Defendants.     )
_____)

## PLAINTIFFS' COMBINED REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO DEFENDANTS' AND THE UNITED STATES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Viet D. Dinh (D.C. Bar No. 456608)
BANCROFT ASSOCIATES PLLC
601 13th Street, N.W.
Suite No. 930 South
Washington, D.C. 20005
(202) 234-0090
(202) 234-2806 (fax)

Sam Kazman (D.C. Bar No. 946376)
Hans Bader (D.C. Bar No. 466545)
COMPETITIVE ENTERPRISE INSTITUTE
1001 Connecticut Avenue, N.W.
Suite 1250
Washington, D.C. 20036
(202) 331-1010 (fax)

Michael A. Carvin (D.C. Bar No. 366784)
Noel J. Francisco (D.C. Bar No. 464752)
Christian G. Vergonis (D.C. Bar No. 483293)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939
(202) 626-1700 (fax)

Kenneth W. Starr (D.C. Bar No. 273425)
24569 Via De Casa
Malibu, CA 90265
(310) 506-4621

*Attorneys for Plaintiffs Free Enterprise Fund and Beckstead and Watts, LLP*

# TABLE OF CONTENTS

ARGUMENT ....................................................................................................................... 1

I.    CONGRESS VIOLATED THE SEPARATION OF POWERS BY INSULATING
      THE PCAOB FROM PRESIDENTIAL SUPERVISION AND CONTROL ................... 1

II.   CONGRESS VIOLATED THE APPOINTMENTS CLAUSE BY LODGING
      THE POWER TO APPOINT PCAOB MEMBERS IN AN INDEPENDENT
      AGENCY THAT IS ITSELF INSULATED FROM PRESIDENTIAL CONTROL ...... 28

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES[*]

## CASES

**Page**

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987)................................................................ 27-28

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984).....................................................................43

*Apprendi v. New Jersey*, 530 U.S. 466 (2000).............................................................................38

*Ayotte v. Planned Parenthood of Northern New England*, 126 S. Ct. 961 (2006) ........................27

*Blakely v. Washington*, 542 U.S. 296 (2004) ...............................................................................38

*\*Bowsher v. Synar*, 478 U.S. 714 (1986).................................................................1, 7, 10, 17, 28

*\*Buckley v. Valeo*, 424 U.S. 1 (1976) ...........................................................................................1

*\*CFTC v. Schor*, 478 U.S. 833 (1986)...................................................................1, 6, 13, 18, 36

*Cellco Partnership v. FCC*, 357 F.3d 88 (D.C. Cir. 2004)............................................................44

*Chao v. Day*, 436 F.3d 234 (D.C. Cir. 2006) ...............................................................................20

*Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*,
   467 U.S. 837 (1984)................................................................................................................20

*Chisom v. Roemer*, 501 U.S. 380 (1991) ......................................................................................20

*Committee for Monetary Reform v. Board of Governors of Federal Reserve System*,
   766 F.2d 538 (D.C. Cir. 1985)................................................................................................44

*Competitive Enterprise Institute v. National Highway Traffic Safety Administration*,
   901 F.2d 107 (D.C. Cir. 1990)................................................................................................45

*Council of Insurance Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103 (1st Cir. 2006) ..........45

*Cunningham v. Neagle*, 135 U.S. 1 (1890) ....................................................................................5

*Dickerson v. United States*, 530 U.S. 428 (2000) ..........................................................................3

*\*Edmond v. United States*, 520 U.S. 651 (1997) ...................................................5, 8, 29-31, 33-37

*Elrod v. Burns*, 427 U.S. 347 (1976) ...........................................................................................16

---

[*] Authorities on which Plaintiffs chiefly rely are marked by an asterisk.

# TABLE OF AUTHORITIES
### (continued)

Page

*FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993) ................................................43

*Fahey v. Mallonee*, 332 U.S. 245 (1947) ....................................................................................44

*Farber v. City of Paterson*, 440 F.3d 131 (3d Cir. 2006) ............................................................16

*First Western Government Securities, Inc. v. Commissioner of Internal Revenue*,
    94 T.C. 549 (1990), *aff'd sub nom Samuels, Kramer & Co. v. Commissioner of
    Internal Revenue*, 930 F.2d 975 (2d Cir. 1991) .................................................................33

*\*Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868 (1990)........ 1, 11, 28, 33, 35, 37-39

*Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001) ...................................................................28

*In re Hennen*, 38 U.S. 230 (1839) ........................................................................................ 5, 7-8

*\*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ........................1-2, 9, 11-12, 17-19

*\*Loving v. United States*, 517 U.S. 748 (1996) ......................................................................1, 6

*MFS Securities Corp. v. SEC*, 380 F.3d 611 (2d Cir. 2004) .........................................................14

*Metropolitan Washington Airports Authority v. Citizens for Abatement of
    Aircraft Noise, Inc.*, 501 U.S. 252 (1991) .........................................................................17

*Mistretta v. United States*, 488 U.S. 361 (1989) .........................................................................11

*\*Morrison v. Olson*, 487 U.S. 654 (1988) .................................. 1-2, 4-10, 12, 15-19, 27, 30-36, 40

*\*Myers v. United States*, 272 U.S. 53 (1926) .................................................................5, 7, 11, 17

*NASD, Inc. v. SEC*, 431 F.3d 803 (D.C. Cir. 2005) ....................................................................20

*National Cable & Telecommunications Association v. Brand X Internet Services*,
    545 U.S. 967, 125 S. Ct. 2688 (2005) .........................................................................15, 20

*National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) ....................................45

*National Treasury Employees Union v. Reagan*, 663 F.2d 239 (D.C. Cir. 1981) .........6, 10, 11, 43

*Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982) .....................1

*Printz v. United States*, 521 U.S. 898 (1997) ...............................................................................40

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Public Citizen v. FTC*, 869 F.2d 1541 (D.C. Cir. 1989) ................................................................45

*Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127 (1st Cir. 2005)................................................16

*SEC v. Blinder, Robinson & Co.*, 855 F.2d 677 (10th Cir. 1988)..................................................42

*In re Sealed Case*, 838 F.2d 476 (D.C. Cir.), *rev'd sub nom.*
    *Morrison v. Olson*, 487 U.S. 654 (1998) ..........................................................................34

*Shurtleff v. United States*, 189 U.S. 311 (1903)................................................................................12

*Ex parte Siebold*, 100 U.S.371 (1879) ...........................................................................................40

*Silver v. U.S. Postal Service*, 951 F.2d 1033 (9th Cir. 1991) .......................................................41

*\*Synar v. United States*, 626 F. Supp. 1374 (D.D.C.),
    *aff'd, Bowsher v. Synar*, 478 U.S. 714 (1986) ...........................................................14, 17

*Touby v. United States*, 500 U.S. 160 (1991)....................................................................................44

*United States v. Booker*, 543 U.S. 220 (2005) ................................................................................38

*United States v. Eaton*, 169 U.S. 331 (1898) ....................................................................................3

*United States v. Germaine*, 99 U.S. 508 (1879)..................................................................................5

*United States v. Grace*, 778 F.2d 818 (D.C. Cir. 1985) ................................................................44

*United States v. Hartwell*, 73 U.S. 385 (1868) ...............................................................................43

*United States v. Jones*, 763 F.2d 518 (2d Cir. 1985) .....................................................................43

*United States v. Lane*, No. 05-0260 (C.A.A.F. Sept. 20, 2006)....................................................43

*United States v. Perkins*, 116 U.S. 483 (1886) ..........................................................................7, 10

*United States v. Salerno*, 481 U.S. 739 (1987) ...............................................................................36

*Wonsover v. SEC*, 205 F.3d 408, 413-15 (D.C. Cir. 2000)............................................................12

*Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C. Cir. 1987) ...............................................11

**TABLE OF AUTHORITIES**
(continued)

Page

## CONSTITUTIONS, STATUTES AND RULES

U.S. Const. art. II, § 1 ......................................................................................1

U.S. Const. art. II, § 2 ......................................................................................3

U.S. Const. art. II, § 3 ......................................................................................1

An Act for the temporary establishment of the Post-Office § 1, 1 Stat. 70 (1789) ......................39

3 U.S.C. § 102 ................................................................................................36

5 U.S.C. § 904 ................................................................................................42

5 U.S.C. §§ 5314-15 .........................................................................................36

10 U.S.C. § 531 ..............................................................................................39

15 U.S.C. § 78ff .............................................................................................19

15 U.S.C. § 78s ..........................................................................................21, 35

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745

      § 2, 15 U.S.C. § 7202 .................................................................................22

      § 101, 15 U.S.C. § 7211 ...............................................................................26

      § 102, 15 U.S.C. § 7212 ...............................................................................19

      § 104, 15 U.S.C. § 7214 ...............................................................................23

      § 107, 15 U.S.C. § 7217 ............................................................ 12, 20, 21, 34-35

      § 109, 15 U.S.C. § 7219 ...............................................................................19

18 U.S.C. § 3501 ..............................................................................................3

28 U.S.C. § 351 ..............................................................................................13

28 U.S.C. § 509 ..............................................................................................22

28 U.S.C. § 541 ..............................................................................................39

## TABLE OF AUTHORITIES
### (continued)

**Page**

29 U.S.C. § 153 ........................................................................................................ 39

42 U.S.C. § 2000e-4 ................................................................................................. 39

## LEGISLATIVE MATERIALS

*1 Annals of Cong. (Joseph Gales ed., 1834) ........................................................... 2

148 Cong. Rec. S6327-06 (daily ed. July 8, 2002) ................................................ 26

H.R. 3795, 107th Cong. (2002) .............................................................................. 25

H.R. 5184, 107th Cong. (2002) .............................................................................. 25

S. 1896, 107th Cong. (2002) ................................................................................... 25

S. 2056, 107th Cong. (2002) ................................................................................... 25

S. Rep. No. 96-362, *reprinted in* 1979 U.S.C.C.A.N. 4315, 4323 ....................... 13

S. Rep. No. 107-205 (2002) .................................................................................... 26

*Accounting Reform and Investor Protection Hearings Before the Senate Comm. on
    Banking, Hous., and Urban Affairs*, 107th Cong. (2002) ........................... 25, 26

Letter from David M. Walker, Comptroller General, Gen. Accounting Office, to Senator
    Paul S. Sarbanes (May 3, 2002), *reprinted in* U.S. Gen. Accounting Office,
    GAO-02-411, *The Accounting Profession: Status of Panel on Audit
    Effectiveness Recommendations to Enhance the Self-Regulatory System*
    app. VI, at 80 (2002), *available at* http://www.gao.gov/new.items/d02411.pdf .............. 25

## EXECUTIVE MATERIALS

*Reorganization Plan No. 10 of 1950, 15 Fed. Reg. 3175, 64 Stat. 1265 (May 24, 1950),
    *reprinted in* 5 U.S.C. app. ............................................................................. 42

37 Op. Att'y Gen. 227 (1933) ................................................................................. 41

*Applicability of Executive Order 12674 to Personnel of Regional Fishery Management
    Councils*, 17 Op. Off. Legal Counsel 150 (1993) ........................................ 31-32

# TABLE OF AUTHORITIES
## (continued)

**Page**

*The Constitutional Separations of Powers Between the President and Congress*,
20 Op. Off. Legal Counsel 124 (1996) ...................................................................10, 17, 41

*Department of Housing and Urban Development – Delegations of Authority – 42 U.S.C.
§§ 3533, 3535*, 2 Op. Off. Legal Counsel 87 (1978) ............................................................3

*United States Attorneys – Suggested Appointment Power of the Attorney General –
Constitutional Law (Art. II, § 2, cl. 2)*, 2 Op. Off. Legal Counsel 58 (1978) .....................3

# MISCELLANEOUS

C.J.S. *Military Justice* (2006) ...........................................................................................7

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During
the First Half-Century,* 47 Case W. Res. L. Rev. 1451 (1997) .........................................38

*The Federalist* No. 48 (Madison).....................................................................................17

*The Federalist* No. 76 (Hamilton) ...................................................................................44

Joseph Story, *Commentaries on the Constitution* (1833) ...............................................7

Noah Webster, *An American Dictionary of the English Language*
(New York, S. Converse 1828).......................................................................................42

*Government Accountability Office, *Securities and Exchange Commission, Actions
Needed to Improve Public Company Accounting Oversight Board Selection
Process* (Dec. 2002), available at http://www.gao.gov/new.items/d03339.pdf................44

U.S. Office of Personnel Management, Salary Table No. 2005-EX ............................36

U.S. Securities and Exchange Commission, *Current SEC Commissioners*,
http://www.sec.gov/about/commissioner.shtml................................................................42

## ARGUMENT

**I.    CONGRESS VIOLATED THE SEPARATION OF POWERS BY INSULATING THE PCAOB FROM PRESIDENTIAL SUPERVISION AND CONTROL**

Separation of powers "ensure[s] that those who wield[] [government power are] accountable to the political force and will of the people." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991). As the Supreme Court has explained, the Constitution's "clear assignment of power to a branch . . . allows the citizen to know who may be called to answer for making, or not making, those delicate and necessary decisions essential to governance." *Loving v. United States*, 517 U.S. 748, 758 (1996). Here, both the United States and the PCAOB (collectively, Defendants) concede that the power exercised by the Board is not legislative, but is "execution of the law" or "executive."[1] And, of course, under our Constitution, it is the President who "shall take Care that the Laws be faithfully executed" and otherwise possesses the "executive Power." U.S. Const. art. II, §§ 1, 3.

Consequently, the question here is whether the Act "impermissibly interferes with the President's exercise of his constitutionally appointed functions," *Morrison*, 487 U.S. at 685, just as the question with respect to intrusions on the courts would be whether Congress has "impermissibly undermined . . . the role of the judicial branch," *CFTC v. Schor*, 478 U.S. 833, 856 (1986); *see also N. Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982). Obviously the most direct means of preventing the President from fulfilling his constitutionally assigned "take care" and other functions is to transfer those functions to an entity that is not

---

[1] *Bowsher v. Synar*, 478 U.S. 714, 733 (1986) ("[i]nterpreting a law enacted by Congress to implement [a] legislative mandate is the very essence of 'execution' of the law"); *Buckley v. Valeo*, 424 U.S. 1, 140-41 (1976) (per curiam) (FEC's "broad administrative powers" do not "operate . . . merely in aid of congressional authority to legislate."); Pl. Br. at 19-21. Indeed, as the Supreme Court has noted, the Court's modern cases have *expanded* the notion of what duties should be considered "executive": "As Justice White noted in his dissent in *Bowsher*, it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Morrison v. Olson*, 487 U.S. 654, 691 n.28 (1988).

accountable to or controllable by the President (and therefore not accountable to or controllable by the people who elect him).  The Supreme Court has tolerated some diminution of presidential control of those who exercise his constitutionally assigned function of executing the law by allowing some restrictions on removal concerning those whom the President has selected and appointed, such as the Commissioners of the SEC.  *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935).  Here, however, Congress has deliberately vested the power to execute a wide-ranging and extraordinarily significant law in officers over whom neither the President nor anyone in the Executive Branch exercises *any* control, because all the mechanisms for control—from appointment to removal to supervision to budget—have been deliberately taken out of the Executive's hands.  Since one of the President's most important constitutionally assigned functions is executing the law, and the elimination of all direct control over the officers executing the law obviously and dramatically interferes with his ability to perform this function, the Sarbanes-Oxley Act is plainly unconstitutional under *Morrison*.  *See* Pls. Br. at 13-28.

While the Act offends basic separation of powers principles in myriad ways, its most obvious and straightforward flaw is that it "completely strips" the President of his "most important" "means of supervising or controlling" government officers—the power to remove them from office.  *Morrison*, 487 U.S. at 696.  As explained in our opening brief, the President's removal power is essential to ensuring that "those who are employed in the execution of the law . . . be in their proper situation, and the chain of dependence preserved."  1 Annals of Congress 499 (J. Gales ed., 1834) (remarks of Madison); *see also* Pls. Br. at 14-18.  The Act's restrictions on the President's removal authority alone render the Act unconstitutional.  *See* Pls. Br. at 14-23.

1.    The PCAOB and the United States try to evade the centrality of the President's removal power to separation of powers jurisprudence through a radical understanding of the

Excepting Clause of the Constitution.  The Excepting Clause allows Congress to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2.  In Defendants' view, under this Clause, "Congress may vest appointment of *inferior* officers in the heads of departments," and when it "does so," Congress may, because the removal power is an incident of the power to appoint, prescribe *any* "conditions for removal" that "'*it deems best for the public interest*.'"  PCAOB Br. at 1, 10, 34-36 (emphases in the original); *see also* U.S. Br. at 29. Accordingly, under Defendants' theory, Congress may prohibit Presidential removal of any inferior officer for any reason if it decides that *permanent* tenure is in the "public interest."  This is not the law.  If it were, separation of powers doctrine would be meaningless.

This is easily demonstrated.  Under Defendants' theory, Congress could assign the authority to appoint the Solicitor General to the Attorney General and, having done so, greatly restrict or even completely eliminate the Attorney General's ability to remove this so-called "inferior officer."  It certainly could, for example, prohibit the Attorney General from removing the Solicitor General if, contrary to the Attorney General's or President's order, the Solicitor General refused to defend the constitutionality of an act of Congress.  *Cf. Dickerson v. United States*, 530 U.S. 428 (2000)  (Solicitor General declines to defend constitutionality of 18 U.S.C. § 3501).  Defendants' theory is all the more stunning given the numerous officers who have been held to be inferior, including those conducting criminal prosecutions and foreign policy.[2]

Indeed, in light of their erroneous contention that "departments" include independent

---

[2] *See, e.g., United States Attorneys—Suggested Appointment Power of the Attorney General—Constitutional Law (Art. II, § 2, cl. 2)*, 2 Op. Off. Legal Counsel 58, 59 (1978) (U.S. Attorneys are "inferior officers"); *Department of Housing and Urban Development—Delegations of Authority—42 U.S.C. §§ 3533, 3535*, 2 Op. Off. Legal Counsel 87, 89 (1978) ("Deputy Assistant Secretaries unquestionably are inferior officers"); *United States v. Eaton*, 169 U.S. 331, 340 (1898) ("vice consul" is a "subordinate officer").

agencies, such as the SEC, that are run by a multi-headed committee, *see infra* pp. 36-41,

Defendants' theory would allow Congress to strip the President of any post-appointment control

over even traditional Cabinet departments and the functions they perform.  Under Defendants'

syllogism, Congress may empower independent agencies, rather than Cabinet officers removable

at will, to both appoint and remove "inferior officers" because such agencies are purportedly

"departments" and purportedly "*no different*" than the Attorney General.  PCAOB Br. at 32; *see

also infra* p. 10.  Thus, Congress could vest the Attorney General's power in an independent

"Law Enforcement Commission," where the Commissioners must consist of members of both

parties and be removable only for cause, and vest the Solicitor General's appointment and

removal in that bipartisan group.  The same would be true of all Cabinet departments and

functions, from State to Treasury to Commerce.

Needless to say, any variant of Defendant's novel theory makes no sense under

separation of powers principles, which indisputably are intended to ensure that Congress does

*not* strip "the President[] [of his] ability to control" the executive powers "wielded by" his

subordinates, *including* by his inferior officers.  *Morrison*, 487 U.S. at 685.  The Excepting

Clause simply is not an exception to separation of powers.  It is therefore not surprising, as we

presently show, that Defendants' interpretation finds no support in the Excepting Clause's text,

history, or jurisprudence and is at war with both basic separation of powers principles and

Supreme Court precedent, particularly *Morrison*.

1.A.    Far from undermining the ability of the President to control the Executive Branch,

it is clear that the Excepting Clause is an administrative mechanism intended to *facilitate* such

control.  The Excepting Clause rests on the notion that the President cannot personally exercise

the entirety of the executive power, but must do so through his subordinates.  Thus, under the

Appointments Clause, the President must have the authority to appoint his principal officers, who are the President's "alter ego" in their respective departments, *Myers v. United States*, 272 U.S. 53, 133 (1926), and who "represent him in a thousand acts to which it can hardly be supposed his personal attention is called; and thus he is enabled to fulfill the duty of his great department, expressed in the phrase that 'he shall take care that the laws be faithfully executed,'" *Cunningham v. Neagle*, 135 U.S. 1, 64 (1890). The "obvious purpose" of the Excepting Clause "is administrative convenience." *Edmond v. United States,* 520 U.S. 651, 660 (1997). The Clause, then, merely authorizes Congress to vest these principal officers with the power to appoint their "aids and subordinates." *United States v. Germaine*, 99 U.S. 508, 511 (1878). And when Congress does so, absent statutory direction otherwise, the President must exercise his removal authority "through" his "alter egos." *See In re Hennen*, 38 U.S. 230, 259 (1839); *Morrison*, 487 U.S. at 692 . But the Excepting Clause does *not* remove these inferior officers from the President's direct control. Rather, it merely ensures "that those officers appointed by the President with Senate approval could on their own appoint their subordinates, who would, of course, by the chain of command still be under the direct control of the President." *Morrison*, 487 U.S. at 720-21 (Scalia, J., dissenting).

1.B.    *Morrison* confirms this beyond all doubt. *Morrison* addressed the constitutionality of restrictions on the Attorney General's authority to remove the independent counsel—who was not appointed by the President (or his subordinate) and was an "inferior officer." 487 U.S. at 671. If Defendants' understanding of separation of powers were correct, the Court would have resolved this case by simply holding that any removal restrictions on this inferior officer were permissible because the power to remove is an incident of the appointment power and Congress deemed removal restrictions to be consistent with the "public interest." It

did not. Instead, the Court said that "the real question" under separation of powers doctrine, *id.* at 690, was whether "the provision of the [Ethics in Government] Act restricting the Attorney General's power to remove the independent counsel to only those instances in which he can show 'good cause,' taken by itself, impermissibly interferes with the President's exercise of his constitutionally appointed functions." *Id.* at 685. The Court, moreover, emphasized that a removal restriction *would* be unconstitutional if it "completely stripped from *the President*" "the power to remove an executive official," including, as in *Morrison*, an "inferior officer," because such a restriction would so "deprive[] the President of control over the independent counsel [as] to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws." *Id.* at 692-93 (emphasis added). Ultimately, the Court concluded that the broad "good cause" removal provision left the President "ample authority" to control the independent counsel "through the Attorney General." *Id.* at 692. The important point, however, is that this entire analysis would have been utterly meaningless if, as Defendants assert, Congress could impose *any* restriction on the removal of an inferior officer consistent with the "public interest."[3]

 1.C. Thus, *National Treasury Employees Union v. Reagan*, 663 F.2d 239 (D.C. Cir. 1981) ("*NTEU*"), and the other cases that Defendants cite are beside the point. None of them addressed Congress's attempt to restrict the President's removal powers. *NTEU*, for example, observed that although the President could not himself revoke an appointment made by the Secretary of Defense, he could, as in *Morrison*, "of course, order the Secretary of Defense to

---

 [3] *Morrison* likewise belies the assertion that separation of powers doctrine "limit[s] Congress only in one particular way: Congress cannot retain any legal right to participate *itself* directly in the appointment or removal of officials." Former SEC Chmn Br. at 15. Were that the law, *Morrison* would have ended with the observation that the Ethics in Government Act did "not involve an attempt by Congress itself to gain a role in the removal of executive officials." *Morrison*, 487 U.S. at 686. Of course, it did not. *See also Loving*, 517 U.S. at 757 (even where "a branch does not arrogate power to itself, . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties"); *Schor*, 478 U.S. at 856 (undertaking separation of powers analysis where there was "no question of the aggrandizement of congressional power at the expense of a coordinate branch").

revoke the appointment, and can fire the Secretary of Defense if he refuses to revoke it." *Id.* at

247-48.  The same is true with respect to the cadet in *United States v. Perkins*, 116 U.S. 483

(1886), who, as the United States concedes, could be removed by the Secretary of the Navy for

"the failure to accept supervision" in any manner whatsoever.  U.S. Br. at 31; *see also Morrison*,

487 U.S. at 724 (Scalia, J., dissenting).[4]  Indeed, as explained in our opening brief, the Supreme

Court has *never* countenanced any restriction upon the President's removal power more intrusive

than a requirement that such removal be "for cause."  Pls. Br. at 18.[5]

Instead, Defendants' cases simply stand for the modest proposition that, as even

PCAOB's selective quotation confirms, "in the *absence of all constitutional provision* or

statutory regulation, it would seem to be a sound and necessary rule to consider the power of

removal as incident to the power of appointment."  PCAOB Br. at 28 (quoting *In re Hennen,*

38 U.S. 230, 259 (1839) (emphasis added)).  For the reasons already explained, the rule of these

cases thus establishes, at most, that the President, in a case of statutory silence, should effect the

removal of an inferior officer appointed by a Department head via a directive to that Department

head, rather than doing it directly himself.  It plainly says nothing about whether Congress can,

consistent with the separation of powers, deprive the President of the power to remove officers

---

[4] In this respect, the United States has rejected the PCAOB's suggestion that in *Perkins*, the cadet was not removable for "any failure to accept supervision." *Compare* PCAOB Br. at 36 n.21 w*ith* U.S. Br. at 31. And, of course, the PCAOB's assertion that a cadet in a military academy cannot be removed or court martialed for failure to follow a superior's order is absurd, as such rank insubordination has always been cause for removal in the military.  *See* 57 C.J.S. *Military Justice* § 62 (2006).

[5] Defendants' reliance on Justice Story's idiosyncratic views to bolster their view that Congress can impose any restriction on the removal of an inferior officer consistent with the "public interest" is misplaced. *See* PCAOB Br. at 34-35 (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* §§ 1531, 1538 (1833)).  Justice Story believed that Congress's authority to regulate the removal of "'inferior officers' (which appellation probably includes ninety-nine out of a hundred of the lucrative offices in the government)," allowed Congress to "'requir[e] the consent of the Senate to [such] removals.'"  *Myers*, 272 U.S. at 150 (quoting Justice Story).  Needless to say, Justice Story's views have not withstood the test of time.  *See id.* at 162 (finding that Justice Story's views "cannot be supported"); *Bowsher*, 478 U.S. at 726 ("Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws.").

performing important executive functions.  *Cf. Morrison*, 487 U.S. at 674 (*Hennen* was "not intended to define the constitutional power of Congress" (quotation omitted)).  As the United States aptly notes, protecting the President's removal authority is "important" precisely because it is a "powerful tool for control" "over what a subordinate does," and thus must be analyzed in that light, not on the basis of who appointed the officer.  U.S. Br. at 25 (quoting *Edmond*, 520 U.S. at 664).  As the United States also correctly notes, *Morrison* makes this explicit:  "The analysis contained in our removal cases is designed . . . to ensure that Congress does not interfere with the President's exercise of the 'executive power' in his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II."  *Id.* (quoting *Morrison*, 487 U.S. at 689-90).  As noted, *Morrison* exhaustively analyzed this question of presidential interference, even though neither the President nor any executive branch subordinate had appointed the independent counsel, thus conclusively refuting the assertion that the Constitution provides no protection for such removal authority if the President has been denied appointment authority.

     1.D.    Consequently, as *Morrison* explicitly holds, "the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duties," not on who appointed the officer at issue.  487 U.S. at 691.  That being so, it is clear as can be that depriving the President of the power to appoint in the first instance does not, as the PCAOB suggests, provide Congress with *carte blanche* over restricting the President's removal authority.  Any such rule would not only be contrary to *Morrison*, but to common sense.  The power to appoint like-minded subordinates is an important means for the President to ensure that his constitutional duties are vigorously carried out (albeit not as important as the removal power).  It would make no sense to say that Congress' authority to deprive the President of the most important control mechanism—removal—is somehow

*enhanced* if Congress has also deprived him of another important mechanism—appointment—by vesting appointment in an entity not beholden to him, such as the SEC.

Indeed, no case has suggested that the determinant of Congress's power to restrict removal turns on whether the officer is "inferior" or principal. Even *Humphrey's Executor* held that the question of the President's removal authority turned on whether the officer was in "one of the units of the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive." 295 U.S. at 627. Removal limitations were permissible there only because the FTC commissioners, unlike those in the "Department of Foreign Affairs" discussed by Madison in the "decision of 1789," "exercise[d] no part of the executive power vested by the Constitution in the President," but were "an agency of the legislative and judicial departments." *Id.* at 628, 630.[6] Thus, the *Humphrey's Executor* test turns on whether the *function* performed by the officer is executive or legislative, not on whether the officer is inferior or principal. (And, as noted, no one contends here that the PCAOB performs a legislative rather than executive function, assuming *arguendo* that this "rigid categorization" approach survives *Morrison*. *But see Morrison*, 487 U.S. at 689 (rejecting such "rigid categor[ization]").)

In light of these established principles, it is not at all surprising that, until now, the United States has repudiated the argument that Congress may restrict the Executive Branch's authority to remove an inferior officer for any reason it determined to be in the "public interest." Indeed, the Department of Justice opinion upon which Defendants rely squarely rejects this argument. It concludes, rather, that the most that Congress may do is impose a "good cause" restriction on the removal of an inferior officer, and even then:

---

[6] The FTC's powers at the time were, moreover, extremely limited, and included no rulemaking power at all. *See* Pl. Br. at 21 n.5.

> *Bowsher* and *Morrison* together suggest that a generous reading of the President's
> (or a department head's) power to remove an *inferior officer for cause* may be
> *essential* to the constitutionality of removal restrictions concerning *even those
> officers whose functions are narrow*.[7]

In short, as explained in our opening brief, separation of powers principles require that

the President control *all* exercises of executive power through the broad power of removal. He

may, of course, exercise this power *through* principal officers, like the Attorney General (as in

*Morrison*) or the Secretary of Defense (as in *NTEU*), who are the President's "alter ego" subject

to his plenary authority and control. And with respect to some "[inferior] officers whose

functions are narrow," Congress may impose a "for cause" restriction, broadly understood, on

the President's removal power. *Id.*; *see also Perkins*, 116 U.S. at 485. But it may not break this

"chain of command" to the President either by vesting the power to remove an executive branch

official in someone who is *not* accountable to the President or by imposing anything greater than

a broad for-cause restriction on removal, because to do so would "impermissibly interfere with

the President's exercise of his constitutionally appointed functions." *Morrison,* 487 U.S. at 685.

2.    Defendants argue in the alternative that the President does "indirectly" exercise

some removal authority (and some control) over PCAOB members, because PCAOB members

"are removable by the SEC." PCAOB Br. at 32. This "indirect form of removal authority,"

Defendants contend, "is *no different* from the sort upheld in *Morrison*," wherein "the statute . . .

granted removal authority to the Attorney General." *Id.* at 33 (emphasis added). This argument

is plainly wrong for a number of reasons.

2.A.    The SEC is not even remotely analogous to the Attorney General. The Attorney

General (like the Secretary of Defense in *NTEU* and the Secretary of the Navy in *Perkins*) is the

---

[7] *The Constitutional Separations of Powers Between the President and Congress*, 20 Op. Off. Legal
Counsel 124, 169 n.117 (1996) (emphases added).

President's "alter ego," subject to his unfettered control. *Myers*, 272 U.S. at 133. From a separation of powers standpoint it is utterly irrelevant whether the President removes an inferior officer directly or "order[s] the Secretary of Defense" or Attorney General to do so on his behalf. *NTEU*, 663 F.3d at 248. The only difference is a telephone call. In stark contrast, the SEC is an "independent agency." *Mistretta v. United States*, 488 U.S. 361, 387 n.14 (1989); *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 33 n.3 (D.C. Cir. 1987). As such, it is "specifically designed *not* to have the quality . . . of being 'subject to . . . the President's accountability to the people.'" *Freytag*, 501 U.S. at 916 (Scalia, J., concurring in the judgment). Even the PCAOB acknowledges the self-evident truism that the whole point of creating "an 'independent agency'" is to make it "independent of the control of the President." PCAOB Br. at 25 (quoting *Mistretta*, 488 U.S. at 424 (Scalia, J., dissenting)). As *Humphrey's Executor* held and as the SEC's Former Chairmen candidly acknowledge, "modern administrative agencies" like the SEC "'cannot in any proper sense be characterized as an arm or an eye of the executive.'" Former SEC Chmn. Br. at 28 (quoting *Humphrey's Executor*, 295 U.S. at 628).

      2.B.    More generally, there is simply nothing to Defendants' assertion that the President may "indirectly remove" PCAOB members and thus indirectly exercise some control over their exercise of the PCAOB's extraordinary powers. According to the PCAOB (at 32-33), "[i]f a Board member engaged in sufficiently serious misconduct and the [SEC] Commissioners nevertheless refused to remove him, the President could remove the SEC Commissioners." But the PCAOB's own analysis of both the SEC's removal power over PCAOB members and the President's removal authority over SEC Commissioners shows that the President does not have any meaningful power, direct or indirect, to remove PCAOB members for any arguably rational exercise of discretionary power, and thus has no ability to influence their exercise of that power.

First, with respect to the SEC's own removal authority over PCAOB members, the removal power of that independent agency is far more limited than any restriction ever upheld by the Supreme Court, even with respect to the President himself.  The Attorney General in *Morrison*, for example, could remove the independent counsel "for good cause."  *Morrison*, 487 U.S. at 663.  Similarly, the FTC commissioners in *Humphrey's Executor* could be removed for "inefficiency, neglect of duty, or malfeasance in office."  *Humphrey's Executor*, 295 U.S. at 629.  Here, in contrast, the SEC may remove a PCAOB member only if, after notice and hearing, it concludes that the member: "(A) has *willfully violated* any provision of this Act, the rules of the Board, or the securities laws; (B) has *willfully abused* the authority of that member; or (C) without reasonable justification or excuse, has *failed to enforce* compliance with any such provision or rule, or any professional standard."  SOX § 107(d)(3), 15 U.S.C. § 7217(d)(3) (emphasis added).[8]

However this niggardly removal provision is parsed, it is plain as can be that the SEC has no power to remove a member who engages in negligent misconduct, who launches deep and onerous investigations into what he erroneously perceives as violations of law, or who otherwise interprets and enforces the securities laws in a manner that the SEC believes is completely improper.  *See* Pl. Br. at 22.  Under Defendants' own interpretation of this provision, "willful" means that the member "knows what he is doing."  PCAOB Br. at 36 (quoting *Wonsover v. SEC*, 205 F.3d 408, 413-15 (D.C. Cir. 2000)).  Thus, the Board member must at a minimum *know* that

---

[8] The United States half-heartedly suggests that it might be possible to construe Section 107(d)(3) of the Act as permitting removal for any "good cause shown," regardless of the statutory enumeration of bases for removal.  U.S. Br. at 31 n.23.  The Supreme Court, however, squarely rejected this argument in *Humphrey's Executor*.  It held that where, as here, an office is limited to a term of years and removal is limited to enumerated causes, those causes are exclusive.  *See Humphrey's Executor*, 295 U.S. at 621-24 (finding the statutory language "definite and unambiguous" and limiting *Shurtleff v. United States*, 189 U.S. 311 (1903), to government offices for which "no term of office was fixed by the act").

he was abusing his authority or violating the law to be removed, just like a securities dealer would have to know that he was defrauding an investor in order to be liable. (And, of course, any other interpretation would impermissibly render the word "willful" utterly meaningless.) Therefore, the SEC would have no power to remove a member for what *it* perceives as a legal violation or an abuse of authority, unless the charged Board member "knows [that] what he is doing" is such an abuse. Moreover, the statute does not allow for removal of those members who unreasonably *enforce* the law, but only those who "*fail* to enforce" it unreasonably.

Needless to say, the power to remove those who violate the law or knowingly abuse their authority or unreasonably fail to enforce the law only enables the SEC to, at most, remove those who most egregiously and deliberately flout their duties or the securities statutes. Indeed, this standard is substantively the same as that governing the discipline of Article III judges, which extends to conduct "prejudicial to the effective and expeditious administration of the business of the courts," 28 U.S.C. § 351(a), and which, the Senate has explained, is "intended to include [among other things] *willful misconduct* in office [and] *willful and persistent failure* to perform duties of the office," S. Rep. No. 96-362, at 9, *reprinted in* 1979 U.S.C.C.A.N. 4315, 4323 (emphasis added). No one, however, would contend that this authority, along with Congress's corresponding power of impeachment to remove offending judges, enables Congress to ensure that the laws are interpreted in the manner Congress deems best.[9]

In all events, however the removal provision is construed, Defendants concede that the SEC cannot remove a member who pursues an interpretation of the law, or otherwise exercises his enforcement discretion, in a manner about which reasonable people could disagree. Accordingly, the PCAOB may—without fear of removal—adopt any view of the Act and its own

---

[9] *See Schor*, 478 U.S. at 848 ("Article III, § 1, was designed as a protection for the parties from the risk of legislative or executive pressure on judicial decision" (internal quotation marks omitted)).

enforcement policies supported by a rational basis, even if that view is wholly at odds with the SEC's firm view of the law and proper enforcement.

Second, and more importantly, the *President's* power to remove Board members for failure to properly implement the President's constitutional duties is nonexistent. Indeed, the PCAOB's own interpretation of the President's power to remove SEC Commissioners completely refutes its simultaneous assertion that the President may remove the Commissioners for failure to follow the President's directive to fire a Board member. The PCAOB quite clearly asserts that even a "good cause" standard for removal of SEC Commissioners would "'not [authorize] removal because of the appointee's failure to accept presidential instructions.'" PCAOB Br. at 36 n.21 (quoting *Synar v. United States*, 626 F. Supp. 1374, 1398-99 (D.D.C. 1986) (per curiam)). According to the PCAOB, moreover, the President's removal authority over SEC Commissioners is even narrower, being limited to "'inefficiency, neglect of duty, or malfeasance in office.'" PCAOB Br. at 33 (quoting *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619 (2d Cir. 2004). It follows that, at most, the President could remove an SEC Commissioner for failing to remove a Board member only if the Commissioner had a "duty" to remove that Board member, such that the failure to do so constituted a "neglect of duty." *Id.* And a Commissioner would have a *duty* to remove a Board member only if it was indisputable that the member had engaged in serious misconduct justifying removal under the statutory provision. Thus, for example, if a Commissioner had a good faith, arguable basis for concluding that a Board member had not abused his authority, or that his conceded violation of the law or abuse of authority was not "willful" or "knowing," or that his undisputed failure to enforce the law was "reasonably justified" by the Board member's personal problems, then the Commissioner would have no "duty" to remove him. (And, of course, removal of an SEC Commissioner by the President

would not cause the removal of the miscreant Board member, which could only be accomplished if the President removed and *replaced* a *majority* of the Commissioners, who then might take the President's view of the Board member's transgressions.)

Consequently, the President can indirectly remove a Board member only if *both* the SEC Commissioners and the Board member were completely and unreasonably derelict in their duties. Needless to say, it would be virtually impossible to show that both the Commissioners and the Board member engaged in such unreasonable and unjustified actions. More to the point, the President's power to remove only those Board members who, by any reasonable standard, have knowingly failed in their duties, enables him only to ensure that the Board does not obviously "flout the law" or engage in "serious misconduct." PCAOB Br. at 32-33, 40. But firing such obvious wrongdoers does not enable the President to fulfill his duty to "take care that the law is faithfully executed" since it disables him from even indirectly requiring pursuit of what he views as the *best* enforcement policies and the *best* view of the securities laws. This is in stark contrast to *Morrison*, where the independent counsel's "lack[] [of] policymaking or significant administrative authority" was one of the primary reasons why the much broader for-cause removal provision withstood constitutional scrutiny. *Morrison*, 487 U.S. at 691.

The range of enforcement and legal interpretation choices available to the Board that could be viewed as reasonable is, of course, virtually limitless. Thus, any policy choice about which Congress has not spoken directly—and which the agency has unfettered authority to flesh out under *Chevron's* second prong—would be left completely to the Board, free from any threat of even SEC removal, just as, for example, a new Antitrust chief is able to choose among a wide array of minimally rational enforcement policies. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 125 S. Ct. 2688, 2702 (2005). Where a governmental position

"involve[s] decision making on issues where there is room for political disagreement on goals or their implementation," *Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127, 132 (1st Cir. 2005) (internal quoation marks omitted), a "new administration is justified in replacing policymaking employees with members of its own party in order to ensure 'that representative government not be undercut by tactics obstructing the implementation of policies of the new administration.'" *Farber v. City of Paterson*, 440 F.3d 131, 142 n.12 (3d Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 367 (1976)).  Here, however, the President would be wholly unable to influence those fundamental and important policy choices, thus eliminating any democratic check on the Board.

In short, the President's reactive ability to nudge the SEC to stop the Board from blatantly "flouting the law" hardly amounts to any realistic ability to influence how the Board enforces the law.  Thus, under *Morrison*, the Act's removal provision, "taken by itself, impermissibly interferes with the President's exercise of his constitutionally appointed functions."  *Morrison*, 487 U.S. at 685.

3.      Perhaps recognizing that the Act cannot possibly be read as according the President the constitutionally necessary removal power, Defendants attempt to argue that "the removal provisions of the statute cannot be considered in isolation, but rather must be examined as one aspect of an overall statutory scheme."  U.S. Br. at 25.  To the extent that Defendants believe that the President may be "completely stripped" of his removal authority provided that he is given other, less effective means of oversight, they are wrong.  As noted, the President must have at least for-cause removal power over all executive branch officers (either directly or through an officer subject to his plenary authority).  As the Department of Justice has explained, even with respect to "an inferior officer . . . whose functions are narrow," "a *generous reading*"

of that removal power "may be *essential* to the constitutionality of removal restrictions."  20 Op. Off. Legal Counsel at 169 n.117 (emphases added).

"'Once an officer is appointed, it is only the authority that can remove him . . . that he must fear and, in the performance of his functions, obey.'"  *Bowsher*, 478 U.S. at 726 (quoting *Synar*, 626 F. Supp. at 1401).  That is precisely why the vast majority of *Morrison*'s separation of powers analysis is devoted to assessing whether the for-cause removal restriction on the independent counsel, "taken by itself," was unconstitutional.  *Morrison*, 487 U.S. at 685, 692-93. *Morrison* and the Supreme Court's other seminal separation-of-powers cases, including *Myers*, *Bowsher*, and *Humphrey's Executor*, reflect the fact that the *sine qua non* of the President's ability to control the exercise of executive power lies in his ability to fire those individuals who wield that power on his behalf.

*Morrison*'s analysis of the statutory scheme "taken as a whole" was not instead of, but *in addition* to, its recognition that a removal provision "taken by itself" and "in isolation" would, if too restrictive, violate the Constitution.  *Morrison*, 487 U.S. at 685, 691.  As James Madison "presciently observed, the legislature 'can with greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments.'"  *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 277 (1991) (quoting *The Federalist* No. 48 (Madison)).  Thus, even where, as in *Morrison*, the President has broad for-cause removal authority, courts still must undertake a careful and perceptive analysis to determine whether Congress has attempted to "unduly interfer[e] with the role of the Executive Branch" through other, more subtle means.  487 U.S. at 693.  But where, as here, Congress directly attacks the President's removal power, the "wolf comes as a wolf."  *Id.* at 699 (Scalia, J., dissenting).  In such circumstances, the judicial inquiry begins and ends with an

analysis of the removal power. That is why in *Morrison*, the Court examined the statute "taken as a whole" only *after* concluding that the broad "'good cause' removal provision," "taken by itself" and "in isolation," left "the Executive, through the Attorney General," with "ample authority" to control the independent counsel. 487 U.S. at 685, 691, 693.

In any event, even if the balancing test posited by Defendants applied, the PCAOB is still unconstitutional. Under this balancing test, the Court must consider a variety of factors, including the extent of the PCAOB's exercise of executive power, the limitations on the President's ability to control that power, and the reasons, if any, for Congress's incursion into presidential control. *See id.* at 695-96. Applying these factors, it is clear that the PCAOB, taken as a whole, "'impermissibly undermines' the powers of the Executive Branch." *Id.* at 696 (quoting *Schor*, 478 U.S. at 856).

3.A.    The PCAOB's wide-ranging governmental power far exceeds that of the independent counsel in *Morrison* or the FTC in *Humphrey's Executor*. Defendants' remarkable contention that the PCAOB's authority is narrow because, in their words, it is limited to "one narrow, technical field," PCAOB Br. at 16, is tantamount to saying that the State Department's authority is narrow because it is limited to foreign affairs. As the Former Chairmen of the SEC explain, the creation of the PCAOB was considered "essential to remedying" the "major structural defects [that] existed in the pre-Sarbanes-Oxley regulatory system for overseeing financial reporting by, and audits of, public companies." Former SEC Chmn. Br. at 1. These "major structural defects" are what Congress believed were a primary cause of the "rash of audit failures [that] cost investors nearly half a *trillion* dollars." PCAOB Br. at 2 (emphasis added). The PCAOB was thus created "'to deter and punish corporate and accounting fraud and corruption, ensure justice for wrongdoers, and protect the interests of workers and

shareholders.'"  U.S. Br. at 3; *see also* Council of Institutional Investors Br. at 4 ("The

*centerpiece* of [the Sarbanes-Oxley Act] is the PCAOB.").

In order to address what Congress considered to be this massive, structural problem in the

U.S. economy, the PCAOB was invested with broad authority to regulate the manner in which

every publicly traded company in America must maintain its finances.  This broad authority is

underscored by the fact that the PCAOB sets its own budget, which it then funds through a tax

imposed on the publicly traded companies that accountants audit.  SOX § 109(b)-(d), 15 U.S.C.

§ 7219(b)-(d).  And were there the slightest doubt as to the breadth and depth of the PCAOB's

authority, it would be eliminated by the fact that a violation of the PCAOB's rules or regulations

can result in imprisonment for twenty years.  *See* SOX § 102(b), 15 U.S.C. § 7202(b); 15 U.S.C.

§ 78ff(a).  In contrast, the "independent counsel [in *Morrison* was] appointed essentially to

accomplish a single task, and when that task [was] over the office [was] terminated."  *Morrison*,

487 U.S. at 672.  The Board's authority is likewise far broader than the FTC's in *Humphrey's

Executor*, which lacked any rulemaking authority whatsoever.  Pls. Br. at 21 n.5.

3.B.    Given the breadth of the PCAOB's authority, one would expect the President's

control over the PCAOB to be greater than, or at least comparable to, his control over the

independent counsel in *Morrison* or the FTC commissioners in *Humphrey's Executor*.  Instead,

he exercises far *less* control over the PCAOB.  Defendants repeatedly emphasize the various

forms of oversight exercised by the SEC.  But it is evident that each of these statutory provisions

is designed not to enhance, but rather, to *constrain* the President's control of PCAOB.

First, the Act "completely strips" the President of removal power, which is the "most

importan[t]" "means of supervising or controlling" federal officers.  *Morrison*, 487 U.S. at 696.

Thus, Defendants' assertion that the President has more control over the PCAOB than he did

over the independent counsel (PCAOB Br. at 8, 16; U.S. Br. at 27) is inexplicable.

Second, Defendants repeatedly emphasize that the SEC must "approve" every rule passed by the PCAOB. *See* PCAOB Br. at 12; U.S. Br. at 25. But, of course, the Act's requirement that the SEC "*shall* approve a proposed rule, if it finds that the rule is consistent with the requirements of this Act and the securities laws, *or* is necessary or appropriate in the public interest or for the protection of investors," is plainly a *restriction* on the SEC's authority. SOX § 107(b)(3), 15 U.S.C. § 7217(b)(3) (emphases added). The presence of the word "or" in this provision unambiguously means that the SEC must approve any rule that is "consistent with the requirements of this Act and the securities laws," regardless of whether "the rule is necessary or appropriate in the public interest" (and vice versa). Defendants' attempt to rewrite this provision by treating the disjunctive "or" as if it were the conjunctive "and" is contrary to both the English language and the decisions of the D.C. Circuit and the Supreme Court.[10] Defendants' hyperbole and obfuscation aside, *see* PCAOB Br. at 19; U.S. Br. at 29 n.22, the requirement that the SEC approve any rule "consistent with" the law plainly is no less deferential than the requirement under *Chevron* that a court approve an agency's rule if it is a "reasonable" construction of the law. *Nat'l Cable & Telecomms. Ass'n*, 125 S. Ct. at 2769; *see also Chevron U.S.A., Inc. v. Nat'l Res. Defense Council*, 467 U.S. 837, 843-44 (1984). And just as *Chevron* is designed to restrain the judiciary, so too is Section 107(b)(3) designed to restrain the SEC.[11]

---

[10] *See, e.g.*, *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006) (rejecting identical argument and collecting authorities); *Chisom v. Roemer*, 501 U.S. 380, 397 (1991) (noting that it would constitute "radical surgery" and "distort the plain meaning of the [statute] to substitute the word 'or' for the word 'and'").

[11] To the extent that Defendants mean to suggest that SEC review of PCAOB rules is conducted under a *de novo* standard, rather than the standard explicitly set forth in the statute, they are wrong. *See* PCAOB Br. at 14-15, 19; U.S. Br. at 14. The authorities that Defendants cite for this proposition, such as *NASD, Inc. v. SEC*, 431 F.3d 803, 806-07 (D.C. Cir. 2005), address the SEC's review of *sanctions* imposed by self-regulatory organizations, not SEC review of PCAOB rules. The SEC, however, has broader authority to review PCAOB sanctions than it does to review PCAOB rules. *See* SOX § 107(c)(3), 15 U.S.C. § 7217(c)(3).

Given these constraints on SEC oversight, Defendants understandably move to other, more indirect and less effective methods of oversight.  Defendants, for example, emphasize the SEC's authority to "abrogate, delete, or add to" PCAOB rules, "relieve the [PCAOB]" of its responsibilities, and "limit the activities of the [PCAOB]."  PCAOB Br. at 12; U.S. Br. at 25-26.  But what Defendants omit is that, far from enhancing the SEC's control, these provisions, too, are designed to constrain the SEC's ability to control the PCAOB.

For example, the SEC may not "censure or impose limitations" on the PCAOB unless it finds, "after notice and an opportunity for a hearing, that the Board—(A) has *violated or is unable to comply* with any provision of this Act, the rules of the Board, or the securities laws; or (B) without reasonable justification or excuse, has *failed to enforce compliance* with any such provision or rule, or any professional standard."  SOX § 107(d)(2), 15 U.S.C. § 7217 (d)(2) (emphases added).  For the reasons discussed above with respect to the removal provision, the SEC therefore cannot impose limits on the PCAOB because it has engaged in *unreasonable enforcement* or completely wrong-headed, albeit legally defensible, *failure* to enforce.  Likewise, the SEC may not "abrogate, delete, or add to" a PCAOB rule, or "relieve" the PCAOB of its responsibilities, *except* through notice-and-comment rulemaking.  *See id.* § 107(b)(5), 15 U.S.C. § 7217(b)(5) (cross-referencing 15 U.S.C. § 78s(c)); SOX § 107(d)(1), 15 U.S.C. § 7217(d)(1).  Defendants' suggestion (PCAOB Br. at 20-21; U.S. Br. at 28) that this notice-and-comment requirement somehow *enhances* the SEC's control over the PCAOB is simply baffling.  If a judge was required to undertake notice-and-comment rulemaking every time he instructed his law clerk to make a change in an opinion, this would plainly *constrain* the judge's control over that subordinate.  And this is so regardless of whether the Administrative Procedure Act creates limited exceptions to notice-and-comment procedures.

As this analysis reflects, the ability to amend or promulgate *rules* is not, and never has been, a procedure that is either designed or equipped to supervise or control discretionary enforcement or execution of the laws. Congress obviously has the power to amend any rule by an Executive Branch agency, or relieve it of certain responsibilities, by changing the relevant law. This hardly suggests that Congress is either directing or supervising an agency on how to implement or enforce the law.

More generally, Defendants also assert that the SEC exercises effective control over the PCAOB because it can bypass the PCAOB altogether by "engag[ing] directly in regulation and oversight of public accounting firms." U.S. Br. at 9 (citing SOX § 2, 15 U.S.C. § 7202); *see also id.* at 28-29; PCAOB Br. at 14, 41.[12] Supervisors across America will surely recoil at the notion that they can adequately supervise and control their subordinates by doing their work for them. The example set forth at the outset of this brief is illustrative. The Attorney General may exercise the power of any official within the Department of Justice. *See* 28 U.S.C. § 509. If, however, the Solicitor General were appointed by the Attorney General but not removable by him except in narrow circumstances, it is inconceivable that the Attorney General's ability to supplant the Solicitor General would cure the constitutional problem. Indeed, it would be no different than suggesting that a judge could adequately supervise and control his law clerks by writing his own bench memoranda and doing all legal research by himself.

In short, a wholly unexercised and theoretical power of an agency to *take over* certain powers of an unconstitutional entity hardly suggests that that entity's continued exercise of those

---

[12] The Defendants' understanding of the scope of the SEC's "general rulemaking authority" under Section 2(a) of the Act, 15 U.S.C. § 7202(a), is highly dubious. The Act gives the SEC numerous responsibilities of its own to enforce, *see, e.g.*, SOX tits. III-XI, and it would be passing odd if this generic grant of authority were understood as authorizing the SEC to also take over those very functions delegated to the PCAOB.

powers is constitutional.  Unless and until the properly-structured agency does assume the enforcement powers, it continues to be exercised by persons unconstitutionally able to do so, because removed from any presidential supervision.

Defendants' argument that the SEC can control the PCAOB therefore rests on its two remaining oversight powers:  the SEC's approval of the PCAOB's budget and its authority to review sanctions imposed by the PCAOB.  *See* PCAOB Br. at 13; U.S. Br. at 12.  Neither, however, is even remotely sufficient.  To suggest that approval of the PCAOB's budget allows the SEC to control the PCAOB's exercise of government power is to suggest that Congress has like power over the Executive Branch.  Obviously, however, Congress does not control the Executive Branch.  And while the SEC's authority to review PCAOB sanctions is fairly broad, its authority over this single aspect of the PCAOB's functions—which does not even take place until virtually the entire regulatory process has run its course—cannot cure the absence of control over the myriad other governmental powers exercised by the PCAOB.

Defendants, moreover, ignore the vast authority that the PCAOB exercises subject to no SEC oversight at all.  The PCAOB, for example, is required to conduct a "continuing program of inspections" of every "registered public accounting firm."  SOX § 104(a), 15 U.S.C. § 7214(a).  And in conducting its these regular inspections, the PCAOB must "inspect and review selected audit and review engagements of the firm . . . , performed at various offices and by various associated persons of the firm, *as selected by the Board*."  *Id.* § 104(d)(1), 15 U.S.C. § 7214(d)(1) (emphasis added).  The SEC, however, exercises no control over which "engagements" the PCAOB decides to review, or which of a firm's "various offices" or "various associated persons" that PCAOB investigators decide to visit and interview.  The PCAOB likewise has broad authority to commence an investigation of an accounting firm whenever it

believes that a violation "may" have occurred, in the course of which it may, among other things, require "the testimony of the firm or of any person associated with" it and "the production of audit work papers and any other document or information." *Id.* § 105(b), 15 U.S.C. § 7215(b). The SEC, however, does not control the PCAOB's determination that a violation "may" have occurred. Nor does it control the PCAOB's determination that any violation is sufficiently serious to warrant an investigation or how any investigation that the PCAOB does decide to undertake will be conducted. And the SEC has no authority to direct the PCAOB to impose sanctions on the target of an investigation when the PCAOB chooses not to. In short, the SEC exercises no control over the PCAOB's daily exercise of prosecutorial discretion.

Defendants' only response is that the SEC can control the PCAOB through its authority to approve or "abrogate, delete, or add to" PCAOB rules under Section 107(b) of the Act, 15 U.S.C. § 7217(b), or promulgate its own rules under Section 2, 15 U.S.C. § 7202. U.S. Br. at 28. As explained above, this authority is highly circumscribed and so does not constitute control in any meaningful sense. *See supra* p. 21. More fundamentally, the promulgation of rules and regulations simply cannot dictate the myriad decisions that must be made in determining whether and to what extent prosecutorial discretion is to be exercised—such as whether a violation "may" have occurred in a given circumstance, whether that possible violation is sufficiently serious to warrant further investigation, or how much further investigation is necessary to determine whether the pursuit of sanctions may (or may not) be warranted. In short, as previously explained, notice-and-comment rulemaking is not a means of supervising and controlling prosecutorial discretion. It is therefore not surprising that the SEC has never even attempted to use its rulemaking power in this utterly bizarre way.

3.C. At bottom, Defendants' argument is that the PCAOB really is nothing more than a

"subunit . . . of its parent, the SEC." Former SEC Chmn. Br. at 33. Defendants would have this Court believe that the SEC can control the PCAOB as if the PCAOB were simply the SEC's Bureau of Audits. This assertion, however, is belied by the entire legislative scheme adopted in the Sarbanes-Oxley Act.

First, Congress considered and rejected making the PCAOB part of the SEC. As Defendants note, Congress "consider[ed] at least 26 different bills and conduct[ed] 33 hearings" before settling upon the current structure of the PCAOB. PCAOB Br. at 2. These different proposals included, among other things, requiring the SEC to "establish the Office of Audit Review within the Division of Corporate Finance of the Commission to oversee the audits of certain public companies," H.R. 5184, 107th Cong. (2002); "establish[ing] a Federal Bureau of Audits within the Securities and Exchange Commission to conduct audits of all publicly registered companies," H.R. 3795, 107th Cong. (2002); and delegating to the SEC the power, ultimately given to the PCAOB by Sections 103(b) and 201(a) of the Act, to identify and prohibit non-audit services that impair the independence of the auditor, *see* S. 2056, 107th Cong. (2002); S. 1896, 107th Cong. (2002). Numerous witnesses likewise urged Congress either to create a "new body . . . housed within the SEC"[13] or to forego creation of a new agency entirely and instead delegate the power to regulate the accounting profession directly to the SEC.[14] Congress,

---

[13] Letter from David M. Walker, Comptroller General, Gen. Accounting Office, to Senator Paul S. Sarbanes (May 3, 2002), at 6, *reprinted in* U.S. Gen. Accounting Office, GAO-02-411, *The Accounting Profession: Status of Panel on Audit Effectiveness Recommendations to Enhance the Self-Regulatory System* app. VI, at 80 (2002), *available at* http://www.gao.gov/new.items/d02411.pdf.

[14] *See Accounting Reform and Investor Protection Hearings Before the Senate Comm. on Banking, Hous., and Urban Affairs*, 107th Cong. 37 (2002) [hereinafter *Hearings*] (testimony of Richard C. Breeden, Former Chairman, SEC) ("We do not need to go and invent another [body]. We need to invigorate the SEC . . . ."); *id.* at 745 (statement of Robert E. Litan, Vice President and Director, Econ. Studies Program, The Brookings Inst.) ("I urge [Congress] at least to consider whether the SEC itself should be performing the oversight of auditors directly"); *id.* at 208 (testimony of Walter O. Schuetze, Chief Accountant, SEC, 1992-1995) ("I wouldn't have this board. . . . [D]o not create another board that is going to compete with the[ SEC].");  *id.* at 745 (statement of Arthur R. Wyatt) ("I would . . . have [the SEC] assume the principal role

however, rejected all these alternatives.

Instead, Congress decided to make the PCAOB "independent" of all "political" influence—in the words of one key participant in the debate, to vest the PCAOB with "massive unchecked power, by design."[15]  This design is not, as Defendants would believe, limited to shielding the PCAOB from the influence of the accounting industry, but, as the statutory constraints on the SEC's removal and oversight authority make clear, from the SEC itself.   As Former SEC Chairman Arthur Levitt explained, one problem with the prior regime was the "extraordinary amount of political pressure [that] was [previously] brought to bear on the [SEC]" when it attempted to limit the consulting work that auditors could perform.  *Hearings*, *supra*, at 15.  And others expressed the desire to "insulate the establishment of accounting standards from politics and pressures, both from the industry and, frankly, from Congress," *id.* at 186 (comments of Sen. Stabenow); to avoid "pressure [brought] to bear" "on Capitol Hill and throughout the business and legal communities," *id.* at 793 (statement of Bevis Longstreet, former Commissioner of the SEC); and "frankly," of the need for "an extra guarantee of [the PCAOB's] independence and its plenary authority to deal with this important situation," 148 Cong. Rec. at S6331 (statement of Sen. Sarbanes).

Indeed, it was to further this independence that Congress decided not only to make the PCAOB separate from the SEC, but to make clear that for all non-constitutional purposes, the PCAOB was "not . . . an agency or establishment of the United States Government" at all. 15 U.S.C. § 7211(b).  Instead, Congress made the PCAOB a *private corporation*, vesting it with

_____

(continued…)

in overseeing the effectiveness of the financial reporting process.  Creation of a new agency to undertake this responsibility seems unnecessary in view of the record established by the SEC over the past 65 years.").

[15] 148 Cong. Rec. S6327-06, S6334 (daily ed. July 8, 2002) (statement of Sen. Gramm); *see also* S. Rep. No. 107-205, at 6 (2002) (refereing to PCAOB's "independence"); *Hearings*, *supra*, at 44 (testimony of Arthur Levitt, former Chairman of the SEC) (referring to desire to "insulate" PCAOB).

"all the powers conferred upon a nonprofit corporation by[] the District of Columbia Nonprofit Corporation Act." *Id.* In short, Congress did everything within its power to ensure that the PCAOB was *not* part of the SEC.

3.D.     Unlike in *Morrison*, there is no apparent reason why the PCAOB needs to be insulated from presidential control. The Ethics in Government Act at issue in *Morrison* authorized an independent counsel to investigate the President and his political appointees, including the Attorney General and other Department of Justice officials. The modicum of independence accorded the independent counsel was therefore intended to ameliorate the conflict of interest that would have inhered in an investigation conducted by the very political appointees under investigation. *See Morrison*, 487 U.S. at 693. Here, in contrast, there is no possible basis for insulating the regulatory authority of the PCAOB from the President's influence, since the PCAOB exercises authority no different than numerous other regulatory agencies whose commissioners, unlike the PCAOB's, are both appointed and removable by the President. *See* Pls. Br. at 19-20 n.4. Indeed, Defendants acknowledge as much in their vigorous yet unpersuasive arguments that the PCAOB is, in fact, subject to the President's extensive control and supervision.

4.     Finally, the PCAOB's unconstitutional structure cannot be cured by severing specified provisions from the statute. It is axiomatic that a "court cannot use its remedial powers to circumvent the intent of the legislature." *Ayotte v. Planned Parenthood of N. New Eng.*, 126 S. Ct. 961, 968 (2006) (internal quotation marks omitted). Thus, where the "valid and invalid provisions [of a statute are] so intertwined that the Court would have to rewrite the law to allow it to stand," it must be invalidated in full. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). Nor is severance permissible where absent the severed provision, the statute would not

"function in a *manner* consistent with the intent of Congress." *Id.* at 685; *see also Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001). Severance is thus particularly inappropriate in cases involving the President's removal power, because striking the offensive provision from the statute produces a "significant alteration" in the "balance that Congress had in mind," "lead[ing] to a statute that Congress would probably have refused to adopt." *Bowsher*, 478 U.S. at 734-35.

These principles foreclose severance in this case. As explained above, the unconstitutional constraints on the President and SEC's ability to control the PCAOB permeate the statutory scheme. Moreover, the statute and legislative history demonstrate that Congress explicitly *rejected* the structure that Defendants propose—*viz.*, rendering the PCAOB a "subunit" of the SEC. Although Congress could have expanded the SEC's authority to regulate the accounting industry by itself or, alternatively, created an agency whose commissioners were appointed by the President and subject to his removal, it rejected these proposals in favor of an independent "corporation." It is thus "abundantly clear from both the statute and its legislative history" that judicially dissecting this statute in a vain effort to cure its unconstitutionality would "significant[ly] alter[]" the "balance that Congress had in mind." *Id.*

## II. CONGRESS VIOLATED THE APPOINTMENTS CLAUSE BY LODGING THE POWER TO APPOINT PCAOB MEMBERS IN AN INDEPENDENT AGENCY THAT IS ITSELF INSULATED FROM PRESIDENTIAL CONTROL

Congress also violated the Constitution by vesting the SEC with the power to appoint PCAOB members. *See* Pls. Br. at 28-43. Like the power to remove, the power to appoint is vital to the Constitution's structural guarantee that the Chief Executive bear ultimate responsibility— and political accountability—for those who exercise the executive power on his behalf. *See Freytag*, 501 U.S. at 884. This aspect of the separation of powers manifests itself in the Appointments Clause, which requires that principal officers be appointed by the President and

that inferior officers be appointed by either the President or the "Head" of one of his "Departments."

Defendants do not dispute that PCAOB members are officers of the United States who must be appointed pursuant to the Appointments Clause.  *See* PCAOB Br. at 10 & n.3; U.S. Br. at 11 n.8.  They argue, however, that PCAOB members are inferior officers and that, as such, they may be appointed by the "Head" of a "Department"—*viz.*, a majority of the five Commissioners of the SEC.  Defendants are wrong on all counts:  PCAOB members are principal officers; the SEC is not a "Department"; and the Commissioners are not its "Head."

1.    For an officer of the United States to be deemed inferior, he must be "directed and supervised" by a principal officer appointed by the President and confirmed by the Senate. *Edmond*, 520 U.S. at 663.  Supreme Court precedent, as well as common experience in a normal workforce, demonstrate that the question whether one is subject to direction and supervision by another is a function of whether one's continued employment is subject to the unfettered discretion of a supervisor; the extent to which a superior is expressly provided direct oversight authority; and the scope of one's power to decide important policy issues.  To the extent a supervisor has complete, unfettered power to fire a subordinate, it is rarely necessary to spell out the superior's ability to direct and supervise because the ability to enforce his policy preferences is inherent in his ability to fire the subordinate at will.  Conversely, the more restricted the power to remove, the more important it is to spell out the specifics of supervisory control, because the supervisor lacks the ability to enforce his will through the threat of removal.  And, of course, the more that an officer exercises wide-ranging policy authority akin to that normally exercised by principal officers, the less likely it is that the officer can be deemed "inferior."

Here, as detailed below, the Board members are superior officers under all three criteria. The SEC cannot remove them at will or for failing to follow supervision, so the traditional method of supervision—either comply with a superior's policies and orders or lose the job—is not present. Nor is this gap plugged by any statutory provisions which authorize or contemplate the SEC's "direction and supervision" of the Board's enforcement policies. And, of course, the Board's policy-making authority is extraordinarily broad.

The Supreme Court's cases reflect these common sense principles. The Supreme Court has labeled officers "inferior" although not subject to at will removal, if they have limited responsibilities. *See Morrison*, 487 U.S. at 671-72. It has also done so where officers exercise somewhat broader governmental authority if they are removable at will. *See Edmond*, 520 U.S. at 664-65. But those cases make clear that an officer cannot be inferior where, as here, the removal protections foreclose policy direction by any superior entity, the officers exercise extraordinarily expansive policy making authority, and that broad authority is subject only to circumscribed review.

In addition, at the most basic level, the Board has none of the normal, common sense attributes of an "inferior." As noted, Congress deliberately designed it as a private corporation and, as such, it is an autonomous entity which does not report under any organizational plan to the SEC or anyone else. It also finances itself through its own taxation. These bedrock hallmarks of independence from normal governmental constraints were, again, done precisely to "insulate" the Board from any "pressure" brought to "bear" by the SEC. Given this extraordinary autonomy from the normal budgetary and administrative process, it plainly would be contrary to congressional intent and the logic of the statutory scheme to relegate this free-standing independent corporation to "inferior" status.

As we presently show, Defendants' efforts to negate the compelling force of the foregoing arguments are without merit.

1.A.    The PCAOB simply ignores the Act's removal restrictions, asserting in a footnote that because Congress allegedly has broad discretion to restrict the power to remove inferior officers, removal is "immaterial" to an Appointments Clause analysis.  PCAOB Br. at 15 n.5. Both the Supreme Court and the Department of Justice, however, have repeatedly and consistently recognized that the power to remove an individual is the very essence of the ability to direct and supervise and, therefore, the principal factor in determining whether an officer is inferior for purposes of the Appointments Clause.  Indeed, Plaintiffs are aware of no case in which the Supreme Court has found an officer to be "inferior" where that officer was not subject to at least a broad for-cause removal provision.

For example, the Supreme Court in *Edmond* noted that "[t]he power to remove . . . is a powerful tool for control," 520 U.S. at 664, and relied upon the Judge Advocate General's power to remove military judges *without cause* as a principal factor in concluding that these judges were inferior officers.  *See id.* at 666.  Concurring, Justice Souter emphasized that administrative supervision "*combined with* [the Judge Advocate General's] power to control [the judges] by *removal* from a case, establishes that the [judges] have the necessary superior."  *Id.* at 668 (Souter, J., concurring in part and concurring in the judgment) (emphasis added).  Similarly, in *Morrison*, the Attorney General's authority to remove the Independent Counsel was one of the key factors supporting the Independent Counsel's characterization as an inferior officer.  *See* 487 U.S. at 671.  By contrast, members of the Regional Fishery Management Council are *not* "subject to the supervision of" the Secretary of Commerce precisely because the relevant statute "severely limits the Secretary's removal power and is [therefore] designed to constrain narrowly

the Secretary's ability to supervise and control the Council members he appoints." *Applicability of Executive Order 12674 to Personnel of Regional Fishery Management Councils*, 17 Op. Off. Legal Counsel 150, 155 (1993).[16]  The power to remove, these authorities make clear, is the *sine qua non* of direction and supervision.

The United States argues that the Act's removal provisions suffice, noting that the independent counsel in *Morrison* was deemed inferior even though she could only be removed for cause.  U.S. Br. at 30.  But "for cause" removal is consistent with being "directed and supervised" because an official subject to a for-cause removal provision may be discharged for failure to accept a supervisor's directive.  *See supra* p. 10; Pls. Br. at 17-18.  Thus, the independent counsel could be fired if she defied a lawful directive of the Attorney General.  This is particularly true since the independent counsel statute obliged her to follow Justice Department policy established by the Attorney General for prosecutors, unless it was impossible to do so.  *See Morrison*, 487 U.S. at 662.  Any departure from those policies would therefore provide specific "cause" under the statute for termination.

In contrast, as established above, the removal provisions here completely prevent the SEC from removing those Board members who pursue policies and practices that the SEC considers anathema, particularly *enforcement* policies and practices, so long as they are arguably consistent with a rational conception of the securities laws and the Board member's own statutory responsibilities.  *See supra* pp. 12-14.  When, as here, a subordinate cannot be removed

---

[16] The PCAOB argues that the Justice Department distinguished the "unusual" removal restrictions at issue in *Regional Fishery Management Councils* from "more traditional legislation in which some form of 'cause' is all that is required before removal can occur."  PCAOB Br. at 37-38 (quoting *Regional Fishery Management Councils*, 17 Op. Off. Legal Counsel at 157).  But that is precisely Plaintiffs' point here:  the Act's allowance of removal only for willful abuse of authority is "unusual[ly]" restrictive and, as a result, vests the PCAOB with far "greater autonomy than that enjoyed . . . by typical 'independent' agencies."  *Regional Fishery Management Councils*, 17 Op. Off. Legal Counsel at 157.

for pursuing policies at odds with the agency's controlling policies, then he is not subject to "direction and supervision" under any intelligible understanding of that phrase.

In addition, of course, the extraordinarily circumscribed nature of the independent counsel's duties—prosecuting only one matter—did not either suggest that she possessed authority akin to that of a traditional principal officer or create any particular need for extensive supervision. If an officer's "jurisdiction" and "duties" and "tenure" are as "limited" as that of the independent counsel, it would not be possible for that officer to create significant policies affecting a large number of individuals. *Morrison*, 487 U.S. at 671-72. Thus, for example, civil service employees of the Justice Department could not be deemed principal officers, regardless of any restrictions on removal, because their duties are so circumscribed in the first instance. In contrast, where, as in *Edmond* and *Freytag*, the responsibilities of the "inferior" officers are broader (although narrower than the Board's here), they have been removable at will. *See Edmond*, 520 U.S. at 664-65; *First W. Gov't Sec., Inc. v. Comm'r of Internal Revenue*, 94 T.C. 549, 558 (1990), *aff'd*, 930 F.2d 975 (2d Cir. 1991); Pls. Br. at 32. Thus, nothing in *Morrison* suggests that wide-ranging policy makers like the Board members here could be considered inferior, even if they were subject to "good cause" removal, much less the extraordinarily limited removal permitted here.

1.B.    There is also no merit to Defendants' contention that, notwithstanding the SEC's inability to supervise and direct via removal, the PCAOB members are inferior because of the purportedly "comprehensive" oversight the SEC exercises over the PCAOB's rules, sanctions and budgets. PCAOB Br. at 11-13; *see also* U.S. Br. at 13-15. As an initial matter, Defendants confuse the authority to review for the authority to direct and supervise. The SEC exercises only the former: it conducts an appellate-like review of the PCAOB's rules and sanctions to assess

whether those rules and sanctions comply with certain statutory requirements, and rejects the ones that do not. *See* Pls. Br. at 9-10. This "power of appellate review" does not constitute direction and supervision because it "does not extend to the[ Members] personally, but is limited to their judgments." *Edmond*, 520 U.S. at 667 (Souter, J., concurring in part and concurring in the judgment). Nor does it allow the SEC to *direct* decisions before they are made rather than review them after-the-fact. Thus, the SEC's power of review under the Act no more makes the PCAOB members inferior officers than appellate review of a district court's decisions makes a district judge an inferior officer. *See id.* ("'lower federal judges . . . are principal officers' because they are 'not subject to personal supervision'" (quoting *In re Sealed Case*, 838 F.2d 476, 483 (D.C. Cir.), *rev'd sub nom. Morrison v. Olson*, 487 U.S. 654 (1998) (alteration in *Edmond*))).[17] This conclusion is reinforced by the fact that SEC review of PCAOB's actions generally proceeds not via straightforward direction to the PCAOB members, but rather through the cumbersome notice-and-comment rulemaking procedures. *See* Pls. Br. at 9.

In any event, even if mere appellate review could sometimes constitute direction and supervision for purposes of the Appointments Clause, here, the relevant statutory provisions were purposefully designed to *constrain* the SEC's oversight authority. *See supra* pp. 25-27. For reasons already explained, these provisions only permit the SEC to prevent the PCAOB's *rules* from straying outside the bounds of *rational* policy choices and do not provide *any* oversight of many of the Board's most important *enforcement* activities. Indeed, the SEC's lack of supervisory authority is underscored by Act's further constraints on the sort of "administrative oversight" that was critical to the Court's conclusion in *Edmond* that the officers were inferior.

---

[17] Nor does anything else in the Act give the SEC sufficient authority to supervise PCAOB Members "personally." As noted above, the SEC's power to remove or "censure" PCAOB Members is limited under the Act to willful abuse of authority. *See* SOX § 107(d), 15 U.S.C. § 7217(d); *supra* pp. 12-14.

520 U.S. at 664. Specifically, the Act provides that PCAOB rules "concerned solely with the administration" of the PCAOB take effect *without* prior approval by the SEC. 15 U.S.C. § 78s(b)(3)(A), (C); SOX § 107(b)(4), 15 U.S.C. § 7217(b)(4). In order to overturn such a rule, the SEC would have to actively abrogate it and subject it to the ordinary rule approval process, pursuant to which the SEC would then be required to approve it as long as it was "consistent" with law. *See supra* p. 20. It is, however, impossible to understand how administrative housekeeping rules could fail to meet that deferential standard.

In short, the PCAOB's exercise of its broad administrative and enforcement powers without direction and supervision means that the PCAOB Members are principal officers even if the SEC's limited and deferential review of rules and sanctions somehow constituted direction and supervision of *those* activities. *See Freytag*, 501 U.S. at 882 (explaining that officials cannot have one status "for purposes of some of their duties" but another status "with respect to other responsibilities"; the performance of lesser duties "does not transform [an officer's] status under the [Appointments Clause]"). And the dubious proposition that the SEC might be able to completely supplant the PCAOB through its own rulemaking power is irrelevant, since the power to supplant simply is *not* the power to direct and supervise. *See supra* p. 22.

Finally, even if the SEC's constrained oversight could somehow be deemed direction and supervision, "[i]t does not follow . . . that . . . [PCAOB members are] inferior officer[s]. Having a superior officer is necessary for inferior officer status, but not sufficient to establish it." *Edmond*, 520 U.S. at 667 (Souter, J., concurring in part and concurring in the judgment); *see also Morrison*, 487 U.S. at 654 (Scalia, J., dissenting) ("To be sure, it is not a *sufficient* condition for 'inferior' officer status that one be subordinate to a principal officer. Even an officer who is subordinate to a department head can be a principal officer."). "What is needed," even if there is

direction and supervision, "is a detailed look at the powers and duties of" the officers in question "to see whether reasons favoring their inferior officer status within the constitutional scheme weigh more heavily than those to the contrary." *Edmond*, 520 U.S. at 668 (Souter, J., concurring in part and concurring in judgment). Here, all such indicia point to principal officer status: the PCAOB Members exercise broad regulatory jurisdiction over an entire industry, including the power to enact rules and standards that are binding as criminal law, to conduct a continuing program of inspections, and to conduct disciplinary proceedings. *Cf. Morrison*, 487 U.S. at 671-72. They exercise the extraordinary powers to set their own budget and to fund that budget through a tax levied on all publicly traded companies, or on whatever subset of those public companies the PCAOB deems appropriate. Even the salaries of PCAOB Members—which, at $500,000 and $615,000 for the Chairman, far exceed the salaries of SEC Commissioners, *see* 5 U.S.C. §§ 5314-15; U.S. Office of Personnel Management, Salary Table No. 2005-EX, and even the President, *see* 3 U.S.C. § 102—point to principal officer status.[18]

      2.      Even if the PCAOB members were deemed to be inferior officers, their appointments by the SEC would still be unconstitutional both because the SEC is not a "Department" and because its commissioners are not the "Head" of the SEC.

---

[18] The PCAOB argues that the doctrine of constitutional avoidance means the Court should interpret the scope of the SEC's power to supervise in a manner favorable to rendering the PCAOB Members inferior. PCAOB Br. at 16-17, 20. As explained above, however, Defendants' statutory arguments are not a plausible interpretation of the language and purpose of the Act (and, in any event, do not render the statute constitutional). And, in the separation of powers context, like in other contexts, "th[e] canon of [constitutional avoidance] does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; [a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it." *Schor*, 478 U.S. at 841 (internal quotation marks omitted, last two alterations in *Schor*). Thus, in *Edmond* and *Morrison*, the statutes were interpreted in a straightforward manner, without any straining to give them narrow application. Moreover, the rule of *United States v. Salerno*, 481 U.S. 739 (1987), concerning facial challenges, has no applicability here. *See* PCAOB Mem. at 16. This is not a case contending that the PCAOB "will exercise its discretion unlawfully," *id.*, but that its very structure is unconstitutional, thus rendering *all* regulatory authority impermissible, no matter how beneficial on the merits.

2.A.    The SEC is not a "Department" under the Appointments Clause.  The Appointments Clause reflects the Framers' judgment that the President should retain ultimate responsibility and political accountability for the appointment of those who exercise the executive power on his behalf.  *Freytag*, 501 U.S. at 884.  The Framers understood, too, that the President and Senate would benefit from an "administrative convenience" that permitted less than the full-blown advise-and-consent process to be used for certain officers.  *Edmond,* 520 U.S. at 660; *see also* Pls. Br. at 36.  The Supreme Court has consistently recognized that these "Departments" in the Excepting Clause must be understood to refer to those divisions of the Executive Branch that constitute or resemble cabinet departments in the degree to which they are answerable to the President and subject to his unfettered control.  This requirement reflects the Framers' wisdom that only those who are subject to the direct oversight of the President and share his accountability to the people should be allowed to share in his appointment power.  It is not an authorization for Congress to insulate certain inferior officers from political pressure by vesting their appointment in an entity that is itself independent of the President.

This conclusion, moreover, is compelled by the Supreme Court's most recent consideration of the matter in *Freytag*.  *Freytag* held that the term "Department" was confined only to those agencies that resemble a cabinet department and, most significantly, only those the "heads [of which] are subject to the exercise of political oversight and share the President's accountability to the people."  501 U.S. at 886.  The Court emphasized that "[c]onfining the term 'Heads of Departments' in the Appointments Clause to executive divisions like the Cabinet-level departments constrains the distribution of the appointment power . . . .  The Cabinet-level departments are limited in number and easily identified.  Their heads are subject to the exercise of political oversight and share the President's accountability to the people."  *Id.*

Defendants attempt to downplay the importance of *Freytag* by arguing that the case turned on the characterization of the Tax Court as a legislative court.  PCAOB Br. at 23-24; U.S. Br. at 18-19.  To be sure, the Supreme Court in *Freytag* discussed Congress's 1969 decision to "mak[e] the Tax Court an Article I court rather than an executive agency."  501 U.S. at 887 (internal quotation marks omitted).  But this discussion was *in the alternative to* the Court's principal holding.  *See id.* ("[e]ven if we were not persuaded [by the 'Heads of Departments' argument], we still could not accept [the Commissioner's] treatment of the intent of Congress, which enacted [the 1969] legislation").  And that principal holding was unequivocal:  the Court would "[c]onfin[e] the term 'Heads of Departments' in the Appointments Clause to executive divisions like the Cabinet-level departments."  *Id.* at 885-86.

Defendants all but ignore this reasoning, focusing instead on the concurring Justices' conclusion that independent agencies like the SEC are "departments."  PCAOB Br. at 22.[19]  But the Court and the concurring Justices *disagreed* over how the phrase "Heads of Departments" should be interpreted.  *See Freytag*, 501 U.S. at 915 (Scalia, J., dissenting).  What matters here is the Court's opinion, and if *Freytag*'s holding that the term "departments" includes only "executive divisions like the Cabinet-level departments" means anything, it means that politically unaccountable independent agencies such as the SEC are not departments.[20]

---

[19] Even assuming *arguendo* that, as Defendants assert, *Freytag* did reserve judgment on the status of the SEC, *but see* Pl. Br. at 39 n.10, it is hardly unusual for the Supreme Court to exercise such restraint in discussing the implications of its holdings, even where those implications follow inexorably from the logic and reasoning of the Court's decisions.  *See, e.g.*, *United States v. Booker*, 543 U.S. 220 (2005) (striking down United States Sentencing Guidelines under authority of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), despite having expressly reserved the question in both *Apprendi*, 530 U.S. at 497 n.21, and *Blakely*, 542 U.S. at 305 n.9).

[20] The PCAOB argues that *Freytag*'s interpretation of the term "departments" cannot be correct because the Postmaster General was not a member of the cabinet and yet was given the power in 1792 to appoint inferior officers.  PCAOB Br. at 23.  But even if the Postmaster General was not a member of the cabinet, *but see* Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During the First Half-Century*, 47 Case W. Res. L. Rev. 1451, 1480-83 (1997) (challenging this assertion), he was still the "alter

The PCAOB next argues that "[t]he SEC is 'similar' to a cabinet department in the sense that matters" because its Commissioners are answerable to some degree to the President. PCAOB Br. at 24.  As we have already shown, this unsupported assertion is irreconcilable with the very notion of an agency "independent" of direct presidential control.  *See supra* pp. 10-11.

Finally, the PCAOB contends that "[t]he consequences of plaintiffs' position would be astounding" because "[i]ndependent agencies are replete with inferior officers appointed by those agencies."  PCAOB Br. at 25.  To be sure, a proper interpretation of the Appointments Clause might raise some questions about the propriety of the appointment by agency commissioners of subordinate officers within their own agencies.  This Court of course need not resolve such questions here, but the PCAOB in any event overstates the impact of Plaintiffs' position.  It would further the Appointments Clause's core purpose of political accountability and control to have the President appoint all persons who carry out important enough duties to be deemed officers (as opposed to mere employees).  This would hardly be an unusual or substantial administrative burden:  the President already appoints "inferior officers" throughout the government, including, for example, the general counsels of agencies like the EEOC, 42 U.S.C. § 2000e-4(b), and the NLRB, 29 U.S.C. § 153(d), all United States Attorneys, 28 U.S.C. § 541(a), and thousands of military officers, 10 U.S.C. § 531(a).

2.B.    Even if the SEC were a "Department," the Members of the PCAOB are not appointed by its "Head."  The Constitution's text, the historical record, and Supreme Court precedent all show that the Appointments Clause was specifically designed to preclude

---

(continued…)

ego" of the President in the sense of being expressly "subject to the direction of the President," and removable by him at will.  An Act for the temporary establishment of the Post-Office § 1, 1 Stat. 70 (1789).  The Postmaster General therefore was "subject to the exercise of political oversight and share[d] the President's accountability to the people."  *Freytag*, 501 U.S. at 886.

appointments-by-committee and instead ensure that appointments would be made by a "single, responsible person." Pls. Br. at 39-43. The notion of a department run by committee would have been utterly foreign to our Founding Fathers.

Defendants try to downplay this historical record. The PCAOB argues that the fact that cabinet secretaries were historically individuals is "beside the point." PCAOB Br. at 26 n.12. But "early congressional enactments provid[e] contemporaneous and weighty evidence of the Constitution's meaning," and if "earlier Congresses avoided use of [a] power," such as vesting the appointments authority in a multimember commission, there is "reason to believe that the power was thought not to exist." *Printz v. United States*, 521 U.S. 898, 905 (1997) (internal quotation marks omitted). Nor is there merit to the contention (PCAOB Br. at 26) that the Framers' statements concerning the advantages of an individual appointing authority relate only to the appointment of principal officers by the President. While principal officers may have been the Framers' main concern, the Framers spoke broadly and unqualifiedly about the benefits of lodging the appointment power in a single individual. *See* Pls. Br. at 40-41.

Defendants also contend that the Excepting Clause's allowance of appointments by "courts of law" shows that the Framers were not averse to appointments by multi-member bodies. PCAOB Br. at 26; U.S. Br. at 23. But the Framers' concerns about the loss of political accountability engendered by appointments-by-committee obviously do not apply to the appointment of inferior officers in the Judicial Branch, given that the Constitution seeks to insulate judicial officers from political accountability.[21] If anything, the Excepting Clause's

---

[21] Indeed, with narrow exceptions, the Constitution prohibits courts of law from appointing inferior officers in the Executive Branch. *See Morrison*, 487 U.S. at 676 & n.13 (recognizing "constitutional limitation on 'incongruous' interbranch appointments" that prohibits Congress from vesting courts with "power to appoint an officer in an area in which they have no special knowledge or expertise, as in, for example, a statute authorizing the courts to appoint officials in the Department of Agriculture or the Federal Regulatory Commission"); *Ex parte Siebold*, 100 U.S. 371, 398 (1879).

reference to courts of law—as opposed to, say, the chief judges of the courts of law—demonstrates that the Framers understood the difference between vesting the appointment power in collective body and vesting it in the *head* of a collective body.  And, with respect to inferior officers appointed by another officer of the Executive Branch, the Framers deliberately and expressly chose to require the latter.

Defendants fall back on certain Attorney General opinions and one Ninth Circuit case to contend that appointments by multi-member commissions have been "commonly understood" to be constitutional for "at least seventy years."  PCAOB Br. at 26.  But on further inspection, this "common understanding" turns out to be nothing more than the unquestioning repetition of an (incorrect) *ipse dixit*.  The 1933 opinion of Attorney General Biggs does state that "the three Commissioners, who constitute the [Civil Service] Commission, are the 'head of a Department' in the constitutional sense."  37 Op. Att'y Gen. 227, 231 (1933).  But the entire substantive analysis of that opinion was devoted to addressing the question whether the Civil Service Commission was a "Department" under the Appointments Clause.  The Attorney General's conclusory observation that the three-member commission was, as a whole, the "head" of a department came only at the very end of his opinion and was asserted without analysis.  *See id.* at 231.  Subsequent Department of Justice opinions merely follow the 1933 opinion and, like the Ninth Circuit's decision in *Silver v. U.S. Postal Service*, 951 F.2d 1033, 1038-39 (9th Cir. 1991), contain no analysis of the origins and purpose of the term "Heads of Departments" in the Appointments Clause.  *See, e.g.*, 20 Op. Off. Legal Counsel at 151-152.

More importantly, even if Defendants were correct that a multi-member commission could, as a constitutional matter, be the "head" of a department when the department is actually led by a multi-member commission, the SEC does not qualify.  Rather, if there is a "head" of the

SEC, it is the SEC's Chairman.  Specifically, the Reorganization Act of 1949 gives the President

the power to "provide for the appointment and pay of the *head* and one or more officers of any

agency."  5 U.S.C. § 904(2) (emphasis added).  The President in turn exercised this power with

respect to the SEC in Reorganization Plan No. 10 of 1950.  *See* 15 Fed. Reg. 3175, 64 Stat. 1265

(May 24, 1950), *reprinted in* 5 U.S.C. app.  Reorganization Plan No. 10 delegated to the

Chairman of the SEC "the executive and administrative functions of the Commission, including

functions of the Commission with respect to (1) the appointment and supervision of personnel

employed under the Commission, (2) the distribution of business among such personnel and

among administrative units of the Commission, and (3) the use and expenditure of funds."  *Id.*

§ 1(a).  As a result of thereby "control[ling] key personnel, internal organization and the

expenditure of funds, the chairman [of the SEC] exerts far more control [over the SEC] than his

one vote would seem to indicate."  *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir.

1988).  Indeed, the SEC itself recognizes on its website that the Chairman is "the SEC's top

executive."[22]  Accordingly, if there is a "chief," "principal person," "leader," "commander," or

"one who has the first rank or place" at the SEC, then it is the Chairman, not the five-member

SEC as a whole.  Noah Webster, *An American Dictionary of the English Language* (New York,

S. Converse 1828).

Finally, the PCAOB contends that even if the head of the SEC is its Chairman, there is no

Appointments Clause violation because the Chairman concurred in each of the SEC's votes.

PCAOB Br. at 27.  But the Chairman's concurrence in the SEC's decision does not and cannot

avoid or ameliorate the constitutional violation.  The fact that the Chairman concurred in the

majority's views does not change the fact that it is the *majority* of the *Commission*, not the

---

[22] U.S. Securities and Exchange Commission, *Current SEC Commissioners*,
http://www.sec.gov/about/commissioner.shtml (last visited Sept. 22, 2006).

Chairman, who appoint Board members. The fact that the President concurs in a resolution by the United Nations Security Council hardly suggests that *he* is making the Security Council's decision or that he would have made the *same* decision if he had acted alone. And it would hardly be constitutional to transfer foreign policy power to the Security Council, "so long as the President concurs" in their decision. With respect to such collective decisionmaking, the D.C. Circuit has held that even the *non*-voting presence of constitutionally improper persons in a decisionmaking process will have, as a matter of law, a constitutionally prohibited impact.[23] It follows *a fortiori* that the presence of *voting* members would have an even *greater* impact[24]

Here, moreover, there is no need to speculate, as an investigation by the Government Accountability Office ("GAO") determined that the SEC's selection process for the PCAOB's original members was marred by disputes between the Chairman of the SEC and other commissioners, who "wanted more involvement in the process and thought it best for each

---

[23] *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 825 (D.C. Cir. 1993) (presence of additional, improperly present members "during the [agency's] deliberations" will necessarily "have some impact (even though the extent of which may be impossible to measure) on how the [agency] decides matters before it"); *Andrade v. Lauer*, 729 F.2d 1475, 1496 (D.C. Cir. 1984) ("it cannot be assumed that action in accord with the correct procedures would have produced the same result"); *see also United States v. Jones*, 763 F.2d 518, 523 (2d Cir. 1985) ("[w]hen alternate jurors are present during the deliberations, the possible prejudice is that defendants are being tried not by a jury of 12, as is their right, but by a larger group"); *United States v. Lane*, No. 05-0260, slip op. at 16-17 (C.A.A.F. Sept. 20, 2006) (presence of a single unconstitutional judge on an three-judge panel invalidates the decision of that panel).

[24] The cases cited by the PCAOB do not suggest otherwise. *NTEU* involved federal employees, not officers, and therefore said nothing at all about the requirements of the Appointments Clause. 663 F.2d at 246. Moreover, even with respect to the propriety of employee appointments under the governing statutes, the court held only that "[i]t is not necessary . . . that the letters notifying individuals of their appointments be written by the appointing authorities," provided that "the [proper] appointing authorities exercise *their* discretion in *making* the appointment[s]." *Id.* at 246 n.9 (emphasis added). Here, the Chairman did not *make* any appointments. Similarly, *United States v. Hartwell*, 73 U.S. 385 (1868), did not, as the PCAOB contends (Br. at 27), "uphold[]" an appointment. It simply held that an individual was an "officer" for purposes of a criminal statute. As the PCAOB concedes, whom Congress deems to be an officer for purposes of a federal statute may be different than whom the Constitution defines as an officer. *See* PCAOB Br. at 10 n.3. More to the point, unlike the statute in *Hartwell*, the Act does not condition appointment of PCAOB Members on the Chairman's *approval*; an appointment may be made by a majority of the Commissioners over the Chairman's dissent. As a result, as *NRA Political Victory Fund* and *Andrade* make clear, this Court may not presume that the same persons would have been appointed in the absence of influence by the other Commissioners.

Commissioner independently to do due diligence on the potential candidates."[25]  These disputes had a demonstrable effect on the Chairman's choices:  "[a]s Commissioners raised concerns, the SEC Chairman . . . would adjust the process to accommodate the[ir] input."  *Id.* at 21.  Pressure by other Commissioners, who felt as if they were being cut out of the process, even forced the SEC Chairman to abandon his preferred choice for chairman of the PCAOB.[26]

In short, the actual experience of the SEC in choosing the PCAOB's initial members belies the PCAOB's contention that the involvement of the other Commissioners is harmless, and vividly illustrates Hamilton's concern that appointments of federal officers not be tainted by "that diversity of views, feelings, and interests, which frequently distract and warp the resolutions of a collective body."  *The Federalist* No. 76 (Hamilton).[27]

---

[25] Government Accountability Office, Securities and Exchange Commission, *Actions Needed to Improve Public Company Accounting Oversight Board Selection Process* 9 (Dec. 2002), *available at* http://www.gao.gov/new.items/d03339.pdf.

[26] *See id.* at 3, 9-10 ("[The appointment] strategy broke down when the Commission was unable to agree upon and attract a consensus candidate to serve as PCAOB chairman.  As the statutory deadline [for the appointment] approached, SEC was ultimately forced to appoint members to the PCAOB that had not been adequately vetted.").

[27] Defendants' other arguments also lack merit.  *First*, as explained in Plaintiffs' opening brief and expanded upon by amicus Washington Legal Foundation, the Act's broad delegation of authority to impose taxes and define crimes violates the non-delegation doctrine.  Defendants' assertion that the Supreme Court has upheld delegations of this sort is wrong.  To the contrary, the Supreme Court has explained that its cases finding unlawful delegations all involved the "delegation of a power to make federal crimes of acts that never had been such." *Fahey v. Mallonee*, 332 U.S. 245, 249 (1947).  Moreover, Defendants fail to acknowledge that six years after the D.C. Circuit issued its decision in *United States v. Grace*, 778 F.2d 818 (D.C. Cir. 1985), the Supreme Court concluded that a standard more stringent than the "intelligible principle" standard might well apply where, as here, "Congress [has] authorize[d] another Branch to promulgate regulations that contemplate criminal sanctions." *Touby v. United States*, 500 U.S. 160, 165-67 (1991).  Finally, the Court need not address the delegation problems that would arise if the PCAOB were deemed a private entity because Defendants now concede, as they must, that the PACOB is a governmental entity.  PCAOB Br. at 10 n.3; U.S. Br. at 9 n.6; *see also* Pls. Br. at 14 n.3.

*Second*, there is no merit to the PCAOB's contention (Br. at 43-44) that FEF lacks standing.  In opposition to the PCAOB's cross-motion, Plaintiffs have filed the declaration of James Terry, the Executive Director of FEF, establishing that FEF's membership comprises companies subject to the PCAOB's taxing and regulatory powers, including plaintiff Beckstead & Watts, whose standing Defendants do not challenge.  *See* Terry Decl. ¶¶ 4-5.  These members plainly have standing in their own right to challenge the PCAOB's regulations on separation of powers grounds.  *See Cellco P'ship v. FCC*, 357 F.3d 88, 100 (D.C. Cir. 2004); *Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.*, 766 F.2d 538, 543 (D.C. Cir. 1985).  In

## CONCLUSION

For the reasons stated herein and in Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment, the Court should enter summary judgment in favor of Plaintiffs and against Defendants.

Dated:  September 22, 2006                    Respectfully submitted,

 

       /s/                                             

| | |
|---|---|
| Viet D. Dinh (D.C. Bar No. 456608) | Michael A. Carvin (D.C. Bar No. 366784) |
| BANCROFT ASSOCIATES PLLC | Noel J. Francisco (D.C. Bar No. 464752) |
| 601 13th St., N.W. | Christian G. Vergonis (D.C. Bar No. 483293) |
| Suite No. 930 South | JONES DAY |
| Washington, D.C. 20005 | 51 Louisiana Avenue, N.W. |
| (202) 234-0090 | Washington, D.C.  20001-2113 |
| (202) 234-2806 (fax) | (202) 879-3939 |
| | (202) 626-1700 (fax) |
| Sam Kazman (D.C. Bar No. 946376) | |
| Hans Bader (D.C. Bar No. 466545) | Kenneth W. Starr (D.C. Bar No. 273425) |
| Competitive Enterprise Institute | 24569 Via De Casa |
| 1001 Connecticut Avenue, N.W. | Malibu, CA 90265 |
| Suite 1250 | (310) 506-4621 |
| Washington, D.C. 20036 | |
| (202) 331-1010 (fax) | *Attorneys for Plaintiffs Free Enterprise Fund and Beckstead and Watts, LLP* |

---

(continued…)

addition, because the interests this lawsuit seeks to protect are germane to FEF's organizational purpose, *see* Terry Decl. ¶ 2, FEF may maintain the lawsuit on behalf of these members.  *See Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 111-12 (D.C. Cir. 1990).  FEF need not go further and disclose the identities of its unnamed members.  *See Pub. Citizen v. FTC*, 869 F.2d 1541, 1552 (D.C. Cir. 1989); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 313 (D.C. Cir. 1987); *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 110 (1st Cir. 2006).