SEC Speech: Remarks Before the Federalist Society; Washington, D.C.; September 21, 2006 (Paul S. Atkins)
Case 1:06-cv-00217-JR   Document 51-2   Filed 11/06/2006   Page 1 of 9

Home | Previous Page

U.S. Securities and Exchange Commission

**Speech by SEC Commissioner:
Remarks Before the Federalist Society**

*by*

**Commissioner Paul S. Atkins**

*U.S. Securities and Exchange Commission*

Washington, D.C.
September 21, 2006

Thank you Ben for that introduction. It is wonderful to be here among fellow believers in the limitations of government and the unlimited ingenuity of the marketplace. There are few organizations in our country that can claim to have the philosophical consistency and impact that this organization has. Over the years, its tenets of basic constitutionalism, free market freedoms, and individual liberty protected and advanced by a government sensitive to all three have grown in adherents and influence. So, it makes sense that I am here to talk to you today about whack-a-mole, peekaboo, bingo, and tug-of-war. No, I will not talk about the children's games, but about several issues before the SEC at the moment. Before I begin, however, I must remind you that the views that I express here are my own and do not necessarily represent those of the Securities and Exchange Commission or my fellow commissioners.

Much has happened at the SEC since Chairman Chris Cox took over the reins a little more than a year ago. Under the Chairman's leadership, we have, for example, adopted a set of guidelines to govern the imposition of penalties against corporations and retooled our executive compensation disclosure requirements. The Chairman (with a fair amount of help from Ben Cohen) also recruited excellent talent to fill, among others, the vacant top spots in three of the agency's four divisions, the Commission's Offices of General Counsel and Chief Accountant, and the Public Company Accounting Oversight Board.

Unfortunately, a substantial portion of our agenda during the past year has been driven by litigation over misguided decisions taken before Chris was sworn in. This is where whack-a-mole comes in. The U.S. Court of Appeals for the District of Columbia has had to whack the Commission several times in the past year for not doing our job right. The Court overturned two Commission rulemakings, both of which were billed by proponents as "centerpieces" of our regulatory program, but from which my former

colleague Commissioner Cynthia Glassman and I dissented.

The first of these was the rule that would effectively have mandated that mutual fund boards have independent chairmen and no less than seventy-five percent independent directors. I dissented from this rulemaking for a number of reasons, including a belief that it is inappropriate for the government to mandate the adoption of one particular corporate governance structure by a whole sector of the economy. It took two decisions from the Court of Appeals to make the Commission realize that our process for adopting that rule was deeply flawed. In a June 2005 opinion, the Court of Appeals found that the Commission had violated the Administrative Procedure Act in adopting the rule by failing to consider adequately the costs of and alternatives to the measure. At a meeting that took place a mere eight days after the Court's decision, the Commission readopted the provisions that had been struck down with only a perfunctory nod to the flaws that the Court had pointed out. In a second opinion, in which it vacated the contested provisions, the Court made it clear that it was not moved by the Commission's argument that it had needed to readopt the provisions within days of the Court's initial decision because two of the rule's major proponents, including former Chairman Donaldson, were about to leave the Commission. After the second decision, under the leadership of our new chairman, we decided to seek public comment on the rule before deciding how to proceed.

The Court also vacated the Commission's rule that required hedge fund advisors to register with the Commission. I dissented from the hedge fund rule for a number of reasons, not the least of which is that I do not believe it necessary for the Commission to allocate its limited resources for the oversight of a sector that is the province of a relatively small number of investors who can carry out their own due diligence about an advisor or hire someone else to do so. Also, some have advocated that we monitor the systemic risk to the financial markets posed by hedge fund activities. Our former rule would not have accomplished that at all. In fact, other more economist-based agencies, like the Fed, are much better situated to look after that sort of risk, than is the SEC, which I like to say is of, by, and for lawyers.

To extend registration to hedge fund advisors, the Commission made a technical change to its rules and began requiring hedge fund advisors to start counting their investors as their clients, rather than the funds themselves. This approach runs counter to the reality that hedge fund advisors cannot make investment decisions for the fund that turn on the circumstances and objectives of individual investors, because the needs of one investor in the fund might conflict with those of another. The Court found that the approach embodied in the rule was an awkward and inadequately justified departure from the Commission's prior approach and that of the underlying statute. The new rule was vacated.

Chairman Cox has turned these two judicial reprimands into an opportunity to look with fresh eyes at our Commission processes to see how we can improve them. He directed the Commission's General Counsel to carry out a

"top-to-bottom review" of the Commission's process for assessing the economic ramifications of its rulemakings.[1] Processes designed to better invite and incorporate the insights of those outside the agency will help to generate effective, efficient rules.

I turn next to Peekaboo. This is a reference to the Public Company Accounting Oversight Board, the entity that grew out of Sarbanes-Oxley Act to oversee public company audits. Although operated as a nonprofit corporation, it possesses powers that look very governmental and salaries that don't, because they are intended to rival those in the for-profit private sector. Their salaries even eclipse those of the President, although they don't travel by helicopter or motorcade. Not yet anyway. Because the Board's name is a bit of a mouthful and even the initials don't roll off the tongue, I use the affectionate shorthand — Peekaboo.

Recently, PCAOB has been in the news because it is the subject of a constitutional challenge. I am not here to talk about that today. I am but an amateur at constitutional law, and I know that many of you are accomplished con law geeks, so I will stay away from that subject.

Instead, I would like to talk about one very important task on PCAOB's plate at the moment, namely revising one of its rules, Audit Standard 2. AS2, as it is called, governs the process by which auditors assess the internal controls in place at public companies. As you all know, organizations faced with important projects like to form teams or special units to work out solutions. So, in light of the importance of the AS2 revision project, PCAOB should establish a new office to concentrate on these internal control issues. I'd suggest calling it the Internal Control Unit, or ICU. So I guess that would make it — the Peekaboo, I See You.

Pursuant to the Sarbanes-Oxley Act, each public company must include in its annual report an assessment by management on the state of the company's internal control over financial reporting. The Act also requires a company's auditor to attest to and report on management's assessment of internal controls. AS2 tells the auditor how to carry out that attestation. This all sounds quite harmless, but in reality has proved to be a tremendous burden for public companies because of the definitions of AS2 that basically remove professional judgment and make the auditor reinvent the wheel. Audit bills have ballooned and the relationship between auditors and their public company clients has been strained as auditors focus on minutiae. It is widely recognized that AS2 needs a major overhaul. PCAOB is in the process of carrying this out.

Because the Sarbanes-Oxley Act made the PCAOB our ward, the Commission is overseeing the AS2 rewrite. In the past, the Commission has taken too light a hand in the drafting of PCAOB Audit Standards. It is incumbent upon us at the SEC to ensure that the PCAOB does the job right on AS2 and to insist on modifications if it is not done right. Getting AS2 right could involve the SEC's invoking as yet untried and somewhat unwieldy oversight powers.

PCAOB rules cannot take effect until the Commission has approved them. The procedure for adopting rules involves two rounds of comments: first the PCAOB solicits comment on their proposal. Once they have voted on the rule, we put it out for comment again. Based on the comments that we receive, we then can approve or disapprove the rule. We can request changes in a rule in response to comments that we receive during our comment process, but if we do so, the rule has to go back to the Board for another vote. If we were to decide to vote a rule down, we would have to initiate a hearing process.

Once a revised AS2 is adopted, we will need to be vigilant to ensure that the PCAOB staff is not interpreting it in a manner that is inconsistent with the spirit of the revisions. Unfortunately, the Commission abandoned plans for so-called Regulation PCAOB, which, among other things, would have helped to formalize the SEC's oversight of PCAOB staff actions. The PCAOB's former Chairman McDonough complained to former SEC Chairman Donaldson that Reg PCAOB would give SEC staff undue authority over Board operations. He likened the relationship of the SEC and PCAOB not to that of the relationship between parent and child, nor even siblings, but that of cousins. If we exerted tighter oversight or if the statutory language were clearer, the parent-child nature of the relationship would be clearer.

Recent experience suggests that we should put methods in place to oversee PCAOB staff interpretations. The PCAOB apparently plans to continue to make the issuance of staff guidance, without adhering to formal guidelines or formally seeking public input on that guidance, a routine part of its regulatory program.[2] The PCAOB recently issued a staff audit practice alert pertaining to accounting for options grants.[3] A footnote in the document attempted to weigh in on the legality of options granting practices, a matter clearly outside of the purview of the PCAOB, let alone its staff.[4] We at the SEC have little or no chance under current practices to change the wording, let alone the substance, of PCAOB staff guidance. I believe it is time that we dust off the Reg PCAOB draft and set it out as a baseline for our relationship with the PCAOB. I look forward to working with new PCAOB Chairman Mark Olson on this and other initiatives.

Next I will turn to bingo, which is what the plaintiffs' attorneys in a pending class action said when they prevailed in a recent Second Circuit ruling. I am referring to *Billing v. Credit Suisse First Boston*,[5] a class action lawsuit that seeks to apply antitrust law to the underwriting process and thereby threatens the securities litigation reforms that Congress passed in 1995.

At issue are alleged violations by a wide swath of the investment banking industry in taking public hundreds of technology companies in the late 1990s. The plaintiffs bought stock primarily in the IPO aftermarket; in a very loosely worded complaint, they blame the losses that they suffered when the technology bubble burst in 2000 on the underwriters' allegedly anticompetitive practices in marketing the IPOs.

If securities claims can simply be restructured as antitrust claims, which

carry with them treble damages, Congress's clear intent through the PSLRA[6] and SLUSA[7] to block abusive suits will once again be thwarted. Twice Congress spoke loudly and clearly and even overrode a presidential veto in the process. The underwriting process is extensively regulated by the SEC as well as by the NASD under SEC supervision. Among other factors, the Commission must take into account the effect of its regulations on competition and capital formation. Thus, asking that the underwriters' activities be assessed within the securities framework will not give underwriters a free pass to engage in anticompetitive behavior. In fact, the illegal and unethical behavior alleged in *Billing*, if true, would be a violation of SEC and SRO rules.

The Second Circuit Court of Appeals has decided that the antitrust case can go forward. I hope that the Supreme Court will grant certiorari so that it can decide this important question. The unanimous decision, authored by Justice Scalia in 2004, in *Verizon v. Trinko*, sets out a clear guidepost of how to treat these sorts of cases that sound in antitrust but overlap with other regulatory regimes.[8] The practical consequences to our capital markets of allowing antitrust challenges to survive the pleading stage based on allegations like those presented in *Billing* are of grave and paramount concern. If certiorari is denied, the parties to this case will likely be forced into a settlement at some point, which, as all of you know, is far too common in these sorts of cases because of the vagaries of our jury system in civil litigation. That result will certainly deter capital formation in the United States because of the out-sized litigation risks attendant to this activity.

Finally, I would like to turn to tug-of-war — the tug-of-war between the government with its substantial girth, on one side, and defendants on the other. I am talking about the issue of privilege waivers in the context of the Commission's enforcement and examinations program. Twenty five years ago, a unanimous Supreme Court articulated the importance of the attorney-client privilege and work product doctrine, which serve "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[9]

As most of you have undoubtedly heard, the Department of Justice recently has come under criticism in the press, by the bar, and on Capitol Hill for the standards that it had issued in a 2003 memorandum to guide U.S. Attorneys in determining whether to indict a corporation. The memo, of course, was issued near the zenith of the accounting and corporate scandals that plagued the first half of this decade.

As I understand it, the purpose of the memo was to emphasize and encourage the scrutiny of cooperation by corporations. Although it makes perfect sense to afford credit for cooperation, and to make the factors constituting cooperation transparent, some claim that these factors have been used as a tool to coerce the production of protected information. The U.S. Chamber of Commerce and the ABA have led the call for reconsideration

of these factors. One of the factors that they cited most for criticism was whether a corporation waived the attorney-client privilege and/or other protections.

In response, the Department of Justice last year required all U.S. Attorneys to adopt written waiver request procedures. I understand that these procedures generally require that the U.S. Attorney or a senior supervisor approve requests to corporations for waiver of privilege or work product protection.

More importantly, after months of hearings and testimony, the U.S. Sentencing Commission, which had added waiver to its cooperation guidelines in 2004, recently voted to drop waiver as a determinative factor in the evaluation of cooperation. This was a significant step forward in the fight to mitigate the "culture of waiver."

In support of their position, the Chamber and the ABA have cited several reports indicating that we are experiencing a severe erosion of the attorney-client privilege and work product doctrine. One statistic in these reports really stuck out to me: 55% of outside counsel surveyed who had represented clients in government investigations stated that the government requested waiver of the attorney-client privilege either directly or indirectly.

In light of entreaties for reform last week by both the majority and minority leadership of the Senate Judiciary Committee, I imagine that the Department of Justice will soon be reconsidering its current policy regarding waiver. Reconsideration of the policy was also called for a couple of weeks ago by several former senior Justice Department officials from all sides of the political spectrum. I applaud those who have raised the profile of this important issue.

The rules of the SEC require me as an SEC Commissioner to guard against any infringement of the constitutional rights, privileges, or immunities of those who are subject to regulation by the SEC. With that in mind, I have been carefully following the debate regarding the Department of Justice practices. In fact, although the privilege waiver "limelight" has focused on the Justice Department, the SEC's practices and policies have come under the same scrutiny, in the same forums. It makes sense that the focus has been largely on the criminal authorities' treatment of waiver, given the high stakes in criminal investigations. That does not mean, however, that we at the Commission are unaware of the concerns and the need for introspection.

I have no reason to believe that there are systemic abuses of respondents' due process rights by our staff. Indeed, I have the utmost respect for the Commission's Enforcement Division and Office of Compliance, Inspections and Examinations. Nonetheless, I believe it is important for the Commission periodically to take a hard look at the policies and procedures that govern the daily activities of the staff. We need to be checking constantly to ensure that all of our practices are consistent with our own high standards.

Traditionally, many respondents in SEC actions have chosen to waive privilege without any formalized expectation of cooperation credit. In 2001, before I became a Commissioner, former Chairman Pitt spearheaded an effort to formalize the factors the Commission will consider when determining whether to afford cooperation credit to respondents. The culmination of that effort was the so-called "Seaboard" report.[10] The Seaboard report is a Commission statement of the factors the Commission will consider when determining whether to afford cooperation credit.

Like the Department of Justice guidelines, the Seaboard report was an effort to clarify standards and to provide transparency. Unlike the Justice Department factors, however, the Seaboard report does not enumerate waiver of privilege or work product protection as a factor to be considered when evaluating cooperation. It is true that the Seaboard report does make reference to waiver — but the reference is embedded in a footnote. The footnote is tied to factor 11, which deals with the production of internal investigation materials to the Commission's staff. The relevant part of the footnote reads as follows:

> [T]he Commission does not view a company's waiver of a privilege as an end in itself, but only as a means (where necessary) to provide relevant and sometimes critical information to the Commission staff.

I was not on the Commission in 2001 when Seaboard was considered. Five years later, however, I strongly believe that the Commission should not view a company's waiver of privilege as a factor that will afford cooperation credit. This would ensure that a waiver is not considered a "plus" even when the Staff points it out in a recommendation. Maybe it is time for the Commission to revisit this issue in a formal way and to clarify that waiver or fundamental rights and protections will not result in lesser allegations and/or remedies.

It is easy to understand why government investigators would want waivers of privileged material. It might help speed up the investigation and free up resources for other things. This is particularly true if a corporation has hired a law firm to conduct an internal investigation. But, public policy should look askance at this shortcut. Due process protections do not attach in internal investigations, and the findings could be wrong. Also, invariably the knowledge that internal investigations really are not ultimately privileged could undermine their effectiveness and usefulness. This also pertains to requests or demands by our examiners of broker-dealers and investment advisors for waivers of privilege. In those cases, the staff is acting without direct supervision of the Commission. I personally would take a very critical view of such requests and would seriously question their appropriateness.

Likewise, maybe it is time for the Commission to review our internal policies and procedures governing Staff requests — whether enforcement or examination — for protected information. We need to consider whether we ought to follow the latest example set by the Department of Justice. Should

we not ensure that such requests, despite the fact that they are rarely made, have been appropriately vetted by senior personnel, such as the General Counsel, before they are made?

Thank you all for your attention. I would be happy to hear your thoughts on any of these issues, answer any questions that you might have about these or other issues on the Commission's agenda, or give you a chance to share the promises of wealth and fame that are inside your fortune cookies.

## Endnotes

[1] SEC Complies with Court Order on Mutual Fund Governance Rule, SEC Press Release No. 2006-95 (June 13, 2006) (available at: http://www.sec.gov/news/press/2006/2006-95.htm).

[2] PCAOB Press Release, PCAOB Issues Audit Practice Alert Regarding Timing and Accounting for Stock Option Grants (July 28, 2006) (available at: http://www.pcaobus.org/News_and_Events/News/2006/07-28.aspx) ("The Public Company Accounting Oversight Board today announced an initiative to publish, from time to time, Audit Practice Alerts issued by the Board's staff. These alerts will highlight new, emerging, or otherwise noteworthy circumstances that may affect how auditors conduct audits under the existing requirements of PCAOB standards and relevant laws.").

[3] Matters Related to Timing and Accounting for Option Grants, PCAOB Staff Audit Alert No. 1 (July 28, 2006) (available at: http://www.pcaobus.org/News_and_Events/News/2006/07-28_Release.pdf).

[4] See id at n.1..

[5] *Billing v. Credit Suisse First Boston Ltd.*, 426 F.3d 130 (2d Cir. 2005).

[6] Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified in scattered sections of 15 U.S.C.).

[7] Securities Litigation Uniform Standards Act of 1998 , Pub. L. No. 105-353, 112 Stat. 3227 (1998) (codified in scattered sections of 15 U.S.C.).

[8] *Verizon Communications Inc. v. Trinko, LLP*, 540 U.S. 398 (2004).

[9] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

[10] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions, Securities Exchange Act Release No. 44969 (Oct. 23, 2001) (available at: http://www.sec.gov/litigation/

investreport/34-44969.htm).

*http://www.sec.gov/news/speech/2006/spch092106psa.htm*

Home | Previous Page                                              Modified: 10/13/2006